ACCEPTED
01-14-00880-cv
FIRST COURT OF APPEALS
HOUSTON, TEXAS
9/25/2015 3:28:27 PM
CHRISTOPHER PRINE
CLERK

**CAUSE NO. 01-14-00880-CV**

IN THE COURT OF APPEALS
FOR THE FIRST JUDICIAL DISTRICT OF TEXAS
AT HOUSTON

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
9/25/2015 3:28:27 PM
CHRISTOPHER A. PRINE
Clerk

**THEAOLA ROBINSON**
**Appellant,**

**v.**

**KTRK TELEVISION, INC.,**
**Appellee.**

On Appeal from the 234th District Court of Harris County, Texas
the Hon. Wesley Ward, Presiding

**BRIEF OF APPELLEE KTRK TELEVISION, INC.**

Catherine Lewis Robb
State Bar No. 24007924
Catherine.robb@haynesboone.com
*Laura Lee Prather
State Bar No. 16234200
Laura.prather@haynesboone.com
HAYNES AND BOONE, LLP
600 Congress Avenue
Suite 1300
Austin, Texas 78701
Telephone: (512) 867-8400
Facsimile: (512) 867-8470

COUNSEL FOR APPELLEE
KTRK TELEVISION, INC.

*Lead counsel for Appellee

**CAUSE NO. 01-14-00880-CV**

IN THE COURT OF APPEALS
FOR THE FIRST JUDICIAL DISTRICT OF TEXAS
AT HOUSTON

**THEAOLA ROBINSON**
**Appellant,**

**v.**

**KTRK TELEVISION, INC.,**
**Appellee.**

On Appeal from the 234th District Court of Harris County, Texas
the Hon. Wesley Ward, Presiding

___

## IDENTIFICATION OF PARTIES

Pursuant to Texas Rule of Appellate Procedure 38.2(a)(1)(A), the following

are the parties and counsel for this appeal[1]:

**Appellant *pro se*:**
Theaola Robinson
5505 Jensen Drive
Houston, Texas 77028

___

[1] Although Appellant listed "Respondents" as "The Walt Disney Company, ABC Television Network, Inc., CC Texas Holding Company, Inc. and KTRK Television, Inc.," only KTRK is a party to this appeal. The Walt Disney Company ("TWDC"), ABC Television Network, Inc., and CC Texas Holding Company, Inc. ("CCTHC") are not, and cannot be, parties to this appeal. Robinson's Notice of Appeal states that she desires "to appeal from the judgment rendered against Plaintiff by the 234th Judicial District Court of Harris County, Texas on October 8, 2014." CR 622 (Tab A). The only "judgment" rendered against the Plaintiff on October 8, 2014 was the "Order and Final Judgment" in which the 234th District Court awarded attorney's fees and sanctions on behalf of KTRK (the sole remaining defendant) against Robinson (the sole remaining plaintiff) in the trial court proceeding. CR 537 (Tab B). Furthermore, in addition to not being parties to the Order being appealed, ABC Television Network is not a corporate entity and was never served in the underlying suit. Additionally, TWDC and CCTHC were dismissed from the underlying suit pursuant to Special Appearances. CR 536; 796.

**Trial Counsel For Appellant Theaola Robinson[2]**

Berry Dunbar Bowen
Fed. ID No. 6177
State Bar No. 02721050
3014 Brazos Street
Houston, TX  77006
Telephone:    (713) 521-3525
Telecopier:    (713) 521-3575

**Appellee:**

KTRK Television, Inc.

**Trial and Appellate Counsel For Appellee KTRK Television, Inc.:**

Laura Lee Prather
State Bar No. 16234200
Laura.prather@haynesboone.com
Catherine Lewis Robb
State Bar No. 24007924
Catherine.robb@haynesboone.com
Haynes and Boone, LLP
600 Congress Avenue, Suite 1300
Austin, Texas 78701
Telephone:  (512) 867-8400
Facsimile:   (512) 867-8470

---

[2] Although Robinson states in the "Identity of Parties and Counsel" section of her Brief that Berry Dunbar Bowen is her trial and appellate counsel, she has made multiple attestations to the trial court and to this Court that she is proceeding *pro se*, and has signed her Brief *pro se*. CR 557, 607, 609.  Mr. Bowen was Robinson's attorney of record in the first appeal of this matter.

# TABLE OF CONTENTS

IDENTIFICATION OF PARTIES ...........................................................................i

TABLE OF CONTENTS.................................................................................. iii

RECORD REFERENCES ................................................................................v

TABLE OF AUTHORITIES ............................................................................vi

STATEMENT OF THE CASE...........................................................................xi

STATEMENT REGARDING ORAL ARGUMENT ........................................... xiii

ISSUES PRESENTED....................................................................................xiv

I. STATEMENT OF FACTS ...........................................................................1

II. SUMMARY OF THE ARGUMENT...........................................................6

III. ARGUMENT ...........................................................................................8

   A. Not Only Did This Court Have Jurisdiction To Hear The First
      Appeal Of This Case, But This Court Has Already Addressed
      – And Denied – Robinson's Arguments That It Lacked Such
      Jurisdiction. ...........................................................................................8

   B. The First Court Of Appeals Did Not Err In Its Opinion In
      *KTRK Television, Inc. v. Robinson,* Dated July 11, 2013, An
      Opinion That Was Correctly Decided And For Which All
      Appeals Have Been Exhausted, And Over Which This Court
      No Longer Has Jurisdiction..................................................................10

      1. This Court's Plenary Power Regarding Its Prior Decision
         Expired on September 24, 2013. ...................................................12

      2. This Court's Prior Decision Is the Law of the Case,
         Barring Further Reconsideration of Robinson's Issues...........................14

      3. This Case Was Correctly Decided in the First Appeal
         and, Should This Court Look at the Substance of
         Robinson's Brief, the Court Should Re-Affirm Its Prior
         Decision.....................................................................................17

   C. The Trial Court Properly Awarded Attorneys' Fees, Costs,
      And Sanctions To KTRK; Its Order Doing So Does Not Raise
      Any Constitutional Questions; Robinson Waived Any
      Constitutional Challenge To The TCPA By Failing To Raise It
      At The Trial Court. ...............................................................................21

1. Robinson's Arguments that the Trial Court's Fee Award Was Punitive and in Violation of Open Courts Are Without Merit and Were Waived.................................................22

2. The Trial Court's Award of Fees, Costs, Expenses, and Sanctions Was in Accordance with the TCPA. ........................................25

3. The Trial Court's Award of Fees, Costs, Expenses, and Sanctions Was in Accordance with the Mandate of This Court.................................................................................30

PRAYER................................................................................................32

CERTIFICATE OF COMPLIANCE..................................................33

CERTIFICATE OF SERVICE ..........................................................33

APPENDIX...........................................................................................34

# RECORD REFERENCES

Citations to the Clerk's Record are in the form of [supplement ] CR [page #]. For clarification:

CR refers to the Clerk's Record filed on December 30, 2014;

1st CR refers to the Special Supplemental Clerk's Record (Pauper's Documentation) filed on December 31, 2014.

2nd CR refers to the Second Supplemental Clerk's Record requested on September 9, 2015, which has not yet been filed.[3]  Because the 2nd CR cites are not yet available, Appellee will include the referenced documents in the Appendix and reference the Appendix, as well.

Citations to Appellant's Brief filed on June 10, 2015 are in the form of Br. [page #].

---

[3] Appellee has been informed that the Second Supplemental Clerk's Record has not been completed, but is tentatively scheduled to be filed on October 9, 2015.

# TABLE OF AUTHORITIES

**Cases**

*Abdel Hazif v. ABC, Inc.,* 240 S.W.3d 492 (Tex. App.—Fort Worth 2007, pet. denied) ...............................................................................19

*Algae Int'l Grp., Inc. v. Stegman*, No. DC-13-03933 (44th Dist. Ct., Dallas County, Tex. Sept. 13, 2013) ...............................................29

*Am. Heritage Capital, LP v. Gonzalez*, 436 S.W.3d 865 (Tex. App.—Dallas 2014, no pet.) .................................................... 28, 29

*Anderson Dev. Co. v. Tobias*, 116 P.3d 323 (Utah 2005) .....................................24

*Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812 (Tex. 1997) .........................................................................................30

*Aycock v. State of Texas,* 863 S.W.2d 183 (Tex. App.—Houston [14th Dist.] 1993, writ denied) ......................................................15

*Better Bus. Bureau of Metro Dallas, Inc. v. BH DFW, Inc.,* 402 S.W.3d 299 (Tex. App. Dallas 2013, no pet) ........................................8

*Better Bus. Bureau of Metro. Hous., Inc. v. John Moore Servs., Inc.*, 441 S.W.3d 345 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) .......................................................................................27

*Brewer v. Simental*, 268 S.W.3d 763 (Tex. App.—Waco 2008, pet. denied) .......................................................................................22

*Caplinger v. Allstate Ins. Co.*, 140 S.W.3d 927 (Tex. App.—Dallas 2004, pet. denied) ...........................................................15

*Carbajal v. ACCC General Agency, Inc.*, No. 05-15-00382-CV (Tex. App.—Dallas September 10, 2015, no pet. h.)(mem. op.) ............................................................................................5

*Cleveland* v. *Taylor,* 397 S.W.3d 683 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) .....................................................31

*Combined Law Enforcement Ass'ns. of Tex. v. Sheffield*, No.
 03-13-105-CV, 11 2014 WL 411672 (Tex. App.—Austin Jan.
 31, 2014, pet. denied)(mem. op.) ................................................. 23, 25

*Cook v. Cameron,* 733 S.W.2d 137 (Tex. 1987) ..................................................... 14

*Cruz v. Van Sickle*, 452 S.W.3d 503 (Tex. App.—Dallas 2014,
 pet. denied) ........................................................................................ 29

*Dallas County v Sweitzer,* 971 S.W.2d 629 (Tex. App.—Dallas
 1998, no pet.) ..................................................................................... 14

*Day v. Farrell*, No. 97-2722, 2000 WL 33159180 (R.I. May 15,
 2000) .................................................................................................. 24

*Direct Commercial Funding, Inc. v. Beacon Hill Estates, LLC*,
 2013 WL 407029 (Tex. App.—Hou. [14th] 2013, no pet.) .................................. 8

*El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757 (Tex. 2012) ................................... 26

*Equilon Enters. v. Consumer Cause, Inc*., 52 P.3d 685 (Cal.
 2002) .................................................................................................. 24

*Guam Greyhound v. Brizill*, No. CVA07-021, 2008 WL
 4206682 (Guam Sept. 11, 2008) ...................................................... 24

*Gulf Energy Exploration Corp. v. Fugro Chance,* 2012 WL
 601413 (Tex. App.—Corpus Christi 2012, no pet.)(mem. op.) ................... 12, 16

*Head v. Chicory Media, LLC*, No. 2013-0040 (714st Dist. Ct.,
 Harrison County, Tex. Sept. 25, 2013), *appeal dism'd*, 415
 S.W.3d 559 (Tex. App.—Texarkana 2013, no pet.) ..................... 28, 29

*Hometown Props., Inc. v. Fleming*, 680 A.2d 56 (R.I. 1996) ................................ 24

*Huckabee v. Time Warner Entm't Co.*, 19 S.W.3d 413 (Tex.
 2000) .................................................................................................. 20

*Hudson v. Wakefield,* 711 S.W.2d 628 (Tex. 1986) ................................. 12, 15, 16

*In re Thuesen*, No. 2012-49262 (151st Dist. Ct., Harris County,
 Tex. Mar. 4, 2013), *appeal docketed*, No. 14-13-00523-CV
 (Tex. App.—Houston [14th Dist.]) ................................................... 29

*James v. Calkins*, 446 S.W.3d 135 (Tex. App.—Houston [1st Dist.] 2014, pet. granted) ...................................................27

*Kinney v. BCG Attorney Search, Inc.*, No. 03-12-00579-CV, 2014 WL 1432012 (Tex. App.—Austin Apr. 11, 2014, pet. denied) (mem. op.) ...........................................................28

*KTRK Television, Inc. v. Robinson*, 409 S.W.3d 682 (Tex. App. —Houston [1st Dist.] 2013, pet. denied) .................................8

*Lafayette Morehouse, Inc. v. Chronicle Publ'g Co.*, 37 Cal. App. 4th 855 (1995) ...................................................24

*Lee v. Pennington*, 830 So.2d 1037 (La. Ct. App. 2002)........................................24

*Miller v. University Sav. Assoc.*, 858 S.W.2d 33 (Tex. App.— Houston [14th Dist.] 1993, writ denied)...............................15

*Moore v. Waldrop,* 166 S.W.3d 380 (Tex. App.—Waco 2005, no pet.) ........................................................... 18, 20

*Musser v. Smith Protective Servs.*, 723 S.W.2d 653 (Tex. 1987)...........................20

*Neely v. Wilson*, 418 S.W.3d 52 (2013)........................................................13

*Newspaper Holdings, Inc. v. Crazy Hotel Assisted Living, Ltd.*, 416 S.W.3d 71 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) ...........................................................27

*Newspapers, Inc. v. Matthews*, 339 S.W.2d 890 (Tex. 1960) ................................20

*Nexus v. Swift*, 785 N.W.2d 771 (Minn. Ct. App. 2010) ........................................24

*Phillips v. Bramlett,* 407 S.W.3d 229 (Tex. 2013) ..................................................14

*Ramsey v. Lynch*, No. 10-12-00198-CV, 2013 WL 1846886 (Tex. App.—Waco May 2, 2013, no pet.) (mem. op.).......................28

*Rehak Creative Servs., Inc. v. Witt*, 404 S.W.3d 716 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) ..............................28

*Rustic Cedar Cabins Inc. v. Cortell*, No. 28500 (21st Dist. Ct., Bastrop County, Tex. Sept. 5, 2012) .................................29

*San Jacinto Title Svcs., LLC V. Kingsley Props. LP.,* 452 S.W.2d 343 (Tex. App.—Corpus Christi 2013, pet. denied) ..................................8

*Sandholm v. Kuecker*, 942 N.E.2d 544 (Ill. App. Ct. 2010) ......................................24

*Sax v. Votteler*, 648 S.W.2d 661 (Tex. 1983) (internal quotation marks and citation omitted) ..................................................................23

*Schauer v. Memorial Care Sys.*, 856 S.W.2d 437 (Tex. App.—Hou. [1st Dist.] 1993, no writ) ............................................................20

*Schimmel v. McGregor* 438 S.W.3d 847 (Tex. App.—Houston [1st Dist.] 2014, no pet.) ................................................ 26, 27

*Schlumberger Ltd. v. Rutherford*, No. 01-14-00776-CV (Tex. App.—Houston [1st Dist.] Aug. 25, 2015, no pet. h.) ................................. 27, 29

*Senator Jeff Wentworth v Elizabeth Ames Jones,* Cause No. 2012-CI-08201 (73rd Dist. Ct., Bexar Co., Tex. filed May 17, 2012) ..........................................................................................23

*Simpton v. High Plains Broad., Inc.*, No. 2011-13290 (285th Dist. Ct., Bexar County, Tex. July 30, 2012) ......................................29

*Spencer v. Pagliarulo*, 448 S.W.3d 605 (Tex. App.—Houston [1st Dist.] 2014) ......................................................................13

*Texas Pub. Bldg. Auth. v. Mattox*, 686 S.W.2d 924 (Tex. 1985) ...........................23

*Weaver v. Jamar*, 383 S.W.3d 805 (Tex. App.—Houston [14th Dist.] 2012, no pet.) ....................................................................26

*WFAA v. McLemore*, 978 S.W.2d 568 (Tex. 1998), cert. denied, 119 S. Ct. 1358 (1999) ..............................................................19

**Statutes**

Tex. Civ. Prac. & Rem. Code § 51.014 ......................................................................9

Tex. Civ. Prac. & Rem. Code § 73.002 ....................................................................19

Tex. Civ. Prac. & Rem. Code Ann. § 27.009 ................................................. passim

Tex. R. App. P. 19.1............................................................................ 12, 13

Tex. R. App. P. 19.3............................................................................ 12, 13

Tex. R. App. P. 33.1.................................................................................22

Tex. R. App. P. 42.3.................................................................................32

Tex. R. App. P. 51.1.................................................................................14

Tex. R. Civ. P. 13....................................................................................23

## STATEMENT OF THE CASE

In accordance with Tex. R. App. P. 38.2(a)(1)(B), Appellee disagrees with Appellant's statement of the case. Appellant states that "This is an appeal of a denial of a Motion to Dismiss claims for defamation/libel pursuant to the Texas Citizens' Participation Act, Tex. Civ. Prac. & Rem. Code Ann. § 27.001, *et seq*. (Vernon Supp. 2011)." Appellant is wrong. Appellee has already appealed that ruling through five different filings before this Court and the Texas Supreme Court. *See* discussion in Appellee KTRK Television, Inc.'s Motion to Dismiss Appellant's Appeal and Request to Declare Appellant Robinson A Vexatious Litigant, filed in No. 01-14-008800-CV (Tab H).

| | |
|---|---|
| **NATURE OF THE CASE:** | Defamation |
| **COURSE OF PROCEEDINGS:** | Appeal of Order of October 8, 2014 of the 234th Judicial Court of Harris County on remand from this Court, ordering final judgment and dismissal with prejudice in accordance with this Court's July 11, 2013 Order, and attorney's fees, costs, and expenses. CR 615, 455, 469 (Tabs B, C, and D). |
| **TRIAL COURT'S DISPOSITION:** | Appellant Theaola Robinson filed suit against multiple Defendants in September, 2011. CR 560. KTRK filed an anti-SLAPP motion pursuant to Chapter 27 of the Texas Civil Practice & Remedies Code, which was denied by the trial court and timely appealed to this court, which found in favor of KTRK on July 11, 2013. CR 455 (Tabs C and D). After exhausting her appeals, on October 8, 2014, the trial court, on remand and in accordance with this Court's July 11, 2013 Order and with Tex. Civ. Prac. & Rem. Code § 27.009, awarded KTRK its attorney's fees, expenses, court costs, and sanctions and entered its final judgment. CR 615 (Tab B). |

**APPELLATE PROCEEDINGS:** Robinson filed a Notice of Appeal on October 30, 2014. CR 622 (Tab A).[4] This appeal was docketed as No. 01-14-00880-CV and, on June 10, 2015, Appellant filed her brief.[5]

---

[4] Robinson failed to serve her Notice of Appeal upon KTRK, thereby failing to properly perfect this appeal. CR 545, n.15.

[5] Although Appellant filed subsequent briefing and appendixes, her motion for leave to file such was denied by Order of this Court on September 3, 2015; thus, the Appellant's brief dated June 10, 2015 is the brief before this Court, and to which Appellee responds.

## STATEMENT REGARDING ORAL ARGUMENT

KTRK does not request oral argument. KTRK believes that this Court can determine this case without the necessity of oral argument.

## **ISSUES PRESENTED**

RESPONSE TO APPELLANT'S ISSUE 1: Not only did this Court have jurisdiction to hear the first appeal of this case, but this Court has already addressed – and denied – Robinson's arguments that it lacked such jurisdiction.


RESPONSE TO APPELLANT'S ISSUE 2: The First Court Of Appeals did not err in its Opinion in *KTRK Television, Inc. v. Robinson,* dated July 11, 2013, an opinion that was correctly decided and for which all appeals have been exhausted, and over which this Court no longer has jurisdiction.


RESPONSE TO APPELLANT'S ISSUE 3: The trial court properly awarded attorneys' fees, costs, and sanctions to KTRK; Its Order doing so does not raise any constitutional questions; and, Robinson waived any constitutional challenge to the TCPA by failing to raise them at the trial court.

# I.
## STATEMENT OF FACTS

Robinson has been suing KTRK over the same broadcasts for more than four years and has attempted to appeal this Court's prior ruling denying her claims on at least six occasions. It began when Robinson sued The Walt Disney Company in federal court in January 2011, but dismissed that case when she tried to add The Walt Disney Company and KTRK to an already pending § 1983 case she had filed against numerous government defendants. *See* Original Complaint in *Theaola Robinson v. The Walt Disney Company*, Cause No. 4-11-CV-0358, in the Southern District of Texas, Houston Division (Tab I); Motion for Leave to Amend and Supplement Complaint in *Shenitha Comb, et. al. v. Rick Schneider, et al.*, Cause No. 4-10-CV-03498, in the Southern District of Texas, Houston Division (Tab J); Nonparty KTRK Television, Inc.'s Opposition to Plaintiffs' Motion for Leave to Amend and Supplement Complaint in Cause No. 4-10-CV-03498 (Tab K). Robinson was unsuccessful on both counts. *See* Notice of Dismissal in Cause No. 4-11-CV-0358 (Tab L); Memorandum and Order in Cause No. 4-10-CV-03498 (Tab M). Then, after the multiple attempts to sue in federal court failed, in September of 2011, Robinson filed this action for defamation in state court against KTRK, The Walt Disney Company ("TWDC"), CC Texas Holding Co., Inc.

("CCTHC"), and ABC Television Network.[6] CR 560. TWDC and CCTHC immediately filed Special Appearances. CR 5, 15. KTRK filed an Answer (CR 22) and then filed a Motion to Dismiss ("Anti-SLAPP Motion") pursuant to Chapter 27 of the Texas Civil Practice & Remedies Code ("TCPA" or "the Act"). On January 23, 2012, prior to the hearing on KTRK's Anti-SLAPP motion, Robinson filed her First Amended Petition. 2nd CR ___ (Tab N).[7] KTRK's Anti-SLAPP Motion was denied by the trial court, and KTRK timely appealed to this Court. CR 309-310, 469 (Tabs C and D).

On July 11, 2013, in *KTRK Television, Inc. v. Robinson*, No. 01-12-00372-CV, this Court reversed the trial court's denial of KTRK's Anti-SLAPP Motion and remanded this case back to the trial court to order dismissal of the suit and for final proceedings on attorneys' fees as required by Tex. Civ. Prac. & Rem. Code Ann. § 27.009(a). CR 455, 469 (Tabs C and D). In issuing its Opinion, this Court also addressed – and denied – Robinson's Motion to Dismiss the appeal in which she argued the Court had no jurisdiction to hear the appeal. *See* Appellee's Motion

---

[6] As discussed, ABC Television Network is not a corporate entity, was never served, and was dismissed through the filing of the First Amended Petition. CR 796.

[7] Robinson later filed a Second Amended Petition on February 3, 2014 (CR 281) and a "Supplemental Petition" on October 1, 2014 (CR 533). However, the Second Amended Petition was filed in contravention of this Court's order of February 22, 2013 in No. 01-12-00372-CV, which stayed the proceedings in the trial court pending final resolution of the appeal. 2nd CR ___ (Tab P). Because the Second Amended Petition was filed after the Court's order staying trial proceedings, but prior to the issuance of this Court's mandate on March 14, 2014, it was never before the trial court. The Supplemental Petition, filed <u>after</u> the trial court's remand hearing on KTRK's attorney's fees, contained only non-specific and non-justiciable claims against this Court's mandate. CR 533. As a result, the Supplemental Petition was also never before the trial court.

to Dismiss For Lack of Jurisdiction, in No. 01-12-00372-CV (Tab O). Robinson then filed a Motion for Rehearing of this Court's Opinion (CR 566), which was overruled by this Court on August 21, 2013. CR 455 (Tab C). Next, Robinson filed a Petition for Review with the Supreme Court of Texas, which was denied on January 3, 2014 (CR 569), and a Petition for Rehearing of the Denial, which was denied on March 7, 2014. 2nd CR __ (Tab F). Lastly, Robinson filed a Petition for Writ of Mandamus with the Supreme Court of Texas, which was denied on June 6, 2014, followed by a "Motion for Rehearing on Petition for Review of Writ of Mandamus and Request for Oral Argument," which was also denied. CR 475, 572; 2nd CR __ (Tab G).

After Robinson had wholly and completely exhausted any and all possible appeals regarding this Court's Opinion, in accordance with this Court's Opinion and March 14, 2014 mandate and Chapter 27 of the Civ. Prac. and Rem. Code, KTRK moved the trial court to award its attorney's fees, costs, and expenses, to award sanctions, and to enter final judgment. CR 309. In support of KTRK's Motion and Brief, KTRK offered and submitted as evidence extensive billing records as proof of its fees and expenses, provided extensive case law to the trial court in support of an award of fees, and requested sanctions sufficient to deter Robinson from filing additional similar claims. CR 309. After properly noticing a hearing on KTRK's request for fees (2nd CR ___ (Tab Q)), and after filing a

3

supplemental affidavit on attorney's fees and costs reflecting the final fees and costs in the trial court (2nd CR __ (Tab R)), a hearing was held before the Honorable Wesley Ward on September 29, 2014. Robinson failed to submit or present any evidence, either prior to or at the hearing, to contradict or refute KTRK's evidence of attorney's fees and costs.[8] At that same hearing, TWDC and CCTHC's Special Appearances were heard.[9] CR 5, 15. Robinson filed her response to the Special Appearances one day prior to the hearing (CR 524), and TWDC and CCTHC replied to Robinson's response. CR 528. On October 8, 2014, the 234th District Court signed an order sustaining the special appearances of TWDC and CCTHC. CR 536. [10] On the same day, the trial court signed its final judgment in which it, in accordance with this Court's Opinion and mandate, dismissed the case with prejudice, and awarded KTRK attorney's fees, costs, and expenses pursuant to the Texas Anti-SLAPP statute.[11] CR 615 (Tab B).

---

[8] Although trial counsel Berry Bowen ("Bowen") had previously filed a Motion to Withdraw (CR 612), and Robinson had clearly informed KTRK in writing that Bowen no longer represented her and that she was proceeding *pro se* (CR 609), Robinson and Bowen both appeared at the hearing on attorney's fees and Bowen proceeded to represent Robinson at the hearing with Robinson's apparent acquiescence. CR 545. No evidence or argument was ever offered or filed in contradiction of KTRK's requested fees.

[9] Although the Special Appearances had been on file since the start of the case, they had never been decided because the interlocutory appeal stayed the underlying trial court proceedings.

[10] Robinson has not appealed that Order.

[11] The Court also ordered nominal sanctions in the amount of $100. CR 615. (Tab B).

Robinson filed a Notice of Appeal on October 30, 2015.[12] CR 622. This Notice of Appeal states that she desires "to appeal from the judgment rendered against Plaintiff by the 234th Judicial District Court of Harris County, Texas on October 8, 2014." CR 622. Thus, it appears Robinson is attempting to appeal the "Order and Final Judgment," of the trial court executed in accordance with the mandate of this Court. CR 469 (Tab D). As a preliminary matter, Robinson failed to perfect her appeal because it was not served upon KTRK.[13] CR 545 n.15. On October 31, 2014, after Robinson filed her *pro se* Notice of Appeal, Robinson's former counsel Berry Bowen, purporting to act on behalf of Robinson, filed a Motion for New Trial in the trial court. CR 540. KTRK moved to strike the Motion for New Trial on the grounds that Robinson and her former counsel were both simultaneously filing conflicting pleadings. CR 543. A hearing on the Motion for New Trial was not set, and the motion was eventually overruled by operation of law. Meanwhile, Robinson's *pro se* appeal was docketed as No. 01-14-00880-CV and, although a docketing statement was due on November 20, 2014, a docketing statement has never been filed. Robinson's brief was eventually

---

[12] Although Robinson states that she filed a "Request for Facts and Conclusion of Law" in addition to her Notice of Appeal, no such request was ever filed. Br. 2.

[13] *See* KTRK's Motion to Dismiss, filed in this Court on July 23, 2015 (Tab H). The fact that Robinson failed to perfect her appeal and has not served several documents (including her Appellant's Brief) upon KTRK has not been refuted by Robinson nor has any evidence of service ever been provided. Very recently, the Dallas Court of Appeals agreed that "Pro se litigants are held to the same standard as licensed attorneys." *Carbajal v. ACCC General Agency, Inc.*, No. 05-15-00382-CV at *2 (Tex. App.—Dallas September 10, 2015, no pet. h.)(mem. op.). For this reason, KTRK re-urges its previously filed Motion to Dismiss.

5

filed more than six months later on June 10, 2015. KTRK filed its Motion to Dismiss on July 23, 2015, on the grounds that Robinson was attempting to re-litigate previously appealed issues causing this Court to have no jurisdiction over the appeal. KTRK further demonstrated that Robinson had failed to perfect her appeal and had failed to comply with the Texas Rules of Appellate Procedure. KTRK's Motion to Dismiss was denied on September 3, 2015, in an order signed by Justice Lloyd acting individually. On that same day, Robinson's motion to allow late filed amended briefs and appendixes was denied.

## II.
## SUMMARY OF THE ARGUMENT

At the heart of this case is the (already answered) question of whether certain reports broadcast by KTRK were defamatory *per se,* as alleged by Robinson, and whether Robinson sustained her burden to provide by clear and specific evidence a *prima facie* case for each and every essential element of her claim for defamation *per se,* including that no affirmative defenses applied. The First Court of Appeals correctly decided this case in its Opinion of July 11, 2013 in No. 01-12-00372-CV – the first appeal of the underlying merits of this matter – finding that Robinson had not sustained her burden and that the lawsuit should be dismissed pursuant to the TCPA. In that Opinion, this Court also correctly found that the Court had jurisdiction to hear the appeal. Although Robinson exhausted all available appellate remedies in that prior appeal, Robinson now attempts to

6

again re-litigate (for the seventh time)[14] the same issues – issues that were decided by this Court more than two years ago and over which this Court no longer maintains jurisdiction.[15] In addition, Robinson appears to attempt to appeal issues not the subject of the October 8, 2014 Order and that have been waived or already decided definitively against her.[16]

As an initial matter, this Court should not consider the merits of this appeal because this Court is without jurisdiction to do so, the Opinion being appealed is the law of the case,[17] because all appeals of that Opinion have been exhausted – unsuccessfully – by Robinson, and because Robinson does not appeal the one issue that she could have appealed: the amount of attorneys' fees, other costs and expenses, or sanctions awarded by the trial court. KTRK re-urges its argument that this appeal should be dismissed for those reasons.[18] Still, however, to the extent the Court in any way considers Robinson's current appeal an attack on the amount of fees, costs, or sanctions, the trial court properly awarded attorney's fees, costs, and

---

[14]*See, e.g.,* Appellant's Statement of the Case ("this is an appeal of a denial of a Motion to Dismiss"), her Statement of Jurisdiction (pertaining to mandamus), her Issues 1 & 2, her Statement of Facts, etc. Br. viii-x, 1-21.

[15] *See* Br. viii-x, 1-21.

[16] *See* Plaintiff's Response to Motion to Dismiss in No. 2011-54895 (Tab S).

[17] If the Court does address Robinson's arguments about the appropriateness of review and dismissal of the underlying lawsuit, KTRK re-urges and adopts by reference all of the arguments made in the prior appeal of this case. *See* the following documents in No. 01-12-00372-CV: Brief of Appellant KTRK Television, Inc. (Tab T); Appellant's Brief in Reply (Tab U); Appellant's Response to Appellee's Motion to Dismiss for Lack of Jurisdiction (Tab V).

[18] (Tab H).

sanctions to KTRK in accordance with this Court's mandate and the evidence on attorney's fees and costs that was admitted by the trial court.[19]

## III.
## ARGUMENT

A. **Not Only Did This Court Have Jurisdiction To Hear The First Appeal Of This Case, But This Court Has Already Addressed – And Denied – Robinson's Arguments That It Lacked Such Jurisdiction.**

Robinson's first point on appeal concerns her argument that this Court did not have jurisdiction to hear the appeal in No. 01-12-00372-CV, because (1) appellate courts did not, at the time, have jurisdiction to hear an interlocutory appeal of the denial of an Anti-SLAPP Motion and (2) Robinson's lawsuit was filed before the effective date of the TCPA, thereby making it inapplicable to her underlying lawsuit. She is wrong on both points – on both the facts and the law. This Court found in the first go around, "section 27.008 permits an interlocutory appeal from the trial court's written order denying a motion to dismiss under the TCPA." *KTRK Television, Inc. v. Robinson*, 409 S.W.3d 682, 688 (Tex. App. — Houston [1st Dist.] 2013, pet. denied).[20] Furthermore, if anything, the argument that this Court properly exercised its jurisdiction over the prior appeal is even

---

[19] CR 309 (Tabs C and D).

[20] KTRK attaches as Appendix Tab V its Response to Robinson's Motion to Dismiss in No. 01-12-00372-CV, and, to the extent necessary, incorporates it by reference. *See also Direct Commercial Funding, Inc. v. Beacon Hill Estates, LLC,* 2013 WL 407029 (Tex. App.—Hou. [14th] 2013, no pet.); *Better Bus. Bureau of Metro Dallas, Inc. v. BH DFW, Inc.,* 402 S.W.3d 299, 306-07 (Tex. App. Dallas 2013, no pet); *San Jacinto Title Svcs., LLC V. Kingsley Props. LP.,* 452 S.W.2d 343 (Tex. App.—Corpus Christi 2013, pet. denied).

8

stronger now. In response to a handful of Texas appellate courts incorrectly finding no right to an interlocutory appeal when an Anti-SLAPP Motion was denied by written order, but only when denied by operation of law, the Texas Legislature strengthened the language of the Anti-SLAPP statute to make it even clearer that an interlocutory appeal was allowed in either circumstance.[21] This Court did not err in finding it had jurisdiction to hear the appeal in No. 01-12-00372-CV.

With regard to Robinson's second argument, that the TCPA is being applied retroactively, the record speaks for itself. The TCPA statute became effective on June 17, 2011.[22] Robinson's underlying lawsuit was filed on September 14, 2011, after the effective date of the TCPA. Therefore, the Act, including the section on interlocutory appeals, applies to Robinson's lawsuit. Further, although Robinson argues that she filed a lawsuit prior to the effective date of the TCPA, which she believes should preclude the application of the TCPA to this lawsuit, she is wrong for several reasons. To begin with, she fails to cite any authority for her proposition that filing a federal lawsuit starts the clock for any later-filed state lawsuits on a similar topic, and there is no such authority. Even if her argument otherwise held water, the lawsuit Robinson refers to in her Brief was a federal lawsuit filed against multiple state actors – not KTRK – claiming 1983

---

[21] *See* Tex. Civ. Prac. & Rem. Code § 51.014(a)(12) (amended by Texas Legislature in 2013).
[22] (Tab W).

9

violations.[23]  Although Robinson did eventually attempt to add KTRK and other media defendants to that federal lawsuit, she did not seek leave to do so until June 24, 2011 – after the effective date of the TCPA.  Further, and decisively, the Court denied Robinson's motion for leave to amend her Complaint to add KTRK and the media defendants; as such, KTRK was never a party to the federal lawsuit.  KTRK was never a party to the federal lawsuit and her ill-fated request for leave to add KTRK was not even sought until after the TCPA became effective.  Thus, Robinson's claim that she filed her lawsuit prior to the enactment of the TCPA and that she is being subject to a "retroactive law" is without merit.  This Court properly exercised its jurisdiction in hearing the appeal in No. 01-12-00372-CV.

**B.    The First Court Of Appeals Did Not Err In Its Opinion In *KTRK Television, Inc. v. Robinson,* Dated July 11, 2013, An Opinion That Was Correctly Decided And For Which All Appeals Have Been Exhausted, And Over Which This Court No Longer Has Jurisdiction.**

On July 11, 2013, in *KTRK Television, Inc. v. Robinson*, this Court reversed the trial court's denial of KTRK's Anti-SLAPP Motion and remanded this case back to the trial court to order dismissal of the suit and for final proceedings on attorneys' fees as required by Tex. Civ. Prac. & Rem. Code Ann. § 27.009(a).  On October 8, 2014,[24] after Robinson's appellate remedies had been exhausted, the

---

[23] (Tab M).

[24] The large time delay between the July 2013 judgment of this Court and October 2014 judgment of the trial court was caused by Appellee Robinson's six filings attempting to overturn

10

234th Judicial Court of Harris County, **in accordance with the Order of this Court,** issued its final judgment and dismissed the case with prejudice, awarding KTRK attorney's fees, costs, and expenses pursuant to the TCPA.[25]

Robinson's Notice of Appeal states that she desires "to appeal from the judgment rendered against Plaintiff by the 234[th] Judicial District Court of Harris County, Texas on October 8, 2014." The referenced Judgment did only two things: (1) dismissed Robinson's claims and entered a final judgment in accordance with this Court's Opinion and mandate (a ministerial act), and (2) awarded KTRK its attorneys' fees, expenses, court costs, and sanctions pursuant to this Court's mandate.[26] What Robinson's Brief makes clear is that she is really appealing this Court's earlier decision in Cause No. 01-12-00372-CV, not the more recent ministerial order.[27] This current appeal is Robinson's attempt to revisit this Court's July 11, 2013, Opinion in Cause No. 01-12-00372-CV dismissing Robinson's claim for defamation against KTRK.[28] Robinson states outright in her Brief that "This is an appeal of a denial of a Motion to Dismiss claims for

---

this Court's ruling. *See* Robinson's Motion for Rehearing in this Court (which was denied), Petition for Review and a Motion for Rehearing on her Petition for Review (in the Supreme Court of Texas, No. 13-0809)(both denied) and a Petition for Writ of Mandamus and a Motion for Rehearing on her Petition for Writ of Mandamus (in the Supreme Court of Texas, No. 14-0321)(both denied). *See* (Tabs E, F, and G).

[25] Also on October 8, 2014, the 234th District Court signed an order sustaining the Special Appearances of TWDC and CCTHC. That Order was not appealed.

[26] *See KTRK Television, Inc. v. Robinson*, 409 S.W.3d at 682.

[27] *See* Brief viii, 1.

[28] *See* Br. viii-x, 1-21.

defamation/libel" and states that the First Court of Appeals "committed clear error/abuse of discretion when it did not affirm trial court decision." [29]   Therefore, there can be no doubt that Robinson's appeal in this case is nothing more than one more appeal of this Court's decision in Cause No. 01-12-00372-CV, which is not allowed.[30]

Under Texas Rule of Appellate Procedure 19.1, this Court's plenary power to alter that judgment expired in September of 2013. *See* Tex. R. App. P. 19.1; *see also* Tex. R. App. P. 19.3 ("[a]fter its plenary power expires, the court cannot vacate or modify its judgment").  Furthermore, this Court's decision in Cause No. 01-12-00372-CV is the law of the case and this Court does not have jurisdiction to revisit the issues raised in that first appeal.  *Hudson v. Wakefield,* 711 S.W.2d 628, 630 (Tex. 1986); *Gulf Energy Exploration Corp. v. Fugro Chance,* 2012 WL 601413 (Tex. App.—Corpus Christi 2012, no pet.)(mem. op.).

**1.     This Court's Plenary Power Regarding Its Prior Decision Expired on September 24, 2013.**

Robinson's attempt to appeal **this Court's** July 11, 2013 decision on the merits is not permitted.  This Court "cannot vacate or modify its judgment"

---

[29] *See* Brief viii, 1.

[30] KTRK also re-urges its previously filed Motion to Dismiss this appeal in accordance with Tex. R. App. P. 42.3 for Robinson's failure to comply with the Texas Rules of Civil Procedure, including failing to serve KTRK with her Notice of Appeal and failing to serve KTRK with filings (although certifying to this Court that she had done so) or serving KTRK with documents that differ from the ones filed with the Court.  *See* Appellee KTRK Television, Inc.'s Motion to Dismiss Appellant's Appeal and Request to Declare Appellant Robinson a Vexatious Litigant, filed on July 23, 2015.

because its plenary power over that decision expired in 2013.[31] After this Court's ruling on the merits, reversing and remanding to the lower court, Robinson filed a motion for rehearing on July 25, 2013. The Court's "plenary power over its judgment expire[d]… 30 days after the court overruled[d] all timely filed motions for rehearing...."[32] This Court overruled Robinson's motion for rehearing on August 21, 2013.[33] Accordingly, this Court's plenary power to vacate or modify its judgment expired on September 20, 2013.

The fact that Robinson claims to be appealing the trial court's judgment – one that is in complete compliance with this Court's prior mandate – does not change the fact that what she is really trying to do is appeal, now for the <u>sixth time</u>, this Court's earlier decision. Again, Robinson's brief makes her true aim crystal clear:

> Appellant Robinson has been defamed and it was confirmed when the lower court dismissed KTRK Channel 13 Motion to Dismiss under the Texas Anti-Slapp statute. Appellant Robinson asks that her case be reviewed under *Neely v. Wilson*, 418 S.W.3d 52 (2013) and *Spencer v. Pagliarulo*, 448 S.W.3d 605 (Tex. App.—Houston [1st Dist.] 2014).[34]

The time and methods for reviewing this Court's prior decision have expired (and been exhausted), and Robinson's prior five attempts to have this Court and the Texas Supreme Court review that decision have all failed.

---

[31] *See* Tex. R. App. P. 19.3.
[32] *See* Tex. R. App. P. 19.1(b).
[33] *See* this Court's August 21, 2013 notice that it denied Robinson's Motion for Rehearing (Tab E).
[34] *See* Br. 19-20.

## 2. This Court's Prior Decision Is the Law of the Case, Barring Further Reconsideration of Robinson's Issues.

The Order that Robinson purports to appeal was simply the trial court's ministerial act of enforcing this Court's prior mandate that the trial court dismiss the case and enter a final judgment in accordance with this Court's opinion. "When an appellate court … renders a judgment which the trial court should have rendered, that judgment becomes the judgment of both courts." *Cook v. Cameron,* 733 S.W.2d 137, 139 (Tex. 1987). At that point,

> [t]he trial court's only duty is to enforce the judgment as rendered. The district court has no jurisdiction to review or interpret that judgment. Its only authority is to carry out the mandate of the appellate court. A district's court's orders carrying out the mandate are ministerial.

*Dallas County v Sweitzer,* 971 S.W.2d 629, 630 (Tex. App.—Dallas 1998, no pet.)(citations omitted). Furthermore, "[t]he district court must execute the judgment as it was framed by the appellate court." *Id.* It "has no authority to take any action that is inconsistent with or beyond the scope of that which is necessary to give full effect to the appellate court's judgment and mandate." *Phillips v. Bramlett,* 407 S.W.3d 229, 234 (Tex. 2013). *See also* Tex. R. App. P. 51.1(b) ("When the trial court clerk receives the mandate, the appellate court's judgment must be enforced.").

This Court's prior opinion is the law of the case and cannot be further appealed simply because the trial court has enforced this Court's mandate through

14

the ministerial act of entering a final judgment. *See, e.g., Miller v. University Sav. Assoc.,* 858 S.W.2d 33, 37 (Tex. App.—Houston [14th Dist.] 1993, writ denied)(finding appellant precluded from bringing claims on appeal because court had already determined issues and "law of the case" applied). Under the law of the case doctrine, a court of appeals must be consistent with its earlier ruling on legal questions unless an earlier decision was clearly erroneous. In a case such as this, when a petition for review is filed and the Texas Supreme Court denies the petition for review, as a matter of law, this Court of Appeals has not "committed clear error/abuse of discretion." *See Caplinger v. Allstate Ins. Co.*, 140 S.W.3d 927, 930 (Tex. App.—Dallas 2004, pet. denied).[35] Therefore, this Court cannot and should not consider Robinson's appeal of the law of the case.

"The 'law of the case' doctrine is defined as that principle under which questions of law decided on appeal to a court of last resort will govern the case throughout its subsequent stages." *Hudson v. Wakefield,* 711 S.W.2d 628, 630 (Tex. 1986); *see also Aycock v. State of Texas,* 863 S.W.2d 183, 187 (Tex. App.—Houston [14th Dist.] 1993, writ denied). ("'The law of the case' is a doctrine which mandates that the ruling of an appellate court on a question of law raised on appeal will be regarded as the law of the case in all subsequent proceedings of the same case."). Because Robinson's appeal is nothing more than one more attempt at

---

[35] *See* Br. 1; *see also* Supreme Court of Texas' denial of Robinson's Petition for Review (Tab G).

overturning "the law of the case" by "appealing" the trial court's unappealable ministerial entry of the final judgment, this Court is without jurisdiction to hear this appeal. *See, e.g., Gulf Energy Exploration Corp. v. Fugro Chance, Inc.,* No. 13-10-686-CV, 2012 WL 601413, at \*2 (Tex. App.—Corpus Christi 2012, no pet.)(mem. op.) (finding court was without jurisdiction to hear appeal of issue it had previously decided in first appeal).

Finally, dismissing this appeal serves the purpose of the "law of the case" doctrine, which is "based on public policy and is aimed at putting an end to litigation." *Hudson,* 711 S.W.2d at 630. This Court entered its Opinion in this matter dismissing this case in July of 2013. Since that time, Robinson (either acting *pro se*, or through her former attorney) has filed <u>five</u> prior appellate pleadings in an effort to overturn the decision: a Motion for Rehearing to the First Court of Appeals, a Petition for Review to the Texas Supreme Court, a Motion for Rehearing the Denial of her Petition for Review to the Texas Supreme Court, a Mandamus with the Texas Supreme Court, and a Motion for Rehearing the Denial of Mandamus.[36] In addition, after the trial court issued its order in compliance with this Court's Mandate, Robinson filed a Motion for New Trial prior to filing

---

[36] CR 566, 455, 569, 475, 512.

this appeal.  Thus, public policy and the law of the case dictate that this litigation must end.[37]

> **3. This Case Was Correctly Decided in the First Appeal and, Should This Court Look at the Substance of Robinson's Brief, the Court Should Re-Affirm Its Prior Decision.**

Although Robinson attempts to frame her second issue as some sort of due process challenge, this too is simply an attempt to challenge the merits of this Court's July 11, 2013 Opinion.  As discussed herein, this Court has previously heard and decided the issue that Robinson now attempts to again appeal before this Court – whether the trial court should have granted KTRK's Anti-SLAPP Motion and dismissed Robinson's cause of action against KTRK.  Therefore, to the extent this Court wishes to again review the underlying merits of this case, KTRK incorporates by reference and re-urges all of the arguments made in its briefing in the first appeal, No. 01-12-00372-CV, specifically, its:  Brief of Appellant KTRK Television, Inc. (Tab T); Appellant's Brief in Reply (Tab U); Appellant's Response to Appellee's Motion to Dismiss for Lack of Jurisdiction (Tab V); and, Clerk's Record in No. 01-012-00372-CV (where referred to in referenced pleadings in that appeal).

---

[37] Robinson has already been ordered to pay KTRK's attorneys' fees in this matter, but has indicated that she will be unable to pay; therefore, she has nothing to lose by continuing her appeals.

In short, as argued at the trial court and in the first appeal before this Court, Robinson sued KTRK for defamation based on its accurate reporting on allegations about Robinson's financial mismanagement of Benji's Special Education Academy, which was under investigation by the State. The Act required the trial court to dismiss the defamation claim unless Robinson established, by the heightened standard of clear and specific evidence, a *prima facie* case for each essential element of her claim.

In the underlying lawsuit, Robinson claimed that the broadcasts at issue were defamatory *per se*.[38] An essential element of defamation *per se* is the accusation of the commission of a crime, dishonesty, fraud, rascality, or general depravity ― which, in this case, was disproven by reading the Complained of Statements themselves. There was no mention of a crime being committed by Robinson, nor was there any reference to Robinson committing fraud or dishonest acts. *See* Tab W (and references to Clerk's Record in No. 01-12-00372-CV: CR 4:963-973). In a defamation per se claim one cannot use inference or innuendo to support such a claim either.[39]

Another essential element of the defamation claim at issue in the underlying case was the constitutional requirement of showing "actual malice" – a burden that

---

[38] As this Court previously found, Robinson pled only a claim for defamation *per se*, not *per quod*.

[39] *Moore v. Waldrop,* 166 S.W.3d 380 (Tex. App.—Waco 2005, no pet.).

arises when the plaintiff is a public figure or when the statements made are privileged. Both circumstances exist in this case. Plaintiff was a limited purpose public figure because she was at the heart of the controversy people were talking about,[40] and the matters discussed were privileged as a fair report on a governmental proceeding and a fair comment about a matter of public concern.[41] To establish actual malice, a plaintiff must demonstrate the defendant published an allegedly defamatory statement knowing it to be false or having entertained serious doubts about the truth of the statement. The key issues is the state of mind of the publisher at the time the statement was made.[42] In the trial court and in the first appeal of this matter, Robinson provided <u>no</u> evidence on KTRK's state of mind, instead just speculating about what KTRK might have known or believed. KTRK, on the other hand, introduced substantial evidence of the absence of actual malice (CR 36-38, 238-240, 241-243).

Robinson was also required to produce clear and specific evidence that the Complained of Statements in the broadcasts were *materially* false, which she was unable to do. The Court is required to look at what the broadcasts actually said, as a whole, in light of surrounding circumstances, and how a person of ordinary

---

[40] *WFAA v. McLemore*, 978 S.W.2d 568 (Tex. 1998), cert. denied, 119 S. Ct. 1358 (1999).
[41] Tex. Civ. Prac. & Rem. Code § 73.002.
[42] *Abdel Hazif v. ABC, Inc.,* 240 S.W.3d 492 (Tex. App.—Fort Worth 2007, pet. denied).

intelligence would perceive the entire broadcast series.[43]   In the absence of being able to demonstrate that the Complained of Statements were materially false, Robinson ignored the statements that were actually made by KTRK and instead constructed her own version of the broadcasts, distorting the statements with her own interpretations and conjecture.  Such interpretation is not controlling.[44]

Finally, as KTRK argued at the trial and appellate level, Robinson was not even mentioned in the Complained of Statements, and Robinson failed to demonstrate those statements were "of and concerning" her.[45]

In short, Robinson failed to demonstrate to the trial court, or to this Court in the first appeal, that she could succeed on the merits of her defamation *per se* claim, much less show clear and specific evidence to support each element of her claim, as required by the TCPA.   Robinson failed to establish that KTRK's statements were defamatory *per se* (or even *per quod*), did not establish material falsity of the Complained of Statements, did not establish that KTRK made the statements with actual malice, did not overcome the applicable privilege(s), and did not establish that the Complained of Statements were of and concerning Robinson.

---

[43] *See Musser v. Smith Protective Servs.*, 723 S.W.2d 653 (Tex. 1987).
[44] *Schauer v. Memorial Care Sys.*, 856 S.W.2d 437, 449 (Tex. App.—Hou. [1st Dist.] 1993, no writ); *Moore v. Waldrop*, 166 S.W.3d 380 (Tex. App.—Waco 2005, no pet.).
[45] *Huckabee v. Time Warner Entm't Co.*, 19 S.W.3d 413, 429 (Tex. 2000); *Newspapers, Inc. v. Matthews*, 339 S.W.2d 890, 893 (Tex. 1960).

After briefing and oral argument, this Court found that KTRK's Anti-SLAPP Motion should have been granted and ordered the trial court to dismiss the lawsuit. This Court correctly found that Robinson failed to adduce clear and specific evidence that the challenged statements were defamatory *per se,* and thus failed to establish a *prima facie* case for each essential elements of her claim, requiring dismissal pursuant to the Texas Citizens' Participation Act.

**C. The Trial Court Properly Awarded Attorneys' Fees, Costs, And Sanctions To KTRK; Its Order Doing So Does Not Raise Any Constitutional Questions; Robinson Waived Any Constitutional Challenge To The TCPA By Failing To Raise It At The Trial Court.**

Although the October 8, 2014 "Order and Final Judgment" dismissing the case with prejudice also awarded to KTRK attorneys' fees and sanctions in accordance with this Court's mandate, Robinson does not challenge the amount of attorney's fees or the methodology used to arrive at the fees. The only mention of fees or sanctions is in Robinson's "Issue 3" where she attempts to argue that the trial court's award of fees was "punitive" and in violation of open courts; such arguments are without merit and were waived because they were not raised at the trial court. Nevertheless, out of an abundance of caution, should this Court view Robinson's complaint as one attacking the amount of attorneys' fees, expenses, costs, or sanctions, KTRK provides briefing on that argument, as well.

1. **Robinson's Arguments that the Trial Court's Fee Award Was Punitive and in Violation of Open Courts Are Without Merit and Were Waived.**

Robinson argues that the fees award was punitive and violates the open courts provision of the Texas Constitution.[46] Robinson's assertions are without merit and have been waived. It is a prerequisite to presenting a complaint on appeal that the complaint was made to the trial court in a timely manner, and that the trial court ruled on the request, or refused to do so.[47] This is true even when the issue is a constitutional question.[48] Because Robinson did not make any constitutional challenge argument at the trial court level,[49] she has waived it, and it cannot be considered now. Robinson tried this same argument in her first appeal, and KTRK raised the issue of waiver then, as well. Robinson lost on this issue in her first appeal (because the Court dismissed the lawsuit pursuant to the TCPA). As discussed previously, all appeals of this Court's earlier Order have been exhausted and that Opinion – including its implicit denial of Robinson's argument on the constitutionality of the statue – is the law of the case.

Even if this Court were to find the constitutional issue has not been waived and reaches the merits of the question, the anti-SLAPP statute has already been

---

[46] Br. 14-16.
[47] *See* Tex. R. App. P. 33.1.
[48] *See Brewer v. Simental*, 268 S.W.3d 763, 767 (Tex. App.—Waco 2008, pet. denied) ("Constitutional violations must be raised in the trial court to be preserved for appellate review.").
[49] *See, generally,* Robinson's Response to Motion to Dismiss (absent any discussion of constitutionality).

22

held to be constitutional and not a violation of the open courts doctrine.[50]

Furthermore, a statute enacted by the Legislature is presumed to be constitutional and valid.[51] "[A] mere difference of opinion, where reasonable minds could differ, is not a sufficient basis for striking down legislation as arbitrary or unreasonable."[52]

In addition, there is no constitutional right to file a meritless defamation claim. If a plaintiff can establish *prima facie* evidence of each element of the claim, the case will not be dismissed. This is not an insurmountable standard. In fact, this sort of analysis and research on the validity of one's claim should have been done prior to filing suit. *See* Tex. R. Civ. P. 13. Courts throughout the state interpreting the statute have found a *prima facie* case was established in other cases and denied the relevant motions to dismiss.[53] Thus, the standard adopted by the Legislature is working.

Like Texas, other states considering the constitutionality of similar Anti-

---

[50] *Combined Law Enforcement Ass'ns. of Tex. v. Sheffield*, No. 03-13-105-CV, 11 2014 WL 411672 at *9 (Tex. App.—Austin Jan. 31, 2014, pet. denied)(mem. op.).

[51] *See Texas Pub. Bldg. Auth. v. Mattox*, 686 S.W.2d 924, 927 (Tex. 1985) ("We begin our analysis of the issues presented in this case by presuming, as we must, the constitutionality of an act of the Legislature.").

[52] *Sax v. Votteler*, 648 S.W.2d 661, 664 (Tex. 1983) (internal quotation marks and citation omitted).

[53] *See, e.g., Senator Jeff Wentworth v Elizabeth Ames Jones,* Cause No. 2012-CI-08201 (73rd Dist. Ct., Bexar Co., Tex. filed May 17, 2012) (motion to dismiss denied)(appeal dismissed by agreement).

SLAPP statutes have upheld their constitutionality.[54] In fact, California, the statute upon which Texas' statute was largely patterned after and a state that has had the benefit of 20 years of jurisprudence in this area, has repeatedly upheld the constitutionality of the law.[55] The Supreme Court of California, addressing this very concern, held that the Anti-SLAPP statute of that state "does not bar a plaintiff from litigating an action that arises out of the defendant's free speech or petitioning. It subjects to potential dismissal only those causes of action as to which the plaintiff is unable to show a probability of prevailing on the merits."[56] Finally, Robinson's argument that the TCPA is unconstitutional because it imposes higher standard of proof is also without merit. *See In re Lipsky*, 460 S.W.3d 579 (Tex. 2015)(finding clear and specific standard of TCPA is not heightened standard).

---

[54] *See, e.g., Equilon Enters. v. Consumer Cause, Inc.*, 52 P.3d 685, 691 (Cal. 2002). *See also Guam Greyhound v. Brizill*, No. CVA07-021, 2008 WL 4206682, \*3-6 (Guam Sept. 11, 2008) (rejecting argument that statute limited a right to bring a defamation claim); *Anderson Dev. Co. v. Tobias*, 116 P.3d 323, 338 (Utah 2005) (bill of attainder); *Sandholm v. Kuecker*, 942 N.E.2d 544, 570-71 (Ill. App. Ct. 2010) (finding that statute did not violate state constitution's guarantee to a remedy), rev'd on other grounds, 692 N.E. 2d 418 (Ill. 2012); *Nexus v. Swift*, 785 N.W.2d 771 (Minn. Ct. App. 2010) (addressing due process and right to jury trial); *Lee v. Pennington*, 830 So.2d 1037, 1041-43 (La. Ct. App. 2002) (rejecting arguments that anti-SLAPP statute violated open access to courts, jury trial and due process); *Day v. Farrell*, No. 97-2722, 2000 WL 33159180, at \*2-4 (R.I. May 15, 2000) (rejecting constitutional challenge to anti-SLAPP law based on access and due process); *Hometown Props., Inc. v. Fleming*, 680 A.2d 56, 60-64 (R.I. 1996) (addressing numerous challenges, including separation of powers and right of access); *Lafayette Morehouse, Inc. v. Chronicle Publ'g Co.*, 37 Cal. App. 4th 855, 864-68 (1995) (right of access).

[55] *See, e.g., Equilon Enters.*, 52 P.3d at 690-94; *Lafayette Morehouse, Inc. v. Chronicle Publ'g Co.*, 37 Cal. App. 4th 855 (1995) (right of access).

[56] *Equilon Enters.*, 52 P.3d at 691.

Robinson's challenge as it specifically relates to the fees provision has also been rejected by Texas courts. In *Combined Law Enforcement Ass'ns of Texas v. Sheffield*, the plaintiff argued that the TCPA's "mandatory (non-discretionary) fee awards and sanctions upon dismissal" unreasonably restricted a plaintiff's ability to pursue redress for defamation.[57] The Third Court of Appeals rejected the party's argument and held that the attorney's fees provision of the TCPA was not unconstitutional because, despite the mandatory nature of the language, "the subsequent language tempers the conditions for making an award with discretionary terms like 'justice' and 'equity' and 'sufficient to deter.'"[58] Thus, the provision did not violate the open courts guarantee.[59]

## 2. The Trial Court's Award of Fees, Costs, Expenses, and Sanctions Was in Accordance with the TCPA.

The Mandate of this Court in No. 01-12-00372-CV on March 14, 2014 clearly ordered the trial court on remand to:

> dismiss the case, to award court costs, reasonable attorney's fees, and other expenses incurred in defending against the legal action as justice and equity may require to the appellant, KTRK Television, Inc., and to award sanctions against the appellee, Theaola Robinson, as the court determines sufficient to deter her from bringing similar actions, as required by section 27.009(a) of the Civil Practice and Remedies Code.

---

[57] *Combined Law Enforcement Ass'ns of Tex. v. Sheffield*, No. 03-13-105-CV, 11 2014 WL 411672, at *9 (Tex. App.—Austin Jan. 31, 2014, pet. denied)(mem. op.).
[58] *Id.* at *19.
[59] *Id.*

CR 469.

As stated in the Mandate, Section 27.009(a) of the TCPA states that the trial court shall award court costs, reasonable attorney's fees, and other expenses to the movant incurred in defending against the legal action as justice and equity may require. KTRK's Motion, and its subsequent Amended Motion, not only provided extensive evidence of its requested fees, but offered extensive authority to the trial court as to the attorney's fees, costs, and expenses that had been previously awarded by other district courts in Texas in accordance with the TCPA. CR 309; 2nd CR ___.

A successful anti-SLAPP movant should submit evidentiary proof of the attorney's fees that includes: '(1) the nature of the work, (2) who performed the services and their rate, (3) approximately when the services were performed, and (4) the number of hours worked.'[60] In *Schimmel v. McGregor*, this Court held the

---

[60] *Schimmel v. McGregor* 438 S.W.3d 847, 863 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (quoting *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 763 (Tex. 2012)). Reasonableness can also be established by demonstrating: '(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly; (2) the likelihood . . . that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.' *Weaver v. Jamar*, 383 S.W.3d 805, 813–14 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (quoting *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997)). The movant, however, need not present evidence on each of these factors as "[t]he trial court may also consider the entire record, the evidence presented on reasonableness, the amount in controversy, the common knowledge of the participants as lawyers

affidavit evidence submitted by Schimmel stating "the date on which work was performed, the number of hours spent, the particular tasks involved, and the applicable billing rate" sufficiently established reasonable attorney's fees.[61]  On appeal, when a denial of an anti-SLAPP motion is reversed, this court (and most of the appellate courts in Texas), typically have remanded the case to the trial court for a determination of attorney's fees.[62]

Courts throughout Texas have awarded attorney's fees as appropriate and reasonable in anti-SLAPP cases.  The reported fee awards have ranged from zero to $350,000.[63]  The largest award to date has been from a Harris County court in the 127th District Court wherein the court awarded $350,000 in attorney's fees to the defendant–movant after less than a year in the trial court and without any appellate fees.[64]  The tortured four year history of this case is even more extensive and would anticipate similar fees.  Likewise, in Harrison County, the district court awarded a total of $187,310.32 to the defendants and a total of $55,000 in

---

and judges, and the relative success of the parties." *Id.* (citing *Rapid Settlements, Ltd. v. Settlement Funding, LLC*, 358 S.W.3d 777, 786 (Tex. App.—Houston [14th Dist.] 2012, no pet.)); *see Acad. Corp. v. Interior Buildout & Turnkey Constr., Inc.*, 21 S.W.3d 732, 742 (Tex. App.—Houston [14th Dist.] 2000, no pet.).

[61] *Schimmel*, 438 S.W.3d at 863.

[62] *See, e.g.*, *James v. Calkins*, 446 S.W.3d 135, 139–40 (Tex. App.—Houston [1st Dist.] 2014, pet. granted); *Schimmel*, 438 S.W.3d at 862; *Newspaper Holdings, Inc. v. Crazy Hotel Assisted Living, Ltd.*, 416 S.W.3d 71, 90 (Tex. App.—Houston [1st Dist.] 2013, pet. denied); *Better Bus. Bureau of Metro. Hous., Inc. v. John Moore Servs., Inc.*, 441 S.W.3d 345, 350 (Tex. App.— Houston [1st Dist.] 2013, pet. denied).

[63] *See, e.g.*, *Schlumberger Ltd. v. Rutherford*, No. 01-14-00776-CV (Tex. App.—Houston [1st Dist.] Aug. 25, 2015, no pet. h.) (upholding trial court's granting of a motion to dismiss and subsequent award to the defendants of $350,000 in attorney's fees)

[64] *Id.*

sanctions after granting the defendants' anti-SLAPP motions.[65] Texas appellate courts consistently have upheld reasonable fee awards in anti-SLAPP matters.[66]

An award of sanctions is also provided for under the TCPA.[67] Sanctions can be particularly appropriate when, as here, the plaintiff has shown a propensity for retaliating against individuals, corporations, or the media for exercising their constitutional rights and has clearly shown an intention to harass *via* the court system.[68] To deter plaintiffs from filing retaliatory legal actions, sanctions sufficient to deter a plaintiff from filing similar claims are appropriate under § 27.009 and may be levied against the party personally, not the plaintiff's attorney.[69] Under the TCPA, courts have "broad discretion to determine what amount is sufficient to deter the party from bringing similar actions in the future".[70] In *Kinney v. BCG Attorney Search, Inc.*, an award of $75,000 in sanctions was upheld because the matters had previously been litigated in a prior action that

---

[65] *Head v. Chicory Media, LLC*, No. 2013-0040 (714st Dist. Ct., Harrison County, Tex. Sept. 25, 2013), *appeal dism'd*, 415 S.W.3d 559 (Tex. App.—Texarkana 2013, no pet.).
[66] *See, e.g., Am. Heritage Capital, LP v. Gonzalez*, 436 S.W.3d 865, 880–81 (Tex. App.—Dallas 2014, no pet.); *Rehak Creative Servs., Inc. v. Witt*, 404 S.W.3d 716, 734 (Tex. App.—Houston [14th Dist.] 2013, pet. denied); *Ramsey v. Lynch*, No. 10-12-00198-CV, 2013 WL 1846886, at *3 (Tex. App.—Waco May 2, 2013, no pet.) (mem. op.).
[67] Tex. Civ. Prac. & Rem. Code Ann. § 27.009(a)(2).
[68] *Id.*; *see, e.g., Kinney v. BCG Attorney Search, Inc.*, No. 03-12-00579-CV, 2014 WL 1432012, at *11 (Tex. App.—Austin Apr. 11, 2014, pet. denied) (mem. op.) ("Section 27.009(a)(2) requires the trial court to award sanctions if it dismisses a claim pursuant to section 27.003 and gives the trial court broad discretion to determine what amount is sufficient to deter the party from bringing similar actions in the future.").
[69] Tex. Civ. Prac. & Rem. Code § 27.009(a)(2).
[70] *Kinney*, 2014 WL 1432012, at *12 (upholding a sanctions award of $75,000 based in part on "the broad discretion afforded the trial court by section 27.009").

"resulted in an award of attorney's fees against [the plaintiff] in the amount of $45,000."[71] The appellate court noted that "[g]iven the history of the litigation, the trial court could have reasonably determined that a lesser sanction would not have served the purpose of deterrence."[72] Courts considering the appropriate amount of sanctions under the statute have awarded between $100 and $350,000.[73] Depending upon the tactics employed by the plaintiff, any un-recoupable expenses incurred (such as expenses from prior proceedings), and the need for a deterrent effect, a trial court may award a higher amount.[74] Although some trial courts ultimately have denied requests for sanctions,[75] all appellate courts to address the issue have determined that the consideration of sanctions is mandatory.[76] Here, the

[71] *Id.*

[72] *Id.*

[73] *See Am. Heritage Capital,* 436 S.W.3d at 880-81 (upholding an award of $15,000 in sanctions); *Schlumberger Ltd. v. Rutherford*, No. 01-14-00776-CV (Tex. App.—Houston [1st Dist.] August 25, 2015, no pet. h.) (upheld award of $350,000 in sanctions); *Simpton v. High Plains Broad., Inc.*, No. 2011-13290 (285th Dist. Ct., Bexar County, Tex. July 30, 2012) (awarding $85,000 in sanctions); *Head v. Chicory Media, LLC,* No. 2013-0040 (714st Dist. Ct., Harrison County, Tex. Sept. 25, 2013) (awarding a total of $55,000 in sanctions), *appeal dismissed*, 415 S.W.3d 559 (Tex. App.—Texarkana 2013, no pet.); *Algae Int'l Grp., Inc. v. Stegman*, No. DC-13-03933 (44th Dist. Ct., Dallas County, Tex. Sept. 13, 2013) (awarding $29,395.25 in sanctions to the defendants after a nonsuit was filed prior to a hearing on the defendants' motion to dismiss); *In re Thuesen*, No. 2012-49262 (151st Dist. Ct., Harris County, Tex. Mar. 4, 2013), *appeal docketed*, No. 14-13-00523-CV (Tex. App.—Houston [14th Dist.]) (awarding $24,000 in sanctions); *Rustic Cedar Cabins Inc. v. Cortell*, No. 28500 (21st Dist. Ct., Bastrop County, Tex. Sept. 5, 2012) (awarding $500 in sanctions).

[74] *Schlumberger Ltd. v. Rutherford,* No. 01-14-00776-CV (Tex. App.—Houston [1st Dist.] Aug. 25, 2015, no pet. h.) (awarding $250,000 in sanctions after only several months on file).

[75] *Cruz v. Van Sickle*, 452 S.W.3d 503, 519 (Tex. App.—Dallas 2014, pet. denied) (noting that "[t]he trial court denied appellees' request for sanctions pursuant to section 27.009(2)").

[76] *See Am. Heritage Capital, LP*, 436 S.W.3d at 881 ("Section 27.009 prescribes that a court that dismisses a legal action under Chapter 27 shall award the movant 'sanctions against the party who brought the legal action as the court determines sufficient to deter the party who brought the

trial court awarded KTRK $100 in sanctions, which is hardly an abuse of discretion.

### 3. The Trial Court's Award of Fees, Costs, Expenses, and Sanctions Was in Accordance with the Mandate of This Court.

After the mandate was issued, KTRK proceeded to finalize the case in accordance with this Court's mandate by filing its Motion and Brief in Support of Award of Award Of Attorneys' Fees, Court Costs, Expenses, And Sanctions And For Entry Of Final Judgment Pursuant To Chapter 27 Of The Civil Practice And Remedies Code ("Motion"), and setting the Motion for oral hearing. CR 309. In its Motion, KTRK provided extensive evidence of attorney's fees incurred, as well as authority, in accordance with the requirements of *Arthur Andersen & Co. v. Perry Equip. Corp.,* 945 S.W.2d 812, 818 (Tex. 1997). This included uncontroverted evidence of KTRK's reasonable and necessary attorney's fees, costs and expenses that were incurred in defending against Robinson's claims and causes of action for three years of litigation and appeals, including all billing statements (from two consecutive law firms), and an affidavit from the lead attorney attesting to the amount of the fees and their necessity, in addition to the qualifications of the attorneys involved and a summary of the case history for the benefit of the trial court. Six weeks after filing its Motion, and prior to the hearing

---

legal action from bringing similar actions described in this chapter.'" (quoting Tex. Civ. Prac. & Rem. Code Ann. § 27.009(a)(2)).

30

on the Motion, KTRK filed its Supplemental Affidavit, which contained final fees and costs pertaining to KTRK's defense, including those final costs and fees involved in preparing for the hearing and responding to Robinson's final filings. 2nd CR __. The trial court order issued was consistent with the evidence presented to it.

The reasonableness of a fee can be established as a matter of law where clear, direct, and uncontroverted evidence is submitted and the opposing party fails to disprove the testimony despite having the opportunity to do so. *Cleveland* v. *Taylor,* 397 S.W.3d 683, 701 (Tex. App.—Houston [1st Dist.] 2012, pet. denied). At the hearing on attorney's fees, for which Robinson had six weeks prior notice, Robinson failed to submit or provide any controverting evidence regarding KTRK's Motion. Further, at the oral hearing on the Motion, at which Robinson was present and purported to appear *pro se,* but at which her prior trial counsel appeared and argued on her behalf (despite previous strenuous attestations that she was *pro se),* Robinson (and her counsel) offered <u>no argument or evidence</u> in contravention of KTRK's requested fees.[77]

---

[77] *See* CR 557, 607, 609. Although Mr. Bowen filed a Motion to Withdraw in the trial court prior to the hearing on attorney's fees, Bowen was present at the hearing on attorney's fees and proceeded to represent Robinson, seemingly at Robinson's behest. CR 545. Because Bowen had failed to set a hearing on his Motion to Withdraw in accordance with the Harris County Local Rules, the trial court allowed him to proceed on Robinson's behalf. After the trial court issued its order on fees and final judgment, and one day <u>after</u> Robinson filed a *pro se* Notice of Appeal, Bowen filed a Motion for New Trial with the trial court which was overruled by operation of law. CR 553, 609, 612.

## PRAYER

For the above reasons, KTRK moves the Court to uphold its prior Opinion in this matter and affirm the October 8, 2014 Order of the trial court, reject Robinson's appeal, and/or to dismiss Robinson's appeal because this Court does not have jurisdiction to hear this appeal and/or in accordance with Tex. R. App. P. 42.3(c) because Robinson has failed to comply with the Rules of Appellate Procedure.

Respectfully Submitted,

HAYNES AND BOONE, LLP

/s/ Laura Lee Prather
Laura Lee Prather
State Bar No. 16234200
Laura.prather@haynesboone.com
Catherine Lewis Robb
State Bar No. 24007924
Catherine.robb@haynesboone.com
600 Congress Avenue, Suite 1300
Austin, Texas 78701
Telephone:    (512) 867-8400
Facsimile:    (512) 867-8470

COUNSEL FOR KTRK TELEVISION,
INC., APPELLEE

## CERTIFICATE OF COMPLIANCE

I certify that this document was produced on a computer using Microsoft Word 2010 and contains 11,858 words, as determined by the computer software's word-count function, excluding the sections of the document listed in Texas Rule of Appellate Procedure 9.4(i)(1).

/s/ Laura Lee Prather
Laura Lee Prather

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on the following parties this the 25th day of September, 2015 via certified mail, return receipt requested:

Theaola Robinson
5505 Jensen Drive
Houston, Texas 77026

/s/ Laura Lee Prather
Laura Lee Prather

# APPENDIX

Pursuant to Texas Rules of Appellate Procedure 38.1(k)(1)(A) and 38.2(a)(2), Appellee attaches the following items to its Appendix:

|  | **TAB** |
|---|---|
| Notice of Appeal filed on October 30, 2014 | A |
| Final Judgment and Order on Attorney's Fees in *Robinson v. KTRK*, No: 2011-54895, (234th Dist. Ct., Harris County, Tex., October 8, 2014) | B |
| Opinion of the First Court of Appeals in No. 01-12-00372-CV, *KTRK v. Robinson*, 409 S.W.3d 682 (Tex. App.—Houston [1st Dist.] 2013 reh'g overruled, pet. denied) | C |
| Mandate of the First Court of Appeals in No. 01-12-00372-CV, *KTRK v. Robinson* | D |
| Notice from the First Court of Appeals in No. 01-12-00372-CV, *KTRK v. Robinson,* of the denial of Appellant's Motion for Rehearing | E |
| Notices from the Supreme Court of Texas in No. 13-0809, *KTRK v. Robinson,* of the denial of Robinson's Petition for Review and Motion for Rehearing on Petition for Review | F |
| Notices from the Supreme Court of Texas in No. 14-0321, *In Re Robinson*, of the denials of Robinson's Petition for Writ of Mandamus and Motion for Rehearing on Petition for Writ of Mandamus | G |
| Appellee KTRK Television, Inc.'s Motion to Dismiss Appellant's Appeal and Request to Declare Appellant Robinson A Vexatious Litigant, filed in No. 01-14-008800-CV | H |

Original Complaint in *Theaola Robinson v. The Walt Disney Company*, Cause No. 4-11-CV- 0358, in the Southern District of Texas, Houston Division — I

Motion for Leave to Amend and Supplement Complaint in *Shenitha Comb, et al. v. Rick Schneider, et al.*, Cause No. 4-10-CV-03498, in the Southern District of Texas, Houston Division — J

Nonparty KTRK Television, Inc.'s Opposition to Plaintiffs' Motion for Leave to Amend and Supplement Complaint in Cause No. 4-10-CV-03498 — K

Notice of Dismissal in Cause No. 4-11-CV-0358 — L

Memorandum and Order in Cause No. 4-10-CV-03498 — M

First Amended Original Petition in Cause No. 2011-54895 — N

Appellee's Motion to Dismiss For Lack of Jurisdiction, in No. 01-12-00372-CV — O

Order of February 22, 2013 in No. 01-12-00372-CV — P

Notice of Hearing in Cause No. 2011-54895 — Q

Supplemental Affidavit on Attorney's Fees in Cause No. 2011-54895 — R

Plaintiff's Response to Motion to Dismiss in No. 2011-54895 — S

Brief of Appellant KTRK Television, Inc. No. 01-12-00372-CV — T

Appellant's Brief in Reply in No. 01-12-00372-CV — U

Appellant's Response to Appellee's Motion to Dismiss for Lack of Jurisdiction in No. 01-12-00372-CV — V

Defendant KTRK Television Inc.'s Motion to Dismiss Pursuant to Tex. Civ. Prac. & Rem. Code Chapter 27 Anti-SLAPP Motion in Cause No. 2011-54895 — W

# APPENDIX TAB A:
Notice of Appeal filed on
October 30, 2014

CONFIRMED FILE DATE: 10/30/2014

CAUSE NO. 201154894 5

| | | |
|---|---|---|
| THEAOLA ROBINSON | § | IN THE DISTRICT COURT OF |
| | § | |
| | § | HARRIS COUNTY, TEXAS |
| | § | |
| | § | 234TH JUDICIAL DISTRICT |
| v. | § | |
| | § | |
| THE WALT DISNEY COMPANY; ABC | § | |
| TELEVISION NETWORK, INC.; CC | § | |
| TEXAS HOLDING CO., INC.; and | § | |
| KTRK TELEVISION, INC. | § | |

**NOTICE OF APPEAL**

Pursuant to Texas Rule of Appellate Procedure 25.1, Theaola Robinson, Plaintiff in the above-styled and numbered action, files this notice of appeal to Fourteenth Court of Appeals. Plaintiff desire to appeal from the judgment rendered against Plaintiff by the 234th Judicial District Court of Harris County, Texas on October 8, 2014.

Dated: October 28, 2014.

Respectfully submitted,

_____/s/_____
Theaola Robinson
5505 Jensen Drive
Houston, Texas 77028
832-250-4444
benji's@wt.net

**FILED**
Chris Daniel
District Clerk

OCT 3 0 2014
Time:_____ 9:00 AM
Harris County, Texas
By_____ JCL
Deputy

7

## CERTIFICATE OF SERVICE

In accordance with the Texas Rules of Appellate Procedure I certify that a copy of this Notice of Appeal was served on Respondent KTRK Channel 13 through counsel of record, Laura Lee Prather of Haynes & Boone by US. Mail certified mail, via email, and facsimile on October 28, 2014.

Laura Lee Prather
State Bar No. 16234200

Catherine Lewis Robb
State Bar No. 24007924
Haynes and Boone LLP

600 Congress Avenue, Suite 1300
Austin, Texas 78701
Telephone: (512) 867-8400
Facsimile: (512) 867-8470
Email: laura.prather@haynesboone.com

Respectfully submitted,

_____/s/_____
**Theaola Robinson**
**5505 Jensen Drive**
**Houston, Texas 77028**
**832-250-4444**
**benji's@wt.net**

8

# APPENDIX TAB B:
Final Judgment and Order on Attorney's Fees in *Robinson v. KTRK*, No: 2011-54895, (234th Dist. Ct., Harris County, Tex., October 8, 2014)

8/14/2014 5:58:21 PM
Chris Daniel - District Clerk
Harris County
Envelope No: 2167749
By: CORNETT, LAWANDA

CAUSE NO. 2011-54895

*P-3*

*86*

| THEAOLA ROBINSON, | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| THE WALT DISNEY COMPANY; | § | *ATFEX* |
| CC TEXAS HOLDING CO., INC.; and, | § | *SANCX* |
| KTRK TELEVISION, INC. | § | |
| | § | |
| Defendants. | § | 234TH JUDICIAL DISTRICT |

## ORDER AND FINAL JUDGMENT

On this day, came to be considered Defendant KTRK Television, Inc.'s ("KTRK") Motion and Brief In Support Of Award Of Attorneys' Fees, Court Costs, Expenses, And Sanctions And For Entry Of Final Judgment Pursuant To Chapter 27 Of The Civil Practice And Remedies Code. The Court having considered the Motion, the Plaintiff's response thereto, if any, the arguments of counsel, if any, and the pleadings on file, is of the opinion that the Motion is well taken and should be GRANTED in its entirety. It is therefore,

ORDERED, ADJUDGED AND DECREED that Defendant KTRK's Motion and Brief In Support Of Award Of Attorneys' Fees, Court Costs, Expenses, And Sanctions And For Entry Of Final Judgment Pursuant To Chapter 27 Of The Civil Practice And Remedies Code, be and is hereby GRANTED in ~~its entirety~~. It is further;

ORDERED, ADJUDGED AND DECREED that the Affidavit of Laura Prather, attached to the Motion as Exhibit A, and that the Exhibit No. A-1 attached to such affidavit are hereby ADMITTED into evidence in their entirety. It is further,

ORDERED, ADJUDGED AND DECREED that Defendant KTRK recover from Plaintiff Theaola Robinson for such amounts:

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging 4

*PC/1-1*

1. $251,689.29 for attorneys' fees, an amount which the Court finds to be reasonable and necessary based on the evidence admitted and considered in this cause;

2. $3895.80 for expenses, an amount which this Court finds to be reasonable and necessary based on the evidence admitted and considered in this cause; and

3. $3133.33 in court costs. It is further,

ORDERED, ADJUDGED AND DECREED that Defendant KTRK recover from Plaintiff Theaola Robinson $100.00 in sanctions under Civil Practice and Remedies Code §27.009(a)(2), an amount which, based on the evidence admitted and considered in this case, the Court finds to be sufficient and necessary to deter Plaintiff from bringing similar actions described by Chapter 27 of the Texas Civil Practice and Remedies Code. It is further,

ORDERED, ADJUDGED AND DECREED that Plaintiff shall pay post-judgment interest on all of the above at the rate of 5%, compounded annually, from the date this judgment is entered until all amounts are paid in full. It is further,

ORDERED, ADJUDGED AND DECREED that if Plaintiff unsuccessfully appeals this judgment to an intermediate court of appeals, Defendant will additionally recover from Plaintiff the amount of $25,000, representing the anticipated reasonably and necessary fees and expenses that would be incurred by Defendant in defending the appeal. It is further,

ORDERED, ADJUDGED AND DECREED that if Plaintiff unsuccessfully appeals this judgment to the Texas Supreme Court, Defendant will additionally recover from Plaintiff the amount of $25,000, representing the anticipated reasonably and necessary fees and expenses that would be incurred by Defendant in defending the appeal. It is further,

2

ORDERED, ADJUDGED AND DECREED that Plaintiff Theaola Robinson TAKE NOTHING on her claims against Defendant KTRK, and that all such claims are hereby DISMISSED WITH PREJUDICE.

THIS IS A FINAL JUDGMENT. ALL RELIEF NOT EXPRESSLY GRANTED HEREIN IS DENIED.

The Court orders execution to issue for this judgment.

SIGNED this ___8___ day of __October__ , 2014

OCT - 8 2014

_____
JUDGE PRESIDING

3

6

APPENDIX TAB C:
Opinion of the First Court of Appeals in No. 01-12-00372-CV, *KTRK v. Robinson*, 409 S.W.3d 682 (Tex. App.—Houston [1st Dist.] 2013 reh'g overruled, pet. denied)

Opinion issued July 11, 2013



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-12-00372-CV

_____

**KTRK TELEVISION, INC., Appellant**

**V.**

**THEAOLA ROBINSON, Appellee**

On Appeal from the 234th District Court
Harris County, Texas
Trial Court Case No. 2011-54895

## OPINION

Following a series of news reports by KTRK Television, Inc. alleging financial mismanagement, Benji's Special Education Academy ("BSEA"), a charter school, and Theaola Robinson sued KTRK. KTRK moved to dismiss the action pursuant to the then-recently enacted Texas Citizens Participation Act

("TCPA").[1] In a written order, the trial court denied the motion. In five issues, KTRK contends that the trial court erred in denying KTRK's motion to dismiss. In her brief, the school's former director and superintendent, Robinson, also challenges this Court's jurisdiction to consider KTRK's appeal.[2] We hold that we have jurisdiction over this appeal, that the trial court erred by denying KTRK's motion to dismiss, and we reverse.

## Background

### A. The Charter School

In May 1980, Robinson founded BSEA, a non-profit corporation, to provide a day care and education for special needs children ("Benji's"). In November 1998, the Texas State Board of Education ("SBOE") granted BSEA a charter to operate Benji's as an open-enrollment, publicly funded pre-K through twelfth grade charter school.[3] As such, compliance with the laws governing public schools was required.

---

[1] See TEX. CIV. PRAC. & REM. CODE ANN. §§ 27.001-.011 (West Supp. 2012).

[2] BSEA is no longer a party to this case.

[3] The original plaintiffs in this suit were BSEA, the non-profit corporation that ran the charter school, and Robinson. Although both the school and the corporation use the name "Benji's" or "Benji's Special Education Academy," Benji's (the school) was never a plaintiff. Robinson amended her petition and dropped BSEA from the case, leaving Robinson as the sole plaintiff. As a result, Robinson is the sole appellee.

By the mid-2000s, Benji's enrollment had increased nearly five-fold and, on behalf of BSEA, Robinson applied for a renewal of the charter to the Texas Education Agency ("TEA") in April 2003. The TEA refused action on the application, however, pending resolution of BSEA's growing list of problems. Indeed, five years later, the renewal application was still pending and, in December 2008, the TEA informed Robinson that it would remain pending until resolution of BSEA's problems in the following areas: financial management, academic performance, performance-based monitoring activities, audit requirements, and special education laws and policies.

By letter dated July 8, 2010, TEA Commissioner Robert Scott notified Robinson that in light of longstanding academic, governance, and financial concerns, and despite numerous agency investigations and interventions, the TEA intended to appoint a Board of Managers and a new Superintendent for the school. Following a hearing on August 19, 2010, Robinson and Benji's board of directors were notified on September 3, 2010, that the TEA would proceed to appoint a Board of Managers and Superintendent, which appointments effectively suspended any and all prior grants of authority to the former board of directors and Robinson.

On September 16, 2010, after the TEA had learned of the extent of the financial problems at Benji's, it issued an Order Suspending Charter Operations and Funds, stating, in relevant part, as follows:

3

[The urgent financial conditions at Benji's were not] known either to the board of managers or to the new superintendent when they met on September 6, 2010. Rather, the information leading to the conclusion that an urgent financial condition may exist at the charter school was disclosed by painstaking effort to assemble and evaluate information that had not been viewed by the former administration as indicating such a conclusion. Subsequent events have made plain that the former administration continues to maintain that there was and is no urgent financial condition presented by these facts.

The newly appointed Superintendent advised the parents by letter of the immediate suspension of the school's operations. The letter cited the school's critical cash flow problem, which included a virtually depleted bank account and numerous outstanding debts (including one to the Internal Revenue Service), as the reason that "the school cannot continue to operate as it does not have the necessary funds to pay its staff members or meet its current financial obligations."

Despite having been relieved of her duties as superintendent, Robinson directed staff to continue reporting to work as usual and asked parents to continue sending their children to school. Robinson also conducted a televised press conference at which she stated that she would not allow the new superintendent to carry out the TEA's decision and that the school would remain open despite the board's decision. Notwithstanding the State-mandated closure, on September 15, 2010, Robinson re-opened Benji's as an unaccredited private school using the same public school property and buses.

4

The next day, TEA Commissioner Scott ordered the immediate suspension of all of Benji's funding as well as its open-enrollment charter. Commissioner Scott subsequently sent a letter to Robinson and BSEA's board outlining the various grounds for revoking Benji's charter, including its "failure to satisfy generally accepted accounting standards of fiscal management." The letter detailed examples of the school's fiscal mismanagement, which had resulted in significant wasting of financial resources. Examples of Benji's financial problems while under Robinson's direction included the following:

(1) BSEA was the subject of a warrant hold following its nonpayment to the Teachers Retirement System in the amount of $43,000 for retirement contributions and $13,000 in health coverage;

(2) The Department of Agriculture cancelled BSEA's participation in child nutrition programs because of BSEA's failure to demonstrate fiscal responsibility;

(3) BSEA owed a debt of $87,000 to the IRS in unpaid taxes;

(4) BSEA's board failed to oversee or adequately supervise its financial resources; and

(5) BSEA had been in poor financial condition for many years.

In his letter, the TEA Commissioner also noted the irregularities in Benji's rental arrangement and payments: BSEA leased the property from the City of Houston for $1 per year and re-leased this same property to Benji's for $9,000 per month, an arrangement for which the City had never given its permission.

5

## B. KTRK's Statements at Issue

A public outcry ensued over the charter revocation and the school's closing. Several local media outlets—including KTRK—broadcast and posted numerous reports about the ongoing controversy. KTRK's reports included the following statements upon which Robinson bases her defamation claim:

(1) "According to the State[,] millions in taxpayer dollars cannot be accounted for" and "[t]he State closure is based on a lack of sufficient financial records, meaning the State doesn't know where over three million dollars of taxpayer money given last year has been spent." (4:30 p.m., September 15, 2010 broadcast)[4]

(2) "For the State, the issue is simple—where is the money? They say millions of taxpayer dollars are unaccounted for . . . The State closure is based on a lack of sufficient financial records, meaning the State doesn't know where the more than $3 million of taxpayer money given last year has been spent . . . ." (September 15, 2010 article published on KTRK's website)

(3) "Where is taxpayer money going and how is a taxpayer-owned building being used? . . . The Texas Education Agency says it doesn't know how Benji's spent $3 million of taxpayer money, and a lease agreement obtained by Eyewitness News raises even new questions." (September 25, 2010 article published on KTRK's website)

(4) "The Texas Education Agency doesn't know how the academy spent $3 million of state money." (September 27, 2010 article published on KTRK's website)

(5) "The [S]tate says it had no choice, alleging Benji's did not provide proper financial records to account for over $3 million in state

---

[4] As an exhibit to its Motion to Dismiss, KTRK attached the affidavit of KTRK reporter Cynthia Cisneros. In her affidavit, Cisneros states "I was [] informed by the TEA that Benji's had received $3.3 million in 2009-2010."

6

funding for the past year." (September 30, 2010 article published on KTRKs website)

(6) "On September 14, the TEA ordered Benji's Academy to close, citing millions of dollars in State funding that was not accounted for." (October 11, 2010 article published on KTRK's website)

## C. Trial Court Proceedings

On September 14, 2011, Robinson and BSEA sued KTRK for defamation.[5]

On December 21, 2011, KTRK filed a motion to dismiss under the TCPA. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 27.001-.011 (West Supp. 2012). KTRK argued that it was entitled to dismissal because (1) plaintiffs' claim was based on, related to, or in response to KTRK's exercise of its right of free speech, and (2) plaintiffs could not establish by clear and specific evidence a prima facie case for each essential element of their case. Robinson filed a response.[6] Both parties attached affidavits and other evidence to their pleadings.

The trial court conducted a hearing on February 13, 2012. On February 23, 2012, the trial court entered an amended order denying KTRK's motion to dismiss. On February 29, 2012, KTRK filed its request for findings and conclusions regarding the court's denial of its motion to dismiss. On March 20, 2012, the trial

---

[5] Robinson originally filed this suit against KTRK's parent company, The Walt Disney Company, in federal court. After the suit was dismissed, Robinson attempted to add Disney and KTRK to a federal lawsuit against the TEA in which she had joined. The federal court denied leave to add Disney and KTRK as defendants in the federal action.

[6] BSEA was no longer a plaintiff in the case.

7

court issued its "Findings of Fact In Connection with CPRC §27.007." KTRK timely appealed.

## Discussion

### A. Appellate Jurisdiction

As a threshold matter, we address Robinson's contention that we do not have jurisdiction over this interlocutory appeal. *See Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 228 (Tex. 2004) ("[A] court must not proceed on the merits of a case until legitimate challenges to its jurisdiction have been decided.") Generally, courts of appeals have jurisdiction only over appeals from final judgments. *Lehmann v. Har–Con Corp.*, 39 S.W.3d 191, 195 (Tex. 2001). Further, appellate courts have jurisdiction over interlocutory orders only when that authority is explicitly granted by statute. *Tex. A & M Univ. Sys. v. Koseogtu*, 233 S.W.3d 835, 840 (Tex. 2007). Statutes authorizing interlocutory appeals are strictly construed because they are a narrow exception to the general rule that interlocutory orders are not immediately appealable. *CMH Homes v. Perez*, 340 S.W.3d 444, 447 (Tex. 2011).

Section 27.008 of the TCPA, entitled "Appeal," provides:

> (a) If a court does not rule on a motion to dismiss under Section 27.003 in the time prescribed by Section 27.005, the motion is considered to have been denied by operation of law and the moving party may appeal.

(b) An appellate court shall expedite an appeal or other writ, whether interlocutory or not, from a trial court's order on a motion to dismiss a legal action under Section 27.003 or from a trial court's failure to rule on that motion in the time prescribed by Section 27.005.

(c) An appeal or other writ under this section must be filed on or before the 60th day after the date the trial court's order is signed or the time prescribed by Section 27.005 expires, as applicable.

TEX. CIV. PRAC. & REM. CODE ANN. § 27.008.

Robinson relies on the Fort Worth Court of Appeals's decision in *Jennings v. Wallbuilders Presentations, Inc.* to argue that although section 27.008(a) authorizes an interlocutory appeal when a movant's motion to dismiss is denied by operation of law, the TCPA does not authorize an interlocutory appeal of a trial court's signed order denying a motion to dismiss. *See Jennings*, 378 S.W.3d 519, 524–27 (Tex. App.—Fort Worth 2012, pet. filed). There, the court held that the language in the TCPA conferred jurisdiction to review a decision under the TCPA, but only if the motion is denied by operation of law, and not if the trial court signs an order denying the motion. *See id.* at 526–27. The *Jennings* court concluded that the legislature intended to ensure that a court would review and rule on the motion, but not that its ruling would be subject to appellate review. *See id.* at 527.

Since *Jennings*, several other courts of appeals have considered the issue. In *Direct Commercial Funding, Inc. v. Beacon Hill Estates, LLC*, the Fourteenth Court of Appeals declined to follow *Jennings*. *See* No. 14–12–00896–CV, 2013

WL 407029 (Tex. App.—Houston [14th Dist.] Jan. 24, 2013, order). The *Beacon Hill Estates* court noted that section 27.008(b) requires an appellate court to "expedite an appeal or other writ, whether interlocutory or not, from a trial court order on a motion to dismiss . . . or from a trial court's failure to rule." *Id.* at *3. The court reasoned that "[i]f no interlocutory appeal is available when the trial court expressly rules on a motion to dismiss by signing an order, then the phrase 'from a trial court order on a motion to dismiss' appearing after the phrase 'whether interlocutory or not' is rendered meaningless." *Id.* The court further concluded the most natural reading of the phrase "whether interlocutory or not" is to read it as modifying both of the subsequent references to "a trial court order" and "a trial court's failure to rule." *Id.* Finally, the court noted that section 27.008(c) states an appeal "must be filed on or before the 60th day after the date the trial court's order is signed or the time prescribed by section 27.005 expires, as applicable." *Id.* at *4. The court concluded that "[i]f no signed order can be the subject of an interlocutory appeal, then the reference to the date on which 'the trial court's order is signed' also is superfluous." *Id.* The Fifth and Thirteenth Courts of Appeals have since adopted the Fourteenth Court of Appeals's interpretation of section 27.008. *See Better Bus. Bureau of Metro. Dallas, Inc. v. BH DFW, Inc.,* \_\_ S.W.3d \_\_, No. 05-12-00587-CV, 2013 WL 2077636, at *6 (Tex. App.—Dallas May 15, 2013, no pet. h.) (finding reasoning of Fourteenth Court of Appeals

10

persuasive and concluding that it had jurisdiction under TCPA over interlocutory appeal of trial court's order denying defendant's motion to dismiss); *San Jacinto Title Svcs., LLC v. Kingsley Props., LP.*, __ S.W.3d __, No. 13-12-00352-CV, 2013 WL 1786632, at *4 (Tex. App.—Corpus Christi Apr. 25, 2013, no pet. h.) (agreeing with Fourteenth Court of Appeals that to conclude that no signed order can be subject of interlocutory appeal would render portions of section 27.008(b) and (c) meaningless).

We agree with the Fourteenth Court of Appeals's reasoning in *Beacon Hill Estates*. We conclude that section 27.008 permits an interlocutory appeal from the trial court's written order denying a motion to dismiss under the TCPA.

## B. Application of the TCPA

In enacting the TCPA, the Legislature explained that the statute's purpose "is to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury." TEX. CIV. PRAC. & REM. CODE ANN. § 27.002. The statute is to "be construed liberally to effectuate its purpose and intent fully." *Id.* § 27.011(b).

In deciding whether to grant a motion under the TCPA and dismiss the lawsuit, the statute directs the trial court to "consider the pleadings and supporting

and opposing affidavits stating the facts on which the liability or defense is based." *Id.* § 27.006. The court must then determine whether (1) the moving defendant has shown "by a preponderance of the evidence that the legal action is based on, relates to, or is in response to the party's exercise of the right of free speech, the right to petition, or the right of association"; and (2) the plaintiff has shown "by clear and specific evidence a prima facie case for each essential element of the claim in question." *Id.* § 27.005(b), (c). The first step of this inquiry is a legal question we review de novo. *Newspaper Holdings, Inc. v. Crazy Hotel Assisted Living, Ltd.*, No. 01-12-00581-CV, 2013 WL 1867104, at *6 (Tex. App.—Houston [1st Dist.] May 2, 2013, no pet. h.).

The Legislature's use of the term "prima facie case" in the second step implies a minimal factual burden: "[a] prima facie case represents the minimum quantity of evidence necessary to support a rational inference that the allegation of fact is true." *Id.* at *6 (quoting *Rodriguez v. Printone Color Corp.*, 982 S.W.2d 69, 72 (Tex. App.—Houston [1st Dist.] 1998, pet. denied)). Nonetheless, the statute requires that the proof offered address and support each "essential element" of every claim asserted with "clear and specific evidence." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(b), (c). Because the statute does not define "clear and specific" evidence, these terms are given their ordinary meaning. *See TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011). "Clear"

12

means "unambiguous," "sure," or "free from doubt." BLACK'S LAW DICTIONARY 268 (8th ed. 2004). "Specific" means "explicit" or "relating to a particular named thing." *Id.* at 1167. Accordingly, we examine the pleadings and the evidence to determine whether Robinson marshaled "clear and specific" evidence to support each alleged element of her cause of action.

As a preliminary matter, we note that Robinson has never asserted, either in the trial court below or on appeal, that her claim is not covered by the TCPA. That is, she does not argue that her defamation claim is not based on, related to, or in response to KTRK's exercise of its right to "petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law." As such, we begin with the second step of the inquiry—whether Robinson has demonstrated by clear and specific evidence a prima facie case for each essential element of her claim.

## C. Prima Facie Case

To maintain a defamation cause of action, a plaintiff must prove that the defendant (1) published a statement; (2) that was defamatory concerning the plaintiff; (3) while acting with either actual malice, if the plaintiff was a public official or public figure, or with negligence, if the plaintiff was a private individual, regarding the truth of the statement. *WFAA–TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998). "Whether words are capable of the defamatory

13

meaning the plaintiff attributes to them is a question of law for the court." *Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex. 1989). Questions of law are subject to de novo review. *In re Humphreys*, 880 S.W.2d 402, 404 (Tex. 1994). Whether a publication is an actionable statement of fact depends on its verifiability and the context in which it was made. *See Bentley v. Bunton*, 94 S.W.3d 561, 581 (Tex. 2002).

## Defamatory Statement

Robinson argues that she has demonstrated that KTRK "made up" the complained-of statements and, in doing so, has established a prima facie case of defamation *per se*. KTRK contends that Robinson failed to establish with clear and specific evidence that the complained-of statements were defamatory *per se*.

We initially address KTRK's contention that Robinson has alleged only a claim of defamation *per se*. Defamation claims are divided into two categories—defamation *per se* and defamation *per quod*—according to the level of proof required to make them actionable. *See Texas Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc.*, 219 S.W.3d 563, 580 (Tex. App.—Austin 2007, pet. denied). Statements that are defamatory *per quod* are actionable only upon allegation and proof of damages. *Id.* at 580; *Alaniz v. Hoyt*, 105 S.W.3d 330, 345 (Tex. App.—Corpus Christi 2003, no pet.). That is, before a plaintiff can recover for defamation *per quod*, she must carry her burden of proof as to both the

14

defamatory nature of the statement and the amount of damages caused by its publication. *See Texas Disposal*, 219 S.W.3d at 580 (citing *Leyendecker & Assocs., Inc. v. Wechter*, 683 S.W.2d 369, 374 (Tex. 1984)). By contrast, in cases involving defamation *per se*, damages are presumed to flow from the nature of the defamation itself and, in most situations, a plaintiff injured by a defamatory *per se* communication is entitled to recover general damages without specific proof of the existence of harm. *Bentley*, 94 S.W.3d at 604 ("Our law presumes that statements that are defamatory *per se* injure the victim's reputation and entitle him to recover general damages, including damages for loss of reputation and mental anguish.").

KTRK argues that Robinson neither pleaded nor presented any proof of the amount of alleged damages, and thus, her claim is one for defamation *per se* only. In her petition, Robinson alleged that KTRK's statements damaged her reputation. In her prayer, Robinson sought judgment "[f]or libel *per se* damages found by the trier of fact without proof of special damages [and] for actual damages and exemplary damages for malicious libel . . . ." In her appellate brief, Robinson does not dispute KTRK's contention that her claim sounds only in defamation *per se*. Indeed, she asserts that she has "established by clear and specific evidence a prima facie case on each element of her claim that the complained of statements were defamatory *per se*." Based upon the record before us, we agree that Robinson has

defamatory nature of the statement and the amount of damages caused by its publication. *See Texas Disposal*, 219 S.W.3d at 580 (citing *Leyendecker & Assocs., Inc. v. Wechter*, 683 S.W.2d 369, 374 (Tex. 1984)). By contrast, in cases involving defamation *per se*, damages are presumed to flow from the nature of the defamation itself and, in most situations, a plaintiff injured by a defamatory *per se* communication is entitled to recover general damages without specific proof of the existence of harm. *Bentley*, 94 S.W.3d at 604 ("Our law presumes that statements that are defamatory *per se* injure the victim's reputation and entitle him to recover general damages, including damages for loss of reputation and mental anguish.").

KTRK argues that Robinson neither pleaded nor presented any proof of the amount of alleged damages, and thus, her claim is one for defamation *per se* only. In her petition, Robinson alleged that KTRK's statements damaged her reputation. In her prayer, Robinson sought judgment "[f]or libel *per se* damages found by the trier of fact without proof of special damages [and] for actual damages and exemplary damages for malicious libel . . . ." In her appellate brief, Robinson does not dispute KTRK's contention that her claim sounds only in defamation *per se*. Indeed, she asserts that she has "established by clear and specific evidence a prima facie case on each element of her claim that the complained of statements were defamatory *per se*." Based upon the record before us, we agree that Robinson has

not alleged a claim for defamation *per quod* and, therefore, our analysis treats upon

Robinson's claim as one for defamation *per se.*

The law presumes certain categories of statements are defamatory *per se,* including statements that (1) unambiguously charge a crime, dishonesty, fraud, rascality, or general depravity or (2) are falsehoods that injure one in his office, business, profession, or occupation. *Main v. Royall,* 348 S.W.3d 381, 390 (Tex. App.—Dallas 2011, no pet.). Robinson complains of the following statements made by KTRK:

(1) "According to the State[,] millions in taxpayer dollars cannot be accounted for" and "[t]he State closure is based on a lack of sufficient financial records, meaning the State doesn't know where over three million dollars of taxpayer money given last year has been spent." (4:30 p.m., September 15, 2010 broadcast)

(2) "For the State, the issue is simple—where is the money? They say millions of taxpayer dollars are unaccounted for . . . The State closure is based on a lack of sufficient financial records, meaning the State doesn't know where the more than $3 million of taxpayer money given last year has been spent . . . ." (September 15, 2010 article published on KTRK's website)

(3) "Where is taxpayer money going and how is a taxpayer-owned building being used? . . . The Texas Education Agency says it doesn't know how Benji's spent $3 million of taxpayer money, and a lease agreement obtained by Eyewitness News raises even new questions." (September 25, 2010 article published on KTRK's website)

(4) "The Texas Education Agency doesn't know how the academy spent $3 million of state money." (September 27, 2010 article published on KTRK's website)

16

(5) "The [S]tate says it had no choice, alleging Benji's did not provide proper financial records to account for over $3 million in state funding for the past year." (September 30, 2010 article published on KTRKs website)

(6) "On September 14, the TEA ordered Benji's Academy to close, citing millions of dollars in state funding that was not accounted for." (October 11, 2010 article published on KTRK's website)

Robinson argues these statements to be defamatory *per se* because they insinuate that she embezzled over $3 million and thereby falsely imputed criminal behavior to her. Robinson also contends that KTRK's statements have damaged her reputation and, in support of her argument, points to the following third-party comments posted by readers on KTRK's website in response to the broadcasts and articles:

- "Call and ask where the money went. I'm sure Theola [sic] Robinson tell you."

- "Could it be in somebody's pockets?"

- "Ms. Robinson should be arrested, not because she's black, because she's a thief!"

- "I am just amazed as to why the parents are not suing Theaola Robinson and the old Board of Director[s], they are the ones who are stealing their children's future . . . ."

- "You bet they want to keep it open, if its [sic] closed an investigation will show they were all taking money not to mention they won't be able to afford their new house, Hummer and boat payments the school and taxpayers were helping to buy."

17

- "The state is not to blame here. They need to sue the administrators to find out where the money is followed by prosecution of those who may have 'mis-spent' it. Put blame where blame is due!"

- "Simple! No money! Can not account for $9 million! Close the doors and take the administrators to court for mis-use of government (your) money . . . ."

- "The only thing organized about this plan is the organized crime."

- "The parents are supporting the administrators who have a little charisma along with a talent for lining their pockets . . . ."

- "The mgmt. of this facility will continue to steal under the guide [sic] of a school, where the kids will continue to suffer."

Robinson's reliance on third-party comments posted on KTRK's comment board to prove defamation *per se* is misplaced. To be defamatory *per se*, the defamatory nature of the challenged statement must be apparent on its face without reference to extrinsic facts or "innuendo." *Moore v. Walthrop*, 166 S.W.3d 380, 386 (Tex. App.—Waco 2005, no pet.) (noting that "the very definition of '*per se*,' 'in and of itself,' precludes the use of innuendo"). If the court must resort to innuendo or extrinsic evidence to determine whether a statement is defamatory, then it is defamation *per quod* and requires proof of injury and damages. *Main*, 348 S.W.3d at 390. There is nothing intrinsically defamatory about KTRK's reports on the State's investigation into Benji's mismanaged funds. The reports did not say or imply that the entire $3 million in state funds had been

18

misappropriated or embezzled. Rather, the statements speak to the insufficiency of financial records to account for spent state funds. Similarly, the September 25th broadcast questioning the lease situation neither states nor implies that state funds were misappropriated.

Further, the evidence shows that the TEA's longstanding concern about and subsequent investigation into Benji's accounting resulted in the suspension and, ultimately, the revocation of the school's charter due to the urgent financial conditions and its fiscal mismanagement. Thus, KTRK's reports that the State found Benji's financial records insufficient to fully account for the money spent, and that the State did not know how the money had been spent, were based on evidence that Robinson did not counter. Media defendants cannot be liable for varying subjective impressions that may have been generated from the broadcast of true statements. *See ABC, Inc. v. Gill*, 6 S.W.3d 19, 35–38 (Tex. App.—San Antonio 1999, pet. denied).

Robinson also argues that because KTRK's broadcasts on questions of financial mismanagement reported the amount of total funding, the statements falsely suggest that she failed to account for any of it, when, in fact, she did provide records to show how part of the funds were spent. KTRK's reports, however, never recited that she had failed to account for any of it, but that the TEA had found the records provided were insufficient to account for the full amount.

19

Moreover, discrepancies as to details do not demonstrate material falsity for defamation purposes. *See, e.g., Dolcefino v. Turner*, 987 S.W.3d 100, 115 (Tex. App.—Houston [14th Dist.] 1998), *aff'd*, 38 S.W.3d 103 (Tex. 2000) (showing that insurance fraud "scam" involved $1.7 million, rather than $6.5 million, did not demonstrate falsity of statement); *Rogers v. Dallas Morning News, Inc.*, 889 S.W.2d 467, 471–73 (Tex. App.—Dallas 1994, writ denied) (misstatement that charity spent 10% of its donations on actual services, rather than 43%, was immaterial to gist of articles concerning misuse of charity funds); *Finklea v. Jacksonville Daily Progress*, 742 S.W.2d 512, 514–15 (Tex. App.—Tyler 1987, writ dism'd w.o.j.) (misstatement that plaintiff had four drug convictions, rather than two, was substantially true); *Shihab v. Express-News Corp.*, 604 S.W.2d 204, 206–08 (Tex. Civ. App.—San Antonio 1980, writ ref'd n.r.e.) (inaccurate designation of which of several news stories was fabricated was insignificant where the main charge was fabrication and one story was fabricated); *Downer v. Amalgamated Meatcutters & Butcher Workmen of N. Am.*, 550 S.W.2d 744, 747 (Tex. Civ. App.—Dallas 1977, writ ref'd n.r.e.) (misstatement that plaintiff embezzled $2,187.77, rather than $840.73, was substantially true); *Fort Worth Press Co. v. Davis*, 96 S.W.2d 416, 419–20 (Tex. Civ. App.—Fort Worth 1936, writ ref'd) (article charging official with wasting $80,000 of tax money rather than only $17,500 was substantially true).

In sum, there is nothing in the complained-of statements that unambiguously charged Robinson with engaging in criminal behavior or constituted a falsehood that injured her in her profession. Because Robinson has not adduced clear and specific evidence that the challenged statements made by KTRK in its broadcasts and reports are defamatory *per se*, she has not made a prima facie case for each essential element of her defamation claim against KTRK. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005 (b), (c) (West Supp. 2012).

## Conclusion

Having concluded that we have jurisdiction over this interlocutory appeal and that Robinson failed to sustain her burden to show a prima facie case for each essential element of her defamation claim, we reverse the trial court's denial of KTRK's motion to dismiss, and remand the case to the trial court for further proceedings as required by the statute to order dismissal of the suit. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.009(a).


Jim Sharp
Justice


Panel consists of Justices Bland, Sharp, and Massengale.

21

# APPENDIX TAB D:
Mandate of the First Court of Appeals in No. 01-12-00372-CV, *KTRK v. Robinson*



# MANDATE

# Court of Appeals

# First District of Texas

NO. 01-12-00372-CV

KTRK TELEVISION, INC., Appellant

V.

THEAOLA ROBINSON, Appellee

Appeal from the 234th District Court of Harris County.   (Tr. Ct. No. 2011-54895).

**TO THE 234TH DISTRICT COURT OF HARRIS COUNTY, GREETINGS:**

Before this Court, on the 11th day of July 2013, the case upon appeal to revise or to reverse your judgment was determined.   This Court made its order in these words:

> This case is an appeal from the order signed by the trial court on February 23, 2012.   After submitting the case on the appellate record and the arguments properly raised by the parties, the Court holds that there was reversible error in the trial court's judgment.   Accordingly, the Court **reverses** the trial court's judgment and **remands** the case with instructions for the trial court to dismiss the case, to award court costs, reasonable attorney's fees, and other expenses incurred in defending against the legal action as justice and equity may require to the appellant, KTRK Television, Inc., and to award sanctions against the appellee, Theaola Robinson, as the court determines sufficient to deter her from bringing similar actions, as required by section 27.009(a) of the Civil Practice and Remedies Code.

The Court **orders** that the appellee, Theaola Robinson, pay all appellate costs.

The Court **orders** that this decision be certified below for observance.

Judgment rendered July 11, 2013.

Panel consists of Justices Bland, Sharp, and Massengale.
Opinion delivered by Justice Sharp.

**WHEREFORE, WE COMMAND YOU** to observe the order of our said Court in this behalf and in all things to have it duly recognized, obeyed, and executed.

March 14, 2014

_____
Date

CHRISTOPHER A. PRINE
CLERK OF THE COURT

# APPENDIX TAB E:
Notice from the First Court of Appeals in No. 01-12-00372-CV, *KTRK v. Robinson,* of the denial of Appellant's Motion for Rehearing

FILE COPY

 **FIRST COURT OF APPEALS**
**301 Fannin Street**
**Houston, Texas 77002-2066**

August 21, 2013

RE:   Case No. 01-12-00372-CV

Style: KTRK Television, Inc.
   v.  Theaola Robinson

Please be advised the Court today **DENIED** Appellee's motion for rehearing in the above referenced cause.

Panel consists of: Justices Bland, Sharp and Massengale

T. C. Case # 1154895                Christopher A. Prine, Clerk of the Court

Berry D. Bowen
Berry Dunbar Bowen
3014 Brazos St
Houston, TX  77006
***DELIVERED VIA E-MAIL***

 **FIRST COURT OF APPEALS**
**301 Fannin Street**
**Houston, Texas 77002-2066**

August 21, 2013

RE:   Case No. 01-12-00372-CV

Style: KTRK Television, Inc.
   v.  Theaola Robinson

Please be advised the Court today **DENIED Appellee's** motion for rehearing in the above referenced cause.

Panel consists of: Justices Bland, Sharp and Massengale

T. C. Case # 1154895                Christopher A. Prine, Clerk of the Court

Laura Lee Prather
Haynes & Boone, L.L.P.
600 Congress Ave., Suite 1300
Austin, TX  78701
***DELIVERED VIA E-MAIL***

FILE COPY

 **FIRST COURT OF APPEALS**
**301 Fannin Street**
**Houston, Texas 77002-2066**

August 21, 2013

RE:   Case No. 01-12-00372-CV

Style: KTRK Television, Inc.
   v.  Theaola Robinson

Please be advised the Court today **DENIED Appellee's** motion for rehearing in the above referenced cause.

Panel consists of: Justices Bland, Sharp and Massengale

T. C. Case # 1154895            Christopher A. Prine, Clerk of the Court

Catherine Lewis Robb
Haynes & Boone, L.L.P.
600 Congress Ave., Suite 1300
Austin, TX  78701
***DELIVERED VIA E-MAIL***

# APPENDIX TAB F:

Notices from the Supreme Court of Texas in No. 13-0809, *KTRK v. Robinson,* of the denial of Robinson's Petition for Review and Motion for Rehearing on Petition for Review

FILE COPY

RE: Case No. 13-0809                    DATE: 1/17/2014
    COA #: 01-12-00372-CV      TC#: 2011-54895
STYLE: THEAOLA ROBINSON
    v. KTRK TELEVISION, INC.

    Today the Supreme Court of Texas denied the
petition for review in the above-referenced case.


                    MR. CHRIS  DANIEL
                    HARRIS COUNTY DISTRICT CLERK
                    201 CAROLINE, SUITE 420
                    HOUSTON, TX  77002

FILE COPY

RE: Case No. 13-0809     DATE: 1/17/2014
 COA #: 01-12-00372-CV  TC#: 2011-54895
STYLE: THEAOLA ROBINSON
 v. KTRK TELEVISION, INC.

Today the Supreme Court of Texas denied the petition for review in the above-referenced case.

MS. LAURA LEE PRATHER
HAYNES AND BOONE, LLP
600 CONGRESS AVENUE, SUITE 1300
AUSTIN, TX   78701

FILE COPY

RE: Case No. 13-0809            DATE: 1/17/2014
COA #: 01-12-00372-CV     TC#: 2011-54895
STYLE: THEAOLA ROBINSON
   v. KTRK TELEVISION, INC.

Today the Supreme Court of Texas denied the petition for review in the above-referenced case.

MR. BERRY D. BOWEN
BOWEN | LAWYERS
3014 BRAZOS STREET
HOUSTON, TX   77006

FILE COPY

RE: Case No. 13-0809          DATE: 1/17/2014
    COA #: 01-12-00372-CV    TC#: 2011-54895
STYLE: THEAOLA ROBINSON
    v. KTRK TELEVISION, INC.


    Today the Supreme Court of Texas denied the
petition for review in the above-referenced case.



                    MR. CHRISTOPHER  PRINE
                    CLERK, FIRST COURT OF APPEALS
                    301 FANNIN
                    HOUSTON, TX   77002

FILE COPY

RE: Case No. 13-0809                     DATE: 3/7/2014
    COA #: 01-12-00372-CV     TC#: 2011-54895
STYLE: THEAOLA ROBINSON
    v. KTRK TELEVISION, INC.

    Today the Supreme Court of Texas denied the motion
for rehearing of the above-referenced petition for
review.


                    MR. CHRIS  DANIEL
                    HARRIS COUNTY DISTRICT CLERK
                    201 CAROLINE, SUITE 420
                    HOUSTON, TX   77002

FILE COPY

RE: Case No. 13-0809          DATE: 3/7/2014
COA #: 01-12-00372-CV     TC#: 2011-54895
STYLE:THEAOLA ROBINSON
    v. KTRK TELEVISION, INC.


    Today the Supreme Court of Texas denied the motion for rehearing of the above-referenced petition for review.


                    MS. LAURA LEE PRATHER
                    HAYNES AND BOONE, LLP
                    600 CONGRESS AVENUE, SUITE 1300
                    AUSTIN, TX   78701

FILE COPY

RE: Case No. 13-0809                    DATE: 3/7/2014
    COA #: 01-12-00372-CV      TC#: 2011-54895
STYLE: THEAOLA ROBINSON
    v. KTRK TELEVISION, INC.

    Today the Supreme Court of Texas denied the motion
for rehearing of the above-referenced petition for
review.


                    MR. BERRY D. BOWEN
                    BOWEN | LAWYERS
                    3014 BRAZOS STREET
                    HOUSTON, TX   77006

FILE COPY

RE: Case No. 13-0809                    DATE: 3/7/2014
    COA #: 01-12-00372-CV      TC#: 2011-54895
STYLE: THEAOLA ROBINSON
    v. KTRK TELEVISION, INC.

    Today the Supreme Court of Texas denied the motion
for rehearing of the above-referenced petition for
review.


                    MR. CHRISTOPHER  PRINE
                    CLERK, FIRST COURT OF APPEALS
                    301 FANNIN
                    HOUSTON, TX  77002

APPENDIX TAB G:
Notices from the Supreme Court
of Texas in No. 14-0321, *In Re
Robinson*, of the denials of
Robinson's Petition for Writ of
Mandamus and Motion for
Rehearing on Petition for Writ of
Mandamus

FILE COPY

RE: Case No. 14-0321                    DATE: 10/10/2014
    COA #: 01-12-00372-CV      TC#: 1154895
STYLE: IN RE  THEAOLA ROBINSON


    Today the Supreme Court of Texas denied the motion
for rehearing in the above-referenced petition for writ
of mandamus.


                    HONORABLE MAURICIO RONDON
                    JUDGE, 234TH DISTRICT COURT
                    HARRIS COUNTY CIVIL COURTHOUSE
                    201 CAROLINE, 13TH FLOOR
                    HOUSTON, TX  77002

FILE COPY

RE: Case No. 14-0321          DATE: 10/10/2014
    COA #: 01-12-00372-CV     TC#: 1154895
STYLE: IN RE  THEAOLA ROBINSON


    Today the Supreme Court of Texas denied the motion
for rehearing in the above-referenced petition for writ
of mandamus.


                    THEAOLA   ROBINSON
                    5505 JENSEN DRIVE
                    HOUSTON, TX   77026

FILE COPY

RE: Case No. 14-0321                    DATE: 10/10/2014
    COA #: 01-12-00372-CV      TC#: 1154895
STYLE: IN RE   THEAOLA ROBINSON


     Today the Supreme Court of Texas denied the motion
for rehearing in the above-referenced petition for writ
of mandamus.



                    MS. LAURA LEE PRATHER
                    HAYNES & BOONE, L.L.P.
                    600 CONGRESS AVENUE, SUITE 1300
                    AUSTIN, TX   78701

FILE COPY

RE: Case No. 14-0321           DATE: 10/10/2014
   COA #: 01-12-00372-CV    TC#: 1154895
STYLE: IN RE  THEAOLA ROBINSON


   Today the Supreme Court of Texas denied the motion
for rehearing in the above-referenced petition for writ
of mandamus.


               MR. CHRISTOPHER  PRINE
               CLERK, FIRST COURT OF APPEALS
               301 FANNIN
               HOUSTON, TX  77002

FILE COPY

RE: Case No. 14-0321                    DATE: 10/10/2014
    COA #: 01-12-00372-CV     TC#: 1154895
STYLE: IN RE   THEAOLA ROBINSON


Today the Supreme Court of Texas denied the motion for rehearing in the above-referenced petition for writ of mandamus.


MR. CHRIS  DANIEL
HARRIS COUNTY DISTRICT CLERK
201 CAROLINE, SUITE 420
HOUSTON, TX  77002

FILE COPY

RE: Case No. 14-0321                    DATE: 6/6/2014
    COA #: 01-12-00372-CV      TC#: 1154895
STYLE: IN RE   THEAOLA ROBINSON


    Today the Supreme Court of Texas denied the
petition for writ of mandamus in the above-referenced
case.


                    HONORABLE MAURICIO RONDON
                    JUDGE, 234TH DISTRICT COURT
                    HARRIS COUNTY CIVIL COURTHOUSE
                    201 CAROLINE, 13TH FLOOR
                    HOUSTON, TX   77002

FILE COPY

RE: Case No. 14-0321          DATE: 6/6/2014
   COA #: 01-12-00372-CV     TC#: 1154895
STYLE: IN RE   THEAOLA ROBINSON


Today the Supreme Court of Texas denied the petition for writ of mandamus in the above-referenced case.


THEAOLA   ROBINSON
5503 JENSEN DRIVE
HOUSTON, TX   77028

FILE COPY

RE: Case No. 14-0321                    DATE: 6/6/2014
    COA #: 01-12-00372-CV      TC#: 1154895
STYLE: IN RE   THEAOLA ROBINSON


    Today the Supreme Court of Texas denied the
petition for writ of mandamus in the above-referenced
case.


                    MS. LAURA LEE PRATHER
                    HAYNES & BOONE, L.L.P.
                    600 CONGRESS AVENUE, SUITE 1300
                    AUSTIN, TX   78701

FILE COPY

RE: Case No. 14-0321                    DATE: 6/6/2014
    COA #: 01-12-00372-CV      TC#: 1154895
STYLE: IN RE   THEAOLA ROBINSON


    Today the Supreme Court of Texas denied the
petition for writ of mandamus in the above-referenced
case.


                    MR. CHRISTOPHER  PRINE
                    CLERK, FIRST COURT OF APPEALS
                    301 FANNIN
                    HOUSTON, TX   77002

FILE COPY

RE: Case No. 14-0321                    DATE: 6/6/2014
    COA #: 01-12-00372-CV      TC#: 1154895
STYLE: IN RE   THEAOLA ROBINSON


Today the Supreme Court of Texas denied the petition for writ of mandamus in the above-referenced case.


MR. CHRIS  DANIEL
HARRIS COUNTY DISTRICT CLERK
201 CAROLINE, SUITE 420
HOUSTON, TX   77002

# APPENDIX TAB H:
Appellee KTRK Television, Inc.'s Motion to Dismiss Appellant's Appeal and Request to Declare Appellant Robinson A Vexatious Litigant, filed in No. 01-14-008800-CV (WITHOUT EXHIBITS)

ACCEPTED
01-14-00880-cv
FIRST COURT OF APPEALS
HOUSTON, TEXAS
7/23/2015 1:11:42 PM
CHRISTOPHER PRINE
CLERK

**CAUSE NO. 01-14-00880-CV**

IN THE FIRST COURT OF APPEALS
HOUSTON, TEXAS

THEAOLA ROBINSON
Appellant,

v.

KTRK TELEVISION, INC.,
Appellee.

---

Appealed from the 234th District Court
Harris County, Texas

---

## APPELLEE KTRK TELEVISION, INC.'S MOTION TO DISMISS APPELLANT'S APPEAL AND REQUEST TO DECLARE APPELLANT ROBINSON A VEXATIOUS LITIGANT

Catherine Lewis Robb
State Bar No. 24007924
Catherine.robb@haynesboone.com
*Laura Lee Prather
State Bar No. 16234200
Laura.prather@haynesboone.com
HAYNES AND BOONE, LLP
600 Congress Avenue
Suite 1300
Austin, Texas 78701
Telephone: (512) 867-8400
Facsimile: (512) 867-8470

COUNSEL FOR APPELLEE
KTRK TELEVISION, INC.

*Lead counsel for Appellee

## APPELLEE'S MOTION TO DISMISS
## APPELLANT'S APPEAL

Appellee, KTRK Television, Inc. (hereinafter "KTRK") moves to dismiss this appeal because this case was already decided by this Court in July 2013, and petition for review was subsequently denied by the Texas Supreme Court. *See KTRK v. Robinson*, 409 S.W.3d 682 (Tex. App.—Houston [1st Dist.] 2013 reh'g overruled, pet. denied) attached hereto as Exhibit "A." The Court has no jurisdiction over the issues currently being appealed, and Appellant, Theaola Robinson (hereinafter "Robinson") has failed to comply with the Texas Rules of Appellate Procedure. Simply put, this is a *pro se* litigant seeking endless "bites at the apple" in an effort to tie up KTRK in Court *ad infinitum*. Robinson should be declared a vexatious litigant and prohibited from filing additional pleadings. *See, e.g., Nell Nations Forist v. Vanguard Underwriters Ins. Co.*, 141 S.W.3d 668 (Tex. App.—San Antonio 2004, no pet.).

## I.
## INTRODUCTION & STATEMENT OF FACTS

This is Robinson's second appeal to this Court and fifth attempt to overturn this Court's ruling. Although she purports to be appealing a final judgment of the trial court, this appeal is really Robinson's attempt to revisit this Court's July 11, 2013, judgment in Cause No. 01-12-00372-CV dismissing Robinson's claim for defamation against KTRK. Under Texas Rule of Appellate Procedure 19.1, this

Court's plenary power to alter that judgment expired in September of 2013. *See* Tex. R. App. P. 19.1; *see also,* Tex. R. App. P. 19.3 ("after its plenary power expires, the court cannot vacate or modify its judgment"). Furthermore, this Court's decision in Cause No. 01-12-00372-CV is the law of the case and this Court does not have jurisdiction to revisit the issues raised in that first appeal.

After multiple attempts to sue in federal court (none of which were successful), Robinson ultimately sued KTRK, The Walt Disney Company ("Disney"), CC Texas Holding Co., Inc. ("CCTHC"), and ABC Television Network in state court for defamation in September of 2011. Disney and CCTHC filed Special Appearances. KTRK filed an Answer and then a Motion to Dismiss pursuant to Chapter 27 of the Texas Civil Practice & Remedies Code ("Anti-SLAPP Motion").[1] The Anti-SLAPP Motion was denied by the trial court, and KTRK timely appealed to this Court.

On July 11, 2013, in *KTRK Television, Inc. v. Robinson*, this Court reversed the trial court's denial of KTRK's Anti-SLAPP Motion and remanded this case back to the trial court to order dismissal of the suit and for final proceedings on attorneys' fees as required by TEX. CIV. PRAC. & REM. CODE ANN. §27.009(a).

---

[1] ABC Television Network is not a corporate entity and was never served. In its Anti-SLAPP Motion, KTRK advised the trial court of ABC's nonexistent status and non-service and also advised that Disney and CCTHC had filed Special Appearances, but reserved the right to file Anti-SLAPP motions should the Court decide to exercise jurisdiction over them. The motion further advised that Disney and CCTHC would have the same defenses and arguments as KTRK and would assert the same in an Anti-SLAPP motion, if necessary.

Robinson then filed a Motion for Rehearing, which was denied by this Court on August 21, 2013. Next, Robinson filed a Petition for Review with the Supreme Court of Texas, which was denied on January 3, 2014, and a Petition for Rehearing the Denial, which was denied on March 7, 2014.[2] In all, prior to this latest filing, Robinson filed a total of <u>five</u> motions and/or writs in an effort to have the Court of Appeals' decision reversed.

On October 8, 2014,[3] the 234th Judicial Court of Harris County **in accordance with the Order of this Court** issued its final judgment and dismissed the case with prejudice, awarding KTRK attorney's fees, costs, and expenses pursuant to the Texas Anti-SLAPP Statute.[4]

Robinson's Notice of Appeal states that she desires "to appeal from the judgment rendered against Plaintiff by the 234[th] Judicial District Court of Harris County, Texas on October 8, 2014." The October 8, 2014 "Order and Final Judgment," in accordance with the determination of this Court in *KTRK Television, Inc. v. Robinson*, 409 S.W.3d 682, dismissed the case with prejudice and granted

---

[2] Robinson also filed a Writ of Mandamus and a "Motion for Rehearing on Petition for Review of Writ of Mandamus and Request for Oral Argument," both of which were denied.

[3] The large time delay between the July 2013 judgment of this Court and October 2014 judgment of the trial court was caused by Appellee Robinson's filings of a Motion for Rehearing in this Court (which was denied); a Petition for Review and a Motion for Rehearing on her Petition for Review (in the Supreme Court of Texas, No. 13-0809)(both denied); as well as a Petition for Writ of Mandamus and a Motion for Rehearing on her Petition for Writ of Mandamus (in the Supreme Court of Texas, No. 14-0321)(both denied).

[4] Also on October 8, 2014, the 234th District Court signed an order sustaining the special appearances of Disney and CC Texas.

3

attorney's fees and sanctions against Robinson, consistent with the mandate. Robinson's Brief[5] makes clear that she is only appealing this Court's earlier decision in Cause No. 01-12-00372-CV, not the more recent ministerial order. The Brief only raises issues on appeal that relate to the dismissal of the case. The Brief does not challenge the amount of attorney's fees or the methodology used to arrive at the fees. In addition, Robinson states outright in her Brief that "This is an appeal from a decision of the 1[st] Court of Appeals in Houston, Texas reversal of a denied motion to dismiss under the newly enacted TCPA; and the awarding of attorney's fees and sanctions. Appellant Robinson requests this Court to review its holding."[6]

In addition to ignoring the expiration of this Court's plenary power and the law of the case, Robinson has failed to adhere to other requirements of the Texas Rules of Appellate Procedure. First, in violation of Tex. R. App. P. 25.1(8)(e), Robinson never served her Notice of Appeal upon KTRK, thus, failing to timely perfect her appeal.[7] In addition, Robinson has repeatedly failed to properly serve KTRK with other motions or briefs pertaining to this appeal, specifically her First Appellant's Brief, filed with this Court on June 10, 2015 ("the first brief"); her Second Amended Brief (the "2[nd] brief"), filed on June 19, 2015; and her "Motion

---

[5] For clarity, KTRK refers only to Robinson's last brief titled "Amended Appellant Brief" filed on June 19, 2015.

[6] *See* Brief pg. 2. Appellant does not appeal the order granting Disney's or CCTHC's Special Appearances or even make any argument that their granting was improper.

[7] *See* Affidavit of Laura Lee Prather, attached hereto as Exhibit "B" ("Prather Affidavit").

4

for Leave to File Amended Brief" ("3rd motion").[8] Robinson has failed to serve countless other documents on KTRK, and KTRK has only been able to obtain those documents by diligently monitoring this Court's docket.[9]

Robinson has also made several misrepresentations to this Court. Robinson asserted in her 3rd motion that she needed leave to amend and supplement her brief only to add an "additional index to Authorities and Appendix," when in fact, the 2nd Brief also included three additional issues of law comprising ten additional pages of briefing, a "Summary of Argument," and a new 13-page declaration signed by Robinson (which was not part of the trial court record).[10] Further, in Robinson's first request for an extension, she attested that a family illness made her unable to timely file her brief. However, KTRK later discovered that a week earlier, Robinson filed *pro se* a new 136-page lawsuit against the City of Houston, the Commissioner of the Texas Education Agency, and others,[11] clearly indicating she had time to spend on her legal matters.

---

[8] *See* Exhibit B, Prather Affidavit.

[9] Other documents Robinson failed to timely serve include documents regarding her proof of indigence, including the affidavit, and her April 24 and June 10, 2015 Motions to Extend Time to File Brief, despite representing to the Court that she had served the documents. *See* Exhibit B, Prather Affidavit.

[10] Robinson did eventually serve portions of the documents on KTRK's counsel via email on June 23, 2015. *See* Exhibit B, Prather Affidavit.

[11] *See Theaola Robinson and Benji's Special Education Academy,, Inc. vs. City of Houston, Robert Scott, Lisa Berry Dockery, Management Accountability Corporation and Victory Preparatory Academy*, No. 1061237 (Co. Ct. at Law No. 4, Harris County, Tex., April 15, 2015); *see also,* Exhibit B, Prather Affidavit. Robinson's case was dismissed earlier this month when the court sustained the County Attorney's contest to Robinson's paper's oath.

## II.
## ARGUMENT & AUTHORITIES

It is a threshold matter whether this Court has jurisdiction over the appeal filed by Robinson. KTRK believes it does not and moves this Court to dismiss this appeal because this Court does not have jurisdiction to vacate or modify its earlier judgment and the Appellant's Brief only requests the Court to reconsider the earlier issues that have already been decided. Not only does the law of the case doctrine require that this Court dismiss the appeal for lack of jurisdiction, but this Court's plenary power has expired, further depriving it of jurisdiction to rehear the appeal. Finally, given the plethora of filings made – all seeking to reverse this Court's prior ruling – there can be no doubt Robinson should be declared a vexatious litigant under Tex. Civ. Prac. & Rem. Code §11.054(2).[12]

Additionally, this Court may dismiss the appeal under Tex. R. App. P. 42.3 for failure to comply with the rules. Robinson has repeatedly and flagrantly refused to comply with the Texas Rules of Appellate Procedure; her failure to comply with these rules is grounds for dismissal under Tex. R. App. P. 42.3(c).

---

[12] *See In re Douglas*, 333 S.W.3d 273, 287 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) ("We conclude for the foregoing reasons that the trial court did not err in declaring Douglas a vexatious litigant on its own motion"). That court noted that "the evident purpose of the statute is to make it possible for courts to control their dockets rather than permitting them to be burdened with repeated filings of frivolous and malicious litigation by litigants without hope of success while, at the same time, providing protections for litigants' constitutional rights to an open court when they have genuine claims that can survive the scrutiny of the administrative judge and the posting of security to protect defendants." *Id.* at 284.

6

**A.** **This Court Should Dismiss This Appeal for Lack of Jurisdiction Because This Court's Plenary Power Over Its Prior Decision Expired on September 24, 2013.**

This Court should dismiss Robinson's appeal because her current appeal is simply another attempt to appeal **this Court's** July 11, 2013 decision on the merits. However, such an attempt is not permitted. This Court "cannot vacate or modify its judgment" because its plenary power over that decision expired in 2013.[13] After this Court's ruling on the merits, reversing and remanding to the lower court, Robinson filed a motion for rehearing on July 25, 2013. The Court's "plenary power over its judgment expire[d]... 30 days after the court overruled[d] all timely filed motions for rehearing...."[14] This Court overruled Robinson's motion for rehearing on August 21, 2013.[15] Accordingly, this Court's plenary power to vacate or modify its judgment expired on September 20, 2013.

The fact that Robinson claims to be appealing the trial court's judgment – one that is in perfect compliance with this Court's prior mandate – does not change the reality of her attempt to appeal, now for the sixth time, this Court's earlier decision. In fact, in her "Summary of Argument" Robinson makes it clear that she is simply seeking review of the earlier appeals' court decision when she states:

> **This is an appeal from a decision of the 1ˢᵗ Court of Appeals** in Houston, Texas reversal of a denied motion to dismiss under the

---

[13] *See* Tex. R. App. P. 19.3.
[14] *See* Tex. R. App. P. 19.1(b).
[15] *See* this Court's August 21, 2013 notice that it denied Robinson's Motion for Rehearing, attached hereto as Exhibit "C."

newly enacted TCPA .... **The Court of Appeals decision clearly and erroneously conflicts** with the Texas Supreme Court decision in *Neely v. Wilson*, 418 S.W.3d 52 (2013) when it did not broadly construe defamation issues under the substantial truth doctrine or toll the statute of limitations for Appellant Robinson's legal action. The TCPA does not apply to Theaola Robinson legal defamation action.

*See* Appellant's Brief, p. 2 (emphasis added). The time for doing so has expired, and Robinson's prior five attempts to have this Court and the Texas Supreme Court review the decision have all failed.

**B.** **This Court's Prior Decision is the Law of the Case, Barring Further Reconsideration of the Issues Robinson Attempts to Raise (for the Sixth Time). Robinson Should be Declared a Vexatious Litigant.**

Likewise, in the body of her "Argument," Robinson also makes clear that the "issues" she raises in this appeal concern her assertion that the First Court of Appeals erred in its prior holdings in this case.[16] This Court's prior opinion is the law of the case and cannot be further appealed simply because the trial court has enforced this Court's mandate through the ministerial act of entering a final judgment. *See, e.g., Miller v. University Savings Assoc.,* 858 S.W.2d 33, 37 (Tex. App.—Houston [14th Dist.] 1993, writ denied)(finding appellant precluded from bringing claims on appeal because court had already determined issues and "law of the case" applied). Under the law of the case doctrine, a court of appeals must be consistent with its earlier ruling on legal questions unless an earlier decision was

---

[16] *See, e.g.,* Points of Error in Robinson's Brief all addressing the First Court of Appeals ruling, pp. 4, 10, 15, 17 and 20.

8

clearly erroneous. In a case such as this, when a petition for review is filed and the Texas Supreme Court denies the petition for review, as a matter of law, the opinion is not "clearly erroneous." *See Caplinger v. Allstate Ins. Co.*, 140 S.W.3d 927, 930 (Tex. App.—Dallas 2004, pet. denied).[17]

The Order that Robinson purports to appeal was simply the trial court's ministerial act of enforcing this Court's prior mandate that the trial court dismiss the case and enter a final judgment in accordance with this Court's opinion. "When an appellate court … renders the judgment which the trial court should have rendered, that judgment becomes the judgment of both courts." *Cook v. Cameron,* 733 S.W.2d 137, 139 (Tex. 1987). At that point, "the trial court's only duty is to enforce the judgment as rendered. The district court has no jurisdiction to review or interpret that judgment. Its only authority is to carry out the mandate of the appellate court. A district's court's orders carrying out the mandate are ministerial." *Dallas County v Sweitzer,* 971 S.W.2d 629, 630 (Tex. App.—Dallas 1998, no pet.)(internal citations omitted). Furthermore, "[t]he district court must execute the judgment as it was framed by the appellate court." *Id.* It "has no authority to take any action that is inconsistent with or beyond the scope of that which is necessary to give full effect to the appellate court's judgment and mandate." *Phillips v. Bramlett,* 407 S.W.3d 229, 234 (Tex. 2013). *See also,* Tex.

---

[17] *See* Supreme Court of Texas' denial of Robinson's Petition for Review, attached hereto as Exhibit "D."

9

R. App. P. 51.1(b) ("When the trial court clerk receives the mandate, the appellate court's judgment must be enforced.").

In this second appeal to the First Court of Appeals, Robinson simply requests this Court reconsider its prior ruling – one that is now the law of the case. "The 'law of the case' doctrine is defined as that principle under which questions of law decided on appeal to a court of last resort will govern the case throughout its subsequent stages." *Hudson v. Wakefield*, 711 S.W.2d 628, 630 (Tex. 1986); *see also, Aycock v. State of Texas*, 863 S.W.2d at 187. ("'The law of the case' is a doctrine which mandates that the ruling of an appellate court on a question of law raised on appeal will be regarded as the law of the case in all subsequent proceedings of the same case."). Because Robinson's appeal is nothing more than one more attempt to overturn "the law of the case," by "appealing" the trial court's ministerial entry of the final judgment, which is not appealable, the Court is without jurisdiction to hear this appeal and this appeal must be dismissed. *See, e.g., Gulf Energy Exploration Corp. v. Fugro Chance*, 2012 WL 601413 (Tex. App.—Corpus Christi 2012, no pet.)(mem. op.)(finding court was without jurisdiction to hear appeal of issue it had previously decided in first appeal).

Finally, dismissing this appeal serves the purpose of the "law of the case" doctrine, which is "based on public policy and is aimed at putting an end to litigation." *Hudson v. Wakefield*, 711 S.W.2d at 630. This Court entered its

10

Opinion in this matter dismissing this case in July of 2013. Since that time, Robinson (either acting *pro se*, or through her former attorney) has filed <u>five</u> prior pleadings in an effort to overturn the decision: a Motion for Rehearing to the First Court of Appeals, a Petition for Review to the Texas Supreme Court, a Motion for Rehearing the Denial of her Petition for Review to the Texas Supreme Court, a Mandamus with the Texas Supreme Court, and a Motion for Rehearing the Denial of Mandamus. In addition, after the trial court issued its order in compliance with this Court's Mandate, Robinson filed a Motion for New Trial prior to filing this appeal. Given the foregoing volume of baseless filings, Robinson should be declared a vexatious litigant pursuant to Tex. Civ. Prac. & Rem. Code §11.054.[18]

Public policy and the law of the case dictate that this litigation must end.[19]

## C. This Court Should Dismiss This Appeal for Failure to Comply with the Texas Rules of Appellate Procedure.

It is well settled in Texas that, although a *pro se* appellant's briefing may be construed liberally in accordance with Tex. R. App. P. 38.9, *pro se* litigants are

___

[18] Although Robinson has not yet been adjudged a vexatious litigant, she satisfies most, if not all, of the requirements, especially the requirement that "after a litigation has been finally determined against the plaintiff, the plaintiff repeatedly relitigates or attempts to relitigate, *pro se*, either: (A) the validity of the determination against the same defendant as to whom the litigation was finally determined; or (B) the cause of action, claim, controversy, or any of the issues of fact or law determined or concluded by the final determination against the same defendant as to whom the litigation was finally determined...." Tex. Civ. Prac. & Rem Code §11.054.

[19] Robinson has already been ordered to pay KTRK's attorneys' fees in this matter, but has indicated that she will be unable to pay. She appears to believe she has nothing to lose by continuing her baseless appeals. Therefore, a declaration that Robinson is a vexatious litigant and, pursuant to Tex. Civ. Prac. & Rem Code §11.101, is prohibited from filing any new litigation *pro se* without permission of the court is also necessary to ensure that Robinson does not try new methods to further "appeal" this matter (or the underlying subject matter).

11

held to the same standards as licensed attorneys and are required to comply with applicable procedural rules. *See Wheeler v. Green*, 157 S.W.3d 439, 444 (Tex. 2005); *Mansfield State Bank v. Cohn*, 573 S.W.2d 181, 184-85 (Tex. 1978). However, Robinson's failures to adhere to the Texas Rules of Appellate Procedure are not simply a matter of poor briefing. Robinson has consistently failed to serve documents upon KTRK in accordance with Tex. R. App. P. 9.5, 10.1(a)(4), and 25.1(e). Although a failure to include correct details in a certificate of service may be overlooked, actually failing to serve any documents upon the parties involved in an appeal is grounds for dismissal.[20] As one appellate court in Texas has stated "...mere recitation of language consistent with Texas Rule of Appellate Procedure 40(a)(2) in the body... does not constitute a proper notice of appeal." *State v. Organic Composting Resources Co., L.C.*, 925 S.W. 2d 129 (Tex. App.—Austin 1996, no writ).

Further, though a *pro se* litigant, Robinson is not a "new," uneducated litigant who is ignorant about the requirements of proper service. In fact, Robinson

---

[20] *Pena v. McDowell*, 201 S.W. 3d 665 (Tex. 2006). *See Wells v. Target Corp.*, No. 02-14-00359-CV, 2015 WL 1882540 (Tex. App.—Fort Worth, April 23, 2015, no pet.); *McCaleb v. Descisciolo*, No. 12–05–00122–CV, 2005 WL 1177062, at *1 (Tex. App.—Tyler May 18, 2005, no pet.); *Guajardo v. Guajardo*, No. 13–02–364–CV, 2003 WL 1562553, at *1 (Tex. App.—Corpus Christi Mar.27, 2003, no pet.); *Reiners v. Reiners*, No. 10–04–00359–CV, 2005 WL 114669, at *1 (Tex. App.—Waco Jan.19, 2005, no pet.). Rule 37.1 of the Rules of Appellate Procedure clearly requires an appellate clerk to notify the parties of a defect in the notice of appeal so that the appealing party can remedy the defect. However, in this case the appellate clerk could not have correctly identified the defect in Robinson's notice of appeal because the appellate clerk could not have known that Robinson continually misrepresented her claim that she had served KTRK.

12

has filed multiple lawsuits in state and federal court concerning the underlying matters in this very lawsuit.[21] Also, Robinson's "mistake" is not a single failure to serve KTRK (or failure to include correct service information), but rather a repeated failure to serve KTRK, failure to file a docket sheet, misrepresentations to this Court about her failure to serve KTRK, and misrepresentations about her reasons for requesting an extension in the documents being filed with this Court.[22]

Finally, Robinson did not seek, nor was she granted, leave to file a supplemental brief raising new points of error not assigned in her original briefing – although she did so, and did so without notifying this Court. "Generally, a party must seek leave of court to file an amended or supplemental brief, and the appellate court has some discretion in deciding whether to allow the filing." *Heritage Res. v. Hill*, 104 S.W. 3d 612, 619 (Tex. App.—El Paso 2003, no pet.) (quoting *Standard Fruit and Vegetable Co., Inc. v. Johnson*, 985 S.W.2d 62, 65 (Tex. 1998)). Texas courts do not generally favor motions to add new issues unless "justice requires." *Standard Fruit and Vegetable Co., Inc.* 985 S.W.2d at 65. KTRK asks this Court to dismiss Robinson's appeal for all of the above additional reasons.

---

[21] *See* Exhibit B, Prather Affidavit.
[22] *Id.*

13

**D. This Appeal Should be Determined to be Objectively Frivolous and Robinson Should be Sanctioned for Filing a Frivolous Appeal.**

Finally, this Court should determine that this appeal is frivolous, and award Appellees damages under Texas Rule of Appellate Procedure 45, which states that "[i]f the court of appeals determines that an appeal is frivolous, it may—on motion of any party or on its own initiative, after notice and a reasonable opportunity for response—award each prevailing party just damages." Tex. R. App. P. 45. The "just damages" awarded are typically the attorney's fees incurred in defending the appeal.[23] There is no requirement under Rule 45 for a finding of bad faith for sanctions to apply. *See Glassman v. Goodfriend*, 347 S.W.3d 772, 782 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) (rejecting earlier rulings that required a finding of bad faith for sanctions in a frivolous appeal). However, the court may consider bad faith when determining the amount of damages. *Id.* As the *Glassman* Court so succinctly stated, "No litigant has the right to put an opposing party to needless burden and expense or to waste this court's time, which otherwise would be spent on the important task of adjudicating valid disputes." *Id.* at 783.

"To determine whether an appeal is objectively frivolous, [the court should] review the record from the viewpoint of the advocate and decide whether the advocate had reasonable grounds to believe the case could be reversed." *Id.* at 782.

---

[23] *See, e.g., Lookshin v. Feldman*, 127 S.W.3d 100, 102 (Tex. App.—Houston [1st Dist.] 2003, pet. denied) (awarding attorney's fees as sanctions for a frivolous appeal).

14

In *Riggins v. Hill*, the Fourteenth Court of Appeals held that a litigant who seeks to appeal claims that have already been resolved finally by an earlier appeal "has no reasonable grounds to believe that the case could be reversed [and the] appeal is frivolous."[24] Given that this Court has no jurisdiction to overturn its earlier decisions, and that the law of the case precludes this Court from making a ruling contrary to its earlier ruling, there can be no reasonable grounds for Robinson to believe that the case could be reversed or that her appeal could be granted.

## III.
## PRAYER

For the above reasons, KTRK moves the Court to dismiss Robinson's appeal because this Court does not have jurisdiction to hear this appeal. Additionally, KTRK moves to dismiss Robinson's appeal in accordance with Tex. R. App. P. 42.3(c) because Robinson has failed to comply with the Rules of Appellate Procedure. KTRK prays that this Court declare Robinson a vexatious litigant and, pursuant to Tex. Civ. Prac. & Rem. Code §11.101, prohibit her from filing any new litigation *pro se* without permission of the court. KTRK further prays this Court determine that this appeal is objectively frivolous and grant KTRK sanctions against Robinson in the amount of KTRK's reasonable attorney's fees in defending against this appeal.

---

[24] *See Riggins v. Hill*, No. 14-13-00604-CV, 2015 WL 293270, at *4 (Tex. App.—Houston [14th Dist.] Jan. 22, 2015), *reh'g overruled* (Feb. 24, 2015).

15

Respectfully Submitted,

HAYNES AND BOONE, LLP

/s/ Laura Lee Prather
Laura Lee Prather
State Bar No. 16234200
Laura.prather@haynesboone.com
Catherine Lewis Robb
State Bar No. 24007924
Catherine.robb@haynesboone.com
600 Congress Avenue, Suite 1300
Austin, Texas 78701
Telephone:    (512) 867-8400
Facsimile:    (512) 867-8470

COUNSEL FOR KTRK TELEVISION,
INC., APPELLEE

## CERTIFICATE OF COMPLIANCE

I certify that this document was produced on a computer using Microsoft Word 2010 and contains 4,291 words, as determined by the computer software's word-count function, excluding the sections of the document listed in Texas Rule of Appellate Procedure 9.4(i)(1).

/s/ Laura Lee Prather
Laura Lee Prather

## CERTIFICATE OF CONFERENCE

I certify that on July 21, 2015, I attempted to confer with Ms. Robinson regarding this motion and she did not respond.

/s/ Laura Lee Prather
Laura Lee Prather

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on the following parties this the 23rd day of July, 2015 via certified mail, return receipt requested:

Theaola Robinson
5505 Jensen Drive
Houston, Texas 77028

/s/ Laura Lee Prather
Laura Lee Prather

# APPENDIX TAB I:
Original Complaint in *Theaola Robinson v. The Walt Disney Company*, Cause No. 4-11-CV-0358, in the Southern District of Texas, Houston Division (WITHOUT EXHIBITS)

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| THEAOLA ROBINSON, | § | |
| | § | |
| Plaintiff, | § | Civil Action No. _____ |
| | § | |
| | § | Jury Trial Requested |
| v. | § | |
| | § | |
| THE WALT DISNEY COMPANY, | § | |
| | § | |
| Defendant. | § | |

## ORIGINAL COMPLAINT

1. Plaintiff, Theaola Robinson, is a citizen of the State of Texas.

2. Defendant, The Walt Disney Company is a corporation incorporated under the laws of the State of Delaware and having its principal place of business in the State of California.

3. The amount in controversy between Mrs. Robinson and The Walt Disney Company exceeds, exclusive of interest and costs, the sum specified by 28 U.S.C. § 1332.

4. Pursuant to Rule 10(c), Fed.R.Civ.P., Mrs. Robinson adopts by reference Plaintiffs' current complaint and the joinder of Mrs. Theaola Robinson therein in *Comb v. Benji's Special Education Academy*, No. 4-10-CV-03498, In the United States District Court for the Southern District of Texas, Houston Division.

5. The Walt Disney Company is the owner of a television station and a network of television stations and is a "broadcaster" as defined by Texas law.

6. On August 8, 2010, Rick Schneider responded in writing to the original overture from Ron Rowell asking Schneider to become involved in Benji's Special Educational Academy. Schneider's first point in his response to Rowell succinctly expresses the

bottom line situation then prevailing at Benji's, the overarching and defining context in which all the subsequent damaging actions and devastating events have taken place. Schneider wrote:

**If I understand you correctly, the students and school are doing well academically.**

(Exhibit 1).

7. This statement succinctly expresses the situation at a remarkable institution, created and nurtured by the mother love and determination of a tireless educator, Mrs. Robinson, *for thirty years*, and reveals the context in which the occurrences giving rise to the rights to relief stated in this action quickly transpired over the next forty days.

8. For the thirty years prior to August 2010, Mrs. Robinson had, in total and complete obscurity, through much trial and sacrifice, and with virtually no private support, endeavored to provide for the most helpless and disadvantaged, the most forgotten and discarded, of the young in our society, a setting where they could find a loving and caring home, and, just possibly, find a chance at self-respect, self-discipline, and a foundation for a socially productive and rewarding life.

9. Mrs. Robinson is not and never has been a public figure.

10. This thirty years of work began in 1980 with Mrs. Robinson's creation of a day care academy for young special needs children, her own young son being such a child, having recently become disabled at age three on account of an injury, forcing her to abandon other career aspirations in order to care for him, and her abilities, energy, and love guiding her to care for other similarly needy young children. As detailed herein, thirty years of dedicated service and objective achievement was demolished, and Mrs. Robinson's reputation deliberately ruined, in a relative instant.

2

11. Mrs. Robinson began this work in the heart of Houston's Fifth Ward, one of the most blighted, impoverished neighborhoods in Houston, Texas, commonly known as a "ghetto," a place where a host of societal ills routinely conspire to blunt the aspirations of a majority of even the most physically and mentally able.

12. To begin her endeavor in 1980, Mrs. Robinson caused to be incorporated a Texas not-for-profit corporation, named Benji's Special Education Academy, ("Benji's"). She began Benji's by caring for her son and one other child at the Greater Love Missionary Baptist Church at 6913 Jensen Drive. Almost immediately, she had attracted twenty children to her program.

13. Over the ensuing years, Benji's enrollment grew to almost 100 children, and outgrew the facilities at Greater Love, relocating to a previously abandoned building at 5505 Jensen Drive.

14. Benji's continued to flourish with support from the City of Houston, and by 1996, with an enrollment of 140 students and the cooperation and encouragement of the City of Houston, Mayor Bob Lanier, and Councilman Ernest McGowen, Benji's acquired a lease from the City of Houston on another previously abandoned building, formerly known as White's Appliance Store, located at 2903 Jensen Drive.

15. During all these years, Benji's never charged tuition and the school operated and developed its facilities exclusively on grants from the City of Houston and Mrs. Robinson's personal support, primarily from the proceeds of her late husband's insurance.

16. In 1996, the White's Appliance Building was a boarded-up eyesore, which had become what is commonly known as a "crack house" at the time Mrs. Robinson

3

undertook to renovate, and Benji's to occupy, 5,000 square feet of the 30,000 square foot structure.

17. Also, by this time, the State of Texas had recently adopted laws providing for the creation of public charter schools, and Mrs. Robinson determined to expand Benji's successful program to occupy the entire 30,000 square feet of the White's Building and to convert Benji's into an open-enrollment public charter school.

18. On November 2, 1998, Benji's was granted a contract for an open-enrollment charter by the Texas State Board of Education.

19. Benji's is a "charter holder" as defined in Tex. Education Code § 12.1012.

20. As detailed in the Complaint in No. 4-10-CV-03498 (Docket No. 19 at ¶ 25), and as substantially admitted by the Defendants in that action (Docket Nos. 22 and 23 at ¶ 25), Benji's charter, initially set to expire on July 31, 2003, has been in a state of perpetual application for renewal since Benji's timely applied for renewal prior to July 31, 2003.

21. During the ensuing years, primarily beginning in 2008, Benji's became subject to close monitoring of all aspects of its operations, with particular emphasis on its special education programs for disabled students, through appointment of TEA conservators, primarily Dr. Shelly Swedlaw and Dr. Don W. Hooper.

22. Additionally, Benji's financial management and budgets received detailed scrutiny and oversight from both Dr. Hooper and TEA finance expert, Mr. Robert "Mike" Seale.

23. Particularly in light of this intervention and oversight, the objective financial condition of the school, its impressive facilities and learning tools (buildings, physical

4

education track, computers, educational laboratory facilities, uniforms, etc.) were at all times open and obvious to the TEA.

24. During 2009 and 2010, the present use of funds and proposed future budgets were reviewed and analyzed by the TEA and audited financial reporting detailing all expenditures and demonstrating the valuable investment made in facilities and equipment and reflecting a solvent operation, with a net worth of over $1 million, were timely submitted to and accepted by the TEA. No detail was too small to evade notice, and even relatively minor purchases, such as a musical instrument, *i.e.,* a harp, were subjected to criticism by the TEA conservators, themselves being paid out of Benji's current receipts from the TEA and thus further burdening Benji's financial operation.

25. Personality conflicts developed in this process, were not satisfactorily resolved, and culminated in TEA launching a personal vendetta aimed solely at Mrs. Robinson.

26. At the urging of TEA employee Ron Rowell, Drs. Hooper and Swedlaw were directed to make detailed reports concerning Mrs. Robinson personally and her uncooperative and controlling behavior and attitude rather than on objective facts concerning the education and welfare of the students or the financial condition or management of Benji's.

27. As detailed in the Complaint in No. 4-10-CV-03498, at paragraphs 26-58, and in Exhibit 1 above, the plan went into effect in August 2010, and resulted in the appointment of an interim board of managers and interim superintendent on September 3, 2010, displacing Mrs. Robinson from an active role as superintendent. Mrs. Robinson, however, was not discharged, and she continued to report to the school every day. She fully cooperated with the interim board and interim superintendent between September

5

3rd and September 13th, effected changes in the signature cards at the bank and dealt with any and all questions and problems with the transition, and proposed changes in management and operation, including a significantly reduced role and salary for herself. None of this was considered. Instead, as its first order of business, the interim board voted to close Benji's on September 13, 2010, and gave notice of the immediate closure to students, parents, and staff the next day, providing a list of other schools in which to enroll the children but nothing for the displaced educators and staff.

28. Of particular significance to the instant action, even though the TEA had, as set out above, complete and detailed access to, and knowledge of, all of Benji's financial condition, operation, and expenditures, once the interim board of managers took control of Benji's operating bank accounts, the TEA had full control of, and access to, all financial records and thus complete and full knowledge of all payments made by Benji's from the over $3 million in public funds received by Benji's to provide public education to almost 500 children over the preceding year.

29. The defendants in No. 4-10-CV-03495 have effectively admitted this action by the interim board and interim superintendent was unauthorized and *ultra vires,* citing in their answers (Docket Nos. 22 and 23, at ¶ 19), as justification, the provision of law allowing suspension of operations of a school by the charter holder for not more than three days, and that on 14 days advance notice, Tex.Admin.Code § 100.1213(c).

30. In the finest tradition of American citizenship, with the displaced administrator, Mrs. Robinson, leading the fight, the Benji's family stood up to this grossly unlawful action. Mrs. Robinson vowed that Benji's would remain open, the teachers agreed to continue to report, the bus drivers to transport the children, and the parents and students

6

to continue to come to school, all in peaceful disobedience to the grossly unlawful, arbitrary and malicious conduct of the TEA.

31. On September 14, 2010, all the major local news media, including the television station owned by Defendant, The Walt Disney Company, reported the abrupt and sudden closure of the school and the peaceful defiance unfolding at Benji's.

32. Benji's defiance to the events of September 13 and 14, 2010, appeared to surprise the TEA. Mr. Schneider, with apparent misgivings about what he had been a party to, abruptly resigned on September 14, 2010.

33. A new plan was immediately hatched to quash the peaceful and exemplary defiance of the State's arbitrary and malicious action.

34. The first prong of this plan was aimed at quashing public support for Mrs. Robinson's leadership of the school family's peaceful defiance. This prong of the plan was so cynical in formulation and execution that it is hard to imagine any responsible persons charged with carrying out the public trust with even having thought of it, let alone of pursuing it. This prong of the plan was aimed at destroying Mrs. Robinson's reputation in the community at large as a means to undermine her support, and provides the basis of the claim in this action.

35. The plan was simply to report to the major news organizations already involved in covering the story of the abrupt closure of the school and the defiance thereto that over $3 million in public funds given to Benji's over the past year, *i.e.*, the entire annual budget for operations, was unaccounted for, with the clear intent to give the impression to persons of ordinary intelligence that Mrs. Robinson had stolen this vast amount of public

7

money and that Benji's was in effect nothing more than a scam being conducted for the personal benefit of Mrs. Robinson.

36. The proposition that $3 million in public funds was missing and had been pocketed by Mrs. Robinson formed no part of any open meeting held on September 13, 2010, no part of any decision by the interim board of managers, and was not reported by any news organization on September 14, 2010. It only arose after it became clear that Benji's was not going to "take it lying down" in regard to the arbitrary and unlawful decision to immediately close the school.

37. All the current defendants in No. 4-10-cv-0349 deny making any such statement to the news media. (Docket Nos. 22 and 23 at ¶ 57).

38. It remains for discovery to reveal the original source of this devastating calumny.

39. Some credence may be lent to this denial because only one news organization saw fit to publish the accusation.[1] To believe the Defendants is to believe that one news organization concocted the story on its own. That one news organization is Houston ABC Channel 13, KTRK, ("KTRK"), a television station owned by, The Walt Disney Company, as confirmed by The Walt Disney Company's most recent annual report. (Exhibit 2).

40. On September 15, 2010, on the 4:30 PM news, Houston ABC Channel 13, KTRK, in studio reporter Ilona Carson and field reporter Cynthia Cisneros aired a two and a half minute segment on the situation at Benji's. Cisneros said, "According to the State millions in tax payer dollars cannot be accounted for." After playing clips of a parent,

---

[1] KTRK's September 15, 2010 story need only be compared to KHOU or Houston Chronicle, (*infra*, Exhibit 6), stories of the same date which both reported that the Benji's receives more than $3 million annually from the state, but neither report by these other news organizations suggest the entire amount of public funds received by Benji's over the preceding year were unaccounted for and had been misappropriated.

8

Shanika Thompson, and of Benji's spokesmen, Richard Johnson, Cisneros went on to say, "The state closure is based on a lack of sufficient financial records, meaning the state doesn't know where over three million dollars of taxpayer money given last year has been spent." A transcript of the entire broadcast is attached hereto. (Exhibit 3). The video was later published on ABC's website, along with a printed article "Defiant leaders refuse to close school," under Cynthia Cisneros byline. Cisneros wrote: "For the state, the issue is simple – where is the money? They say millions of taxpayer dollars are unaccounted for....The state closure is based on a lack of sufficient financial records, meaning the state doesn't know where the more than $3 million of taxpayer money given last year has been spent..." (Exhibit 4).

41. The article generated 18 Facebook recommendations and 29 comments on KTRK's website, including:

> 4. We have been caught with our hand in the cookie jar, shine the activist bat signal and run out the race card.
> ***
> 10. ...I saw the television report of this story last night, and I am suprised [sic] this school is still open. In true ghetto fashion, our race was made shame of one again. My prayers go out to the children, because most of them are delinquents and truants, that no public school will accept them....
>
> 11. ...poor management.
> ***
> 23. Think about the former TSU President and all the other crooked charter schools that have been the news lately. What do they have in common?
> ***
> 26. It is the money's fault. Those $$$$ stuck their heads up and the people in charge decided they need them for themselves more than the children.
> ***
> 29. I don't understand why they are so upset about the school being closed up. If they had the proper paperwork, could account for all that money and follow the rules like every other school then they wouldn't have this problem.

9

(Exhibit 4).

42. On September 15, 2010, My Fox Houston ran a similar story; however, it made no mention that "millions of taxpayer dollars are unaccounted for". Yet, readers obviously now aware of this allegation posted the following:

> Jasmine. I use to teach at this school and this is BULL BULL...RACE has absolutely NOTHING to do with how misleading this woman Theola Robinson is and this school. TEA did the right thing...and yes I am AFRICAN AMERICAN! This is not a race thing..this woman really is a thief ...
>
> ***
>
> yjones. Theola will never be able to show where the money has gone she is a crook.

(Exhibit 5).

43. The Houston Chronicle also ran a story on September 15, 2010, that made no mention of "millions of taxpayer dollars are unaccounted for." Yet, it had readers saying:

> Gspencer. Where did the $3,300,000.00 for last year go?
>
> ***
>
> RBBR. Something [sic] stinks. Let's get a PI to do an asset search on the "chief executive" and you'll find the missing money.
>
> ***
>
> babydolly. I wonder if Ms. Robinson made a hefty salary and paid herself first? Where IS the money? I can't blame the state for shutting it down. Sooner the better.
>
> ***
>
> RBBR. ...Why didn't you find out what "Chief Executive" Theaola Robinson's annual compensation is? Bet she's not going broke. Dollars to donuts she drives a new Mercedes and lives in an trendy upscale neighborhood...while Benji's swirls down the drain.
>
> ***
>
> A-square...Theaola Robinson where is the remaining 2.3M? TEA should look into her & her crownies' bank accounts/personal assets..just follow the money and you'll find the answer.

(Exhibit 6).

44. On September 16, 2010, the second part of the plan was executed by TEA Commissioner Scott in a letter to Ron Rowell, as Interim Superintendent of Benji's, having replaced Mr. Schneider after his sudden resignation. The letter, while discussing financial concerns, does not mention anything about $3 million in public funds being unaccounted for. Instead, in what can only be characterized as a desperate attempt to bring the TEA action within some semblance of at least the letter of the law, Commissioner Scott, arbitrarily and without any evidence, deemed that the peaceful defiance to the TEA's arbitrary action, the determination to simply continue holding school as usual, was itself endangering the safety, health, and welfare, of the students, thus warranting his immediate action. (No. 4-10-CV-03498, Docket No. 19-7).

45. The story was repeated by Defendant later that month, on September 25, 2010, when KTRK's Dave Ward and Gina Gaston in-studio and Jessica Willey reporting, aired a nearly three minute segment on the situation at Benji's. The video was later published on KTRK's website, along with a printed article "Questions raised over charter school's finances," under Jessica Willey's byline. Willey wrote: "Where is taxpayer money going and how is a taxpayer-owned building being used?...The Texas Education Agency says it doesn't know how Benji's spent $3 million of taxpayer money, and a lease agreement obtained by Eyewitness News raises even new questions."[2]  (Exhibit 7).

46. The article generated 11 comments on KTRK's website, including:

> 1. ...Call and ask where the money went. I'm sure Theola [sic] Robinson tell you.
>
> 2. Could it be in somebody's pockets?

---

[2] The "lease" was no lease but merely a bookkeeping entry labeled "rent in kind," fully accounted for and well known to the TEA, and specifically to Mr. Seale and Dr. Hooper, though review of the Benji's budgets and statements of financial activity. (Exhibit 8).

11

(Exhibit 7).

47. On September 22, 2010, Emi Johnson of the TEA recommended the continued suspension of charter operations and funding, based not on the financial condition of the school, not on $3 million being stolen, but on the civil disobedience led by Mrs. Robinson following September 13, 2010, of simply continuing to keep the school open, having endangered the safety, health, and welfare of the students. (No. 4-10-CV-03498, Docket 19-8).

48. The filing of an action in this Court spurred the next incarnation of KTRK's story on September 27, 2010. The video was later published on ABC's website, along with a printed article "Lawsuit filed against Benji's Academy," under Jessica Willey's byline. Willey wrote: "The Texas Education Agency doesn't know how the academy spent $3 million of state money." (Exhibit 9).

49. The article generated 15 comments on KTRK's website, including:

> 7. ...Ms. Robinson should be arrested, not because she's black, because she's a thief!

> 8. I am just amazed as to why the parents are not suing Theaola Robinson and the old Board of Director, they are the ones who are stealing their children's future...
> ***
> 12. You bet they want to keep it open, if its closed an investigation will show they were all taking money not to mention they won't be able to afford their new house, Hummer and boat payments the school and taxpayers were helping to buy.

(Exhibit 9).

50. KTRK's Cisneros returned to the story on September 30, 2010. The video was later published on KTRK's website, along with a printed article "Charter school fight goes to federal court," under Cynthia Cisneros's byline. Cisneros wrote: "The state says

12

it had no choice, alleging Benji's did not provide proper financial records to account for over $3 million in state funding for the past year." (Exhibit 10).

51. The article generated 14 comments on KTRK's website, including:

> 11. The state is not to blame here. They need to sue the administrators to find out where the money is followed by prosecution of those who may have "mis-spent" it. Put blame where blame is due!
> ***
> 13. Simple! No money! Can not account for $9 [sic] million! Close the doors and take the administrators to court for mis-use of government (your) money....

(Exhibit 10).

52. The KTRK version of the saga was continued by Katie McCall on October 11, 2010. The video was later published on ABC's website, along with a printed article "Organizers plan to reopen troubled charter school," under Katie McCall's byline. McCall wrote: "On September 14, the TEA ordered Benji's Academy to close, citing millions of dollars in state funding that was not accounted for." (Exhibit 11).

53. The article generated 10 comments on KTRK's website, including:

> 2. the only thing organized about this plan is the organized crime
> ***
> 5. ...the parents are supporting the administrators who have a little charisma along with a talent for lining their pockets...
>
> 6. ...The mgmt of this facility, will continue to steal under the guide [sic] of a school, where the kids will continue to suffer[r]

(Exhibit 11).

54. My Fox Houston ran a story about Benji's reopening under new management on October 11, 2010, with no mention of KTRK's reported "millions of dollars in state funding that was not accounted for." Yet, reader comments on Fox's website, reflected

13

the damage to Mrs. Robinson's reputation created by KTRK's statements: "Why isn't Theaola Robinson being charged for misappropriated tax payer funds?" (Exhibit 12).

55. The series of stories broadcast by Defendant, The Walt Disney Company, are untrue and are libelous defamations as defined by Texas law.

56. These libelous defamations were not privileged and were made with malice and the express intent to destroy the reputation of Mrs. Robinson.

57. To the extent any statement in the libelous defamations published or uttered as part of the television broadcast set forth above were uttered or published by one other than The Walt Disney Company, The Walt Disney Company failed to exercise due care to prevent the utterance or publication of the statements.

58. The Court and factfinder need not indulge in any ratiocination to determine how a person of ordinary intelligence would interpret the complained of statements, whether the complained of statements were capable of defamatory meaning, or whether the public generally, and those who know or are acquainted with Mrs. Robinson specifically, understood that the statements referred to Mrs. Robinson. All that is amply demonstrated by the public comments detailed herein, matters not available to courts and juries at the time these legal standards were developed but readily available in the modern digital age and sufficient to prove beyond doubt the wanton and malicious destruction of a good and honest person's reputation.

WHEREFORE, premises considered, Plaintiff demands judgment:

1. For libel *per se* damages found by the trier of fact without proof of special damages;

2. For actual damages and exemplary damages for malicious libel; and

14

3. For all other relief, general and special, legal and equitable, to which she may show herself justly entitled.

Respectfully submitted,

/s/ Berry Dunbar Bowen
Berry Dunbar Bowen
Fed ID No.: 6177
State Bar No.: 02721050
3014 Brazos Street
Houston, TX 77006
(713) 521-3525 (voice)
(713) 521-3575 (fax)
berrybowen@comcast.net
ATTORNEY IN CHARGE FOR
PLAINTIFF

15

APPENDIX TAB J:
Motion for Leave to Amend and
Supplement Complaint in
*Shenitha Comb, et al. v. Rick
Schneider, et al.*, Cause No. 4-
10-CV-03498, in the Southern
District of Texas, Houston
Division (WITHOUT
EXHIBITS)

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

SHENITHA COMB; SHERITA SIMS-COTTON; MINNIE ENGLISH; TRACEY EADEN; LAKEISHA PARKER; NAOMI FLEMMING; IRIS WILLIAMS; BEVERLY BASHIR; BRENDA WITHFIELD; KATHY BUTLER; DEMETRIUS HAWKINS; RANDOLPH NICHOLS; and NANCY WATTA,

§
§
§
§
§
§
§
§
§
§
§
§
§
§

Civil Action No. 4-10-cv-03498

Jury Trial Requested

Plaintiffs,

v.

RON ROWELL, SUPERINTENDENT BENJI'S SPECIAL EDUCATIONAL ACADEMY, INC.; KAY CARR, MEMBER BOARD OF MANAGERS, BENJI'S SPECIAL EDUCATIONAL ACADEMY, INC.; JAMES HOLMAN, MEMBER BOARD OF MANAGERS BENJI'S SPECIAL EDUCATIONAL ACADEMY, INC.; EARNESTINE PATTERSON, MEMBER BOARD OF MANAGERS OF BENJI'S SPECIAL EDUCATIONAL ACADEMY, INC.; and ROBERT SCOTT, COMMISSIONER TEXAS EDUCATION AGENCY,

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

Defendants.

§

**PLAINTIFFS' MOTION FOR LEAVE TO AMEND
AND SUPPLEMENT COMPLAINT**

Pursuant to Rules 15(a) and 15(d), Fed.R.Civ.P., Plaintiffs move for leave to amend and supplement in order to strengthen their allegations both factually and jurisdictionally and to effect the joinder of parties both plaintiff and defendant. The facts alleged in the proposed third amended complaint demonstrate:

1.  The proposed amendment joins parties plaintiff who complain of injuries arising from the same occurrence as alleged by current parties plaintiff.  All plaintiffs seek redress under 42 U.S.C. § 1983.  All issues of fact and law giving rise to the claims are identical.  Only the claims for damages differ as to each plaintiff in nature and amount.

2.  As stated Docket Entry No. 8, part of the story here is the deliberate dissemination of false and misleading information through the media on September 15, 2010, that stated "over 3 million dollars is unaccounted for," successfully creating a public perception that Benji's management and Mrs. Theaola Robinson particularly had simply been running a scam and had stolen millions in public money.  This was done in order to crush at the outset public support for the Benji's community's exemplary campaign of civil disobedience to clearly unlawful state action.  This conduct was committed the day after the unlawful closure in a direct attempt of furtherance of the state's efforts to deprive constitutional rights and summarily close Benji's.  This is one occurrence, one event inflicting multiple harms on variously situated persons.  The joinder of parties defendant properly brings before the Court all parties responsible to redress the harm intentionally inflicted by this calumny maliciously published in order to quash peaceful resistance to unlawful state action depriving constitutional rights, itself resulting in grievous damage of various character and amount, to each plaintiff individually.

3.  Joinder of all parties was sought to be effected by the agreed date, but all previous joinders were stricken as procedurally defective.

2

4. Further facts have come to light, even without discovery, which has just commenced, and the proposed amendment also supplements the previous pleading by setting forth events which have happened since the date of the pleading sought to be amended.

The question on the instant motion is whether, pursuant to Rule 15(a), Fed.R.Civ.P., Plaintiffs should be granted leave to amend and to file the attached amended complaint in this action. A memorandum in support of Plaintiffs' position is attached.

WHEREFORE, movants respectfully request and pray that the Court conclude that justice so requires and freely give leave to Plaintiffs to file the attached amended complaint. A form of order granting the requested relief accompanies this motion.

Respectfully submitted,

/s/ Berry Dunbar Bowen
Berry Dunbar Bowen
Fed ID No.: 6177
State Bar No.: 02721050
3014 Brazos Street
Houston, TX 77006
(713) 521-3525 (voice)
(713) 521-3575 (fax)
berrybowen@comcast.net
ATTORNEY IN CHARGE FOR
PLAINTIFFS

Of Counsel:

Robert A. Jones, Esq.
State Bar No.: 10941500
2211 Norfolk Street, Suite 600
Houston, TX 77098
(713) 526-1171 (voice)
(713) 528-3415 (fax)

3

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served to the parties listed below either via electronic means as listed on the Court's ECF noticing system or via United States first-class mail, on June 24, 2011.

Nancy K. Juren, Esq.
Drew L. Harris, Esq.
Office of the Attorney General
PO Box 12548, Capital Station
Austin, TX 78711

/s/ Berry Dunbar Bowen
Berry Dunbar Bowen

4

# APPENDIX TAB K:
Nonparty KTRK Television, Inc.'s Opposition to Plaintiffs' Motion for Leave to Amend and Supplement Complaint in Cause No. 4-10-CV-03498 (WITHOUT EXHIBITS)

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

SHENITHA COMB, SHERITA            §
SIMS-COTTON, MINNIE ENGLISH,      §
TRACEY EADEN, LAKEISHA PARKER,    §
NAOMI FLEMMING, IRIS WILLIAMS,    §
BEVERLY BASHIR, BRENDA            §
WITHFIELD, KATHY BUTLER,          §
DEMETRIUS HAWKINS, RANDOLPH       §
NICHOLS, NANCY WATTA, SEDALIA     §
PIPPINS, RUFUS PORTER, ANDREA     §
JOHNSON, JACQUELINE BELL-TORAN,   §
THEAOLA ROBINSON, URICA           §
SAMUEL, CHARLES SOLARI, and       §
BENJI'S SPECIAL EDUCATIONAL       §
ACADEMY, INC.,                    §
            Plaintiffs,           §
                                  §
v.                                §    CIVIL ACTION NO. 4-10-CV-03498
                                  §
RICK SCHNEIDER, FORMER            §    JURY TRIAL REQUESTED
SUPERINTENDENT BENJI'S SPECIAL    §
EDUCATIONAL ACADEMY; RON          §
ROWELL, SUPERINTENDENT BENJI'S    §
SPECIAL EDUCATIONAL ACADEMY;      §
KAY CARR, MEMBER BOARD OF         §
MANAGERS, BENJI'S SPECIAL         §
EDUCATIONAL ACADEMY; JAMES        §
HOLMAN, MEMBER BOARD OF           §
MANAGERS, BENJI'S SPECIAL         §
EDUCATIONAL ACADEMY;              §
EARNESTINE PATTERSON, MEMBER      §
BOARD OF MANAGERS OF BENJI'S      §
SPECIAL EDUCATIONAL ACADEMY;      §
ROBERT SCOTT, COMMISSIONER,       §
TEXAS EDUCATION AGENCY; THE       §
WALT DISNEY COMPANY; ABC          §
TELEVISION NETWORK, INC.; CC      §
TEXAS HOLDING CO., INC.; and      §
KTRK TELEVISION, INC.,            §
            Defendants.           §

## NONPARTY KTRK TELEVISION, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO AMEND AND SUPPLEMENT COMPLAINT

Comes Now, KTRK Television, Inc. and files this its Nonparty Opposition to Plaintiffs' Motion for Leave to Amend and Supplement Complaint, and in support thereof would show the Court that one plaintiff in the foregoing matter, Theaola Robinson, has previously filed a lawsuit against The Walt Disney Company for which she could never establish jurisdiction, let her summons lapse and ultimately dismissed the lawsuit without prejudice. She is now trying to incorporate her dismissed libel claims against media defendants for which there is no jurisdiction into this Section 1983 case against state actors. Not only do none of the Plaintiffs besides Ms. Robinson have an interest in any claim against the media, but also, Ms. Robinson's claim, if one exists, belongs only in state court against KTRK Television, Inc. (and none of the other entities she seeks to join in this lawsuit through her current Motion for Leave to Amend) (Docket Entry No. 44). In short, plaintiff Robinson is seeking to have the Court allow her to join improper parties and improper claims after the deadline to amend her pleadings.

## I.
## PROCEDURAL BACKGROUND

1. On or about January 26, 2011, one of the plaintiffs in the foregoing case, Theaola Robinson, through her attorney of record, Berry Dunbar Bowen, filed a completely separate Complaint against The Walt Disney Company, *Robinson v. The Walt Disney Company, Cause No. 4:11-cv-00358*, S.D. Tex. (J. Sim Lake) (attached hereto as Exhibit A). The jurisdiction was allegedly based upon diversity grounds and the claim was for *libel per se* arising out of a broadcast that aired on KTRK on or about September 15, 2010. KTRK Television, Inc. is the owner and operator of the television station KTRK and is the only proper party to any claim that would be brought as a result of a broadcast that aired on KTRK.[1]

---

[1] Plaintiff Robinson has been advised repeatedly as to why there is no jurisdiction over The Walt Disney Company and why it is not a proper party to any claim made against KTRK. The same rationale applies to the distant parent company, CC Texas

2.      As demonstrated by the voluminous correspondence between counsel in the *Robinson v. Disney* suit and attached to the Affidavit of Laura Lee Prather (Exhibit B), jurisdiction over The Walt Disney Company (hereinafter "Disney") was not proper, and Plaintiff Robinson never effectuated service against Disney. In short, and as advised by Disney to Plaintiff Robinson, Disney is an indirect, remote parent corporation that is a nonresident to which Texas' long-arm statute does not extend.

3.      In general, a foreign parent corporation is not subject to the jurisdiction of the forum state merely because its subsidiary conducts business in that forum. *See 3-D Elec. Co., Inc. v. Barnett Const. Co.,* 706 S.W.2d 135, 139 (Tex. App. – Dallas 1986, writ ref'd n.r.e.). More specifically, Disney is a Delaware corporation with its principal place of business in Burbank, California. Disney and KTRK are separate corporate entities and maintain separate corporate identities. Disney has never had any continuous or systematic contacts with Texas; it is not qualified to do business in Texas, has not conducted business in Texas, has not incurred or paid any taxes in Texas, has not appointed an agent for service of process in Texas, has no office or place of business in Texas, has no employees in Texas and owns no real property in Texas. *See* Exhibit B (and attachments thereto). Thus, there is no basis for the courts to exercise personal jurisdiction over Disney in Texas, and courts time and again have held that non-resident Disney is not subject to personal jurisdiction in Texas and that Disney cannot be sued for the alleged conduct of its remote subsidiaries simply for being its parent corporation. *See, Davis v. Star-Telegram Operating, LTD.,* 2000 WL 898839, 29 Media L. Rep. 1755 (Tex. App. – Dallas 2000, writ denied); *Disney Enterprises, Inc. v. Esprit Finance, Inc.,* 981 S.W.2d 25 (Tex. App. – San Antonio 1998, writ dism'd w.o.j.) (attached to Exhibit B-1). *See also, Davidson v. Time Warner,* 1997 WL 405907 (S.D. Tex. 1997) (attached to Exhibit B-3) (J. Rainey held no jurisdiction over parent company, Time Warner, even though its subsidiaries were in the forum state and subject to Texas' jurisdiction.

---

Holding Co., Inc. Further, there is no entity "ABC Television Network, Inc." and, therefore, no such entity can be sued. KTRK Television, Inc. would be the only proper party to a libel claim against the television station. For convenience sake, all of the proposed new defendants are referred to collectively herein as "proposed media defendants."

The court found that simply having a subsidiary corporation in the forum state does not subject the parent company to the personal jurisdiction of the forum state.)

4.     On numerous occasions, Plaintiff Robinson was advised of the corporate and management structure, the lack of jurisdiction over Disney and the identity of the correct potential defendant — KTRK Television, Inc.  In addition, Plaintiff Robinson was advised of the correct venue which is state court for her libel claims against KTRK.  Still, however, Plaintiff Robinson refused to file suit in state court against the proper party.

5.     As recently as May 11, 2011, Plaintiff Robinson was supplied with four more rulings from Texas courts demonstrating there is no jurisdiction over Disney.  *See* Exhibit B-5.  Having not heard back from Plaintiff Robinson's counsel, Disney assumed the matter was closed only to learn, by happenstance, of this latest attempt to drag Disney, ABC Television Network, Inc. (an entity that does not exist), CC Texas Holding Co., Inc. and KTRK into a pending civil rights lawsuit that has been ongoing for more than ten months and for which there is a trial setting in less than a year.  Plaintiff Robinson's counsel never afforded counsel for the proposed media defendants the courtesy of a copy of the proposed Complaint or a "heads up" that the Motion for Leave to Amend had been filed.

6.     In the prior matter, Plaintiff Robinson never did effectuate service on Disney within 120 days after the Complaint was filed as required by Federal Rule of Civil Procedure 4(m) in the *Robinson v. Disney* matter.

7.     Instead, on or about June 2, 2011 (after the deadline had passed to join additional parties in the case before this court — C.A No. 4-10-CV-03498)[2], Plaintiff Robinson filed a Notice of Dismissal and, despite having several exchanges of correspondence with Disney's counsel over a period of approximately two months, never notified Disney's counsel of the dismissal.  A true and correct copy of

---

[2] A true and correct copy of the Scheduling/Docket Control Order is attached hereto as Exhibit B-6.

the Notice of Dismissal and Order of Dismissal without Prejudice signed by Judge Lake are attached hereto as Exhibits B-7 and B-8.

## II.
## ARGUMENT

8.     According to this Court's Scheduling Order (Docket Entry No. 35, 36), the deadline to add new parties passed on June 1, 2011. It was not until June 24, 2011 that Plaintiffs filed their Motion for Leave to Amend and Supplement Complaint (Docket Entry No. 44). The claim Plaintiffs are seeking to add is a state law *libel per se* claim that only plaintiff Robinson holds and one that can only be correctly brought against KTRK Television, Inc. in Harris County, state court pursuant to the mandatory venue provision contained in Tex. Civ. Prac. & Rem. Code §15.017. Contrary to the assertions contained in Plaintiffs' Motion for Leave to Amend and Supplement Complaint, the proposed amended pleading does not "strengthen their allegations factually and jurisdictionally"[3] because all it does is seek to join improper parties over which there is no jurisdiction and join claims that have no bearing on the civil rights issues plead against the state actors which are at the crux of the lawsuit before this Court.

9.     With regard to Plaintiffs' attempt to join improper parties, the affidavit of Laura Lee Prather and exhibits attached thereto establish that Disney is an indirect, remote parent corporation that is a nonresident to which Texas' long-arm statute does not extend. Multiple cases finding no jurisdiction over Disney are attached to the various letters that were previously sent to Plaintiff Robinson's counsel, Berry Bowen. *See* Exhibits B-1, B-3, and B-5. Further, like Disney, CC Texas Holding Co. is also a remote, indirect owner which is incorporated in Delaware and has its principal place of business in New York. It is not registered to do business in Texas and there is no personal jurisdiction over such an entity that has nothing to do with the day-to-day management of KTRK-TV. Finally, there is no entity "ABC Television Network, Inc." as listed in Plaintiffs' proposed Complaint.

---

[3] D.E. No. 44, p. 1.

10.     KTRK Television, Inc. owns and operates the Houston television station KTRK, and if there are any claims to be made arising out of a broadcast that aired on KTRK, the only proper defendant is KTRK Television, Inc. *See* Exhibit B (and attachments thereto).

11.     With regard to Plaintiffs' attempt to add improper claims, Plaintiffs themselves state "[a]ll plaintiffs seek redress under 42 U.S.C. §1983. All issues of fact and law giving rise to the claims are identical."[4] Plaintiffs also claim that all actions were taken "in a direct attempt of furtherance of the state's efforts to deprive constitutional rights...."[5] This is simply not true. KTRK is neither a state actor nor is the alleged claim against KTRK made under Section 1983. In looking at the Complaint filed in *Robinson v. Disney, Cause No. 4:11-CV-00358*, the only claim she attempts to articulate is for *libel per se*. *See* Exhibit A, p. 14. There was no Section 1983 claim alleged against Disney because none can be brought against an entity that is not a state actor.

12.     Plaintiffs now attempt to circumvent the lack of jurisdiction over the proposed media defendants by claiming this Court should exercise supplemental jurisdiction, pursuant to 28 U.S.C. §1367, over a state law claim against the proposed media defendants. Section 1367, however, does not apply if the basis for original jurisdiction is founded upon diversity. Because there is no federal question claim against the proposed media defendants, diversity is the only potential basis for jurisdiction — albeit flawed since there is no personal jurisdiction over any of the proposed out of state media defendants.

13.     Plaintiffs' attempt to cloak the proposed media defendants with the alleged violations of §1983 which they are pursuing against the existing defendant state actors fails on its face. In Plaintiffs' Joinder, they combine both the addition of Benji's Special Educational Academy, which is making Section 1983 claims against the nonmedia defendants with the attempt to join the proposed media defendants, against whom no Section 1983 claims are being brought. In comparing the Joinder of

---

[4] *See* Plaintiffs' Motion for Leave to Amend and Supplement Complaint, para. 1. (Docket Entry No. 44).
[5] *Id.* at para. 2.

Benji's Special Educational Academy (Docket Entry No. 37) to the prior Complaint against Disney (attached hereto as Exhibit A), it is obvious that Plaintiff Robinson has simply cut and pasted virtually her entire dismissed Complaint against Disney[6] into the new Joinder pleading. The only new information contained in the Joinder is Ms. Robinson's claims that TEA deprived her of her employment without due process.

14.    Under §1983, a plaintiff must show a deprivation of a federal right *by a state actor*. *See Nesmith v. Taylor*, 715 F.2d 194, 195 (5th Cir. 1983). To the extent Plaintiffs attempt a Section 1983 claim against the proposed media defendants, as non-governmental actors, the proposed nonmedia defendants can only be held liable if Plaintiffs can allege and prove that, as private actors, the proposed nonmedia defendants were acting under "color of law." To do such, Plaintiffs are required to show that the proposed nonmedia defendants were "willful participant[s] in joint action with the *State* or its agents." *Dennis v. Sparks*, 449 U.S. 24, 27, 101 S.Ct. 183 (1980)(emphasis added). Plaintiffs have not even alleged such in their proposed Third Amended Complaint. (Docket Entry No. 44-3). Thus, because there is no federal question *vis a vis* the proposed nonmedia defendants, there is no basis for supplemental jurisdiction under 28 U.S.C. §1367.

15.    As previously indicated in numerous communications with Plaintiff Robinson's counsel, if there is a claim to be had against KTRK for something that it broadcast, KTRK Television, Inc. is the correct party defendant for any such *libel per se* claim that might be alleged. Because KTRK Television, Inc. is a nondiverse party, there is no basis for federal court jurisdiction. Further, because the claims are state law claims for *libel per se*, pursuant to Tex. Civ. Prac. & Rem. Code §15.017, mandatory venue exists in Harris County state court.

---

[6] The only difference between the dismissed Complaint against Disney and the Joinder is that Plaintiff Robinson has removed her comments about her public figure status (para. 8) and her comments about KTRK being the only entity reporting on the misuse of funds (para. 39). Telling, as well, is the fact that she removes paragraph 28 in which she had previously alleged information that TEA had given to the media.

## III.
## CONCLUSION AND PRAYER

16.     Plaintiff Robinson's attempt to join new parties, out of time, in this lawsuit together with the wholesale failure to notify Disney's counsel of either the dismissal of the prior case (Cause No. 4:11-CV-00358) or the attempt to add Disney, CC Holding Co., Inc., and KTRK Television, Inc. to the pending case are simply an attempt to circumvent the process and have plaintiff Robinson avoid filing her own lawsuit in state court for the claim that she singularly holds against KTRK for *libel per se*. Blatant attempts to circumvent the jurisdictional and procedural laws of the federal and state courts should not be rewarded, and Plaintiffs' Motion for Leave to Amend and Supplement Complaint should be denied.

WHEREFORE PREMISES CONSIDERED, KTRK Television, Inc. prays that Plaintiffs' Motion for Leave to Amend and Supplement Complaint be denied, that this Court refuse to allow Plaintiffs to amend their complaint to add any claims against The Walt Disney Company, ABC Television Network, Inc., CC Texas Holding Co., Inc., and KTRK Television, Inc., and for such other and further relief to which it is justly entitled.

Respectfully submitted,

SEDGWICK, LLP

Laura-Lee Prather
State Bar No. 16234200
Catherine L. Robb
State Bar No. 24007924

919 Congress Avenue, Suite 1250
Austin, TX 78701
Telephone:  (512) 481-8400
Facsimile:  (512) 481-8444

ATTORNEYS FOR NONPARTY KTRK TELEVISION, INC.

## CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of July, 2011, I electronically filed the foregoing document with the Clerk of the Court for the United States District Court, Southern District of Texas, using the CM/ECF system, which will send notification of such filing to the following:

*Plaintiff's Counsel*

Berry Dunbar Bowen
3014 Brazos Street
Houston, TX  77006

And

Robert A. Jones
221 Norfolk Street, Suite 600
Houston, TX  77098

*Counsel for Benji's Special Educational Academy*

Lisa R. McBride
Christopher B. Gilbert
Merri Schneider-Vogel
Thompson & Horton, LLP
3200 Southwest Freeway, Suite 2000
Houston, TX  77027

*Counsel for Defendants Ron Rowell, James Holman,*
*Earnestine Patterson, Robert Scott, Kay Karr and Rick Schneider*

Drew L. Harris
Nancy K. Juren
Office of the Attorney General
P.O. Box 12548
Austin, TX  78711-2548

Laura Lee Prather

# APPENDIX TAB L:
Notice of Dismissal in Cause
No. 4-11-CV-0358

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| THEAOLA ROBINSON, | § | |
| | § | |
| Plaintiff, | § | Civil Action No. 4:11-CV-00358 |
| | § | |
| | § | Jury Trial Requested |
| v. | § | |
| | § | |
| THE WALT DISNEY COMPANY, | § | |
| | § | |
| Defendant. | § | |

## NOTICE OF DISMISSAL

Pursuant to Rule 41(a)(1), Fed.R.Civ.P., Plaintiff, Theaola Robinson, respectfully gives notice of her voluntary dismissal of this action. In support thereof Plaintiff would respectfully show the Court as follows: Defendant, The Walt Disney Company, has neither been served nor answered nor filed a motion for summary judgment in this action. The claims made in this action have been raised in case no. 4:10-cv-03498.

Wherefore, premises considered, Plaintiff prays that the her claims against The Walt Disney Company be dismissed without prejudice, with all costs of court being assessed against the party who incurred them.

Respectfully submitted,

/s/ Berry Dunbar Bowen
Berry Dunbar Bowen
Fed ID No.: 6177
State Bar No.: 02721050
3014 Brazos Street
Houston, TX 77006
(713) 521-3525 (voice)
(713) 521-3575 (fax)
berrybowen@comcast.net
ATTORNEY IN CHARGE FOR
THEAOLA ROBINSON



EXHIBIT
7

# APPENDIX TAB M:
Memorandum and Order in
Cause No. 4-10-CV-03498

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SHENITHA COMB, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-10-3498 |
| | § | |
| BENJI'S SPECIAL EDUCATION | § | |
| ACADEMY, *et al*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

Pending before the Court is a Motion for Summary Judgment filed by Defendants James Holman, Kay Karr, Earnestine Patterson, Ron Rowell, Rick Schneider, and Robert Scott (collectively, the "Defendants"). (Doc. No. 51.) After considering the motion, all responses thereto, and the applicable law, the Court determines that the motion must be GRANTED.

## I.    BACKGROUND

This is an action by a group of parents, guardians, and teachers challenging the abrupt closure of Benji's Special Educational Academy, Inc. ("the Academy" or "Benji's"). Plaintiffs allege that the closure of Benji's violated a number of their rights. Parents and guardians of former Benji's students (the "Parent-Plaintiffs") bring claims for violations of the Individuals with Disabilities Education Act (the "IDEA"), 20 U.S.C. §§ 1400-1490, and 42 U.S.C. § 1983. Randolph Nichols and Nancy Watta, former teachers at Benji's who lost their jobs when the school closed (the "Teacher-Plaintiffs"), also

1

claim violations of 42 U.S.C. § 1983. Defendants are Rick Schneider, the former superintendent of Benji's; Ron Rowell, the current superintendent; Robert Scott, the Commissioner of the Texas Education Agency ("TEA"); and Kay Carr, James Holman, and Earnestine Patterson, members of the Board of Managers installed at Benji's by the TEA.

The facts of this case—which are undisputed, unless otherwise noted—have been discussed in two prior Orders from this Court. (Doc. Nos. 16, 50.) The Court outlines the facts of the case once again, this time considering them in the context of the pending summary judgment motion.

In 1998, Benji's was granted an open-enrollment charter (the "Charter") by the Texas State Board of Education ("SBOE"). (Pl. Am. Compl. ¶ 24, Doc. No. 19.) The Charter specified that it would remain in effect from November 2, 1998 through July 31, 2003, unless renewed or terminated. Paragraph 6 of the Charter states that it may be renewed upon "timely application" by the Academy for an additional period of time to be determined by the SBOE. Upon the Charter's expiration on July 31, 2003, the Academy made a timely application for renewal. The TEA allowed the Academy to continue operating during the pendency of the renewal application.

On July 8, 2010, the Commissioner of the TEA notified the Academy's then-executive director, Theaola Robinson, that he intended to appoint a Board of Managers and a new superintendent in light of the ongoing financial, academic, and governance issues with the Academy. (Pl. Am. Compl., Ex. 2 at 1.) On August 19, 2010, a "record review" hearing was held to provide Ms. Robinson and the Academy with an opportunity to respond to the Commissioner's plan to appoint a Board of Managers and a new

2

superintendent. (Pl. Am. Compl., Ex. 2 at 2.) On September 3, 2010, the Commissioner sent a letter to Ms. Robinson and the members of the Academy's board of directors notifying them that he had decided to appoint a Board of Managers and a new superintendent, Rick Schneider. (Pl. Am. Compl., Ex. 2 at 1, 4.) Under Texas Education Code ("TEC") § 39.112(b), the Commissioner's appointment of a Board of Managers suspended the powers of the Academy's board of directors and of Ms. Robinson.

On September 6, 2010, the interim Board of Managers held a meeting at which they received a report that Benji's was in an urgent financial condition, and might not be able to continue operating. (Doc. No. 51-2 at 17.[1]) On September 10, 2010, the Board of Managers posted notice of a meeting that the Board would be holding on September 13, 2010. (Pl. Am. Compl., Ex. 3.) The notice was accompanied by an agenda stating that meeting would include "discussion and possible action on suspending school programs and/or operations due to budget shortfall." (*Id.* at 3.) In addition, the agenda stated that the Board would consider the "assignment, reassignment, termination or other action" with respect to the school's superintendent/CEO, administrative staff, instructional staff, and other employees. (*Id.*) Neither the notice nor the agenda referred to the possibility of permanently closing the Academy or revoking its Charter. At the September 13 meeting, the Board of Managers voted unanimously to declare financial exigency and to suspend all school programs until further instruction. (Doc. No. 51-2 at 17.)

On September 14, 2010, the new superintendent, Rick Schneider, provided notice to students (which was to be taken home to their parents) that the Board of Managers had

---

[1] This exhibit, submitted with Defendants' Motion for Summary Judgment, is a Proposal for Decision issued by the Administrative Law Judge who heard the appeal by Benji's of the Commissioner's revocation of the Academy's charter. Plaintiffs do not object to this evidence.

3

voted the night before to suspend operations of the school effective at the close of that very same day (September 14th). (Pl. Am. Compl., Ex. 4.) Schneider's notice included an attached list of approximately forty schools in the Houston, Aldine, and North Forest school districts with addresses and phone numbers, and informed parents that they should make arrangements to enroll their students at other schools beginning the next day. (*Id.*) Parents were told that they could pick up their children's school records over the next two business days between 9:00 a.m. and 3:15 p.m. (*Id.*) After Thursday, September 16, 2010, parents would have to contact a regional service center to request their children's records. (*Id.*)

Believing the Board of Managers' suspension of operations to be unauthorized, the Academy's former administrator, Ms. Robinson, along with several other Academy staff members, engaged in a number of activities to prevent the closure of Benji's. On September 14, Ms. Robinson and other staff members allegedly told students to rip up the note from Mr. Schneider to their parents relaying the fact of the Academy's suspension of operations. (Pl. Am. Compl., Ex. 7 at 3.) Ms. Robinson also apparently told students, during a school assembly held on September 14, that the TEA did not think the students were "good enough" to be at the Academy, and that it was shutting down the school for that reason. (*Id.*) She told the assembled students that she would not allow Mr. Schneider to carry out the closure of the Academy. (*Id.*) Both during the assembly and during an employees-only meeting that day, Ms. Robinson stated that she would ensure that the Academy would remain open, and she instructed staff to report to work in the morning as usual. (*Id.* at 4.) Thereafter, Ms. Robinson conducted a televised press conference inside

4

the Academy informing the public that the Academy would continue operating despite the decisions of the Board of Managers and Mr. Schneider. (*Id.* at 4.)

The following day, September 15, 2010, the Academy reopened as an "unaccredited private school," using the Academy's facility and school buses. (*Id.* at 5.) By this point, Mr. Schneider had resigned and been replaced by Ron Rowell as superintendent of the Academy. Mr. Rowell attempted to prepare students' records for distribution to their parents, but was refused access to these records. (*Id.* at 5-6.) Staff from a regional educational service center similarly were refused entrance to the Academy. (*Id.* at 5.)

On September 16, 2010, Commissioner Scott issued an order suspending the Academy's authority to operate as a charter school. (*Id.*) In his order, the Commissioner expressed a finding that conditions at the Academy presented a danger to the health, safety, or welfare of the students, and based this finding upon the actions of the Academy's staff and former administration during the previous two days. (*Id.* at 6.) The Commissioner's letter indicated that a hearing regarding the suspension would be held on September 21, 2010, as required by TEC § 12.1162(d).

The hearing was held on September 21 before the Commissioner's designated hearing officer, Emi Johnson. In a report to the Commissioner dated September 22, 2010, Johnson stated that conditions at the Academy presented a danger to the health, safety, or welfare of the students, as evidenced by the following incidents: (1) school staff instructed students to rip up the communication to parents issued by the school superintendent notifying parents that the school would suspend operations on September 14; (2) school staff told students that TEA did not think the students were "good

5

enough"; (3) school staff directed students to ride on buses and attend classes on September 15; and (4) school staff obstructed the superintendent's access to school records and the school facility. (Pl Am. Compl., Ex. 8.) Johnson noted that there was no indication that the Academy would comply with the September 13 decisions of the Board of Managers. (*Id.*) The Commissioner adopted Johnson's report the same day that it was presented to him. (Doc. No. 51-2 at 20.)

On September 24, the Commissioner issued a notice of intention to revoke the school's open-enrollment charter. (*Id.* at 21.) The notice informed the Academy that it could request a hearing if it notified the Commissioner of such a request within ten business days. (*Id.*) A formal request for hearing was made on October 7, 2010, leading to an administrative hearing on August 12-17, 2011. (*Id.*) Counsel for the Plaintiffs in this case appeared on behalf of Benji's, opposing the charter revocation. A final order was issued on January 17, 2012, revoking the Academy's charter and permanently closing the school. (Doc. No. 51-2.)

## II.    LEGAL STANDARD

Summary judgment is appropriate where the pleadings and evidence show that no genuine issue of material fact exists, and that the movant therefore is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The party moving for summary judgment must demonstrate the absence of any genuine issue of material fact; however, the party need not negate the elements of the nonmovant's case. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1997). If the moving party meets this burden, the nonmoving party must then go beyond the pleadings to find specific facts showing there is a genuine issue for trial. *Id.* "A fact is material if its resolution in favor of one party might affect the outcome

6

of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quotations and footnote omitted).

Factual controversies should be resolved in favor of the nonmoving party. *Liquid Air Corp.*, 37 F.3d at 1075. However, "summary judgment is appropriate in *any* case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *Id.* at 1076 (internal quotations omitted). Importantly, "[t]he nonmovant cannot satisfy his summary judgment burden with conclusional allegations, unsubstantiated assertions, or only a scintilla of evidence." *Diaz v. Superior Energy Servs., LLC*, 341 F. App'x 26, 28 (5th Cir. 2009) (citation omitted). The Court should not, in the absence of proof, assume that the nonmoving party could or would provide the necessary facts. *Liquid Air Corp.*, 37 F.3d at 1075.

## III.   ANALYSIS

### A. Mootness

Plaintiffs seek injunctive relief asking the Court to order Defendants to rescind the notice of suspension or termination of operations of the Academy. Defendants argue that the Court lacks subject matter jurisdiction over Plaintiffs' injunctive relief claim, urging that the revocation of the Academy's charter on January 17, 2012 renders this claim moot.

The "case or controversy" requirement of Article III, § 2, of the Constitution requires that, "throughout the litigation, the plaintiff 'must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision.'" *Spencer v. Kemna*, 523 U.S. 1, 7 (1998) (quoting *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990)). "If a dispute has been resolved or if it has

7

evanesced because of changed circumstances, including the passage of time, it is considered moot." *American Med. Ass'n v. Bowen*, 857 F.2d 267, 270 (5th Cir. 1988). If a case becomes moot, it deprives the court of jurisdiction and should be dismissed under Rule 12(b)(1). *Id.*

It is "beyond dispute that a request for injunctive relief generally becomes moot upon the happening of the event sought to be enjoined." *Harris v. City of Houston*, 151 F.3d 186, 189 (5th Cir. 1998); *Marilyn T., Inc. v. Evans*, 803 F.2d 1383, 1384 (5th Cir. 1986), *abrogated on other grounds by Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190 (1991) (plaintiff's appeal from the denial of preliminary injunctive relief against the suspension of a commercial license moot once the license was permanently revoked). Defendants urge that the request for injunctive relief was mooted by the revocation of the Academy's Charter, as, under Section 12.1161 of the Texas Education Code, a school may not continue to operate or receive state funds once its charter has been revoked. Tex. Educ. Code § 12.1161.

Plaintiffs respond that "[t]his is the only forum to which these truly aggrieved and deserving persons can turn to correct a series of injustices that truly outrage all fundamental and essential values of our Republic." (Doc. No. 55 at 3.) They also urge that "if peaceful disobedience to damaging unlawful state administrative action can itself give rise to a new administrative proceeding which moots the damage claims of all aggrieved parties, then state regulation is a monster with rules without any limits whatever." (*Id.* at 4.) Plaintiffs' responses suggest that they misinterpret Defendants' argument, which is not that Plaintiffs' *damage* claims are moot, but rather that their claims for injunctive relief, which this Court can no longer redress, are moot. The Court

8

agrees that it cannot issue injunctive relief in this case to force the reopening of the Academy. Now that the charter has finally been revoked, the school cannot continue to operate. The Court therefore concludes that Plaintiffs' request for injunctive relief is moot, and must be dismissed under Rule 12(b)(1) for want of jurisdiction.

## B. Teacher-Plaintiffs' Due Process Claims

The Teacher-Plaintiffs bring claims against Defendants under 42 U.S.C. § 1983, alleging that Defendants' actions in suspending the Academy's operations violated the Teacher-Plaintiffs' federal constitutional due process rights. Section 1983 reads:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. To state a cause of action under Section 1983, a plaintiff must (1) allege a violation of rights secured by the Constitution or laws of the United States, and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law. *Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 215 (5th Cir. 1998).

In order to prove that their due process rights were violated, Plaintiffs must show that they have "asserted a recognized liberty or property interest within purview of Fourteenth Amendment and that [they were] intentionally or recklessly deprived of that interest, even temporarily, under color of state law." *Woodard v. Andrus*, 419 F.3d 348, 353 (5th Cir. 2005) (quoting *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 450 (5th Cir. 1994)). Thus, the threshold requirement of any due process claim is the government's deprivation of a plaintiff's liberty or property interest. *DePree v. Saunders*, 588 F.3d 282,

289 (5th Cir.2009). In this case, the Teacher-Plaintiffs allege that they were deprived of their property rights in continued employment at the Academy without due process.

Public employees, including teachers, are entitled to due process protections prior to termination only if they have a property interest in continued employment. *Bd. of Regents v. Roth*, 408 U.S. 564, 576-578 (1972). In order to have a property interest, one must have "a legitimate claim of entitlement" to continued employment, rather than a "unilateral expectation of it." *Id.* at 577. Entitlement to continued employment may be founded upon statutory language creating such an entitlement, or contractual or tenure provisions that require a hearing before dismissal or termination. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985); *Perry v. Sindermann*, 408 U.S. 593, 601 (1972).

In the absence of an explicit contractual provision, a property interest may arise from an implied contract or mutually understood informal procedures. *Perry*, 408 U.S. at 601-02. Ultimately, property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Roth*, 408 U.S. at 577; *see also McDonald v. City of Corinth*, 102 F.3d 152, 155 (5th Cir. 1996) ("State law controls the analysis of whether [a plaintiff] has a property interest in his employment sufficient to entitle him to due process protection."). Thus, to determine whether the Teacher-Plaintiffs had a property interest in continued employment, the Court must look to Texas law.

"In Texas, there is a presumption that employment is at-will unless that relationship has been expressly altered by contract or by 'express rules or policies limiting the conditions under which an employee may be terminated.'" *Leza v. City of*

10

*Laredo*, 2011 WL 2078961, at *3 (S.D. Tex. May 26, 2011) (quoting *Muncy v. City of Dallas*, 335 F.3d 394, 398 (5th Cir. 2003)). At-will employees may be terminated at any time, and therefore have no legitimate right to continued employment and no constitutionally protected property interest in their employment. *Conner v. Lavaca Hosp. Dist.*, 267 F.3d 426, 439 (5th Cir. 2001). In this case, there was a written agreement covering the Teacher-Plaintiffs' employment. The agreement, which was signed by both Teacher-Plaintiffs, has an "At Will Statement." (Doc. Nos. 51-6; 61-7.) The statement reads as follows:

> Employment with Benji's Special Educational Academy is an "At Will Agreement" and at any period of time wage, benefit and conditions of employment or employment can be changed or terminated. Either the employee or Benji's Special Educational Academy may terminate the employment relationship at any time, for any reason, without notice or cause.

(*Id.*) Because the Teacher-Plaintiffs were "at-will" employees, Defendants urge that they had no property interest in continued employment with Benji's.

The Teacher-Plaintiffs contend that that they worked at the Academy under a mutual understanding that they could not be dismissed prior to the end of the school year. They seem to premise this understanding on the fact that, under TEC § 12.1161(b), the Commissioner's denial of a charter school's renewal application requires the state to continue funding the school for the remainder of the year. While the Teacher-Plaintiffs may have believed that the Commissioner's decision not to renew the Academy's charter would not result in their immediate termination, they offer no evidence supporting the notion that they could not be immediately terminated for another reason. Indeed, Defendants offer evidence demonstrating that teachers at Benji's knew, or should have

11

known, that they could be terminated at any time. In a memo sent to Benji's faculty by then-CEO, Ms. Robinson, Robinson informed employees that any employee who contacted Child Protective Services without prior approval by Robinson would be subject to termination. (Doc. No. 51-3.) Although entirely unrelated to the issues in this case, Robinson's memo shows that the Academy's faculty members were (or should have been) aware that they could be fired at any time. Ultimately, Plaintiffs have failed to introduce any evidence of representations made to them regarding a promise or other understanding that they were entitled to employment through the end of the school year.

More importantly, though, an implicit understanding that one's position will continue fails in the face of a written policy indicating that it will not. *See Staheli v. Univ. of Miss.*, 854 F.2d 121, 125 (5th Cir. 1988) (holding that plaintiff's alleged property interest in tenure, arising from his implicit, mutual understanding that his position would continue, failed in light of the university's written tenure policy only allowing tenure to be granted by the chancellor of the university); *Batterton v. Tex. Gen. Land Office*, 783 F.2d 1220, 1223 (5th Cir. 1986) (holding that an informal understanding leading to a property interest may stand only in the "absence of an officially promulgated position, one way or the other, on the issue of a teacher's tenure"). Here, there is both a written contract specifying at-will status, and evidence that the parties' understanding was or should have been consistent with that contract. As such, the Teacher-Plaintiffs' claims must fail.

### C. Parent-Plaintiffs' IDEA Claims

12

The Parent-Plaintiffs claim violations of their statutory right to notice and hearing under the IDEA, 20 U.S.C. § 1415. They also bring a claim under 42 U.S.C. § 1983 based upon the same violations of the IDEA.

The purposes of the IDEA are, among others, "to ensure that all children with disabilities have available to them a free appropriate public education . . . [and] to ensure that the rights of children with disabilities and parents of such children are protected." *Id.* §§ 1400(d)(1)(A)-(B). To that end, the IDEA requires that the local education agency ("LEA") or state educational agency effectuate Individualized Education Programs (IEPs) at the beginning of every school year for each child with a disability in the agency's jurisdiction. *Id.* § 1414 (d)(2)(A). In addition, any state educational agency or LEA that receives funding under the IDEA is required to establish and maintain procedures in accordance with 20 U.S.C. § 1415 of the IDEA to ensure that children with disabilities and their parents are "guaranteed procedural safeguards with respect to the provision of a free appropriate public education." *Id.* § 1415(a).

One aspect of the procedural safeguards mandated by IDEA is the requirement of "written prior notice to the parents of a child, in accordance with subsection (c)(1), whenever the local educational agency—(A) proposes to initiate or change . . . the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to the child." *Id.* § 1415(b)(3). Subsection (c)(1) specifies that the notice required must contain a description of the proposed agency action, an explanation of why the agency proposes to take the action, a description of the agency's bases for taking such action, and a statement notifying the parents that they have due process rights under IDEA to challenge such action. *Id.* § 1415(c)(1). A parent must be

13

given an opportunity to present a complaint "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free public education to such child." *Id.* § 1415(b)(6)(A). A party wishing to make a complaint under this section must provide "due process complaint notice" to the adversary party and forward a copy of it to the State. *Id.* § 1415(b)(7). The "due process complaint notice" is distinct from the "written prior notice" required to be given by the LEA or state educational agency to a parent prior to the proposed change in placement. The state educational agency or LEA must provide for an impartial due process hearing and appeal. *Id.* §§ 1415(f), (g). Parents may seek judicial review of adverse administrative determinations. *Id.* § 1415(i)(2).

The Parent-Plaintiffs' claims focus on the failure of Defendants to provide them with the prior written notice prior to suspending operations of the Academy. They argue that Defendants' closure of the Academy and their directive to parents of IEP students to find new schools constitutes a change in the "educational placement" of students that triggers the written prior notice requirement of 20 U.S.C. § 1415(b)(3). Defendants argue in response that Plaintiffs have not exhausted their administrative remedies, and that, regardless, the IEP students' transfer to a new school is only a "change in location" and not a "change in educational placement" requiring prior written notice to parents.

Before seeking judicial review, plaintiffs bringing a complaint under the IDEA either must exhaust administrative remedies or must show that exhaustion would be futile or inadequate. *Gardner v. Sch. Bd. Caddo Parish*, 958 F.2d 108, 112 (5th Cir. 1992); 20 U.S.C. § 1415(l). In the Fifth Circuit, futility may be shown by either "*systematic* violations that a hearing officer would have no power to address," or a settled state policy

14

that cannot be addressed through the IDEA's administrative remedies. *Papania-Jones v. Dupree*, 275 F. App'x 301, 304 (5th Cir. 2008) (quoting *J.S. v. Attica Cent. Schs.*, 386 F.3d 107, 113 (2d Cir. 2004)). As the Court has noted before, Plaintiffs cannot escape the administrative exhaustion requirements of the IDEA by pleading a cause of action under 42 U.S.C. § 1983 based upon violations of their rights to written prior notice. *See Marc V. v. N. E. Indep. Sch. Dist.*, 455 F. Supp. 2d 577, 592 (W.D. Tex. 2006). Thus, if the Court concludes that Plaintiffs have failed to exhaust their IDEA claims, then their Section 1983 claims must fail on the same basis.

In the Court's October 15, 2010 Memorandum and Order, the Court considered Plaintiffs' request for a preliminary injunction. The Court laid out the standard for administrative exhaustion under the IDEA, and concluded that Plaintiffs had not met their burden of showing that they were excused from the administrative exhaustion requirement. (Doc. No. 16 at 25.) Plaintiffs' Response to Defendants' Motion for Summary Judgment does not even address the administrative exhaustion argument made by Defendants. Thus, the Court must rely upon Plaintiffs' arguments asserted earlier in this case: (1) that administrative exhaustion would be futile because Plaintiffs' right to notice has already been violated; (2) that exhaustion would be inadequate because the administrative process will take between 45 and 60 days to complete; and (3) that the violations alleged are systematic and the result of a settled state policy that cannot be addressed in administrative proceedings.[2]

The Court has already held that the first two of Plaintiffs' arguments are insufficient, noting that, though agency review might not be able to remedy Plaintiffs'

---

[2] Plaintiffs did not put forward the third argument explicitly, but the Court has inferred that they intended to make this argument from the cases relied upon in their preliminary injunction briefing. (Doc. No. 16 at 26.)

15

failure to receive written prior notice, it could fashion an appropriate remedy to address concerns regarding the modification of the students' educational programs. Plaintiffs have not urged reconsideration of this conclusion.

As to Plaintiffs' third argument, the Court found, in its October 15, 2010 Memorandum and Order, that Plaintiffs had not met their burden of showing a systematic violation or a settled state policy. (Doc. No. 16 at 26-27.) Plaintiffs have submitted no further evidence to suggest the presence of either of these factors, and it is clear that they are not implicated in this case. Courts have found systemic violations or settled state policies where plaintiffs are challenging a regulation implementing a state statute, or where deficiencies in the administrative scheme give rise to a plaintiff's injuries. *See, e.g., J.S.*, 386 F.3d at 113-14 (summarizing cases).[3] The "common element" in cases recognizing an exception based upon systemic violations or settled state policies is "that the plaintiffs' problems could not have been remedied by administrative bodies because the framework and procedures for assessing and placing students in appropriate educational programs were at issue, or because the nature and volume of complaints were incapable of correction by the administrative hearing process." *Id.* In the instant case, Plaintiffs' claims do not implicate the framework and procedures for assessing and placing students in appropriate programs; rather, Plaintiffs allege a single, albeit serious, breakdown in the functioning of these procedures. There is no evidence to support an exemption from the administrative exhaustion requirement. Thus, the Parent-Plaintiffs' claims under both the IDEA and Section 1983 must fail.

### D. Qualified immunity

---

[3] The Fifth Circuit has noted that it "find[s] the analysis of the Second Circuit in *J.S.* to be instructive." *Papania-Jones v. Dupree*, 275 F. App'x 301, 304 (5th Cir. 2008).

16

Defendants in this case are all government employees sued in their individual capacities, and thus are entitled to assert a defense of qualified immunity. *Foley v. Univ. of Houston System*, 355 F.3d 333, 338 (5th Cir. 2003). "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). However, as the Court has concluded that none of Plaintiffs' claims can proceed, it need not conduct a qualified immunity analysis.

IV.   **CONCLUSION**

For the reasons discussed above, the Court concludes that Defendants' Motion for Summary Judgment must be **GRANTED**.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this the 28th day of March, 2012.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

17

# APPENDIX TAB N:
First Amended Original Petition
in Cause No. 2011-54895
(WITHOUT EXHIBITS)

No. 2011-54895

THEAOLA ROBINSON,

Plaintiff,

v.

THE WALT DISNEY COMPANY; CC
TEXAS HOLDING CO., INC.; and,
KTRK TELEVISION, INC.

Defendants.

§
§
§
§
§
§
§
§
§
§
§
§
§
§

IN THE DISTRICT COURT OF

FILED
Chris Daniel
District Clerk

JAN 23 2012

Time: _____

By_____
Harris County, Texas
Deputy

HARRIS COUNTY, TEXAS

234th JUDICIAL DISTRICT

## FIRST AMENDED ORIGINAL PETITION

### A. Discovery Control Plan

1. Plaintiff intends to conduct discovery under Level 3 of Rule 190.2, Tex. R. Civ. P.

### B. Parties

2. Plaintiff, Theaola Robinson, a natural person residing in Harris County, Texas.

3. Defendant, The Walt Disney Company is a corporation incorporated under the laws of the State of Delaware and having its principal place of business in the State of California and has entered a special appearance in this action.

4. Defendant, CC Texas Holding Co., Inc., is a corporation incorporated under the laws of Delaware and having its principal place of business in the State of California and has entered a special appearance in this action.

5. Defendant, KTRK Television, Inc., is a corporation incorporated under the laws of Michigan and having its principal place of business in the State of Texas and has appeared and answered in this action.

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

## C. Venue & Jurisdiction

6. Venue is proper in Harris County because all or substantially all of the events or omissions giving rise to the claims occurred in Harris County. At all relevant times to the lawsuit, Plaintiff resided and worked in Harris County.

7. The Defendants have all submitted to the jurisdiction of this Court pursuant to Chapter 73, Tex.Civ.Prac. & Rem. Code or are otherwise generally present. The amount in controversy exceeds the minimum jurisdictional limits of the Court.

## D. Statement of Facts

8. The Walt Disney Company is the owner of a television station and a network of television stations and is a "broadcaster" as defined by Texas law.

9. On August 8, 2010, Rick Schneider responded in writing to the original overture from Ron Rowell asking Schneider to become involved in Benji's Special Educational Academy. Schneider's first point in his response to Rowell succinctly expresses the bottom line situation then prevailing at Benji's, the overarching and defining context in which all the subsequent damaging actions and devastating events have taken place. Schneider wrote:

> If I understand you correctly, the students and school are doing well academically...

(Exhibit 1).

10. This statement succinctly expresses the situation at a remarkable institution, created and nurtured by the mother love and determination of a tireless educator, Mrs. Robinson, *for thirty years*, and reveals the context in which the occurrences giving rise to the rights to relief stated in this action quickly transpired over the next forty days.

2

11. For the thirty years prior to August 2010, Mrs. Robinson had, in total and complete obscurity, through much trial and sacrifice, and with virtually no private support, endeavored to provide for the most helpless and disadvantaged, the most forgotten and discarded, of the young in our society, a setting where they could find a loving and caring home, and, just possibly, find a chance at self-respect, self-discipline, and a foundation for a socially productive and rewarding life.

12. Mrs. Robinson is not and never has been a public figure.

13. This thirty years of work began in 1980 with Mrs. Robinson's creation of a day care academy for young special needs children, her own young son being such a child, having recently become disabled at age three on account of an injury, forcing her to abandon other career aspirations in order to care for him, and her abilities, energy, and love guiding her to care for other similarly needy young children. As detailed herein, thirty years of dedicated service and objective achievement was demolished, and Mrs. Robinson's reputation deliberately ruined, in a relative instant.

14. Mrs. Robinson began this work in the heart of Houston's Fifth Ward, one of the most blighted, impoverished neighborhoods in Houston, Texas, commonly known as a "ghetto," a place where a host of societal ills routinely conspire to blunt the aspirations of a majority of even the most physically and mentally able.

15. To begin her endeavor in 1980, Mrs. Robinson caused to be incorporated a Texas not-for-profit corporation, named Benji's Special Education Academy, ("Benji's"). She began Benji's by caring for her son and one other child at the Greater Love Missionary Baptist Church at 6913 Jensen Drive. Almost immediately, she had attracted twenty children to her program.

3

16. Over the ensuing years, Benji's enrollment grew to almost 100 children, and outgrew the facilities at Greater Love, relocating to a previously abandoned building at 5505 Jensen Drive.

17. Benji's continued to flourish with support from the City of Houston, and by 1996, with an enrollment of 140 students and the cooperation and encouragement of the City of Houston, Mayor Bob Lanier, and Councilman Ernest McGowen, Benji's acquired a lease from the City of Houston on another previously abandoned building, formerly known as White's Appliance Store, located at 2903 Jensen Drive.

18. During all these years, Benji's never charged tuition and the school operated and developed its facilities exclusively on grants from the City of Houston and Mrs. Robinson's personal support, primarily from the proceeds of her late husband's insurance.

19. In 1996, the White's Appliance Building was a boarded-up eyesore, which had become what is commonly known as a "crack house" at the time Mrs. Robinson undertook to renovate, and Benji's to occupy, 5,000 square feet of the 30,000 square foot structure.

20. Also, by this time, the State of Texas had recently adopted laws providing for the creation of public charter schools, and Mrs. Robinson determined to expand Benji's successful program to occupy the entire 30,000 square feet of the White's Building and to convert Benji's into an open-enrollment public charter school.

21. On November 2, 1998, Benji's was granted a contract for an open-enrollment charter by the Texas State Board of Education.

22. Benji's is a "charter holder" as defined in Tex. Education Code § 12.1012.

4

23. During the ensuing years, primarily beginning in 2008, Benji's became subject to close monitoring of all aspects of its operations, with particular emphasis on its special education programs for disabled students, through appointment of TEA conservators, primarily Dr. Shelly Swedlaw and Dr. Don W. Hooper.

24. Additionally, Benji's financial management and budgets received detailed scrutiny and oversight from both Dr. Hooper and TEA finance expert, Mr. Robert "Mike" Seale.

25. Particularly in light of this intervention and oversight, the objective financial condition of the school, its impressive facilities and learning tools (buildings, physical education track, computers, educational laboratory facilities, uniforms, etc.) were at all times open and obvious to the TEA.

26. During 2009 and 2010, the present use of funds and proposed future budgets were reviewed and analyzed by the TEA and audited financial reporting detailing all expenditures and demonstrating the valuable investment made in facilities and equipment and reflecting a solvent operation, with a net worth of over $1 million, were timely submitted to and accepted by the TEA. No detail was too small to evade notice, and even relatively minor purchases, such as a musical instrument, i.e., a harp, were subjected to criticism by the TEA conservators, themselves being paid out of Benji's current receipts from the TEA and thus further burdening Benji's financial operation.

27. Personality conflicts developed in this process, were not satisfactorily resolved, and culminated in TEA launching a personal vendetta aimed solely at Mrs. Robinson.

28. At the urging of TEA employee Ron Rowell, Drs. Hooper and Swedlaw were directed to make detailed reports concerning Mrs. Robinson personally and her

5

uncooperative and controlling behavior and attitude rather than on objective facts concerning the education and welfare of the students or the financial condition or management of Benji's.

29. The plan went into effect in August 2010, and resulted in the appointment of an interim board of managers and interim superintendent on September 3, 2010, displacing Mrs. Robinson from an active role as superintendent. Mrs. Robinson, however, was not discharged, and she continued to report to the school every day. She fully cooperated with the interim board and interim superintendent between September 3rd and September 13th, effected changes in the signature cards at the bank and dealt with any and all questions and problems with the transition, and proposed changes in management and operation, including a significantly reduced role and salary for herself. None of this was considered. Instead, as its first order of business, the interim board voted to close Benji's on September 13, 2010, and gave notice of the immediate closure to students, parents, and staff the next day, providing a list of other schools in which to enroll the children but nothing for the displaced educators and staff.

30. Of particular significance to the instant action, even though the TEA had, as set out above, complete and detailed access to, and knowledge of, all of Benji's financial condition, operation and expenditures, once the interim board of managers took control of Benji's operating bank accounts, the TEA had full control of, and access to, all financial records and thus complete and full knowledge of all payments made by Benji's from the over $3 million in public funds received by Benji's to provide public education to almost 500 children over the preceding year.

6

31. The proposition that $3 million in public funds was missing and had been pocketed by Mrs. Robinson formed no part of any open meeting held on September 13, 2010, no part of any decision by the interim board of managers, and was not reported by any news organization on September 14, 2010.

32. On September 14, 2010, all the major local news media, including the television station owned by Defendant, The Walt Disney Company, reported the abrupt and sudden closure of the school and the peaceful defiance unfolding at Benji's.

33. On September 15, 2010, on the 4:30 PM news, Houston ABC Channel 13, KTRK, in studio reporter Ilona Carson and field reporter Cynthia Cisneros aired a two and a half minute segment on the situation at Benji's. Cisneros said, "According to the State millions in tax payer dollars cannot be accounted for." After playing clips of a parent, Shanika Thompson, and of Benji's spokesmen, Richard Johnson, Cisneros went on to say, "The state closure is based on a lack of sufficient financial records, meaning the state doesn't know where over three million dollars of taxpayer money given last year has been spent." A transcript of the entire broadcast is attached hereto. (Exhibit 2). The video was later published on ABC's website, along with a printed article "Defiant leaders refuse to close school. Under Cynthia Cisneros byline. Cisneros wrote: "For the state, the issue is simple: where is the money? They say millions of taxpayer dollars are unaccounted for....The state closure is based on a lack of sufficient financial records, meaning the state doesn't know where the more than $3 million of taxpayer money given last year has been spent..." (Exhibit 3).

34. The article generated 18 Facebook recommendations and 29 comments on KTRK's website, including:

7

4. We have been caught with our hand in the cookie jar, shine the activist bat signal and run out the race card.

***

10. ...I saw the television report of this story last night, and I am suprised [sic] this school is still open. In true ghetto fashion, our race was made shame of one again. My prayers go out to the children, because most of them are delinquents and truants, that no public school will accept them....

11. ...poor management.

***

23. Think about the former TSU President and all the other crooked charter schools that have been the news lately. What do they have in common?

***

26. It is the money's fault. Those $$$$ stuck their heads up and the people in charge decided they need them for themselves more than the children.

***

29. I don't understand why they are so upset about the school being closed up. If they had the proper paperwork, could account for all that money and follow the rules like every other school then they wouldn't have this problem.

(Exhibit 3).

35. On September 15, 2010, My Fox Houston ran a similar story; however, it made no mention that "millions of taxpayer dollars are unaccounted for". Yet, readers obviously now aware of this allegation posted the following:

> Jasmine. I used to teach at this school and this is BULL BULL....RACE has absolutely NOTHING to do with how misleading this woman Theola Robinson is and this school. TEA did the right thing...and yes I am AFRICAN-AMERICAN! This is not a race thing..this woman really is a thief..
>
> ***
>
> yjones. Theola will never be able to show where the money has gone she is a crook.

(Exhibit 4).

36. The Houston Chronicle also ran a story on September 15, 2010, that made no mention of "millions of taxpayer dollars are unaccounted for." Yet, it had readers saying:

Not a Copy of the Official Office of Christopher Daniel District Clerk

Gspencer. Where did the $3,300,000.00 for last year go?

\*\*\*

RBBR. Something [sic] stinks. Let's get a PI to do an asset search on the "chief executive" and you'll find the missing money.

\*\*\*

babydolly. I wonder if Ms. Robinson made a hefty salary and paid herself first? Where IS the money? I can't blame the state for shutting it down. Sooner the better.

\*\*\*

RBBR. ...Why didn't you find out what "Chief Executive" Theaola Robinson's annual compensation is? Bet she's not going broke? Dollars to donuts she drives a new Mercedes and lives in an trendy upscale neighborhood...while Benji's swirls down the drain.

\*\*\*

A-square...Theaola Robinson where is the remaining $3M? TEA should look into her & her crownies' bank accounts/personal assets..just follow the money and you'll find the answer.

(Exhibit 5).

37. The story was repeated by Defendant later that month, on September 25, 2010. when KTRK's Dave Ward and Gina Gaston in-studio and Jessica Willey reporting, aired a nearly three minute segment on the situation at Benji's. The video was later published on KTRK's website, along with a printed article "Questions raised over charter school's finances," under Jessica Willey's byline. Willey wrote: "Where is taxpayer money going and how is a taxpayer-owned building being used?...The Texas Education Agency says it doesn't know how Benji's spent $3 million of taxpayer money, and a lease agreement obtained by Eyewitness News raises even new questions."[1] (Exhibit 6).

38. The article generated 11 comments on KTRK's website, including:

1. Call and ask where the money went. I'm sure Theola [sic] Robinson tell you.

2. Could it be in somebody's pockets?

---

[1] The "lease" was no lease but merely a bookkeeping entry labeled "rent in kind," fully accounted for and well known to the TEA, and specifically to Mr. Seale and Dr. Hooper, though review of the Benji's budgets and statements of financial activity. (Exhibit 7).

(Exhibit 7).

39. On September 22, 2010. Emi Johnson of the TEA recommended the continued suspension of charter operations and funding. based not on the financial condition of the school. not on $3 million being stolen. but on the civil disobedience led by Mrs. Robinson following September 13, 2010, of simply continuing to keep the school open. having endangered the safety. health. and welfare of the students. (No. 4-10-CV-03498. Docket 19-8).

40. The filing of an action in this Court spurred the next incarnation of KTRK's story on September 27, 2010. The video was later published on ABC's website, along with a printed article "Lawsuit filed against Benji's Academy," under Jessica Willey's byline. Willey wrote: "The Texas Education Agency doesn't know how the academy spent $3 million of state money." (Exhibit 8).

41. The article generated 15 comments on KTRK's website. including:

7. ...Ms. Robinson should be arrested. not because she's black. because she's a thief!

8. I am just amazed as to why the parents are not suing Theaola Robinson and the old Board of Director. they are the ones who are stealing their children's future.

***

12. You bet they want to keep it open. if its closed an investigation will show they were all taking money not to mention they won't be able to afford their new house. Hummer and boat payments the school and taxpayers were helping to buy.

(Exhibit 8).

42. KTRK's Cisneros returned to the story on September 30, 2010. The video was later published on KTRK's website, along with a printed article "Charter school fight goes to federal court." under Cynthia Cisneros's byline. Cisneros wrote: "The state says

10

it had no choice, alleging Benji's did not provide proper financial records to account for over $3 million in state funding for the past year." (Exhibit 9).

43. The article generated 14 comments on KTRK's website, including:

> 11. The state is not to blame here. They need to sue the administrators to find out where the money is followed by prosecution of those who may have "mis-spent" it. Put blame where blame is due!
> ***
> 13. Simple! No money! Can not account for $9 [sic] million! Close the doors and take the administrators to court for mis-use of government (your) money....

(Exhibit 9).

44. The KTRK version of the saga was continued by Katie McCall on October 11, 2010. The video was later published on ABC's website, along with a printed article "Organizers plan to reopen troubled charter school," under Katie McCall's byline. McCall wrote: "On September 14, the TEA ordered Benji's Academy to close, citing millions of dollars in state funding that was not accounted for." (Exhibit 10).

45. The article generated 10 comments on KTRK's website, including:

> 2. the only thing organized about this plan is the organized crime
> ***
> 5. ...the parents are supporting the administrators who have a little charisma along with a talent for lining their pockets...
>
> 6. ...The mgmt of this facility, will continue to steal under the guide [sic] of a school where the kids will continue to suffer]r]

(Exhibit 10).

46. My Fox Houston ran a story about Benji's reopening under new management on October 11, 2010, with no mention of KTRK's reported "millions of dollars in state funding that was not accounted for." Yet, reader comments on Fox's website, reflected

11

the damage to Mrs. Robinson's reputation created by KTRK's statements: "Why isn't Theaola Robinson being charged for misappropriated tax payer funds?" (Exhibit 11).

### E.    Cause of Action – Defamation & Libel

47. The series of stories broadcast by Disney Defendants are untrue and are libelous defamations as defined by Texas law.

48. These libelous defamations were not privileged and were made with malice and the express intent to destroy the reputation of Mrs. Robinson and Benji's.

49. To the extent any statement in the libelous defamations published or uttered as part of the television broadcast set forth above were uttered or published by one other than the Disney Defendants, the Disney Defendants failed to exercise due care to prevent the utterance or publication of the statements.

50. The Court and factfinder need not indulge in any ratiocination to determine how a person of ordinary intelligence would interpret the complained of statements, whether the complained of statements were capable of defamatory meaning, or whether the public generally, and those who know or are acquainted with Mrs. Robinson specifically, understood that the statements referred to Mrs. Robinson. All that is amply demonstrated by the public comments detailed herein, matters not available to courts and juries at the time these legal standards were developed but readily available in the modern digital age and sufficient to prove beyond doubt the wanton and malicious destruction of a good and honest person's reputation.

51. As detailed above, the school was in continuous operation throughout the preceding school year. Over forty staff members, from administrators, to teachers, to janitors, were continuously employed. The school served meals, ran bus transportation,

12

provided activities, etc., all under the watchful eye of the TEA. No rational person could concluded that the entire budget of over $3 million was unaccounted for and the reporting of such an accusation was negligent and malicious.

52. All conditions precedent have been performed or have occurred.

**F.    Request for Disclosures**

53. Under the authority of Rule 194.2. Tex.R.Civ.P., Plaintiff requests the Defendants within fifty (50) days of the service of this Original Petition and Request, produce the information or material described in the relevant rules.

**G.    Conclusion & Prayer**

WHEREFORE, premises considered, Plaintiff demands judgment:

1.  For libel *per se* damages found by the trier of fact without proof of special damages;

2.  For actual damages and exemplary damages for malicious libel; and

3.  For all other relief, general and special, legal and equitable, to which she may show herself justly entitled.

Unofficial Copy Office of Chris Daniel District Clerk

Respectfully submitted,

Berry Dunbar Bowen
State Bar No.: 02721050
3014 Brazos Street
Houston, TX 77006
(713) 521-3525 (voice)
(713) 521-3575 (fax)
berrybowen@comcast.net
ATTORNEY IN CHARGE FOR
PLAINTIFF

13

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing document has been sent via Certified Mail to the following on this 23rd day of January, 2012.

Laura Lee Prather
Catherine Lewis Robb
919 Congress Ave. Suite 1250
Austin, TX 78701

Berry Dunbar Bowen

Unofficial Copy Office of Chris Daniel District Clerk

14

# APPENDIX TAB O:

Appellee's Motion to Dismiss
For Lack of Jurisdiction, in No.
01-12-00372-CV

## NO. 01-12-00372-CV

## IN THE FIRST COURT OF APPEALS
## HOUSTON, TEXAS

### KTRK TELEVISION, INC.,
*Appellant,*

v.

### THEAOLA ROBINSON,
*Appellee.*

### APPEAL FROM THE 234TH JUDICIAL DISTRICT COURT
### HARRIS COUNTY, TEXAS

## APPELLEE'S MOTION TO DISMISS FOR LACK OF JURISDICTION

Berry Dunbar Bowen
Texas Bar No. 02721050
3014 Brazos Street
Houston, Texas 77006
(713) 521-3525
(713) 521-3575 (facsimile)
berrybowen@comcast.net
www.bowenlawyers.net

Attorneys for Appellee

# APPELLEE'S MOTION TO DISMISS FOR LACK OF JURISDICTION

## A. STATEMENT FOR RELIEF

1. Appellee, Theaola Robinson, asks this Court to dismiss the appeal for lack of jurisdiction.

## B. BACKGROUND FACTS

2. On September 4, 2011, Theaola Robinson brought a defamation suit against KTRK Television, Inc. ("KTRK") and others.

3. On December 21, 2011, KTRK filed and served a motion to dismiss pursuant to Chapter 27, Tex. Civ. Prac. & Rem. Code.

4. On January 12, 2012, Robinson and KTRK filed a Rule 11 Agreement consenting to the hearing of the motion to dismiss being set beyond the 30th day after the date of service of the motion.

5. On February 13, 2012, the 234th Judicial District Court heard the motion.

6. On February 23, 2012, the 234th Judicial District Court issued its order denying KTRK's motion to dismiss.

7. On April 20, 2012, KTRK filed its notice of appeal.

## C. ARGUMENT AND AUTHORITIES

8. This case should be dismissed for lack of jurisdiction, as there is no statutory provision authorizing an interlocutory appeal in this situation. Unless an interlocutory appeal is specifically authorized by statute, the appellate court has no

jurisdiction. *See Qwest Communications Corp. v. AT&T Corp.*, 24 S.W.3d 334, 224 (Tex. 2000); *Northeast Indep. Sch. Dist. v. Aldridge*, 400 S.W.2d 893, 895 (1966).

9. The types of interlocutory orders that may be appealed are strictly regulated by statute, and an interlocutory appeal is only authorized if it fits one of the exceptions specifically created by the legislature. *Cherokee Water Co. v. Ross*, 698 S.W.2d 363, 365 (Tex. 1985). Generally, authorized interlocutory appeals are set out in § 51.014 of the Texas Civil Practice and Remedies Code. *See* Tex. Civ. Prac. & Rem. Code § 51.014(a)(1)-(10). KTRK has not brought this interlocutory appeal upon any of the specifically created exceptions in § 51.014, Tex. Civ. Prac. & Rem. Code.

10. KTRK has stated that this appeal is accelerated under § 27.008 Tex. Civ. Prac. & Rem. Code. It is assumed, therefore, that KTRK is relying on that statute to create jurisdiction over an interlocutory appeal of the trial court's February 23, 2012 order denying KTRK's motion to dismiss. However, that section does not provide for an interlocutory appeal of the trial court's February 23, 2012 order, accelerated or otherwise. The statute provides:[1]

> Sec. 27.008. APPEAL.
>
> (a) If a court *does not rule* on a motion to dismiss under Section 27.003 in the time prescribed by Section 27.005, the motion is considered to have been denied by operation of law and *the moving party may appeal.*

---

[1] This is presumably a case of first impression; however, Movant notes that Case No. 02-12-00047-CV, *Jennings v. WallBuilder Presentations, Inc.*, is currently pending in the 2nd Court of Appeals in Fort Worth as an interlocutory appeal of an express order denying a motion to dismiss brought pursuant to Chapter 27.

2

(b)   An appellate court shall expedite an appeal or other writ, whether interlocutory or not, from a trial court order on a motion to dismiss a legal action under Section 27.003 or from a trial court 's failure to rule on that motion in the time prescribed by Section 27.005.

(c)   An appeal or other writ under this section must be filed on or before the 60th day after the date the trial court 's order is signed or the time prescribed by Section 27.005 expires, as applicable.

Section 27.008, Tex. Civ. Prac. & Rem. Code (emphasis added).

11. This appeal does not present an interlocutory appeal under § 51.014(a)(6) which allows media defendants who were denied summary judgment upon a free speech/free press defense to a defamation action under Chapter 73 of the Tex. Civ. Prac. & Rem. Code, to pursue an interlocutory appeal. The order appealed here is an order denying a motion to dismiss brought pursuant to Chapter 27, not an order denying a motion for summary judgment on a claim under Chapter 73. In Chapter 27, the Legislature very clearly set up a procedure outside of summary judgment that provides for early consideration of a motion to dismiss a legal action, upon no or limited discovery, with an expedited time table. The Legislature clearly did not provide for interlocutory appeal of an express denial of a motion to dismiss. By the express terms of § 27.008(a) and (b), an express denial of the motion to dismiss does not trigger a right for a defendant to take an interlocutory appeal. The right to interlocutory appeal is restricted to situations in which the trial court does not timely rule on the motion, and the motion is thus considered to have been denied by operation of law. However, in a defamation action against a media defendant, express denial of a motion to dismiss does not hamper a media defendant from subsequently filing a motion for summary judgment which, if

3

denied, would trigger a specifically legislated right to an interlocutory appeal under § 51.014(a)(6).

12. These schemes are distinct. An interlocutory appeal of the express denial of the motion to dismiss under Chapter 27 cannot be equated to an appeal under § 51.014(a)(6), as that appeal would be untimely. Texas Rules of Appellate Procedure Rule 26.1(b) provides that accelerated appeals must be filed within 20-days of the appealable order being signed. This appeal was taken 57-days after the order was signed, and while timely if it was an accelerated appeal properly brought under Chapter 27, it is not timely for an accelerated interlocutory appeal brought on any grounds in Chapter 51, including an appeal of denial of a motion for summary judgment brought by a media defendant in a defamation action.

13. If the parties agree, a trial court may issue a written order for interlocutory appeal in an action not otherwise appealable under §51.014. *See* Tex. Civ. Prac. & Rem. Code § 51.014(d). There has been no such agreement and order in this action. If the trial court does not issue an order permitting an interlocutory appeal, and none of the other statutory grounds apply, the appellate court must dismiss the appeal for lack of jurisdiction. *See* Tex. Civ. Prac. & Rem. Code §§ 51.014(a), (d); *see also Haase v. Meissner, Bolte & Partner, GBR*, No. 14-11-00114-CV (Tex.App. – Houston [14th Dist.], June 19, 2012, n.w.h.) (Intermediary appellate courts lack jurisdiction to review interlocutory orders unless a statute specifically authorizes an exception to the general rule, *citing Qwest Communications Corp., supra.*).

4

14. The only right to interlocutory appeal by the movant under Chapter 27 arises from a situation where the trial court fails to rule on the motion to dismiss in a timely fashion. Sections 27.008(a) and (b), Tex. Civ. Prac. & Rem. Code, are the only sections which provide for an interlocutory appeal, and are clearly not applicable, as the trial court expressly ruled on KTRK's motion to dismiss within the time prescribed by § 27.005, Tex. Civ. Prac. & Rem. Code. "We strictly apply statutes granting interlocutory appeals because they are a narrow exception to the general rule that interlocutory orders are not immediately appealable." *Homes v. Perez,* 340 S.W.3d 444, 447 (Tex. 2011) (citing *Tex. A & M Univ. Sys. v. Koseoglu,* 233 S.W.3d 835, 841 (Tex. 2007); *Bally Total Fitness Corp. v. Jackson,* 53 S.W.3d 352, 355 (Tex. 2001); *Tex. S. Univ. v. Gilford,* 277 S.W.3d 65, 71 (Tex.App. – Houston [1ˢᵗ Dist.] 2009, pet. filed). No other language in § 27.008, Tex. Civ. Prac. & Rem. Code, can be interpreted as giving rise to the right to an interlocutory appeal when the trial court has timely denied the motion to dismiss, and no language in Section 51.014, Tex. Civ. Prac. & Rem. Code, provides for the right to an interlocutory appeal of a denial of a motion to dismiss under Chapter 27, Tex. Civ. Prac. & Rem. Code. The statute also provides for accelerated appeals by the non-movant plaintiff of orders granting motions to dismiss, but does not provide for an interlocutory appeal where the plaintiff has joined multiple claims or multiple parties in an action and some claims against some defendants are not within the kinds of claims susceptible to a motion to dismiss under § 27.003(a). If the plaintiff has brought only one claim and that claim is dismissed

5

under § 27.005(b), then an appeal by the plaintiff shall be expedited, but such an appeal would not be interlocutory, and that is why § 27.008(b) employs the language "whether interlocutory or not" in mandating expedition of all appeals authorized under Chapter 27, Tex. Civ. Prac. & Rem. Code.

15. KTRK provided a policy discussion regarding passage of the Texas Anti-SLAPP statute in their motion to dismiss pointing out "Texas is the 28[th] state in the nation to adopt an Anti-SLAPP statute." It is therefore instructive to contrast the languages of some of those statutes with that of the Texas statute. For instance, in California, the right to an interlocutory appeal is clearly and explicitly granted: "An order granting or denying a special motion to strike shall be appealable under Section 904.1" Cal. Code of Civ. Proc. § 425.16(i). Additionally compare, Hawaii, Illinois, Missouri, and Vermont which all provide rights to an interlocutory appeal if an anti-SLAPP motion is denied. *See* Haw. Rev. Stat. § 634F-2(2)(A) ("…an immediate appeal from a court order denying the motion"); 735 Ill. Comp. Stat. 110/20(a) ("…from a trial court order denying that motion"); Mo. Rev. Stat. § 537.528.3 ("…shall have the right to an expedited appeal from a trial court order"); and 12 VT. Stat. Ann. Court Procedure § 1041(g) ("An order granting or denying a special motion to strike shall be appealable in the same manner as an interlocutory order."). The Texas Legislature knows how to provide for interlocutory appeals. If the Texas Legislature had wanted to include the right to an interlocutory appeal from a trial court's express order denying a motion to dismiss, it could have; but it didn't. Instead, it specifically limited that right to

6

instances where the trail court does not timely rule and the motion is considered denied by operation of law. This situation is not presented here. The trial court timely denied KTRK's motion. Therefore, this Court has no jurisdiction for this interlocutory appeal.

16. In the specific context of defamation actions against media defendants, there is ample reason and perhaps even wisdom in the Legislature's express limitation of a right to interlocutory appeal by an unsuccessful movant under Chapter 27 to instances in which the trial court fails to rule on a motion to dismiss within a prescribed time period and the motion is thus considered denied by operation of law. If the trial court rules on the motion and grants it, the ruling may result in a final appealable judgment if there are no other claims raised by the petition. If the trial court expressly denies the motion, the case can proceed to discovery. If the trial court is vexed or unsure, it can allow the motion to be denied by operation of law and effectively defer to the appellate court for a ruling in the first instance. This scheme preserves the right of a media defendant whose Chapter 27 motion to dismiss is affirmatively denied by the trial court to perfect an interlocutory appeal if, *after adequate opportunity for discovery*, a motion for summary judgment filed in a defamation action is denied, thus allowing the trial court to exercise discretion over whether to permit interlocutory appeals by media defendants prior to discovery being had. A plaintiff must be given a right to discovery prior to dismissal of a defamation action in which liability is governed by a malice standard. *See Herbert v. Lando,* 441 U.S. 153, 160-177 (1979). What

7

is avoided by the Texas scheme is the possibility of *seriatim* interlocutory appeals in defamation claims against media defendants which trial courts determine to be *prima facie* meritorious without discovery but which may still fail after discovery on motion for summary judgment.

17. Appellate courts have jurisdiction to consider immediate appeals of interlocutory orders only if a statute *explicitly* provides appellate jurisdiction. *Stary v. DeBord*, 967 S.W.2d 352, 352-3 (Tex. 1998). The Court must strictly construe statutes authorizing interlocutory appeals. *See American Online, Inc. v. Williams*, 958 S.W.2d 268, 271 (Tex.App. – Houston [14th Dist.] 1997, no pet.). Lacking a statute explicitly providing the right of interlocutory appeal, this appeal must be dismissed.

**WHEREFORE PREMISES CONSIDERED,** this appeal should be dismissed for lack of jurisdiction.

Respectfully submitted,

By: /s/ Berry D. Bowen
Berry D. Bowen
Texas Bar No. 02721050
3014 Brazos Street
Houston, Texas 77006
(713) 521-3525
(713) 521-3575 (facsimile)
berrybowen@comcast.net
Attorney for Appellee

## CERTIFICATE OF CONFERENCE

I certify that as required by Texas Rules of Appellate Procedure 10.1(a)(5), counsel for Appellee, Berry D. Bowen, conferred with Appellant's counsel-of-record Catherine Robb about the merits of this motion on July 11, 2012, and Appellant opposes this motion.

/s/ Berry D. Bowen
Berry D. Bowen

## CERTIFICATE OF SERVICE

Pursuant to Tex. Rules of Appellate Procedure 9.5(e) and 25.1(e), the foregoing has been served on July 13, 2012 on the following attorney of record.

Laura Lee Prather, Esq.  *Via Facsimile* (512) 867-8609
Catherine Lewis Robb, Esq.
600 Congress Avenue, Suite 1300
Austin, Texas 78701
Attorney for Appellant KTRK Television, Inc.

/s/ Berry D. Bowen
Berry D. Bowen

# APPENDIX TAB P:
Order of February 22, 2013 in
No. 01-12-00372-CV



COURT OF APPEALS FOR THE
FIRST DISTRICT OF TEXAS AT HOUSTON

## ORDER ON MOTION

Cause Number: 01-12-00372-CV

Trial Court Cause
Number: 1154895

Style: KTRK Television, Inc.("KTRK")

v  Theaola Robinson

Date motion filed*: February 22, 2013

Type of motion: Emergency Motion to Stay

Party filing motion: Appellant

Document to be filed: n/a

Is appeal accelerated? ☒ YES  ☐ NO

Ordered that motion is:

☒ Granted

If document is to be filed, document due: _____

☐ Absent extraordinary circumstances, the Court will not grant additional motions to extend time

☐ Denied

☐ Dismissed (e.g., want of jurisdiction, moot)

☒ Other: Trial is stayed pending further action of this Court.

Judge's signature: /s/ Jim Sharp
    ☒ Acting individually  ☐ Acting for the Court

Panel consists of _____

Date: February 22, 2013

# APPENDIX TAB Q:
Notice of Hearing in Cause No.
2011-54895

CAUSE NO. 2011-54895

| | | |
|---|---|---|
| THEAOLA ROBINSON, | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| THE WALT DISNEY COMPANY; | § | |
| CC TEXAS HOLDING CO., INC.; and, | § | |
| KTRK TELEVISION, INC. | § | |
| | § | |
| Defendants. | § | 234TH JUDICIAL DISTRICT |

## DEFENDANTS' NOTICE OF ORAL HEARING

PLEASE TAKE NOTICE that Defendants The Walt Disney Company ("TWDC") and CC Texas Holding Company, Inc. ("CCTHC") Special Appearances filed on November 18, 2011 are hereby set for oral hearing on September 29, 2014 at 1:30 p.m.

Also, PLEASE TAKE NOTICE that Defendant KTRK Television, Inc.'s ("KTRK") Motion And Brief In Support Of Award Of Attorneys' Fees, Court Costs, Expenses, And Sanctions And For Entry Of Final Judgment Pursuant To Chapter 27 Of The Civil Practice And Remedies Code filed on August 14, 2014 is hereby set for oral hearing on September 29, 2014 at 1:30 p.m.

Respectfully submitted,

HAYNES AND BOONE LLP

By: ___/s/ Laura Lee Prather_____
    Laura Lee Prather
    Texas State Bar No. 16234200
    Laura.Prather@haynesboone.com
    Catherine Lewis Robb
    Texas State Bar No. 24007924
    Catherine.Robb@haynesboone.com

600 Congress Avenue, Suite 1300
Austin, Texas 78701
Tel.: (512) 867-8400
Fax.: (512) 867-8470

ATTORNEYS FOR DEFENDANTS KTRK
TELEVISION, INC., THE WALT DISNEY
COMPANY, AND CC TEXAS HOLDING
COMPANY, INC.

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing document has been sent to the following counsel of record and party herein in accordance with the Texas Rules of Civil Procedure on this the 14th day of August, 2014.

Berry Dunbar Bowen
3014 Brazos Street
Houston, Texas 77006

Theaola Robinson
5505 Jensen Drive
Houston, TX 77026

_____
Laura Lee Prather
Catherine Lewis Robb

2

# APPENDIX TAB R:
Supplemental Affidavit on
Attorney's Fees in Cause No.
2011-54895

CAUSE NO. 2011-54895

| | | |
|---|---|---|
| THEAOLA ROBINSON, | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| THE WALT DISNEY COMPANY; | § | |
| CC TEXAS HOLDING CO., INC.; and, | § | |
| KTRK TELEVISION, INC. | § | |
| | § | |
| Defendants. | § | 234TH JUDICIAL DISTRICT |

**SUPPLEMENTAL AFFIDAVIT OF LAURA PRATHER IN SUPPORT OF
AWARD OF ATTORNEYS' FEES, COSTS, EXPENSES AND SANCTIONS,
PURSUANT TO THE TEXAS ANTI-SLAPP STATUTE, CHAPTER 27 OF
THE CIVIL PRACTICE AND REMEDIES CODE**

BEFORE ME, the undersigned authority, on this day personally appeared Laura Lee

Prather, known to me to be the person whose name is subscribed below and after having been

duly sworn, on her oath stated as follows:

1. "My name is Laura Lee Prather. I am over the age of eighteen (18) years. I have
never been convicted of a felony or a crime involving moral turpitude, am under no disabilities,
and am fully competent and qualified to make this affidavit. Each of the statements in this
affidavit is within my personal knowledge and is true and correct.

2. I am a partner with the law firm of Haynes and Boone, LLP, in their Austin,
Texas office. I have been licensed to practice law in the State of Texas since 1992. I hold
degrees from The University of Texas in Austin where I obtained a B.B.A. with highest honors
in 1988 and obtained my J.D. with honors from the University of Texas in Austin in 1991. After
completing law school, I served as a judicial clerk to United States District Judge Hayden W.
Head, Jr. for one year. I am admitted to practice before the United States Courts for the
Southern, Northern, Western and Eastern Districts of Texas, the United States Fifth, Ninth and
Tenth Courts of Appeals, and the Texas Supreme Court. I am also admitted to practice in the
States of California, New York and the District of Columbia. I have received various
recognitions from my peers and through publications, which are described on my résumé,
attached as Exhibit A-2 hereto.

3. I have more than twenty years of experience practicing general civil litigation and
specializing in First Amendment disputes in both federal and state courts throughout Texas
including in Harris County, Nueces County, Bexar County, Travis County, Dallas County, El
Paso County, and more. I have represented hundreds of companies and individuals in a wide
range of cases, including defamation and other cases involving First Amendment concerns.
Accordingly, I am familiar with the standards for practicing law and the usual and customary

fees for litigation of this nature in Harris County. I am qualified by knowledge, skill, experience, training, and education to make the statements contained in this affidavit.

4. I am also intimately familiar with the recently enacted Texas Citizens Participation Act (Tex. Civ. Prac. & Rem. Code, Ch. 27) and the amendments to it contained in HB 2935 passed during the 2013 Legislative session. I worked to obtain passage of both bills, which provide the mechanism for dismissal. Since its passage, I have litigated numerous defamation cases in which we have filed Anti-SLAPP Motions. I have also been called upon as a consultant with regard to Anti-SLAPP matters throughout the State.

5. This affidavit contains information relating to the reasonable attorneys' fees and expenses incurred by Defendant KTRK in defense of the above-captioned legal action. Pursuant to Texas Civil Practices & Remedies Code §27.009(a)(1), I hereby submit this affidavit addressing the following factors: (a) the novelty and difficulty of the question involved and the skill requisite to perform the legal services properly; (b) the fee customarily charged in the locality for similar legal services; (c) the total dollar amount involved and the results obtained; (d) time limitations imposed by the client or the circumstances; (e) the experience, reputation, and ability of the firm and the attorney handling the matter. See Tex. Civ. Prac. & Rem. Code §26.003(a); Rule 1.04(b), Texas Disciplinary Rules of Professional Conduct. I am familiar with the factors established by the Texas Supreme Court regarding the determination of the reasonableness of attorneys' fees, and I have taken all of those factors into consideration in arriving at an opinion as to the reasonable attorneys' fees and expenses incurred by KTRK in this legal action.

6. Plaintiff filed her Original Petition against Defendants on September 14, 2011. In September 2011, I, while a partner at Sedgwick LLP, was engaged to represent Defendants in this lawsuit. In June 2012, I became a partner at Haynes and Boone, LLP and continued to represent Defendants in this lawsuit.

7. Defendants the Walt Disney Company and CC Texas Holding Co., Inc. each filed special appearances while Defendant KTRK filed its answer, special exceptions, and an anti-SLAPP motion to dismiss.

8. Robinson filed suit against KTRK and/or its parent company over the same broadcasts, without success, on two prior occasions, first by improperly suing KTRK's ultimate parent company, The Walt Disney Company ("Disney"), in federal court (Cause No. 4-10-CV-03498) and then by attempting to add Disney and KTRK to a lawsuit she had joined against the TEA (Cause No. 4-11-CV-00358). Robinson filed these actions despite being shown prior decisions and undisputed evidence that there was no jurisdiction over Disney. Not surprisingly, both federal suits were unsuccessful but resulted in substantial unnecessary expenditure of fees by KTRK. However, this state suit and the basis for the Anti-SLAPP award of attorneys' fees, was filed on September 14, 2011.

9. The nature of this proceeding involved a new statute in an emerging area of law. From the outset of this case, Plaintiff chose to ignore the actual statements that were made in the broadcasts at issue and instead mischaracterize them to the Court. Her repeated lawsuits in multiple jurisdictions as well as subsequent writs of mandamus and other unrecognized post-

2

A-308484_1

appeal filings, as well as her refusal to recognize the truth of the statements made (that were further substantiated by discovery responses from the involved state agencies), needlessly increased the cost of this defense. Furthermore, while continuing to ignore Plaintiff's evidentiary issues in this case, Plaintiff's uncompromising stance at every stage in the litigation, including the filing of her 289-page response to Defendant's anti-SLAPP Motion to Dismiss, and the filing of her Amended Petition on January 23, 2012 (after the filing of Defendant's anti-SLAPP Motion to Dismiss), and failure to provide *prima facie* evidence against Defendant's anti-SLAPP Motion to Dismiss, resulted both in the delay of the trial date and the expense of significantly more attorneys' fees than would have otherwise been incurred.

10. KTRK's anti-SLAPP motion filed on December 21, 2011 regarded a new statute in an emerging area of law which required extensive and thorough research into other Texas state court rulings. When Plaintiff filed a 283-page response to Defendant's motion contesting the applicability and the constitutionality of the statute, KTRK was required to defend the statute requiring lengthy hours of drafting and preparation and research of other jurisdictions out of state in preparation for KTRK's Reply.

11. After the hearing on KTRK's anti-SLAPP motion to dismiss, post-submission briefing was extensive as well. On appeal, KTRK not only completely briefed the court on a case that was, at that time, a matter of first impression, but also extensively prepared for and presented oral argument. After the First Court of Appeals issued its opinion, KTRK was required to review not only Plaintiff's Motion for Rehearing, but her subsequent petitions and writs to the Texas Supreme Court. In addition, while the case was on appeal, KTRK had to request emergency relief from the trial court in order to stay discovery.

12. The Anti-SLAPP statute, Tex. Civ. Prac. & Rem. Code §27.009, states that if the court dismisses the case, the Court shall award Defendants, as the moving party, their court costs, reasonable attorneys' fees, and other expenses *incurred in defending against the legal action* as justice and equity may require.

13. In providing the defense of this case, I assigned and supervised all work performed by Sedgwick LLP and then Haynes and Boone, LLP. The majority of the work on this case has been performed by me, with additional work being performed by my fellow partner Thomas Williams, Special Counsel Catherine Robb, and Associate Attorney Alicia Calzada. Haynes and Boone also employed an experienced litigation paralegal, Lucy Netherton, to assist in organizing the enormous amount of evidence required to defend this case.

14. My standard rate is $475 per hour for my services; Mr. Williams' standard rate is $645 per hour; Ms. Robb's standard rate is $400 per hour; and Ms. Calzada's standard rate is $380 per hour. However, Haynes and Boone, LLP has provided KTRK with a negotiated rate of $400 for myself; $495 for Mr. Williams; $295 for Ms. Robb; $225 for Ms. Calzada, and $120 for Ms. Netherton. In addition, after May 2013, an additional 1% fee discount was provided on the negotiated rates for the above attorneys. These rates are comparable to or lower than rates charged by attorneys with similar levels of experience at similar law firms in Harris County, Texas for highly specialized First Amendment work such as the work performed for KTRK in this case. It is also consistent with Defendant's and my opinion, based on my experience in this

3

case and other litigation, that the time spent on this matter was appropriately allocated to various counsel and support staff involved so as to avoid unnecessary duplication of effort and expense.

15. Defendant's counsel has previously submitted invoices to the Court for fees and expenses through July 31, 2014 (billed on August 11, 2014). This Supplemental Affidavit hereby submits the fees and expenses from August 1, 2014 through August 31, 2014 (billed on September 11, 2014) in addition to the Work-in-Progress (WIP) for September (not yet billed) and 8 hours of preparation for the hearing on Defendants' Motion for Attorney Fees for both Ms. Prather and for Ms. Robb, and projected travel expenses to and from the hearing. The fees billed by Defendant's counsel are not contingent on the outcome of this litigation but are fixed fees. Attached hereto as **Exhibit A-1** and incorporated herein by reference are the redacted itemized statement of services rendered by Defendant's counsel on behalf of Defendant and the charge for such services for August 1, 2014 through the present. These records are kept by Haynes and Boone, LLP in the regular course of business, and it was the regular course of business of Haynes and Boone, LLP for an employee or representative with personal knowledge of the act, event or condition recorded, to make the records or to transmit information thereof to be included in such records; and the records were made at or near the time of the act, event, or condition recorded or reasonably soon thereafter. The records attached hereto are exact duplicates of the originals with the exceptions of redactions of billing references that detail Defendant's counsel's strategy and contain attorney-client privilege, and Taxpayer ID and banking account numbers required to be redacted in accordance with the filing rules.

16. The fees, costs, and expenses are broken out on a monthly basis as follows:

| MONTH/YEAR BILLING DATES | ATTORNEY'S FEES | COURT COSTS | EXPENSES & TRAVEL | BILLING TOTALS |
|---|---|---|---|---|
| **PREVIOUS TOTAL[1]** October 2011 – August 2014 | $239,058.80 | $3,123.23 | $2,888.62 | $245,038.97 |
| September 2014 | $5,643.49 | $0.00 | $4.48 | $5,647.97 |
| September WIP | $1,427.00 | $0.00 | $402.70 | $1,829.70 |
| Hearing Prep | $5,560.00 | $0.00 | $600.00 | $6,160.00 |
| | | | | |
| **NEW TOTAL** | **$251,689.29** | **$3,123.23** | **$3,895.80** | **$258,676.64** |

17. The total amount of attorneys' fees incurred on this case between the filing of the Original Petition and the date of the execution of this affidavit has been $251,689.29.

---

[1] The Affidavit of Laura Prather In Support Of Award Of Attorneys' Fees, Costs, Expenses And Sanctions, Pursuant To The Texas Anti-Slapp Statute, Chapter 27 Of The Civil Practice And Remedies Code filed with the Court on August 14, 2014 contained all of the fees information and invoices prior to August 1, 2014 which are reflected in the previous total and incorporated herein by reference.

4

A-308484_1

18. The total amount of expenses incurred on this case between the filing of the Original Petition and the date of the execution of this affidavit has been $3,895.80.

19. The total amount of costs incurred on this case between the filing of the Original Petition and the date of the execution of this affidavit has been $3,123.23.

20. Accordingly, the total reasonable and necessary attorneys' fees, costs and expenses incurred in defending against Plaintiff's suit are $258,676.64, including fees, costs and expenses incurred up to and including the filing of this affidavit.

21. The attorneys' fees incurred are the usual and customary fees for this work and are reasonable and necessary and were incurred in the defense of Plaintiff's claims[2]. In making that evaluation, I considered the fees customarily charged in this area for the same or similar services; the amount that Plaintiff claimed and placed in controversy; the favorable results obtained for Defendant; the likelihood that acceptance of this employment precluded other employment by me and Haynes and Boone; the experience, reputation, and ability of those involved in this lawsuit; the novelty of the Texas Anti-SLAPP statute and its dismissal procedure; and the time limitations imposed by the Texas Anti-SLAPP statute. I also considered the amount of evidence that needed to be filed, the difficulty of the appellate filings, and the fact that the case implicates Defendant's First Amendment rights to report on an ongoing matter of public concern.

22. Counsel in this matter has particularized expertise in this area of the law, has more litigation experience with the anti-SLAPP statute than most, if not all, attorneys in Texas, and was intimately involved in the legislation's history. The litigation has been handled in the most efficient manner possible, and the Anti-SLAPP motion filed in an expeditious fashion within the parameters of the statute. The reasonable and necessary fees incurred in this matter include, but are not limited to, preparing and filing pleadings and other papers with the court; conducting legal research; reviewing and evaluating the case to dismissal; developing, exploring, and implementing legal theories and strategies to present Defendant's defenses to Plaintiff's claims; investigating the facts, documents, testimony, and other evidence relevant to the dispute; preparing for hearing; and, reviewing legal arguments presented by Plaintiff.

23. I have reviewed the time allocated to this matter and the work performed by Haynes and Boone, LLP. I am familiar with my work and the work that was performed by other attorneys in this case. I am also familiar with the work performed by the paralegal, which was performed under my direction and supervision and consists of work traditionally performed by attorneys. The legal services rendered by the paralegal under my direction and supervision in this case have included assisting in preparing exhibits to the Motion to Dismiss, assistance in preparing for court appearances, and document management. The services rendered by the

---

[2] *Arthur Anderson & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812 (Tex. 1997) requires the Court to consider: (a) the time and labor required; (b) the novelty and difficulty of the questions; (c) the skill requisite to perform the legal services properly; (d) the preclusion of other employment by the attorney due to acceptance of the case; (e) the customary fee; (f) whether the fee is fixed or contingent; (g) the time limitations imposed by the client or the circumstances; (h) the amount involved and the results obtained;(i) the experience, reputation, and ability of the attorneys; (j) the "undesirability" of the case; and, (k) the nature and length of the professional relationship with the client. *Id.* at 818.

5

A-308484_1

paralegal and other professionals in this case were not clerical but were the type of services that would have been performed by an attorney if not performed by a paralegal or other professional. The paralegal and other professionals assigned to this case are qualified by education, experience, and training to perform the services required. I am also familiar with the expenses incurred by Defendant in this matter. It is my opinion that the time spent by the attorneys and paralegals, and the expenses incurred by Defendant, were reasonable and necessary in order to defend Defendant in connection with this legal action.

24. Texas Civil Practice & Remedies Code §27.009 also provides for a mandatory award of sanctions in an amount the Court determines is sufficient to prevent Plaintiff from bringing actions similar to this action in the future. The amount of the sanctions award is left to the Court's discretion. However, sanctions sufficient to deter Plaintiff from filing similar claims would be appropriate. It is apparent, from the sheer volume and constancy of Plaintiff's filings and activities in the Court of Appeals and the Texas Supreme Court, that an award of sanctions is not only appropriate, but is vital and necessary to deter Plaintiff from her constant, repetitive filings with the courts always seeking yet another bite of the apple. For example, below is a chart showing the court filings by the Plaintiff since the 1st Court of Appeals opinion was issued on July 11, 2013[3]:

| Motion for Rehearing in No. 01-12-00372-CV | Filed 7/25/2013 | Denied 8/21/2013 |
| --- | --- | --- |
| Petition for Review filed in Supreme Court No. 13-0809 | Filed 10/7/2013 | Denied 1/17/2013 |
| Motion for Rehearing of Petition for Review filed in Supreme Court | Filed 2/03/2014 | Denied 3/7/2014 |
| Petition for Writ of Mandamus filed both in Supreme Court No. 14-0321 and No. 01-12-00372-CV | Filed 4/15/2014 | Denied 6/06/2014 |
| Motion for Rehearing of Petition for Writ of Mandamus and Request for Oral Argument filed in Supreme Court No. 14-0321 | Filed 6/25/2014[4] | Pending |
| Emergencey (sic) Motion To Stay Trial Court Proceeding And Objection To Motion For Summary Judgment And Motion For Continuance Bill of Costs | Filed 9/19/2014[5] (?) | ? |

---

[3] Defendant KTRK hereby requests that the Court take judicial notice of all of the pleadings and papers on file in all of the proceedings, specifically Cause No. 2011-54895, Cause No. 01-12-00372-CV, No. 13-0809, and No. 14-0321.

[4] Due to confusion by the Texas Supreme Court, presumably by Robinson's failure to properly file documents, even though the Motion for Rehearing was supposedly mailed on or about June 25, 2014 the Court failed to file it at that time and only recently "discovered" the document and back-dated it to June 25, 2014. According to the Supreme Court clerk, it has been forwarded to the Court for expedited consideration.

[5] KTRK received an e-mail notification from Robinson on September 19, 2014 that she was filing this document with the Texas Supreme Court; however KTRK has not yet received proof or notification from any court that this document has been filed.

6

A-308484_1

In addition to Plaintiff's copious filings, Plaintiff continuously misrepresents in her Certificates of Service that she is serving pleadings and documents upon Defendants "by US. Mail certified mail, via email, and facsimile." However, Plaintiff continuously mis-states her service to the Courts and to the parties and sends documents only via e-mail. Plaintiff's emailed documents are usually in several forms, are not the same documents which have been filed with the court, and/or contain different exhibits/appendices.[6] Furthermore, Plaintiff's filings with the Court of Appeals and the Supreme Court contain improper attempts at evidence and affidavits which are not allowable under the rules. The economic impact of the Plaintiff's conduct in seeking to deny Defendant their 1st Amendment rights as affirmed by the 1st Court of Appeals is chilling. In light of the foregoing, it is clear that without extensive sanctions, Plaintiff's activities will not be curtailed.

25. If Plaintiff makes an unsuccessful appeal from this lawsuit to the Court of Appeals, I am of the opinion that $25,000 would be a reasonable fee for services performed by Haynes and Boone, LLP on appeal.

26. Further, I am of the opinion that $25,000 would be a reasonable fee for services performed by Haynes and Boone, LLP on appeal of this cause to the Texas Supreme Court.

27. Haynes and Boone, LLP's rates are similar to or lower than rates charged by law firms similar to Haynes and Boone, LLP, for work such as the work we performed in this case. We have experience in defending First Amendment claims and SLAPP suits, and that experience was important in defending this lawsuit, which is based on the Defendant's right of free speech on a matter of public concern. We further have unique experience with the Texas Citizens' Participation Act and its legislative history, which was also important in defending this lawsuit.

28. My opinions expressed herein are based upon all information received to date and are based upon the work performed as of the date of this affidavit. My representation of KTRK will continue through the final resolution of this case, any post-hearing briefing, and any appeals. Therefore, the amounts set forth in this affidavit will change. I reserve the right to supplement this affidavit and its conclusions subject to any additional information made available to me.

FURTHER AFFIANT SAYETH NOT.

DATED this 26 th day of September, 2014.

_____
Affiant

---

[6] Furthermore, Plaintiff's emails containing her partial filings often contain her own personal titles; her "Writ of Mandamus " as emailed to the Defendants on April 15, 2014 contained a document entitled "slapp your moma-1.doc".

7

A-308484_1

SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned authority, on this the 26th day of September, 2014, to certify which witness my hand and official seal.

Cheri Anderson

Notary Public In and For

CHERI ANDERSON
Notary Public
STATE OF TEXAS
My Comm. Exp. July 24, 2015

The State of Texas
My Commission Expires: July 24, 2015

Unofficial Copy Office of Chris Daniel District Clerk

8

# EXHIBIT A-1

Unofficial Copy Office of Chris Daniel District Clerk

# haynes*boone*

Invoice Number: 21090701
Client/Matter Number: 0049141.00002
September 11, 2014

The Walt Disney Company
Indira Satyendra
ABC Inc
77 West 66th Street 15th Fl
New York NY 10023

Tax Identification No, ██████

**Billing Attorney: Laura Prather**

*For Professional Services Through August 31, 2014*

0049141.00002
Theaola Robinson Litigation

---

## Professional Fees

| Date | Timekeeper | Description | Hours |
|------|-----------|-------------|-------|
| 08/04/14 | Laura Prather | Review and SLAPP fee awards in preparation for motion for fees. | 0.70 |
| 08/11/14 | Lucy Netherton | Revise Motion for Attorney's Fees and Revise attorney's fees affidavit. | 4.20 |
| 08/11/14 | Laura Prather | Review and outline suggested revisions to draft motion for fees. | 0.50 |
| 08/12/14 | Alicia Calzada | Review and revise motion for fees. | 1.50 |
| 08/12/14 | Lucy Netherton | Review Motion for Attorney's Fees and all exhibits; prepare and redact all billing statements; revise Ms. Prather's affidavit including attorney's fees numbers. | 5.80 |
| 08/12/14 | Laura Prather | Review and revise Motion for Fees and supporting affidavits. | 0.80 |
| 08/13/14 | Lucy Netherton | Revise Motion for Attorney's Fees and prepare all exhibits for filing; review current John Moore case for latest exhibit; review Ms. Prather's affidavit; research additional attorney's fees cases for inclusion in Motion; communicate with Ms. Prather regarding same; revise exhibit list for inclusion in Motion. | 5.20 |
| 08/13/14 | Laura Prather | Continue working on Motion and Brief in Support of Fees and Affidavits and exhibits in support of same; send to client for comment. | 2.10 |

| 08/14/14 | Alicia Calzada | Locate Rustic Cedars' attorney's fees order for inclusion in motion. | 0.10 |
| 08/14/14 | Lucy Netherton | Revise Motion for Attorney's Fees; finalize all exhibits for same; draft Order Granting Motion on Attorney's Fees; revise Notice of hearing to reflect filing dates; draft Orders granting special Appearances; review district Court's docket regarding special appearances. | 4.70 |
| 08/14/14 | Laura Prather | Review suggested edits to motion and exhibits. | 0.30 |
| 08/14/14 | Catherine Robb | Review and revise proposed Orders for filing; finalize and file Motion for Fees and Orders. | 1.10 |
| 08/18/14 | Lucy Netherton | Communicate with court coordinator regarding new time for hearing; draft amended notice of hearing; obtain all cases cited in briefing in preparation for hearing. | 2.30 |
| 08/28/14 | Laura Prather | Review briefing ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ in preparation for upcoming hearing on motion for fees. | 1.20 |

**Chargeable Hours  30.50**

**Total Fees**                                                   $5,700.50

Adjustment (Fee Adjustment Less 1%)                             ($57.01)

**Total Adjusted Fees**                                          $5,643.49

**Expenses Summary**

| Description | Amount |
| --- | --- |
| Photocopy | $4.48 |
| **Total Expenses** | **$4.48** |

**Total Fees, Expenses and Charges**                            $5,647.97

**Total Amount Due**                                        USD $5,647.97

The Walt Disney Company
Invoice Number: 21090701
Client/Matter Number: 0049141.00002

The Walt Disney Company
Indira Satyendra
ABC Inc
77 West 66th Street 15th Fl
New York NY 10023

**Client/Matter: 0049141.00002**
**Theaola Robinson**
Billing Attorney: Laura Prather

## REMITTANCE PAGE
*For Professional Services Through August 31, 2014*

Remit to:

    Haynes and Boone LLP
    P.O. Box 841399
    Dallas, TX 75284-1399

| | |
|---|---:|
| Total Fees | $5,700.50 |
| Adjustment (Fee Adjustment Less 1%) | ($57.01) |
| Total Adjusted Fees | $5,643.49 |
| Total Expenses | $4.48 |
| **Total Fees, Expenses and Charges** | **$5,647.97** |
| **Total Invoice Balance Due** | **USD $5,647.97** |

**WIRING INSTRUCTIONS FOR OPERATING ACCOUNT**
Any bank wire fees are the responsibility of the sender.
BANK OF AMERICA 100 West 33rd Street New York, NY 10001
For Credit to the Account of HAYNES AND BOONE, LLP
ABA NO. 0260-███    Operating Account No.: 018-████

**SWIFT Address: BOFAUS3N**

**For ACH Payments**
For Credit to the Account of HAYNES AND BOONE, LLP
ABA NO. 111████ Operating Account No.: 018████
Please Reference Invoice Number: 21090701
Responsible Attorney: **Laura Prather**
Client Number: 0049141.00002

Unofficial Copy @ Office of Chris Daniel District Clerk

# EXHIBIT A-2

Unofficial Copy Office of Chris Daniel District Clerk



# haynes*boone*

Setting precedent

**Partner**

**Areas of Practice**
- Business Litigation
- Social Media
- Media and Entertainment
- Sports Law
- Appellate
- Intellectual Property Litigation
- Litigation/Trial Practice
- Government Relations

Austin
600 Congress Avenue
Suite 1300
Austin, Texas 78701
T: +1.512.867.8476
F: +1.512.867.8609

Houston
1221 McKinney Street
Suite 2100
Houston, Texas 77010

**Education**
- J.D., University of Texas at Austin School of Law, 1991, *with honors*
- B.B.A., University of Texas at Austin, 1988, *with highest honors*

**Bar Admissions**
- Texas
- California
- District of Columbia
- New York

**Court Admissions**

## Laura Lee Prather
laura.prather@haynesboone.com

Laura Lee Prather is a partner in the Litigation Practice Group in the Austin office of Haynes and Boone, LLP. Laura focuses her practice on First Amendment, intellectual property and media and entertainment litigation and appeals. She has significant government relations experience as an advocate at the Texas Legislature on First Amendment and open government concerns. Laura advises an extensive array of content providers including online and traditional newspapers, magazines, radio and broadcasters, cable television stations, production companies and music and sports entities. She regularly wins early dismissal and summary judgment of cases - oftentimes without the expense of discovery. For this, she was recognized in 2011 as a BTI Client Service All-Star.

Laura was the lead author and negotiator for the three most significant pieces of First Amendment legislation in recent history in Texas - the reporters' privilege, the anti-SLAPP statute, and the Defamation Mitigation Act. Through her efforts, Laura both formed and led the coalitions in support of all three of these measures, making Texas the 37th state to pass a reporters' privilege, the 28th state to adopt an anti-SLAPP statute, and the 32nd state to enact a retraction statute. All three laws are designed to promote and protect free speech rights in Texas.

In 2011, Laura was named by *The American Lawyer* as one of the best young women lawyers in the nation. She was recognized for her substantial career as a fierce advocate dedicated to preserving First Amendment rights, defending media companies in cases involving reporting on matters of public concern, and defending entertainment companies in theft of idea, trademark and copyright infringement litigation. In addition, Laura is the first woman to receive Texas Daily Newspaper Association's "Legacy Award," and has been named Texas Association of Broadcasters' "Associate of the Year" and as one of Texas Lawyer's "Extraordinary Women in Texas Law."

**Published Decisions**

- *KTRK Television, Inc. v. Robinson*, 409 S.W.3d 682 (Tex. App. – Hou. [1st Dist.] 2013, pet. denied)

- *Jehling v. A.H. Belo Corp.*, slip copy, 2013 WL 5803813, N.D. Tex., October 28, 2013 (No. 3:11-CV-1258-B)

- *Canales v. ALM Media, LLC*, slip copy, 2013 WL 5719476, W.D. Tex. October 18, 2013 (No. A-12-CV-1036-LY)

- *KTRK Television, Inc. v. Robinson*, 01-12-00372-CV, 2013 WL 3483773 (Tex. App.—Houston [1st Dist.] July 11, 2013, no. pet. h.)

- *Hogs Dogs & Lace, LLC v. A&E Television Networks, LLC*, 2013 WL 3367296, E.D. Tex., July 3, 2013 (No. 1:123-CV-583)

- *Neely v. Wilson*, _____ S.W.3d _____, 2013 WL 3240040, 41 Media L. Rep. 2129, 56 Tex. Sup. Ct. J. 766, Tex., June 28, 2013 (No. 11-0228)

- U.S. Court of Appeals for the Fifth Circuit
- U.S. Court of Appeals for the Ninth Circuit
- U.S. Court of Appeals for the Tenth Circuit
- U.S. District Court for the Eastern District of Texas
- U.S. District Court for the Northern District of Texas
- U.S. District Court for the Southern District of Texas
- U.S. District Court for the Western District of Texas

- *Garza v. Eagle Creek Broadcasting*, 2012 WL 6061784, 40 Media L. Rep. 2686, Tex. App. – Corpus Christi, December 6, 2012 (No. 13-10-00573-CV)

- *Arbor Consulting, Inc. v. Better Business Bureau of Austin*, 2011 WL 6160498, Tex. App. – Eastland, December 8, 2011 (No. 11-11-00109-CV)

- *McClain v. USA Today Newspaper*, 2010 WL 2404651, Tex. App. – Dallas, June 17, 2010 (No. 05-08-01123-CV)

- *In re Rabb*, 293 S.W.3d 865, 2009 WL 2437212, Tex. App. – Dallas, July 31, 2009 (No. 05-09-00857-CV)

- *Rosenfeld v. Twentieth Century Fox Film Corp.*, 37 Media L. Rep. 1348 (C.D. Cal. 2009)

- *Busch v. Lovers Lane United Methodist Church*, 2008 WL 345450, Tex. App. – Dallas, February 8, 2008 (No. 05-07-00761-CV)

- *Piki v. Enriching Entertainment, LLC*, 2008 WL 80004, E.D. Tex., January 7, 2008 (No. CIV.A. 4:07CV514)

- *Huffman v. Best for Texas PAC*, 37 Media L. Rep. 1351 (Tx. Dist. Ct. – Harris Co. 2008)

- *KENS-TV, Inc. v. Farias*, 36 Media L. Rep. 1076 (Tex. App. – Dallas 2007, no pet.)

- *Bailey v. Bowles*, 2007 WL 3121678, Tex. App. – Dallas, October 26, 2007 (No. 05-07-00620-CV)

- *Busch v. Lovers Lane United Methodist Church*, 2007 WL 2380293, Tex. App. – Dallas, August 22, 2007 (No. 05-07-00761-CV)

- *Busch v. Williams*, 2007 WL 2254939, N.D. Tex. February 7, 2007 (No. CIV.A. 3:06CV1352-D)

- *In re Guidant Corp.*, 2006 WL 1030153, Tex. App. – Corpus Christi, April 18, 2006 (No. 13-06-166-CV)

- *In re BP Products North America, Inc.*, 263 S.W.3d 117 (Tex. App. – Hou. [1st Dist.] 2006, no pet.)

- *Topheavy Studios, Inc. v. Doe*, 33 Media L. Rep. 2192 (Tex. App. – Austin 2005, no pet.)

- *Boone R. Enterprises, Inc. v. Fox Television Stations, Inc., Paul Adrian and Ernestor Pena*, 189 S.W.3d 795 (Tex. App. – Dallas 2005, no pet.)

- *UTV of San Antonio, Inc. d/b/a KMOL-TV v. Ardmore, Inc.*, 82 S.W.3d 609 (Tex. App. – San Antonio 2002, no pet.)

- *Provencio v. Paradigm Media, Inc., d/b/a The Texas Network*, 44 S.W.3d 677 (Tex. App. – El Paso 2001, no pet.)

- *NW Communications of Texas, Inc., David Christopher and Kay Vinson v. John Power, Individually and d/b/a Brushield Systems of America*, 28 Media L. Rep. 2483 (Tex. App. – Dallas 2000, pet. denied)

- *Sharp v. Cox Texas Publications, Inc.*, 943 S.W.2d 206 (Tex. App. – Austin 1997, no writ)

- *Memorial Hosptial-The Woodlands v. The Honorable F. Scott McCown*, 927 S.W.2d 1 (Tex. 1996)

In addition to her private practice, Laura has served as the program

attorney for the national television shows *Christina's Court* and *Judge Alex*, serves as an adjunct professor at the University of Texas School of Law in Media & Entertainment Law, and was the editor of the *E-Copyright Law Handbook* published by Aspen Law and Business.

Laura works on legislative initiatives and lobbying as a member of the Texas Association of Broadcasters' Legislative Task Force, the Public Participation Project's National Board of Directors, the General Counsel for the Legislative Advisory Committee of the Texas Daily Newspaper Association and the Texas Press Association, and as a co-chair of the Freedom of Information Foundation of Texas' Legislative Committee. She has also initiated and chairs the Media Libel Resource Center's State Legislative Committee, bringing together lobbyists from virtually every state that works on legislation impacting the media industry and government transparency. Laura has been elected to the National Board of Directors for the Student Press Law Center for the 2011-2013 term.

In May 2009, Texas became the 37th state to enact a reporter's privilege when Gov. Rick Perry signed the Texas Free Flow of Information Act. Laura represented the Texas Daily Newspaper Association, the Texas Press Association, the Texas Association of Broadcasters and the Freedom of Information Foundation of Texas on this issue. She was at the forefront of the efforts to get this law passed since 2005 and 2007. Laura was the chief drafter and negotiator for the Free Flow of Information Act and testified multiple times before various legislative committees in the process of gaining its passage.

**Selected Publications and Speeches**

- "A Victory For State Anti-SLAPP Laws," *Law360*, July 16, 2014.

- "Texas Newsroom Legal Toolbox," Speaker, Texas Association of Broadcasters, Austin, Texas, August 21, 2013.

- "Eye on the Lege," Panelist, Freedom of Information Foundation of Texas Annual State Conference, Austin, Texas, August 9, 2013.

- "Anti-SLAPP laws," Speaker, American Legislative Exchange Council, 40th Annual Meeting, August 8, 2013.

- "A Trifecta Of 1st-Amendment Advances In Texas," *Law 360*, July 29, 2013.

- "The New Defamation Mitigation Act – How It Affects Texas Newsrooms," *TABulletin*, July 1, 2013.

- "Open Government Seminar," panelist, State Bar of Texas Annual Meeting June 21, 2013.

- "New Laws Protecting Texas Newsrooms," Freedom of Information Foundation of Texas website, June 2013.

- "Anti-SLAPP Update: Texas' Citizen Participation Act Gets Stronger," Freedom of Information Foundation of Texas website, June 21, 2013.

- "Texas Adopts the Defamation Mitigation Act," Freedom of Information Foundation of Texas website, June 21, 2013.

- "FOI Report," panelist, Texas Associated Press Managing Editors Annual Convention, April 7, 2013.

- "Newsroom Outlook," panelist, Texas Association of Broadcasters 2013 Legislative Day, January 28, 2013.

Unofficial Copy Official Copy of this District Court

Media, Privacy and Defamation Law Committee Newsletter, American Bar Association, Spring 2012.

- "How to Get an Anti-SLAPP Statute Passed," speaker, Newspaper Association Managers 2011 Legislative Conference, Washington, D.C., December 5, 2011.

- "Texas Laws that Benefit the Media: Anti-SLAPP, Reporter's Privilege and Interlocutory Appeal," speaker, Texas Association of Broadcasters (TAB) Newsroom Workshop, Southern Methodist University, Dallas, TX, October 29, 2011.

- "Tort Reform in Media Law," speaker, Texas State University's Mass Communication Week, San Marcos, TX, October 18, 2011.

- "Defending Your Newsroom - Using the Anti-SLAPP Law, Free Flow of Information Act and the Interlocutory Appeal," speaker, webinar for the Texas Association of Broadcasters, October 5, 2011.

- "Passage Of The Texas Anti-SLAPP Statute - How It Happened And What It Could Mean For You!" author, *Media, Privacy and Defamation Law Committee Newsletter,* Fall 2011.

- "Winners & Losers: Scoring the 82nd Legislature," panelist, FOIFT State Conference, Austin, TX, August 12, 2011.

- "FCC Compliance," panelist, FOIFT State Conference, Austin, TX, August 10, 2011.

- "Newspapers Benefit from Anti-SLAPP Law," author, *Daily Tribune,* July 22, 2011.

- "Texas Newsrooms Will Benefit from Anti-SLAPP Law," author, *Texas Daily Newspaper Association e-Bulletin,* July 15, 2011.

- "Primer on Texas Anti-SLAPP Statute," author, Freedom of Information Foundation of Texas (FOIFT) website, July 15, 2011.

- "Texas Newsrooms Will Benefit from Anti-SLAPP Law Protecting First Amendment Rights," author, Texas Association of Broadcasters Bulletin, July 11, 2011.

- "Passage of the Texas Anti-SLAPP Statute," author, MLRC Media Law Letter, July 2011.

- "Strategies for Efficiently and Economically Winning a Media Case," co-author, ABA/TIPS Media Newsletter, Spring 2011.

- "Freedom of Information," panelist, Texas Association of Licensed Investigators Mid-Winter Conference, San Antonio, TX, February 18-19, 2011.

- "Hot Issues in Reporter's Privilege and Anti-SLAPP Laws," panelist, ABA Forum on Communications Law 16th Annual Conference, Rancho Mirage, CA, February 3-5, 2011.

- "The Texas Legislative Process: What Every Lawyer Should Know and Transparency in Government," panelist, State Bar of Texas Continuing Legal Education Program, Austin, TX, February 1, 2011.

- "How to Prevent the Sting of a SLAPP," author, Sedgwick's Media Law Bulletin and the Freedom of Information Foundation of Texas website, November 2010.

- *Reporter's Privilege Compendium,* co-author, The Reporters Committee for Freedom of the Press, 2010.

Unofficial Copy from Chris Daniel District Clerk

Austin, Texas, October 16, 2010.

- "Texas Free Flow of Information Act," speaker, Texas Associated Press Managing Editors 2010 Annual Convention, College Station, Texas, March 27, 2010.

- "Hot Issues in Reporters Privilege/Subpoenas," moderator, ABA Forum on Communications Law 15th Annual Conference, Key Largo, FL, January 28-30, 2010.

- "Alternative Billing Arrangements" moderator, Women in Communications Law Committee meeting, ABA Forum on Communications Law 15th Annual Conference, Key Largo, FL, January 28-30, 2010.

- "The Lawful Truth: Discussing Issues in Mass Communication Law," speaker, Association for Women in Communications, Austin, TX, October 21, 2009.

- "Appeals Court Thwarts Attempt to Gut Shield Bill Provision," author, Texas Press Messenger, September 2009.

- "Let the Free Flow of Information Begin: Texas Adopts 'Reporter's Privilege'," author, Texas Press Association's eBulletin, July 2009.

- "Legislative Update on Free Flow Act," Speaker, Texas Press Association Annual Convention, June 19, 2009.

- "Texas Becomes Number 37 in States that have a Reporter's Privilege," author, MLRC Media Law Letter, May 2009.

- "The Television Decency Cases: Are F-Words and Fleeting Expletives Sanctionable?" moderator, American Bar Association Section of Litigation Annual Conference, April 30, 2009.

- "Hot Issues in Subpoenas," speaker, American Bar Annual Conference Forum on Communications Law, Scottsdale, AZ, February 5, 2009.

- "Advancing the Free Flow of Information Act," speaker, Texas Association of Broadcasters Legislative Day on the Free Flow Initiative, Austin, TX, February 2, 2009.

- "Freedom of Information/Open Government Panel," panelist, Texas Associated Press Managing Editor's Legislative Conference, Austin, TX, January 7, 2009.

- "Golly, I Just Got Fined by the FCC Again!" author, Sedgwick's Media Law Bulletin, January 2009.

- "Recent Attempts to Enact State Shield Laws," author, MLRC Committee Report, December 2008.

- "Newsroom Legal Issues / Free Flow of Information Act (FFOIA)," speaker, Southwest Broadcast Newsroom Workshop, Austin, TX, October 4, 2008.

- "What the $#*& is up with the fleeting expletives (and fleeting images)?" speaker on co-authored article, State Bar of Texas - 18th Annual Entertainment Law Institute, October 2-3, 2008.

- "The Journalist's Privilege and Shield Law," speaker, Austin Bench Bar Conference, San Antonio, TX, April 18, 2008.

- "Free Flow of Information," speaker, Texas Daily Newspaper Association's Statewide Convention, Austin, TX, March 11, 2008.

- "Hot Issues in Newsgathering," facilitator, American Bar Association Forum on Communications Law 13th Annual Conference, Boca Raton,

FL, February 2008.

### Professional Recognition

- Nominated for 2014 Americas Women in Business Awards, presented by Euromoney Legal Media Group

- Named one of the top 45 women lawyers in the nation younger than age 45 by *The American Lawyer*, 2011

- Named to the BTI Client Service All-Stars Team for Law Firms, 2011

- Recipient of the Texas Daily Newspaper Association's Legacy Award, 2010

- Named Associate of the Year by Texas Association of Broadcasters, 2009

- Profiled in Texas Lawyer in "Extraordinary Women in Texas Law," as one of the state's top 30 leading women lawyers, 2008

- Recipient of the Texas Association of Broadcasters' Award of Honor for "Outstanding Efforts in the Continuing Battle to Pass the Texas Free Flow of Information Act" during the 80th Legislature, 2007 Regular Session

- Awarded the Special President's Award by the Texas Association of Broadcasters, 2005

- Selected as a Rising Star in the Legal Field, *Austin Business Journal*, 2004

- Received the "Austin Under 40 Legal Award," the Austin Young Men's Business League and Austin Young Women's Alliance, 2001

- Chosen as one of the top 10 "Up-and-Comers on the Texas Legal Scene" by *Texas Lawyer*, 2000

- Martindale Hubbell® Law Directory with a Peer Review Rating of AV® Preeminent™

### Professional Leadership

- American Bar Association Forum on Communications Law, Internet chair

- American Bar Association *Litigation* magazine, editorial board, 2004-2012

- American Bar Association Women in Communications Law Committee, former national co-chair

- First Amendment and Media Litigation Committee, co-chair, 2005-2009

- Media Libel Resource Center, chair, State Legislative Committee

- Appointed by governor to State of Texas Personal Privacy Task Force, 2002

- Texas Association of Broadcasters, Board of Directors, ex-officio member (2005-2012)

- Freedom of Information Foundation of Texas, Immediate Past President; Legislative Committee, co-chair

- KLRU public broadcast station, board of directors

- College of the State Bar of Texas



- Colorado River Foundation, former board member
- Center for Child Protection, former advisory board member
- Leadership Austin, 1998-1999 graduate

Unofficial Copy Office of Chris Daniel District Clerk

# APPENDIX TAB S:
Plaintiff's Response to Motion to Dismiss in No. 2011-54895 (WITHOUT EXHIBITS)

No. 2011-54895

| THEAOLA ROBINSON, | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| THE WALT DISNEY COMPANY; | § | |
| ABC TELEVISION NETWORK, INC.; | § | |
| CC TEXAS HOLDING CO., INC.; and, | § | |
| KTRK TELEVISION, INC. | § | |
| | § | 234th JUDICIAL DISTRICT |
| Defendants. | § | |
| | § | |
| | § | |



## PLAINTIFF'S RESPONSE TO MOTION TO DISMISS

### Introduction

Last year, Texas lawmakers unanimously passed the Texas Citizen Participation Act ("TCPA"), codified at § 27.003 *et seq.* of the Texas Civil Practice and Remedy Code. Generally termed an anti-SLAPP code, the TCPA took effect June 17, 2011 and controls any actions filed after that date. SLAPP stands for "Strategic Lawsuit Against Public Participation." As an idea it refers to the type of lawsuit filed in retaliation for speaking out on a public issue or controversy, particularly the type of lawsuit that would ultimately fail if fully litigated, but is brought to chill free speech by intimidating critics with the prospects of defending an expensive litigation. In short, the lofty goals of anti-SLAPP laws are to protect the free speech rights of those that lack money in the face of the resources that those they speak out against may bring to bear. This is an early anti-SLAPP case in Texas, and we see the abuse potential of this statue when a large media entity uses an anti-SLAPP motion to fight a defamation lawsuit. Indeed, in other states, such as California, anti-SLAPP motions came to be viewed as "a cloak of invincibility

for the professional liability defense bar, insurance companies, collection agents and unscrupulous attorneys." McClelland, M. Dylan, *SLAPPLash: the Courts Finally turn on California's Anti-SLAPP Motion*, January 2009 (available at http://works.bepress.com/m_dylan_mcclelland/3).

## Summary of the Argument

Upon defendant filing a motion under the TCPA, "a court shall dismiss a legal action against the moving party if the moving party shows by a preponderance of the evidence that the legal action is based on, relates to, or is in response to the party's exercise of: (1) the right of free speech." Tex.Civ.P.&Rem. Code § 27.005(b). Therefore, KTRK bears the burden on its motion, and must show "by a preponderance of the evidence that the legal action is based on," KTRK's exercise of its right to free speech. Tex.Civ.P. & Rem. Code § 27.005(b)(1). The TCPA defines the exercise of free speech as "communication made in connection with a matter of public concern." Tex.Civ.P.&Rem. Code § 27.001(3).

Following KTRK's establishment of its burden, the burden then shifts to Plaintiff, and the Court may not dismiss if Plaintiff establishes by clear and specific evidence a *prima facie* case for the essential elements of her claim. Tex.Civ.P. & Rem. Code § 27.005(c). In determining whether this case should be dismissed, the Court shall consider the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based. Tex.Civ.P. & Rem. Code § 27.006.

The elements of defamation against a media defendant brought by private individuals include: (1) publication of a statement; (2) that the statement was defamatory as to plaintiff; and (3) negligence by defendant. *WFAA-TV, Inc. v. McLemore,* 978

2

S.W.2d 568, 571 (Tex. 1998). Plaintiffs can make a *prima facie* case on these elements, therefore the motion must be denied. *Prima facie* evidence is evidence that until overcome by other evidence suffices as proof of a fact in issue. *Duncan v. Butterowe, Inc.,* 474 S.W.2d 619, 621 (Tex.Civ.App. – Houston [14th Dist.] 1971, n.w.h).

KTRK freely admits that they published the statements complained of, and attach the publications as part of their exhibits. Falsity is an essential element of a defamation claim. *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 776-77 (1986); *Cain v. Hearst Corp.,* 878 S.W.2d 577-580 (Tex. 1994). A statement is defamatory if it tends to injure the person's reputation. *Means v. ABCABCO, Inc.,* 315 S.W.2d 209, 214 (Tex.App. – Austin 2010, no pet.). The statements were false, and injured Plaintiff's reputation.

"Negligent conduct is determined by asking whether the defendant acted reasonably in checking the truth or falsity or defamatory character of the communication before publishing it." *Scripps Texas Newspapers, L.P. v. Belalcazar,* 99 S.W.3d 829, 837 (Tex. App. – Corpus Christi 2003, pet. denied)(internal quotations and citations omitted). As shown by the evidence, no allegation was made by the State of Texas of a missing $3 million. No allegation has anywhere been made by the State of Texas that *any money* was unaccounted for. Defendant has made no affidavit showing that it checked the facts in this regard. To establish that the defamatory statements were published with actual malice, the publication must be shown to be done "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan,* 376 U.S. 254, 279-80 (1964). Even if the Court were to apply the actual malice standard to this claim of a non-public figure, the evidence presented by Plaintiff establishes the

3

legally sufficient standards for an inference of actual malice. Moreover, if the Court concludes malice standard applies and that the objective circumstances do not make a *prima facie* showing of malice, the Court must allow limited discovery to effectuate the TCPA savings provision in Section 27.011, or else the TCPA would violate the U.S. and Texas Constitutions and the common law.

Common sense must be taken into account in the Court's decision. As a California court succinctly put it, "SLAPP suits 'masquerade as ordinary lawsuits' the conceptual features which reveal them as SLAPP'S are that they are generally meritless suits brought by large private interests to deter common citizens from exercising their political or legal rights or to punish them for doing so." *Paul v. Friedman*, 95 Cal.App.4[th] 853, 862 (2002)(citations omitted). This suit was not brought by public figures or large private interests, rather it was brought by one private senior citizen, struggling to do good in one of Houston's most depressed communities. This suit was not brought against common citizens, but brought against one of the largest media corporations in the country and its local affiliate. This suit was not brought to deter the freedom of the press from reporting on the sad story of Benji's closure, rather it was brought to hold the sole outlet of the press accountable for a blatantly false statement. All the major news organizations reported the events which unfolded at Benji's on and after September 13, 2010. As detailed in the petition, none of the other news organizations reported anything like the statements made by Defendants and falsely attributed to the state. If Plaintiffs were attempting to deter free speech, they would have to go after all of them. There is a large difference between reporting the TEA's Commissioner's statement that his state board of managers alleged financial non-

4

viability, and falsely insinuating the embezzlement of over $3 million. Defendants should not be allowed to hide behind an anti-SLAPP shield to destroy the last bit of human dignity remaining to Mrs. Robinson.

## Argument

**1. Plaintiffs have established a *prima facie* case of libel**

The specific statements alleged to be defamatory are fully laid out in the petition:

40. On September 15, 2010, on the 4:30 PM news, Houston ABC Channel 13, KTRK, in studio reporter Ilona Carson and field reporter Cynthia Cisneros aired a two and a half minute segment on the situation at Benji's. Cisneros said, "According to the State millions in tax payer dollars cannot be accounted for." After playing clips of a parent, Shanika Thompson, and of Benji's spokesmen, Richard Johnson, Cisneros went on to say, "The state closure is based on a lack of sufficient financial records, meaning the state doesn't know where over three million dollars of taxpayer money given last year has been spent." A transcript of the entire broadcast is attached hereto. (Exhibit 3). The video was later published on ABC's website, along with a printed article "Defiant leaders refuse to close school," under Cynthia Cisneros byline. Cisneros wrote: "For the state, the issue is simple – where is the money? They say millions of taxpayer dollars are unaccounted for....The state closure is based on a lack of sufficient financial records, meaning the state doesn't know where the more than $3 million of taxpayer money given last year has been spent..." (Exhibit 4).

\*\*\*

45. The story was repeated by Defendant later that month, on September 25, 2010, when KTRK's Dave Ward and Gina Gaston in-studio and Jessica Willey reporting, aired a nearly three minute segment on the situation at Benji's. The video was later published on KTRK's website, along with a printed article "Questions raised over charter school's finances," under Jessica Willey's byline. Willey wrote: "Where is taxpayer money going and how is a taxpayer-owned building being used?...The Texas Education Agency says it doesn't know how Benji's spent $3 million of taxpayer money, and a lease agreement obtained by Eyewitness News raises even new questions." (Exhibit 7).

46. The article generated 11 comments on KTRK's website, including:

1. ...Call and ask where the money went. I'm sure Theola [*sic*] Robinson tell you.

5

2. Could it be in somebody's pockets?

(Exhibit 7).

\*\*\*

48. The filing of an action in this Court spurred the next incarnation of KTRK's story on September 27, 2010. The video was later published on ABC's website, along with a printed article "Lawsuit filed against Benji's Academy," under Jessica Willey's byline. Willey wrote: "The Texas Education Agency doesn't know how the academy spent $3 million of state money." (Exhibit 9).

49. The article generated 15 comments on KTRK's website, including:

> 7. ...Ms. Robinson should be arrested, not because she's black, because she's a thief!

> 8. I am just amazed as to why the parents are not suing Theaola Robinson and the old Board of Director, they are the ones who are stealing their children's future...
>
> \*\*\*
>
> 12. You bet they want to keep it open, if its closed an investigation will show they were all taking money not to mention they won't be able to afford their new house, Hummer and boat payments the school and taxpayers were helping to buy.

(Exhibit 9).

50. KTRK's Cisneros returned to the story on September 30, 2010. The video was later published on KTRK's website, along with a printed article "Charter school fight goes to federal court," under Cynthia Cisneros's byline. Cisneros wrote: "The state says it had no choice, alleging Benji's did not provide proper financial records to account for over $3 million in state funding for the past year." (Exhibit 10).

51. The article generated 14 comments on KTRK's website, including:

> 11. The state is not to blame here. They need to sue the administrators to find out where the money is followed by prosecution of those who may have "mis-spent" it. Put blame where blame is due!
>
> \*\*\*
>
> 13. Simple! No money! Can not account for $9 [*sic*] million! Close the doors and take the administrators to court for mis-use of government (your) money....

(Exhibit 10).

52. The KTRK version of the saga was continued by Katie McCall on October 11, 2010. The video was later published on ABC's website, along with a printed article "Organizers plan to reopen troubled charter school," under Katie McCall's byline. McCall wrote: "On September 14, the TEA ordered Benji's Academy to close, citing millions of dollars in state funding that was not accounted for." (Exhibit 11).

53. The article generated 10 comments on KTRK's website, including:

> 2. the only thing organized about this plan is the organized crime
>
> ***
>
> 5. ...the parents are supporting the administrators who have a little charisma along with a talent for lining their pockets...
>
> 6. ...The mgmt of this facility, will continue to steal under the guide [sic] of a school, where the kids will continue to suffer[r]

(Exhibit 11).

Plaintiff's Original Petition, ¶¶ 40, 45-46, 48-53.

These allegations as to the precise content of both the oral and written statements alleged to be slanderous and libelous defamation are undisputed and are made part of the record for purposes of this motion by both the Movant and Respondent. The *per se* defamatory nature of these utterances is virtually self-evident, and even if this were not the case, they are amply proven *prima facie* by the comments posted on the Defendant's website.

As stated in the petition:

58. The Court and factfinder need not indulge in any ratiocination to determine how a person of ordinary intelligence would interpret the complained of statements, whether the complained of statements were capable of defamatory meaning, or whether the public generally, and those who know or are acquainted with Mrs. Robinson specifically, understood that the statements referred to Mrs. Robinson. All that is amply

7

demonstrated by the public comments detailed herein, matters not available to courts and juries at the time these legal standards were developed but readily available in the modern digital age and sufficient to prove beyond doubt the wanton and malicious destruction of a good and honest person's reputation.

Plaintiff's Original Petition, ¶ 58.

The legal test, *prima facie,* is to determine whether "the words used were reasonably capable of a defamatory meaning." *New Times, Inc. v. Isaacks,* 146 S.W.3d 144, 155 (Tex. 2004); *Musser v. Smith Protective Services, Inc.,* 723 S.W.2d 653, 655 (Tex. 1987); *Gumpert v. Abf Freight System, Inc.,* 293 S.W.3d 256, 264 (Tex.App. – Dallas 2009, pet. denied). To answer this question the Court must determine how a person of ordinary intelligence would perceive the statement. *Isaacks,* 146 S.W.2d at 154; *Musser,* 723 S.W.2d at 656. Disputed issues are for the fact finder

False imputation of criminal behavior is, of course, *per se* defamatory. *Leyendecker & Associates, Inc. v. Wechter,* 683 S.W.2d 369, 374 (Tex. 1984); *Christy v. Stauffer Publications, Inc.,* 437 S.W.2d 814, 815 (Tex. 1969). Thus, the compelling evidentiary force of the website posts by ordinary persons:

> 1. ...Call and ask where the money went. I'm sure Theola [*sic*] Robinson tell you.
>
> 2. Could it be in somebody's pockets?
> ***
> 7. ...Ms. Robinson should be arrested, not because she's black, because she's a thief!
>
> 8. I am just amazed as to why the parents are not suing Theaola Robinson and the old Board of Director, they are the ones who are stealing their children's future...
> ***
> 11. The state is not to blame here. They need to sue the administrators to find out where the money is followed by prosecution of those who may have "mis-spent" it. Put blame where blame is due!
> ***

8

13. Simple! No money! Can not account for $9 [*sic*] million! Close the doors and take the administrators to court for mis-use of government (your) money....

\*\*\*

2. the only thing organized about this plan is the organized crime

\*\*\*

5. ...the parents are supporting the administrators who have a little charisma along with a talent for lining their pockets...

Plaintiff's Original Petition, ¶¶ 46, 49, 51, 53.

The defamatory *per se* nature of all Defendant's published utterances is summed up in one such posted comment:

7. ...Ms. Robinson should be arrested, not because she's black, because she's a thief!

Plaintiff's Original Petition, ¶49.

So the issue becomes, is the imputation of criminal behavior by Mrs. Robinson and Benji's of misappropriating to themselves $3 million dollars in public funds false? On this point, the Court will look in vain for any evidence that the State of Texas has ever claimed "that *millions* in taxpayer dollars cannot be accounted for." The very suggestion is absurd for a number of reasons. These facts also provide ample evidence warranting the conclusion that Defendant's statements were both negligent and malicious.

1. First, the Court's attention is drawn to the annual independent audited financial reports of the school filed for many years. (Exhibit 1 to Robinson Affidavit). These reports contain cash flow statements fully accounting for receipts and disbursements for all prior years. All the money received and spent is accounted for by the independent public accountants. These reports show that the *entire* annual operation of the school funded by the state was near the $3 million level. Additional funding above this amount

9

came from federal grants primarily related to Benji's historic mission to provide for special needs children, who comprised almost 20% of Benji's enrollment.

2. At all times material, Benji's was subject to detailed State oversight, specifically including on-site TEA conservators. Continuously, throughout the preceding school year, the State observed school busses being run, teachers and staff working, utilities functioning, equipment and supplied being used and replenished, and nutritious meals being served to all of nearly 500 students and staff. Basic common sense and reality mandate that the State would never claim that it did not know where any of the $3 million allocated by law to pay for all this had been spent. It is simply inconceivable, absent pure malice that the State or anyone else would make any such statement attributed to it and made by Defendants, that the entire $3 million was unaccounted for.

3. Most significantly, Defendants in their affidavits offer *no* evidence that anyone from the State made any such statements to them. All they offer is the press release from the TEA made September 14, 2010, the day before the Defendants began their campaign of defamation. This press release, Defendant's Exhibit V, which Plaintiff has never seen until its attachment to Defendant's motion, simply states that "A state-appointed board of managers...determined that the school is no longer financially viable and voted to close it at the end of school today." This press release belies the assertion made by the state managers in the SOAH and civil rights proceedings that their vote was to merely "temporarily suspend" operations on an emergency basis rather than to permanently close the school. This seems as good a place as any to object to all evidence offered from the SOAH proceeding, and in particular the proposal for decision issued in that proceeding. Out of an abundance of caution, Respondents submit Benji's pending exception to that

10

proposal for decision. (Exhibit A to Archambault Affidavit). That proceeding has not been finally adjudicated. In the uncharted waters of this anti-SLAPP law motion, this response sets forth in great detail the demonstration that the asserted temporary suspension is but a feeble, after the fact effort of the board of managers to bring their action within *some* lawful authority. But the real point is that nowhere in the record of any of the State's intervention or subsequent administrative proceedings to first remove Benji's board and superintendent and then to revoke Benji's charter based on the remarkable sacrifice of the affected community in continuing operation of the school in defiance of the state appointed board's unlawful action and, by so doing, preserving to the extent possible, the continuity of education for these children until, through their own initiated efforts, they succeeded in getting the school reopened a month later, is there any suggestion that $3 million in taxpayer revenue was unaccounted for. In fact, in a hearing lasting a full four days in Austin, the word "unaccounted" was not even uttered once. (Exhibit B to the Archambault Affidavit). The Movant's effort to put all this evidence before the Court is simply an effort to distract the Court from the very narrow and precise question of whether Defendants' repeated statements that $3 million in taxpayer money could not be accounted for were maliciously or negligently uttered defamatory statements which present a *prima facie* case of defamation *per se* of the Plaintiff.

**2. Movant presents no evidence of substantial truth**

In *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 123 (Texas 2000), the Texas Supreme Court observed: "An average viewer, however, would not view a 1.7 million dollar insurance swindle -- or even an $875,000 insurance swindle -- with any less opprobrium than a 6.5 million dollar swindle." But in this case there is no evidence that

11

the State ever claim that *any* money had been misappropriated. There is no fact in the record that the State of Texas ever claimed that any money had been unaccounted for or misappropriated. The only communication from the State proffered by Movant is the September 14, 2010, press release where the TEA Commissioner simply stated that his appointed managers concluded that the school was no longer financially viable. There is simply no evidence of any claim of unaccounted for disappearances and misappropriation of any sum.

Movant searches far and wide for some basis to claim substantial truth, claiming that there is evidence of financial mismanagement resulting in indebtedness to the IRS and the State and of poor internal record keeping and poor financial condition. Even granting these facts for purposes of this motion, none of this is any evidence of misappropriation. Indeed, the long history of audited financial statements show that in past years Benji's had indebtedness to the IRA and the State well in excess of the amounts owed these two creditors at the time the State took control.[1] There was no allegation of failure to account for expenditures as the cause for the incurrence of these debts.

The final analysis on this issue is merely one of common sense. Companies go bankrupt every day because of "mismanagement" without any suggestion of misappropriation by the controlling persons. Mismanagement and misappropriation are qualitatively different, not separate points on a continuum, not matters of degree. Finally, it must be pointed out that there is no support in Movant's affidavits to support any

---

[1] Over time these debts were extinguished and then reincurred. But from 2003 until 2009 these debts were enumerated and Benji's net assets increased from $200,000.00 to over $1,100,000.00. (Exhibit 1 to the Robinson Affidavit).

12

assertion that, at the time of the broadcasts, Benji's was being investigated for anything. At the time of the broadcasts beginning September 15, 2010, the state appointed board of managers and superintendent were in complete control of Benji's.

### 3. Malice is not applicable to non-public figures

Movant attempts no showing by affidavit that Mrs. Robinson is a public figure.[2] Therefore, a negligence standard applies. As argued above, any reasonable person would entertain doubt that a public school could operate for an entire year and yet the entire annual funding for the school for that year would be completely "unaccounted for."

### 4. Malice can be inferred from the circumstances

If the Court finds that without any proof that Mrs. Robinson is a public figure and that therefore a malice standard applies, Movant still cannot defeat Plaintiff's *prima facie* showing. A plaintiff may prove malice through objective evidence about the publication's circumstances. *Turner*, 38 S.W.3d at 120. In this case, the objective circumstances of the publication are that it was made when the TEA had been involved in exacting oversight for the two previous years, and was in complete control of all financial records and bank accounts at the time of publication. There is simply no way that anyone could conclude that a school had operated for a year without paying payroll or utilities. Furthermore, many payments had been regularly made to TEA and its conservators. *(See* Exhibit 2 to Robinson Affidavit). Nor are Movant's statements that its reporters believed what they said is true enough to defeat a *prima facie* case. As the United States Supreme Court has held.

---

[2] Texas courts have not determined whether voluntariness is a criterion for becoming a limited purpose public figure. *See WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 572 (Texas 1998).

> The defendant in a defamation action brought by a public official cannot, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.

*St Amant v. Thompson,* 390 U.S. 727, 732 (1968).

Again, for emphasis, on the basis of the objective circumstances surrounding the publication, the Defendant's allegations that the entire $3 million budget for the previous school year is unaccounted for and that the State has no idea where any of this vast sum of money was spent "are so inherently improbable that only a reckless man would have put them in circulation." *Id.*

Finally, the United States Supreme Court has held that, if necessary, a plaintiff must be accorded discovery on the issue of malice. *Herbert v. Lando,* 441 U.S. 153, 160-177 (1979). The TCPA at Section 27.011 provides that it does not abrogate or lessen any remedy under the Constitution or common law.[3] Therefore, if the Court should find that malice is the standard and the objective circumstances themselves are not sufficient to make a *prima facie* case of malice, Plaintiff for good cause moves for limited discovery under TCPA §27.006(b).

## Conclusion

For the reasons presented, Plaintiff prays this Court deny the motion to dismiss. A proposed order is attached.

---

[3] *See* Texas Constitution, Art. 1, §§ 8 and 14, set out in *Turner,* 38 S.W.3d at 117.

14

Respectfully submitted,

_____

Berry Dunbar Bowen
State Bar No.: 02721050
3014 Brazos Street
Houston, TX 77006
(713) 521-3525 (voice)
(713) 521-3575 (fax)
berrybowen@comcast.net
ATTORNEY IN CHARGE FOR
PLAINTIFF

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing document has been sent via Federal Express to the following on this 5th day of January, 2012.

Laura Lee Prather                    FedEx Tracking #: 871811542346
Catherine Lewis Robb
919 Congress Ave, Suite 1250
Austin, TX 78701

_____

Berry Dunbar Bowen

15

# APPENDIX TAB T:
Brief of Appellant KTRK Television, Inc. No. 01-12-00372-CV (WITHOUT EXHIBITS)

CAUSE NO. 01-12-00372-CV

IN THE FIRST COURT OF APPEALS
HOUSTON, TEXAS

KTRK TELEVISION, INC.

Appellant,

v.

THEAOLA ROBINSON,

Appellee.

On Appeal from the 234th Judicial District Court of Harris County, Texas,
the Hon. Reece Rondon, Presiding

BRIEF OF APPELLANT KTRK TELEVISION, INC.

Laura Lee Prather
State Bar No. 16234200
Catherine Lewis Robb
State Bar No. 24007924
Haynes and Boone, LLP
600 Congress Avenue, Suite 1300
Austin, Texas 78701
Telephone:    (512) 867-8400
Facsimile:     (512) 867-8470

ATTORNEYS FOR APPELLANT
KTRK TELEVISION, INC.

**APPELLANT REQUESTS ORAL ARGUMENT**

## IDENTITY OF PARTIES & COUNSEL

Pursuant to Texas Rule of Appellate Procedure 38.2(1)(A), the following are parties and counsel for this appeal:

**Appellant:**
KTRK Television, Inc.

**Attorneys For Appellant KTRK Television, Inc.:**
*Trial and Appellate Counsel:*
Laura Lee Prather
State Bar No. 16234200
Catherine Lewis Robb
State Bar No. 24007924
Haynes and Boone, LLP
600 Congress Avenue, Suite 1300
Austin, Texas 78701
Telephone:    (512) 867-8400
Facsimile:    (512) 867-8470

**Appellee:**
Theaola Robinson

**Attorney For Appellee Theaola Robinson**
*Trial and Appellate Counsel:*
Berry Dunbar Bowen
Fed. ID No. 6177
State Bar No. 02721050
3014 Brazos Street
Houston, TX  77006
Telephone:    (713) 521-3525
Telecopier:    (713) 521-3575

# TABLE OF CONTENTS

Page

IDENTITY OF PARTIES & COUNSEL.................................................................. ii

TABLE OF CONTENTS ......................................................................................... iii

STATEMENT OF THE CASE ................................................................................ xi

STATEMENT ON ORAL ARGUMENT.............................................................. xii

ISSUES PRESENTED ........................................................................................... xiii

STATEMENT OF FACTS.........................................................................................2

I.  Benji's Special Education Academy Was Being Investigated by the
    State at the Time of the Broadcast..............................................................3

    A.  Appellee Habitually Provided Inadequate Financial
        Documentation When Accounting for the Use of State Funds
        to TEA. ...............................................................................................4

    B.  Appellee Thwarted the State's Efforts to Investigate and
        Reform Benji's. ..................................................................................5

    C.  Appellee Does Not Dispute Receiving a $9,000/Month Profit
        From The Land Leased to Benji's........................................................10

II. Appellant Reported on the Allegations Being Made in the
    Investigation Into Appellee and the Public Controversy Surrounding
    the Investigation, School Closure, and Defiance of TEA's Order...................10

III. Appellee Has Sued or Attempted to Sue Appellant Three Times Over
     the Broadcasts at Issue..............................................................................12

SUMMARY OF THE ARGUMENT.........................................................................13

ARGUMENT & AUTHORITIES..............................................................................15

I.  Recent Legislation Provides New Protections for Those Exercising
    Their Right of Free Speech. ........................................................................15

    A.  Appellant Established that the Claims at Issue Fall Under the
        Citizens' Participation Act's Protection................................................16

B.     Appellee's Burden Was to Establish By "Clear and Specific Evidence" a "Prima Facie Case" for Each Essential Element of Her Claims Against Appellant. ............................................................17

C.     Appellee Failed to Establish a Prima Facie Case for Defamation. ..................................................................................18

D.     The Trial Court's Findings of Fact and Conclusions of Law Demonstrate Error. ............................................................19

E.     Standard of Review in this Citizens' Participation Act Appeal............22

II.     Appellee Failed to Establish With Clear and Specific Evidence that the Complained of Statements Were Defamatory Per Se. ...............................24

III.     Appellee Was Required to and Failed to Show Clear and Specific Evidence of Actual Malice. ..................................................................28

A.     Appellee is a Public Figure .................................................................28

B.     The Complained of Statements Were Privileged. ...............................33

IV.     Appellee Failed to Prove By Clear and Specific Evidence the Complained of Statements were Published with Actual Malice. .....................35

V.     Appellee Failed to Establish With Clear and Specific Evidence That The Complained of Statements Were Materially False. ...............................37

A.     Appellant's Broadcasts Were Substantially True.................................37

B.     The Substantial Truth Test Applies to Appellant's Reporting on Ongoing Allegations Under Investigation by the TEA....................40

VI.     Appellee Failed to Establish With Clear and Specific Evidence That The Complained of Statements Were "Of and Concerning" Appellee............41

PRAYER ............................................................................................................42

CERTIFICATE OF SERVICE............................................................................43

APPENDIX .........................................................................................................44

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*ABC, Inc. v. Gill,*
    6 S.W.3d 19 (Tex. App. – San Antonio 1999, pet. denied) ..........................25, 30, 40, 41

*ABC, Inc. v. Shanks,*
    1 S.W.3d 230 (Tex. App. – Corpus Christi 1999, pet. denied)........................................36

*Abdel-Hafiz v. ABC, Inc.,*
    240 S.W.3d 492 (Tex. App. – Fort Worth 2007, pet. denied) ............................23, 36, 37

*Ampex Corp. v. Cargyle,*
    128 Cal. App. 4th 1569 (Cal. App. 1st Dist. 2005).........................................................28

*Beck v. Lone Star,*
    970 S.W.2d 610 (Tex. App. – Tyler 1998, pet. denied) ...................................................29

*Bose Corp. v. Consumers Union of the United States, Inc.,*
    466 U.S. 485, 104 S. Ct. 1949 (1984)..............................................................................23

*Brewer v. Capital Cities/ABC, Inc.,*
    986 S.W.2d 636 (Tex. App. – Fort Worth 1998, no pet.) ................................................34

*Brewer v. Memphis Pub. Co.,*
    626 F.2d 1238 (5th Cir. 1980)..........................................................................................30

*Briggs v. Eden Council for Hope & Opportunity*
    (1999) 19 Cal. 4th 1106 ...................................................................................................22

*Brownlee v. Brownlee,*
    665 S.W.2d 11 (Tex. 1984)...............................................................................................36

*Brueggemeyer v. ABC, Inc.,*
    684 F. Supp. 452 (N.D. Tex. 1988)...................................................................................31

*CACI Premier Technology, Inc. v. Rhodes, et. al.,*
    536 F.3d 280 (4th Cir. 2008) ............................................................................................32

*Capuano v. The Outlet Co.,*
    579 A.2d 469 (R.I. 1990)...................................................................................................32

*Carr v. Brasher,*
   776 S.W.2d 567 (Tex. 1989)........................................................................................22

*Carr v. Forbes,*
   259 F.3d 273 (4th Cir. 2001).......................................................................................31

*Carter, et. al. v. NW Communications of Texas, Inc., d/b/a KDFW Fox 4 and
   KDFW-TV, Inc., et. al.,*
   Cause No. 12-02166 (160th Dist. Ct., Dallas County, Tex., May 24, 2012).............20

*Casso v. Brand,*
   776 S.W.2d 551 (Tex. 1989)..................................................................................32, 35

*Channel Two Television v. Dickerson,*
   725 S.W.2d 470 (Tex. App. – Hou. [1st Dist.] 1987, no writ) ...................................17

*Christian Research Institute v. Alnor,*
   148 Cal. App. 4th 71 (Cal. App. 4th Dist. 2007).......................................................29

*City of Keller v. Wilson,*
   168 S.W.3d 802 (Tex. 2005).......................................................................................23

*Clyburn v. New World Communications, Inc.,*
   705 F. Supp. 635 (D.D.C. 1989), *aff'd,.* 903 F.2d 29 (D.C. Cir. 1990)....................32

*Curtis Publishing Co. v. Butts,*
   388 U.S. 130 (1967)....................................................................................................32

*Diamond Shamrock Refining and Marketing Co. v. Mendez,*
   844 S.W.2d 198 (Tex. 1992).......................................................................................19

*Downer v. Amalgamated Meatcutters and Butcher Workmen of N. Am.,*
   550 S.W.2d 744 (Tex. Civ. App. – Dallas 1977, writ ref'd n.r.e.)..............................38

*Fort Worth Press Co. v. Davis,*
   96 S.W.2d 416 (Tex. Civ. App. – Fort Worth 1936, writ denied) ..............................38

*Fox Entm't Group, Inc. v. Abdel-Hafiz,*
   240 S.W.3d 524 (Tex. App. – Fort Worth 2007, pet. denied) ....................................18

*Freedom Communications, Inc. v. Sotelo,*
   2006 WL 1644602 Media L. Rep. 2207 (Tex. App. – Eastland 2006, no pet.)...........33

*Gertz v. Robert Welch, Inc.,*
   418 U.S. 323, 94 S. Ct. 2997, 41 L. Ed. 789 (1974)......................................32, 33, 35

*Green v. CBS, Inc.,*
286 F.3d 281 (5th Cir. 2002)........................................................................................38

*Harte-Hanks Communications, Inc. v. Connaughton,*
491 U.S. 657, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989)..............................................35

*Hearst Corp. v. Skeen,*
159 S.W.3d 633 (Tex. 2005)..........................................................................................23

*Herald-Post Publishing Co., Inc. v. Hill,*
891 S.W.2d 638 (Tex. 1994)....................................................................................33, 39

*Huckabee v. Time Warner,*
19 S.W.3d 413 (Tex. 2000)..............................................................................33, 36, 42

*Humane Society of Dallas v. Dallas Morning News, L.P.,*
180 S.W.3d 921 (Tex. App. – Dallas 2005, no pet.)......................................................34

*In re: Does,*
242 S.W.3d 805 (Tex. App. – Texarkana 2007, no pet.)...............................................17

*Jee v. New York Post,*
671 N.Y.S.2d 920 (N.Y. Sup. Ct. 1998), *aff'd,* 688 N.Y.S.2d 49 (App. Div. 1999) ..............30

*Johnson v. Robinsdale Indep. Sch. Dist. No. 281,*
827 F. Supp. 1439 (D. Minn. 1993)...............................................................................30

*Kapiloff v. Dunn.,*
343 A.2d 251 (Md. Ct. Spec. App. 1975).......................................................................30

*KTRK Television v. Felder,*
950 S.W.2d 100 (Tex. App. – Hou. [14th Dist.] 1997, no writ)........................39, 40, 41

*Langston v. Eagle Publishing Co.,*
719 S.W.2d 612 (Tex. App. – Waco 1986, writ ref'd n.r.e.) .........................................33

*Larson v. Family Violence & Sexual Assault Prevention Center,*
64 S.W.3d 506 (Tex. App. – Corpus Christi 2001, pet. denied) ....................................38

*Leyendecker & Assocs. v. Wechter,*
683 S.W.2d 369 (Tex. 1984)..........................................................................................28

*Main v. Royall,*
348 S.W.3d 381 (Tex. App. – Dallas 2011, no pet.)..............................19, 24, 25, 28

*McDonald v. Clemens,*
464 S.W.2d 450 (Tex. Civ. App. – Tyler 1971, no writ) ........................................18

*McDowell v. Paiewonsky,*
769 F.2d 942 (3d Cir. 1985)..................................................................................31, 32

*McIlvain v. Jacobs,*
794 S.W.2d 14 (Tex. 1990)..........................................................................................39

*McIntyre v. Ramirez,*
109 S.W.3d ....................................................................................................................36

*Moore v. Waldrop,*
166 S.W.3d 380 (Tex. App. – Waco 2005, no pet.)..................................................24, 25

*Musser v. Smith Protective Servs.,*
723 S.W.2d 653 (Tex. 1987).........................................................................................25

*Neely v. Wilson,*
331 S.W.3d 900 (Tex. App. – Austin 2011, pet. granted)............................................40

*New Times, Inc. v. Isaacks,*
146 S.W.3d 144 (Tex. 2004)......................................................................................23, 37

*Newspapers, Inc. v. Matthews,*
339 S.W.2d 890 (Tex. 1960).........................................................................................42

*Patton v. UPS,*
910 F. Supp. 1250 (S.D. Tex. 1995) ............................................................................25

*Provencio v. Paradigm Media, et al.,*
44 S.W.3d 677 (Tex. App. – El Paso 2001, no pet.)....................................................39

*Purvis v. Ballantine,*
487 S.E.2d 14 (Ga. Ct. App. 1997)...............................................................................29

*Randall's Food Market, Inc. v. Johnson,*
891 S.W.2d 640 (Tex. 1995)..........................................................................................37

*Reliance Steel & Aluminum Co. v. Sevcik,*
267 S.W.3d 867 (Tex. 2008)..........................................................................................21

*Rogers v. Dallas Morning News, Inc.,*
889 S.W.2d 467 (Tex. App. – Dallas 1994, writ denied)..............................................38

*Rosanova v. Playboy Enters., Inc.*,
580 F.2d 859 (5th Cir. 1978)..................................................................................30

*Rosenblatt v. Baer*,
383 U.S. 75, 86 S. Ct. 669 (1966) ...............................................29, 30, 32, 42

*Salvaggio v. High Plains Broadcasting, Inc.*,
Cause No. 2011-CI-10127 (131st Dist. Ct., Bexar County, Tex., Feb. 27, 2012) .........20

*Schauer v. Memorial Care Sys.*,
856 S.W.2d 437 (Tex. App. – Hou. [1st Dist.] 1993, no writ) .................................25

*Scott v. News-Herald*,
25 Ohio St.3d 243, 496 N.E.2d 699 (Ohio 1986) ..............................................29

*Scripps Texas Newspapers, LP v. Belalcazar*,
99 S.W.3d 829 (Tex. App. – Corpus Christi 2003, pet. denied) ..............................25

*Simpton, et. al. v. High Plains Broadcasting, Inc.*,
Cause No. 2011-CI-13290 (285th Dist. Ct., Bexar County, Tex., March 23,
2012) .......................................................................................................20

*Southwest Olshan Found. Repair Co., LLC v. Gonzales*,
345 S.W.3d 431 (Tex. App. – San Antonio 2011, no pet.)...................................18

*Standridge v. Ramey*,
733 A.2d 1197 (N.J. Super. Ct. App. Div. 1999).............................................30

*State v. Defley*,
395 So.2d 759 (La. 1981) ..........................................................................29

*Swate v. Schiffers*,
975 S.W.2d 70 (Tex. App. – San Antonio 1998, pet. denied)........................31, 34

*Texas Monthly, Inc. v. Transamerican Natural Gas Corp.*,
7 S.W.3d 801 (Tex. App. – Hou. [1st Dist.] 1999, no pet.) .................................33

*Turner v. KTRK Television, Inc.*,
38 S.W.3d 103 (Tex. 2000)..........................................................................18

*UTV of San Antonio, Inc. v. Ardmore, Inc.*,
82 S.W.3d 609 (Tex. App. – San Antonio 2002, no pet.) ...................................40

*Viera v. Hearst Newspapers, LLC d/b/a The Houston Chronicle, KHOU-TV, Inc.
and Post-Newsweek Stations Houston, Inc. d/b/a KPRCT-TV*,
Cause No. 2011-42884 (190th Dist. Ct., Harris County, Tex., Sept. 11, 2011).............20

*WFAA-TV, Inc. v. McLemore,*
    978 S.W.2d 568 (Tex. 1998), *cert. denied,* 119 S. Ct. 1358 (1999) ............18, 28, 30, 32

*Wilcox v. Superior Court*
    (1994) 27 Cal. App. 4th 809 ..................................................................................22

## STATUTES

Tex. Civ. Prac. & Rem. Code §22.02, *et seq.* ........................................................17

Tex. Civ. Prac. & Rem. Code §27.002 (the "Act") ................................15, 16, 20, 22

Tex. Civ. Prac. & Rem. Code §27.005(c) ................................................. xiii, 22, 24

Tex. Civ. Prac. & Rem. Code §27.006(a) ..............................................................22

Tex. Civ. Prac. & Rem. Code §27.007 ..................................................................19

Tex. Civ. Prac. & Rem. Code § 73.002 (a) and (b) ............................................33, 34

Tex. Civ. Prac. & Rem. Code §73.005 ..................................................................37

Texas Citizens' Participation Act, TEX. CIV. PRAC. & REM. CODE ANN. §27.001,
    *et seq.* (Vernon Supp. 2011)......................................... xii-xiv, 1, 13, 15-17, 22-24, 32, 42, 44

## OTHER AUTHORITIES

U.S. Constitution, First Amendment................................................................17, 22, 23

## STATEMENT OF THE CASE

*Nature of the Case:*      This is an appeal of a denial of a Motion to Dismiss claims for defamation pursuant to the Texas Citizens' Participation Act, TEX. CIV. PRAC. & REM. CODE ANN. §27.001, *et seq.* (Vernon Supp. 2011).

*Trial Court:*      The Honorable Reece Rondon, Judge Presiding, in the 234th District Court, Harris County, Texas

*Trial Court Disposition:*      The trial court denied Appellant KTRK Television, Inc.'s Motion to Dismiss. *See* Appendix, Tab A.

## STATEMENT ON ORAL ARGUMENT

Appellant requests oral argument. This case concerns issues of first impression in the application of the Texas Citizens' Participation Act, and it also concerns important protections for speech concerning matters of public concern involving use of taxpayer dollars and matters concerning public figures entrusted with public funds. The Citizens' Participation Act requires that a plaintiff whose claims arise from an exercise of free speech rights establish for the trial court a *prima facie* case for *each* essential element of his or her claim with "clear and specific evidence." Tex. Civ. Prac. & Rem. Code §27.005(c). Oral argument will assist this Court's decisional process in determining whether the evidence produced by Appellee met this high burden in the trial court and proved each element of her claim with "clear and specific evidence," including overcoming the affirmative defenses and constitutional protections raised by Appellant.

## ISSUES PRESENTED

**Point No. 1:** The Texas Citizens' Participation Act statute requires a court to dismiss a lawsuit where the claims arise out of a defendant's exercise of the right of free speech, unless the plaintiff can establish by *clear and specific evidence* a *prima facie* case for each essential element of every one of his or her claims. Did the trial court err in denying Appellant's Motion to Dismiss brought pursuant to this statute?

**Point No. 2:** Did Appellee establish a *prima facie* case that the Complained of Statements were defamatory *per se* by clear and specific evidence as required by the Texas Citizens' Participation Act?

**Point No. 3:** Did Appellee establish a *prima facie* case of actual malice by clear and specific evidence as required by the Texas Citizens' Participation Act?

**Point No. 4:** Did Appellee establish a *prima facie* case of material falsity by clear and specific evidence as required by the Texas Citizens' Participation Act?

**Point No. 5:** Did Appellee establish a *prima facie* case that the Complained of Statements were "of and concerning" Appellee by clear and specific evidence as required by the Texas Citizens' Participation Act?

CAUSE NO. 01-12-00372-CV

IN THE FIRST COURT OF APPEALS
HOUSTON, TEXAS

KTRK TELEVISION, INC.

Appellant,

v.

THEAOLA ROBINSON,

Appellee.

On Appeal from the 234th Judicial District Court of Harris County, Texas,
the Hon. Reece Rondon, Presiding

BRIEF OF APPELLANT KTRK TELEVISION, INC.

TO THE HONORABLE FIRST COURT OF APPEALS:

This appeal concerns both issues of first impression in the application of the Texas

Citizens' Participation Act (also known as the Anti-SLAPP Statute[1] or "the Act"), and

important protections for speech concerning matters of public concern involving

investigations into use of taxpayer dollars and public figures entrusted with State funds.

It is just this type of action that the Legislature envisioned when enacting the Citizens'

Participation Act — the Act protects those who exercise their free speech rights from

lawsuits brought against them for speaking out about matters of public concern. The Act

requires a preliminary showing by the plaintiff of *clear and specific* evidence of her

---

[1] "SLAPP" stands for Strategic Lawsuit Against Public Participation, and Anti-SLAPP statutes provide a mechanism for early dismissal of meritless lawsuits filed against one out of retaliation for what he or she has said.

1

claims before the speaker is caught up in a myriad of discovery and the expense of defending against a meritless lawsuits brought for the purpose of retaliating against the speaker for bringing issues of public concern to light. In this instance, Theola Robinson ("Robinson" or "Appellee") has brought not one, but *three* lawsuits, against Appellant (or its parent company) for reporting on the State's investigation into her use of $3 million in taxpayer funds as head of a charter school. It is difficult to fathom a more egregious example of retaliation against a media outlet for bringing to light issues of concern to the Houston community. The Act required the Appellee to establish a prima facie case of her defamation[2] claim with clear and specific evidence, and she failed to meet this burden. Thus, the trial court's denial of Appellant's Motion to Dismiss should be reversed.

## STATEMENT OF FACTS

This lawsuit concerns KTRK's reporting on matters of grave public concern. The reports discuss: the allegations of financial and other mismanagement of Benji's Special Education Academy ("Benji's"), which was run by Appellee[3], the State's resulting revocation of Benji's charter, and Appellee's willful violation of the State's orders. The following are undisputed facts taken from the Texas Education Agency's records from its investigation into Appellee's management of the school and her accounting for the use of

---

[2] Plaintiff's Petition attempts to describe a *per se* claim and does not plead any actual damages; however, she does not label her claim. Presumably, she is claiming defamation *per se*. Regardless, under either *per se* or *per quod*, her claim fails.

[3] The original plaintiffs in this suit were both the non-profit corporation that ran Benji's (hereinafter "Charter Holder") and the charter school's former director/Superintendent, Robinson, who was also on the board of the Charter Holder and is now the sole Appellee. (CR 2:220-232). Both the school itself and the Charter Holder use the name "Benji's" or "Benji's Special Education Academy" — often without distinguishing between the two and have, until recently, effectively operated as one. But, while the Charter Holder is a non-profit corporation and was an original plaintiff in this lawsuit, Benji's (the school), has been taken over by the State and was not a plaintiff in this suit. There is a question as to whether Robinson had proper authority to sue on behalf of the Charter Holder at the outset. Regardless, Robinson amended her Petition (CR 4:796-874) and dropped the Charter Holder from the case.

the millions of taxpayer dollars entrusted to her and from the court records in Appellee's lawsuit against TEA for closure of the school.

## I.    Benji's Special Education Academy Was Being Investigated by the State at the Time of the Broadcast.

At the time of the KTRK broadcasts at issue, Benji's was being investigated by the Texas Education Agency ("TEA") for, among other things, mismanagement and poor financial practices regarding use of State taxpayer funds. (CR 4:903-908). In fact, for more than half a decade TEA had expressed dissatisfaction with Appellee's habitually poor recordkeeping and financial accountability. (CR 2:311-312, 355, 357, 360, 492-493; 3:551-553, 585-586; 623, 679-680, 712-713). By the Fall of 2010, Benji's was taken over by TEA who ordered the school's closure and eventually revoked the school's charter. (CR 2:259-263, 470-471; 4:894). It is undisputed that Benji's was responsible for educating hundreds of students and was tasked with utilizing, and accounting for, more than $3 million in State taxpayer funds *each year* to do so. (CR 2:408, 415, 418, 421). After years of receiving either no response or inadequate responses to their inquiries about the school's use of taxpayer money, in Fall 2010, TEA appointed a new Board of Managers and new Superintendent to assist Benji's with its financial and mismanagement woes. (CR 2:259-263). This was just the latest in a series of actions taken by TEA against the Charter Holder. Starting in 2007, TEA had previously appointed one, and, then two, conservators to oversee the school (CR 2:312-314) and had, on at least one prior occasion, threatened to revoke Benji's charter — in 2009. (CR 2:265-270). Benji's had been in continuously poor financial condition and had kept

3

and provided poor financial records to the State throughout the bulk of its existence (CR 2:304-367). Despite the State's attempts to assist the school, Appellee sought to thwart any intervention by the State, only compounding the problems at hand (CR 2:266-267, 271-272, 328, 332, 455, 463; 4:901-904).

A.      **Appellee Habitually Provided Inadequate Financial Documentation When Accounting for the Use of State Funds to TEA.**

The Charter Holder was granted an open-enrollment charter to operate Benji's by the Texas State Board of Education ("SBOE") on or around November 2, 1998. (CR 2:449-454). In 2003, the Charter Holder applied for a renewal of the charter, which was still pending at the time of the controversy that is the subject of this lawsuit. (CR 2:310-313). Appellee's refusal to provide proper documentation of the use of State funds contributed to the failure to approve the Charter Holder's application for renewal during this seven year period (CR 2:310-311). Over the years, TEA's concerns with Benji's grew, including concerns about:

(1)     the school's academically unacceptable state accountability rating for the years 2005, 2007, 2009, and 2010 and federal academic accountability rating as failing to meet Adequate Yearly Progress Standards in 2005, 2006, 2007, and 2009 (CR 2:350);

(2)     the accuracy in reporting student attendance data for the purpose of receiving Foundation School Program funds for four years (CR 2:311);

(3)     the Department of Agriculture's termination of the school's agreement to participate in school breakfast and lunch programs because of failure to maintain a proper financial management system (CR 2:311); and

(4)     its noncompliance with IDEA and No Child Left Behind laws and guidelines. (CR 2:310-311, 350).

4

On July 8, 2010, Appellee, then-executive director of Benji's, was notified by the TEA Commissioner that TEA intended to appoint a Board of Managers and a new Superintendent for the school in light of ongoing financial, academic, and governance concerns with Benji's. (CR 2:455-469). On August 19, 2010, a hearing was held to allow Appellee an opportunity to respond to the Commissioner's plan to appoint a Board and Superintendent. (CR 2:259-263). On September 3, 2010, TEA notified Appellee and Benji's board of directors that TEA would be going forward with the original recommendation to appoint a Board of Managers and a new Superintendent. (CR 2:259-263). This appointment of a Board of Managers and Superintendent suspended the powers of Benji's previous board of directors and Appellee. (CR 2:259-263).

B.  **Appellee Thwarted the State's Efforts to Investigate and Reform Benji's.**

The new Board and Superintendent met immediately after being appointed and began investigating the situation at Benji's, including the finances of the school. (CR 2:476-482). Although they did not fully understand the gravamen of the financial problems until they got access to the school's records, TEA had been concerned about the financial situation since at least 2005. (CR 2:312). The record is clear — until the time that TEA finally took over complete control of Benji's (or as compete control as they could in light of Appellee's insubordination and overt efforts to kick TEA officials off Benji's property and restrict their access to records), TEA had no idea of the full extent of Benji's financial emergency. (CR 2:400; 2:403; 2:407; 2:414) This is, in part, because the audit reports from 2004-2009 were all found deficient. (CR 2:313; 2:465; 2:471;

5

2:477). It is also, in part, because of Appellee's and other Benji's officials repeatedly failing to follow TEA directives aimed at remedying the school's numerous deficiencies. (CR 2:313, 455, 463). Appellee not only interfered with TEA's ability to properly review and address the many deficiencies (including openly preventing TEA from being able to access Benji's financial and other records), but she also disobeyed TEA orders and attempted to prevent TEA officials who had been assigned to oversee Benji's from effectively doing their job. (CR 2:271, 313-15, 328, 463, 488).

It was not until September, 2010, that TEA understood the extent of the financial problems at Benji's[4] and issued its Order Suspending Charter Operations and Funds, stating:

> [The exigent financial conditions at Benji's were not] known either to the board of managers or the new superintendent when they met on September 6, 2010. Rather, the information leading to the conclusion that that an urgent financial condition may exist at the charter school was disclosed by painstaking effort to assemble and evaluate information that had not been viewed by the former administration as indicating such a conclusion. Subsequent events have made plain that the former administration continues to maintain that there was and is no urgent financial condition presented by these facts.

(CR 2:477). After discovering that Benji's had virtually no money in its bank account, TEA issued a statement that Benji's was being closed down at the end of the day because it was no longer financially viable. (CR 2:407, 470). On that same date, the recently appointed Superintendent sent a letter to parents advising them of the decision to immediately close the school. (CR 2:471-475). The letter further advised that recently

---

[4] See CR 2:400, 403, 407, 414, 477.

6

available information indicated that the "school ha[d] virtually no money in the bank and owe[d] numerous creditors, including the Internal Revenue Service." (CR 2:471-475).

When TEA and other state officials attempted to distribute packets to students explaining the suspension of Benji's operations and providing information about alternate public schools in the area, Appellee and other members of the former administration ripped up the materials and encouraged the students to engage in open defiance of state officials. (CR 2:478). Furthermore, despite having been replaced as Superintendent and relieved of her duties, Appellee continued to direct the students and staff, conducting her own staff meeting, calling a press conference about the situation, and inviting the media to comment. (CR 2:479). Over the course of the next few days, Appellee also endeavored to prevent state officials from entering and/or conducting business at the school, and took physical control of the school and its records and facilities without authority. (CR 2:478-481).

Despite the State-mandated closure, on September 15, 2010, Appellee defied TEA and the new Benji's Board and Superintendent by re-opening Benji's as an unaccredited private school using the same facilities and school buses (which were all paid for by the State). (CR 2:476-482). As with the prior days' events, this continuing public controversy was reported on by virtually every local media outlet. (CR 2:414-423). TEA representatives were refused access to the school and its student records. *Id.* (CR 2:476-482). The next day, the TEA Commissioner issued an order effective immediately suspending all funding of Benji's and suspending Benji's open-enrollment charter. (CR 2:476-482). TEA issued another notice to Appellee and others regarding the school's

7

closure and revocation of its open-enrollment charter. A hearing was held on September 21, 2010, at which TEA determined that the acts of Robinson and some of her staff constituted conditions that presented a danger to the health, safety or welfare of the Benji's students. (CR 2:483-487).

On September 24, 2010, the TEA Commissioner sent a letter to Appellee and the Charter Holder's Board outlining the various grounds for revoking Benji's charter, including:

(1)    failure to protect the health, safety, or welfare of students; material violations of the open-enrollment charter; two consecutive years of unsatisfactory ratings;

(2)    serious unsatisfactory fiscal performance; unsatisfactory compliance performance for three consecutive years, and

(3)    failure to renew a lease for the school facility.

(CR 2:488-495). The letter also discussed the fact that "[s]pecial program concerns, academic concerns, governance issues, financial management issues," and failures to comply with TEA requirements and directives had plagued the school for many years. *Id.* (CR 2:489). The letter detailed examples of the school's fiscal mismanagement, which resulted in significant wasting of financial resources and the school's financial insolvency. (CR 2:492). Examples of some of Benji's financial woes while under the direction of Appellee included:

A.    the Charter Holder was the subject of a warrant hold for nonpayment to the Teachers Retirement System in the amount of $43,000.00 for retirement contributions and $13,000.00 in health coverage;

B.    the Department of Agriculture cancelled the Charter Holder's participation in child nutrition programs because of the Charter Holder's failure to demonstrate fiscal responsibility;

8

C.   the Charter Holder owed the IRS a debt of $87,000.00 for unpaid taxes;

D.   the Charter Holder's board of directors failed to oversee or adequately supervise its financial resources, and

E.   the Charter Holder failed to properly account for accrued unreimbursed leave as a liability.

(CR 2:360-361). Specifically, the Commissioner of Education found that:

> The charter holder and charter school's extensive history of special education program deficiencies, its persistent failures to follow conservator directives and comply with statute and intervention requirements, its continued failure to cooperate with Texas Education Agency ("TEA" or "agency") staff to resolve identified deficiencies and areas of noncompliance, its academic and financial deficiencies, and its recent defiance of my Board of Managers, compel me to revoke the open-enrollment charter of Benji's Special Educational Academy.
>
> Problems with the charter holder's operation of its charter school date back many years. Special program concerns, academic concerns, governance issues, financial management issues, failure to follow directives made by a TEA-assigned conservator, and/or failure to comply with Intervention requirements have plagued the charter holder over many years. Despite extensive agency intervention, progress has been sporadic, and regression has been frequent. A recent intervention included the assignment of a second conservator to oversee all charter school activities, as well as charter holder activities, with respect to the operation of the charter school. My interventions culminated in the appointment of a Board of Managers to exercise the powers and duties of the governing body of the charter school operated by the charter holder.

(CR 2:488-489) (footnotes omitted). Thus, Appellee's continual defiance of TEA's mandates and her habitual failure to properly account for the use of State funds contributed to, if not resulted in, the school's charter being revoked.

9

## C. Appellee Does Not Dispute Receiving a $9,000/Month Profit From The Land Leased to Benji's.

The TEA Commissioner's September 24th letter also noted some financial irregularities in Benji's rental arrangement and payments. Comparing the lease between the Charter Holder and the City of Houston and the lease between the Charter Holder and the school itself — for the exact same property — the rental payments paid by Benji's to the Charter Holder for the use of the property appeared to be excessive. (CR 2:493). The Charter Holder (under Appellee's leadership) had been leasing the property from the City of Houston for $1/year and was re-leasing the same property to Benji's for $9,000/month, an arrangement the City was unaware of and for which it had not given permission to the Charter Holder. (CR 2:233-258, 264-303, 492–494). This meant the Charter Holder, run by Appellee, profited almost $9,000/month from this untoward arrangement. Additionally, the July 1, 2010, Tenancy Agreement, which still called for Benji's to pay the Charter Holder $9,000/month, had a term of 10 years — another agreement and term the City did not approve. (CR 2:238-242). Ironically, Appellee does not deny the lease arrangement at issue.

## II. Appellant Reported on the Allegations Being Made in the Investigation Into Appellee and the Public Controversy Surrounding the Investigation, School Closure, and Defiance of TEA's Order.

A public outcry arose over the initial takeover, charter revocation, and attempted closing of Benji's by TEA. The allegations of financial mismanagement of taxpayer funds and indebtedness of the school, as well as the efforts to keep the school open in defiance of the State's orders, were clearly matters of public concern in the Houston

10

community. As a result, beginning on September 14, 2010, Appellant (and several other media outlets) broadcast and posted numerous reports about the ongoing controversy. (CR 2:217-219, 371-373, 433–435).

Appellant was not alone in reporting on Benji's financial problems and lack of accountability, TEA's closure of the school and the actions of Appellee. (CR 1:34-60, 85-87 and 2:303, 368-370, 374–393, 399–400, 403–423). Other media organizations similarly reported that "TEA says . . . the school is unable to document where the state funding is being spent" (CR 1:35) and that TEA stated that "everyday [the newly appointed Board of managers has] been in place they've uncovered additional alarming problems." (CR 2:407) The public interest in this topic can be seen not only by the many articles and broadcasts published, but also by the numerous comments that the stories elicited. (CR 1:38-60). Of all the publications, Appellant was the only station to be sued out of retaliation for what it said.

Appellee bases her sole claim of defamation *per se* on the following statements ("Complained of Statements" or "Statements at Issue"), none of which discuss the commission of a crime or mention Appellee Robinson by name:

(1)     "According to the State, millions in taxpayer dollars cannot be accounted for" and "The State closure is based on a lack of sufficient financial records, meaning the State doesn't know where the over three million dollars of taxpayer money given last year has been spent." (CR 1:26) (4:30 p.m., September 15, 2010 broadcast).

(2)     "For the State, the issue is simple — where is the money? They say millions of taxpayer dollars are unaccounted for .... The State closure is based on a lack of sufficient financial records, meaning the State doesn't know where the more than $3 million of taxpayer money given last year

11

has been spent..." (CR 1:30) (September 15, 2010, story published on Appellant's website).

(3) "Where is taxpayer money going and how is a taxpayer-owned building being used? ... The Texas Education Agency says it doesn't know how Benji's spent $3 million of taxpayer money, and a lease agreement obtained by Eyewitness News raises new questions." (CR 1:63) (September 25, 2010, story published on Appellant's website).

(4) "The Texas Education Agency doesn't know how the academy spent $3 million of State money." (CR 1:73) (September 27, 2010, article published on Appellant's website).

(5) "The State says it had no choice, alleging Benji's did not provide proper financial records to account for over $3 million in State funding for the past year." (CR 1:78) (September 30, 2010 article published on Appellant's website).

(6) "On September 14, the TEA ordered Benji's Academy to close, citing millions of dollars in State funding that was not accounted for." (CR 1:82) (October 11, 2010, article published on Appellant's website).

## III. Appellee Has Sued or Attempted to Sue Appellant Three Times Over the Broadcasts at Issue.

Not only has Appellee sued Appellant in *this* lawsuit out of retaliation for what it said, Appellee previously sued Appellant and/or its parent company over the same broadcasts, without success, on two prior occasions. (CR 4:886; 5:1289). Originally, Appellee improperly sued Appellant's ultimate parent company, The Walt Disney Company ("Disney"), in federal court (Cause No. 4-10-CV-03498) and then she tried to add Disney and Appellant to a lawsuit she had joined against TEA (Cause No. 4-11-CV-00358). Appellee took these actions despite being shown prior decisions and undisputed evidence that there was no jurisdiction over Disney. Not surprisingly, both attempts were unsuccessful but resulted in substantial unnecessary expenditure of fees by Appellant.

12

(CR 4:886). Ultimately, on September 14, 2011, Appellee and Benji's[5] filed this lawsuit in state court. (CR 1:2-87). Appellant moved to dismiss the case under the Texas Citizens' Participation Act, and its motion was denied. (CR 4:994).

## SUMMARY OF THE ARGUMENT

Appellee Robinson sued KTRK for defamation based on its accurate reporting on allegations about Appellee's financial mismanagement of Benji's Special Education Academy, which was under investigation by the State. The Texas Legislature recently passed the Citizens' Participation Act to protect persons who are sued for exercising their right to free speech. Tex. Civ. Prac. & Rem. Code §27.001, *et seq.* (Tab D). The claims against Appellant fall squarely under the protections of the Act. The Act required the trial court to dismiss the defamation claim unless Appellee established, by the heightened standard of clear and specific evidence, a *prima facie* case for each essential element of her claim. The record shows a glaring absence of evidence on every element of the defamation claim. Therefore, the trial court was in error and must be reversed.

Appellee claims the broadcasts at issue are defamatory *per se*.[6] An essential element of defamation *per se* is the accusation of the commission of a crime, dishonesty, fraud, rascality, or general depravity — which, in this case, is disproven by reading the Complained of Statements themselves. There was no mention of a crime being committed by Appellee, nor was there any reference to Appellee committing fraud or dishonest acts. (CR 4:963-973).

[5] *See* fn. 3, *supra.*
[6] *See* fn. 2, *supra.* Appellee's claims sound in *per se* because she argues that she was accused of embezzlement and she only references presumed damages. Even if she is trying to articulate a *per quod* claim, that too fails because, among other things, she has not plead actual damages.

13

Another essential element of the defamation claim at issue in this case is the constitutional requirement of showing "actual malice." This burden arises when the Appellee is a public figure or when the statements made are privileged. Both circumstances exist in this case.

To establish actual malice, a plaintiff must demonstrate the defendant published an alleged defamatory statement knowing it to be false or having entertained serious doubts about the truth of the statement. Appellee provided no evidence and only supposition (which does not constitute evidence) concerning Appellant's state of mind. Appellant, on the other hand, introduced substantial evidence of the absence of actual malice (CR 2:217-219, 371-373, 433-435).

Appellee was also required to produce clear and specific evidence that the Complained of Statements in the broadcasts were *materially* false. To do this, Appellee ignores the actual statements made by KTRK and instead concocts her own version of the broadcasts, distorting the statements with her own interpretations and suppositions. The Court must look at what the broadcasts actually said, as a whole, in light of surrounding circumstances, and it must review them based upon how a person of ordinary intelligence would perceive the entire broadcast series. Appellee's after-the-fact spin is not clear and specific evidence of material falsity.

Furthermore, Appellee is not even mentioned in the Complained of Statements, and Appellee failed to demonstrate those statements are "of and concerning" her.

In short, Appellee did not demonstrate to the trial court that she could succeed on the merits of her defamation claim, much less show clear and specific evidence to support

14

each element of her claim, as required by the Act. Appellee did not establish that Appellant's statements are defamatory *per se* (or *per quod*), did not establish material falsity of the Complained of Statements, did not establish that Appellant made the statements with actual malice, did not overcome the applicable privilege(s), and did not establish that the Complained of Statements were of and concerning Appellee. If she could not meet her burden on a single element, Appellant should have prevailed. In this case, Appellee failed to establish a *prima facie* case for <u>all</u> of the essential elements of her claim, thus, the Texas Citizens' Participation Act clearly required dismissal of her claims.

## ARGUMENT & AUTHORITIES

The Trial Court improperly denied Appellant's Motion to Dismiss and, by doing so, incorrectly found that Appellee has proved a *prima facie* case of each essential element of her claims for defamation *per se* with clear and specific evidence.

**I.** **Recent Legislation Provides New Protections for Those Exercising Their Right of Free Speech.**

Texas' Citizens' Participation Act, signed into law on June 17, 2011, is designed to encourage and safeguard the constitutional rights of persons to speak freely to the maximum extent permitted by law. Tex. Civ. Prac. & Rem. Code §27.002 (the "Act"). The Act applies to any legal action based on, relating to, or in response to a person's exercise of the right of free speech. *Id.* §27.005(b). It specifically provides for a motion to dismiss, and an interlocutory appeal, both in response to a trial court's order and one entered by operation of law, to protect defendants who have been sued for exercising their right to free speech. *Id.* §§27.003 and 27.008(b).

15

## A. Appellant Established that the Claims at Issue Fall Under the Citizens' Participation Act's Protection.

In applying the Act, the Court engages in a two-step inquiry. Upon a party's filing of a motion to dismiss, the Act requires a court to dismiss the action if the moving party shows the legal action was "based on, relates to, or is in response to" the moving party's exercise of free speech. *Id.* §27.005(b)(1). "Exercise of the right of free speech" means any communication "made in connection with a matter of public concern." *Id.* §27.001(3). The definition of "matter of public concern" includes any issue related to economic or community well-being, the government, or about a public official or public figure. *Id.* §27.001(7).

KTRK was reporting on the ongoing dispute between Benji's and the TEA and allegations under investigation by the State. Appellee was the Superintendant of Benji's and on the Board of the Charter Holder, and, as such, was a public figure. Appellee had been brought under scrutiny by the State in the past for her financial mismanagement of the school and her lack of accountability for the use of taxpayer funds. Reporting on matters of public concern, such as these, squarely fall within the protection of the Act. Appellee has conceded that the claims in this action fall within the Act. (CR 3:500-504). The burden, therefore, shifted to Appellee to establish a *prima facie* case for each essential element of her claims with clear and specific evidence. Section 27.005 mandates dismissal of the claims at issue if this burden is not met.

16

**B.**   **Appellee's Burden Was to Establish By "Clear and Specific Evidence" a *"Prima Facie* Case" for Each Essential Element of Her Claims Against Appellant.**

The standard in the Act comes from the *In re: Does* case in which the Court held that before being able to obtain an order mandating a third party to identify an anonymous speaker for the purposes of pursuing a defamation claim, the potential plaintiff had to establish the claim was viable. *In re: Does*, 242 S.W.3d 805 (Tex. App. – Texarkana 2007, no pet.). The Court found the correct balance of interests would be to require a *prima facie* showing of each essential element of the claims at the outset. This meant that, in order to get the names of the anonymous speakers, the plaintiff was required to provide actual proof and not just allegations — that would be sufficient to preclude the granting of summary judgment. *In re Does*, 242 S.W.3d 805 (Tex. App. – Texarkana 2007, no pet.). By adopting this standard in the Anti-SLAPP statute, the Legislature chose to apply the same standard to claims brought against non-anonymous speakers as anonymous ones. One must be able to establish the viability of a claim against one who exercises their free speech rights before being permitted to go forward with a lawsuit.

Furthermore, the term "clear and specific" is a heightened standard of evidence that has recently been implemented in First Amendment legislation in Texas. It is taken from the *Channel Two Television v. Dickerson,* 725 S.W.2d 470, 472 (Tex. App. – Hou. [1ˢᵗ Dist.] 1987, no writ), and is found in the reporters' privilege statute, Tex. Civ. Prac. & Rem. Code §22.02, *et seq.*, as well as the statute at hand. It requires more than a preponderance of evidence but less than clear and convincing evidence. (CR 2:436-445)

17

There can be no doubt that the Act's "clear and specific evidence" requirement precludes a plaintiff from relying on mischaracterizations of what the broadcasts say, circumstantial evidence, and baseless inferences. *See, e.g., Southwest Olshan Found. Repair Co., LLC v. Gonzales*, 345 S.W.3d 431, 440-41 (Tex. App. – San Antonio 2011, no pet.) (although fraud invariably must be proven by circumstantial evidence, a vital fact may not be established with inference stacking); *McDonald v. Clemens*, 464 S.W.2d 450, 456 (Tex. Civ. App. – Tyler 1971, no writ) (affirmative defense of fraud must be established "by clear and specific evidence unaided by presumptions, inferences or intendments"). Appellee has provided nothing more than mischaracterizations, inferences and suppositions — none of which constitute clear and specific evidence.

C.     **Appellee Failed to Establish a *Prima Facie* Case for Defamation.**

Appellee sued Appellant for defamation. To maintain a claim for defamation, Appellee must show that Appellant: (1) published a statement; (2) that was defamatory concerning the plaintiff; (3) which was false; and (4) while acting with "actual malice" regarding the statement's truth where, as here, the plaintiff is a public figure. *See WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998); *cert. denied*, 526 U.S. 1051, 119 S. Ct. 1358, 143 L.Ed.2d 519 (1999) (elements of defamation claim); *Fox Entm't Group, Inc. v. Abdel-Hafiz*, 240 S.W.3d 524, 531 (Tex. App. – Fort Worth 2007, pet. denied) (same); *see also, Turner v. KTRK Television, Inc.*, 38 S.W.3d 103 (Tex. 2000) (public figure has burden to prove falsity as essential element). If a plaintiff cannot establish any <u>one</u> of these elements by clear and specific evidence, the anti-SLAPP motion should be granted. Furthermore, because Appellee's claim was one for

18

defamation *per se,* she must demonstrate that that the words were so obviously hurtful to her — such as accusing her of a crime — that they require no proof of injury. *Main v. Royall,* 348 S.W.3d 381, 390 (Tex. App. – Dallas 2011, no pet.). Appellee failed to establish the statements were *per se* libelous and, because she did not even allege (and did not prove) actual damages, she also failed to establish a *per quod* claim (where damages are not presumed and must be specially pled and proven). *Leyendecker & Assocs. v. Wechter,* 683 S.W.2d 369, 374 (Tex. 1984). Appellant's Motion to Dismiss should have been granted because Appellee failed to establish, with clear and specific evidence, a *prima facie* case of each essential element of her claim.

### D. The Trial Court's Findings of Fact and Conclusions of Law Demonstrate Error.

After denying Appellant's Motion to Dismiss, Appellant requested the Court enter Findings of Fact and Conclusions of Law pursuant to Tex. Civ. Prac. & Rem. Code §27.007. The findings and conclusions entered indicate multiple errors on the part of the trial court. To begin with, the trial court committed error in finding that a lawsuit brought over a prior broadcast could not have been brought to deter or prevent the Appellant from exercising its constitutional rights. *See* Appendix, Tab B. This finding completely ignores the impact such a lawsuit (and the two prior ones) has on future speech and the fact that prior restraints are disfavored under constitutional jurisprudence. Texas Supreme Court precedent requires that the Court consider such important factors. *Diamond Shamrock Refining and Marketing Co. v. Mendez,* 844 S.W.2d 198 (Tex. 1992), *citing New York Times v. Sullivan,* 376 U.S. 254, 272, 84 S. Ct. 710, 721 (1964)

19

("whatever is added to the field of libel is taken from the field of free debate.") The express purpose of the Anti-SLAPP statute is to "encourage and safeguard the constitutional rights of persons to ... speak freely ... to the maximum extent permitted by law ...." Tex. Civ. Prac. & Rem. Code, §27.002. The statute requires the court to consider whether a legal action was brought to deter or prevent the Appellant from exercising its constitutional rights as well as whether it was brought for an improper purpose, including to harass the Appellants. *Id.* Keeping this in mind, courts across Texas have consistently applied the new Anti-SLAPP statute to lawsuits filed over broadcasts that have already aired. *See, e.g., Viera v. Hearst Newspapers, LLC d/b/a The Houston Chronicle, KHOU-TV, Inc. and Post-Newsweek Stations Houston, Inc. d/b/a KPRCT-TV*, Cause No. 2011-42884 (190th Dist. Ct., Harris County, Tex., Sept. 11, 2011); *Salvaggio v. High Plains Broadcasting, Inc.*, Cause No. 2011-CI-10127 (131st Dist. Ct., Bexar County, Tex., Feb. 27, 2012); *Simpton, et. al. v. High Plains Broadcasting, Inc.*, Cause No. 2011-CI-13290 (285th Dist. Ct., Bexar County, Tex., March 23, 2012); *Carter, et. al. v. NW Communications of Texas, Inc., d/b/a KDFW Fox 4 and KDFW-TV, Inc., et. al.*, Cause No. 12-02166 (160th Dist. Ct., Dallas County, Tex., May 24, 2012). In fact, to conclude differently, as the trial court did in this matter, would eviscerate the statute and make it virtually impossible to dismiss any case brought against the media arising out of past publications.

KTRK reported on a public figure entrusted with significant State funds to educate our youth who, not only failed to properly account for those funds, but also thwarted the efforts of TEA to improve financial accounting and governance. This is the type of core

20

speech entitled to the protection of the Anti-SLAPP statute. Yet, the trial court erroneously determined otherwise.

To trigger the Act, Appellant was only required to demonstrate that it was exercising its right to free speech on an issue of public concern, which it did. It was error for the trial court to consider the relative financial means of Appellee in comparison to Appellant in its determination of whether the lawsuit was filed in retaliation for Appellant's speech or publication of the reports. *See* Appendix, Tab B, p. 3. Not only was the court, at best, guessing as to Appellee's resources and type of engagement agreement (*e.g.*, retainer, flat fee, or hourly), but deciding liability or fault on the basis of financial resources was improper and is not called for in the Act. In fact, the Texas Supreme Court has held that the prejudicial effect of a party's wealth is so strong that evidence of a party's wealth should not be admitted in a tort case. *See Reliance Steel & Aluminum Co. v. Sevcik,* 267 S.W.3d 867, 870 (Tex. 2008). Therefore, the trial court's consideration of the relative wealth of the parties was improper and should not have been the basis for any ruling.

Even more egregious, though, was the trial court's apparent disregard for the fact that this lawsuit was the *third* lawsuit filed by Appellee against these defendants. A consistent theme with SLAPP lawsuits, and one that the Anti-SLAPP law sought to curtail, is that they are brought for the purposes of tying up the defendant's resources for a sufficient length of time to accomplish the underlying goal of stifling further speech or coverage of an issue or person. As long as a media defendant is forced to devote its time, energy, and resources to combating the lawsuit, its ability to gather and report on the

news and report on matters of public concern is compromised. *See, e.g., Wilcox v. Superior Court* (1994) 27 Cal. App. 4th 809, 815, fn.2; *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal. 4th 1106, 1126. "The core values of the First Amendment reflect a 'recognition of the fundamental importance of the free flow of ideas and opinions on matters of public interest and concern.'" *Carr v. Brasher,* 776 S.W.2d 567, 570 (Tex. 1989), *quoting Hustler Magazine v. Falwell,* 485 U.S. 46, 108 S. Ct. 876, 879 (1988). By attempting to drag Appellant into three different defamation lawsuits (in both state and federal courts) in an effort to stifle speech, discourage further speech or punish Appellant for speaking out, Appellant's ability to report on matters of public concern and exercise its core First Amendment rights is severely compromised.

### E. Standard of Review in this Citizens' Participation Act Appeal.

The purpose of the Citizens' Participation Act is to protect freedom of speech, and the heightened evidentiary standard of "clear and specific evidence" requires an appellate court to conduct an independent examination of the entire record. Tex. Civ. Prac. & Rem. Code §§27.002, 27.005(c).

Appellant filed affidavits giving full context to the Complained of Statements and demonstrating that the statements were true or substantially true. The affidavits also showed that none of the individuals who worked on the broadcasts at issue had any knowledge that the statements were false in any way.

The Act provides that "in determining whether a legal action should be dismissed under this chapter, the court *shall consider* the pleadings and *supporting and opposing affidavits* stating the facts *on which the liability or defense is based.*" Tex. Civ. Prac. &

Rem. Code §27.006(a) (emphasis added). The Act clearly requires the Court to consider all affidavits stating the facts that relate to liability or to any defense. While Appellee has the burden to establish a *prima facie* case, the Act requires the Court to consider all factual evidence presented.

Further, where First Amendment freedoms are at issue, the appellate court is to review the entire record. *Bose Corp. v. Consumers Union of the United States, Inc.*, 466 U.S. 485, 508, 104 S. Ct. 1949, 1964 (1984) (First Amendment requires that an appellate court make an independent examination of the whole record to protect against a forbidden intrusion on the field of free expression); *Hearst Corp. v. Skeen*, 159 S.W.3d 633, 639 (Tex. 2005) (viewing the summary judgment evidence in its entirety and deciding no fact issue was raised as to whether the article was published with actual malice); *Abdel-Hafiz v. ABC, Inc.*, 240 S.W.3d 492, 504 (Tex. App. – Fort Worth 2007, pet. denied) (review entire record to determine whether there was some evidence of actual malice).

In libel cases, publications "must be viewed as a whole — including accompanying statements, headlines, pictures, and the general tenor and reputation of the source itself." *City of Keller v. Wilson*, 168 S.W.3d 802, 811 (Tex. 2005); *New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 158-59 (Tex. 2004). Where a plaintiff relies on circumstantial evidence to establish actual malice, the court must "view each piece of circumstantial evidence, not in isolation, but in light of all the known circumstances." *City of Keller*, 168 S.W.2d at 813-14.

23

The standard of review in this Citizens' Participation Act appeal, therefore, is that the Court is to review all of the evidence and determine, as a matter of law, whether Appellee established a *prima facie* case as to each essential element of the claims against Appellant with "clear and specific evidence." Tex. Civ. Prac. & Rem. Code §27.005(c).

## II.    Appellee Failed to Establish With Clear and Specific Evidence that the Complained of Statements Were Defamatory *Per Se*.

Appellee brought her claim not for defamation *per quod*, but only for defamation *per se* — that is, that the words are so obviously hurtful that they require no proof of injury, such as a statement that "*unambiguously* charge[s] a crime, dishonesty fraud, rascality, or general depravity[.]" *Main v. Royall,* 348 S.W.3d 381, 390 (Tex. App. – Dallas 2011, no pet.) (emphasis added). Because the Complained of Statements did not unambiguously charge Robinson with any of the *per se* indicia, Appellee has tried to convince the Court she has a viable *per se* claim based on what she felt like the statements insinuated. Appellee argues the statements (1) *insinuated* that she embezzled over $3 million (CR 3:504) and (2) falsely imputed criminal behavior (CR 3:508). As proof for this proposition, Appellee refers to third-party comments posted on various comment boards — many of which were commenting on broadcasts by media organizations *other than* Appellant KTRK (CR 4:822-824, 826-847, 873-874). To be defamatory *per se*, however, the defamatory nature of the challenged statement must be apparent on its face without reference to extrinsic facts or "innuendo." *Moore v. Waldrop,* 166 S.W.3d 380 (Tex. App. – Waco 2005, no pet.). "If the court must resort to innuendo or extrinsic evidence to determine that the statement was defamatory, then it is

24

libel *per quod* and requires proof of injury and damages." *Main v. Royall*, 348 S.W.3d at 390. Appellee has provided no such proof. Appellee's *per se* claim fails because there was nothing intrinsically defamatory about Appellant's report on the State's investigation into Benji's mismanaged funds. Any innuendo Appellee attempted to raise is subjective, is not sufficient to sustain a *per se* claim of defamation, and should not have been considered by the trial court.

In fact, even under a *per quod* analysis, Appellee's opinion of a statement has *no* bearing on whether a statement is defamatory. The test is what construction would be placed on the language by the average reasonable person or the general public, not by the Appellee. *See Patton v. UPS*, 910 F. Supp. 1250, 1274 (S.D. Tex. 1995); *Schauer v. Memorial Care Sys.*, 856 S.W.2d 437, 449 (Tex. App. – Hou. [1st Dist.] 1993, no writ); *Moore v. Waldrop*, 166 S.W.3d 380 (Tex. App. – Waco 2005, no pet.). Furthermore, media defendants cannot be liable for varying subjective impressions that may have been generated from the broadcast of true statements. *See ABC, Inc. v. Gill*, 6 S.W.3d 19, 35-38 (Tex. App. – San Antonio 1999, pet. denied); *see also, Scripps Texas Newspapers, LP v. Belalcazar*, 99 S.W.3d 829, 835 (Tex. App. – Corpus Christi 2003, pet. denied). Instead, allegedly defamatory statements are to be construed as a whole in light of the surrounding circumstances *based upon how a person of ordinary intelligence would perceive it. See Musser v. Smith Protective Servs.*, 723 S.W.2d 653 (Tex. 1987).

Appellee's argument that Appellant said or insinuated the entire $3 million was embezzled is without merit. The broadcasts did not say this nor did they imply it. It is clear from the broadcasts that the school was operating until the time TEA closed it. The

25

problem being investigated (and what Appellant reported) was Appellee's accounting for the use of the funds, because all of the $3 million given to the school, was not accounted for in a proper manner. This is a true statement supported by considerable evidence in the record.

Despite Appellee's unsupported assertions that Appellant has accused her of criminal behavior, it is clear from looking at the broadcasts that Appellant never accused Appellee of embezzling funds or other criminal behavior. (CR 1:26-27, 29-30, 63, 72-73, 77-78, 82-83). None of the broadcasts ever mention the words embezzlement or misappropriation (or assert that such has happened), or any allegations of possible criminal behavior. In the September 15th broadcast, KTRK discusses the fact that State money was not fully accounted for, the "lack of sufficient financial records," the debts Benji's owed and the State's contention that Benji's had not provided many receipts. (CR 1:26-27, 29-30). Never does KTRK state that Robinson (or even, Benji's) has misappropriated or embezzled funds. Similarly, the September 25th broadcast discusses the questionable lease situation, the fact that the State does not know how the State money was spent and that the charter was suspended over "concerns about money mismanagement." (CR 1:63). The September 27th article discusses the school's closing, the suspension of the charter, the fact that the State did not know how the money was spent and the lawsuit. (CR 1:72-73). Nowhere in the Complained of Statements, or in the broadcasts as a whole, does Appellant "*unambiguously* charge" Appellee with a crime, dishonesty, fraud, rascality, or general depravity. (CR 1:26-27, 29-30, 63, 72-73, 77-78, 82-83).

In fact, just the opposite was reported. Rather than unambiguously alleging — or even implying — criminal behavior, one of the broadcasts shows a school representative stating just the opposite — that he did not know of any fraud or abuse. (CR 1:63). What the broadcasts consistently say is that the State of Texas was concerned about Benji's financial mismanagement and failure to properly account for the use of State funds. These statements are indisputably true, do not allege any criminal conduct and are entirely consistent with the Final Order revoking Benji's charter. (CR 4:1099-1112). TEA's concern for Benji's financial situation and failure to properly account for State funds was also demonstrated by statements made by TEA officials in other media reports on the brewing controversy. (CR 1:35; 2:400, 407-408, 415, 418, 421).

Appellee also contended in the trial court that the comments made by others — in response to KTRK's articles *and* in response to articles by other news organizations — demonstrated defamation *per se* because, in those internet comments, third parties accused her of criminal behavior, misappropriation, or other malfeasance.[7] (CR 3:504-508; 1:31-33, 36-37, 41-60, 64-65, 74-74-75, 79-80, 83-84, 87). In a claim for defamation *per se*, however, Appellant can only be held responsible for statements it actually made — and whether it actually unambiguously accused her of a crime, which it clearly did not. Furthermore, Appellant cannot be held responsible for what others say

---

[7] Additionally, Appellee alleged that it did not sue the other media outlets that reported on the ongoing controversy because they did not "report[] anything like the statements made by" KTRK (CR 3:503). But, if the gauge of whether a report is defamatory *per se* is what internet commenters say on the comment message board for an article, as Appellee alleges, then Appellee's own evidence would indicate that the most defamatory (and, perhaps, harmful) report was an article by the *Houston Chronicle*, printed on their website on September 15, 2010, that generated 168 comments (CR 1:41-60), the most (and some of the most damning) comments of any of the reports that Appellee introduced into evidence at the trial court. But, neither the *Houston Chronicle* article nor the KTRK broadcasts accuse Appellee of a crime and none of the comments attached to the broadcasts change that fact.

27

about Robinson. *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (1998) (stating that to maintain a defamation cause of action, the Appellee must prove that the Appellant published a statement). If the Court must resort to such extrinsic evidence to make the determination, as Appellee requested the trial court to do, then the claim may not be sustained for defamation *per se* (but instead is only *per quod,* which Appellee did not plead and certainly did not provide evidence of in the trial court). *Main v. Royall,* 348 S.W.3d at 390. Finally, even if Appellee were now to take the position that the statements were defamatory *per quod,* Appellee has not pled nor proven a *prima facie* case of (and has introduced no evidence of) actual damages. *See, e.g., Leyendecker & Assocs. v. Wechter,* 683 S.W.2d 369, 374 (Tex. 1984) (for libel *per quod,* actual damages must be pleaded and proved before general damages can be recovered).

Because Appellee did not and could not demonstrate clear and specific evidence that what Appellant actually said about Appellee (and not any innuendo or reference of extrinsic evidence and not what unrelated parties feel about Robinson) was defamatory *per se,* it was error for the trial court to deny Appellant's Motion to Dismiss.

## III. Appellee Was Required to and Failed to Show Clear and Specific Evidence of Actual Malice.

### A. Appellee is a Public Figure

The trial court failed to even address the fact that Appellee is a public figure and, therefore, required to prove actual malice as an essential element of her claim. Because the Appellee's status as a public figure is outcome determinative, it was error for the court to gloss over this critical issue. *See, e.g., Ampex Corp. v. Cargyle,* 128 Cal. App.

4th 1569, 1578 (Cal. App. 1st Dist. 2005) (Reversing the denial of an Anti-SLAPP motion when limited purpose public figure did not produce any evidence or inferences from evidence concerning Appellant's attitude or state of mind with respect to the veracity of the messages posted on message boards); *Christian Research Institute v. Alnor*, 148 Cal. App. 4th 71 (Cal. App. 4th Dist. 2007) (Reversing lower court's denial of an Anti-SLAPP motion and holding that although the Appellee had shown falsity it had failed to demonstrate "actual malice by clear and convincing evidence").

State charter schools receive state and federal funding, but have less oversight than schools that are run by a district; therefore, because Appellee held a position of substantial responsibility for or control over the school, the public had an independent interest in the qualifications and performance of Robinson as the person who ran such a school. *See, e.g., Rosenblatt v. Baer*, 383 U.S. 75, 85-86, 86 S. Ct. 669, 676 (1966). As a superintendent of a charter school that received more than $3 million in funds from the State each year, Appellee's occupation was one that invited independent interest beyond the general interest in the qualifications and performance of all governmental employees. *See, e.g., Beck v. Lone Star*, 970 S.W.2d 610, 614-15 (Tex. App. – Tyler 1998, pet. denied) (holding assistant superintendent is public official for all purposes).[8] Furthermore, there exists significant precedent holding that an array of public school and

---

[8] *See also, Purvis v. Ballantine*, 487 S.E.2d 14, 17 (Ga. Ct. App. 1997) (holding superintendent public official because he routinely made personnel, administrative and budgetary decisions affecting the public school system); *Scott v. News-Herald*, 25 Ohio St.3d 243, 496 N.E.2d 699 (Ohio 1986) (holding school superintendent is public official because he was responsible for implementing policies, expected to serve as a role model for students, and exercised supervisory authority over students); *State v. Defley*, 395 So.2d 759 (La. 1981) (holding positions of school superintendent and school supervisor are such that the public has an independent interest in the qualifications and performance of the persons who hold them, beyond the public interest in the qualifications and performance of all government employees and, thus, both are "public officials" for defamation purposes).

other public employees with administrative responsibility are public officials within the meaning of *Rosenblatt*.[9] Thus, because of her role at Benji's, Appellee is a public figure and/or public official for purposes of this Court's defamation analysis.

In addition, as a government contractor who was paid close to $3 million annually in taxpayer money, at a time when charter schools were embroiled in public controversy (CR 5:1267-1286), Appellee, by her own conduct, was involved in a subject of legitimate public concern that was sufficient to invite public comment. This fact alone makes Appellee a public figure. *Brewer v. Memphis Pub. Co.*, 626 F.2d 1238, 1254 (5th Cir. 1980) (by choosing to engage in activities that necessarily involved increased public exposure and media scrutiny, plaintiff played more than a trivial or tangential role in the controversy and, therefore, bore the risk of injury to his reputation); *Rosanova v. Playboy Enters., Inc.*, 580 F.2d 859, 862 (5th Cir. 1978) (individual's desire not to be a public figure does not matter if his activities are of legitimate public concern that invited public comment). *See also, WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568 (Tex. 1998), *cert. denied*, 119 S. Ct. 1358 (1999); *American Broadcasting Co. v. Gill*, 6 S.W.3d 19 (Tex. App. – San Antonio 1999, pet. denied) (brothers who maintained ownership interests in savings and loans during the savings and loan crisis and who were the subject of

---

[9] *See, e.g., Standridge v. Ramey*, 733 A.2d 1197, 1201-02 (N.J. Super. Ct. App. Div. 1999) (public school athletic director was public official because his position involved "public visibility and responsibility for the conduct of governmental affairs" which included "managing and supervising" duties); *Jee v. New York Post*, 671 N.Y.S.2d 920, 923-24 (N.Y. Sup. Ct. 1998) (public school principal is public official because she "appeared to have responsibility over the conduct of education at the school [which] was sufficient to trigger public official standards, even if she did not actually have the power that the public perceived [she had]"), *aff'd*, 688 N.Y.S.2d 49 (App. Div. 1999); *Johnson v. Robinsdale Indep. Sch. Dist. No. 281*, 827 F. Supp. 1439, 1443 (D. Minn. 1993) (public elementary school principal was a public official where he managed school employees and "appeared to have responsibility over the conduct of education" at the school "sufficient to trigger public official standards"); *Kapiloff v. Dunn.*, 343 A.2d 251, 258 (Md. Ct. Spec. App. 1975) (high school principal was within the public figure-public official classification and his "suitability for the position was a matter of public or general interest or concern").

numerous investigations regarding the institution were public figures); *Swate v. Schiffers,* 975 S.W.2d 70, 75-76 (Tex. App. – San Antonio 1998, pet. denied) (trial court properly concluded Swate was a public figure even if he may not have voluntarily injected himself into the controversy when his behavior described by the articles was the type that interests the public); *Brueggemeyer v. ABC, Inc.,* 684 F. Supp. 452, 458 (N.D. Tex. 1988) (trial court properly concluded Brueggemeyer was a public figure even if he did not, of his own volition, undertake to become one, because he voluntarily engaged in a course that was bound to invite attention and comment).

Although one does not become a public figure merely by contracting with the government or accepting public money, one who contracts with the government can become a public figure because of the way in which she conducts herself in connection with those public contracts. *See, e.g., McDowell v. Paiewonsky,* 769 F.2d 942, 949 (3d Cir. 1985); *Carr v. Forbes,* 259 F.3d 273 (4th Cir. 2001). Appellee claims to have not voluntarily injected herself into the controversy; however, the fact that she chose to be the Founder, Superintendent and Executive Director of Benji's Special Academy at a time when such involvement in charter schools generally, and Benji's in particular, was inviting a tremendous amount of public comment and scrutiny by law enforcement (looking into the double payment of rent issue), government agencies (the TEA revoking its charter), and the general public is enough. There can be no doubt that by ignoring TEA's financial reporting requirements and orders, by encouraging parents to defy the State's closure of the school, by *calling her own press conference* to announce the school remaining open despite the State's order, by refusing to allow the auditors to do their

31

work at the school, and through speaking to the media, Appellee conducted herself in a manner in connection with her government contract that invited public comment and scrutiny.[10]

Finally, it has long been the law that when a person "thrust herself to the forefront of any particular public controversy to influence the resolution of the issues involved in it," she becomes a limited purpose public figure. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351-2, 94 S. Ct. 2997, 3013, 41 L. Ed. 789 (1974). Appellee frequently spoke out in public venues, to the media, and to TEA in an effort to influence the outcome of the controversy concerning the accreditation of Benji's. (CR 1:39; 2:358-59, 2:403-404, 407, 415, 418, 420, 423; 2:478-481,484-85; 5:1291-1292, 1296-1300). Whether a person is a public official or public figure is a question of law, and the evidence presented to this Court clearly establishes Appellee is just that. *See Rosenblatt v. Baer*, 383 U.S. 75, 88, 86 S. Ct. 669, 15 L.Ed.2d 597 (1966); *WFAA–TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998). As such, Appellee must establish KTRK knew what it said about Appellee was false and purposefully lied in its broadcasts. *See, Curtis Publishing Co. v. Butts*, 388 U.S. 130, 154-55 (1967); *Casso v. Brand*, 776 S.W.2d 551, 557-58 (Tex. 1989). Appellee has failed to provide any evidence of this essential element of her claim.

---

[10] *See, e.g., CACI Premier Technology, Inc. v. Rhodes, et. al.*, 536 F.3d 280 (4th Cir. 2008) (government contractor held public figure); *Capuano v. The Outlet Co.*, 579 A.2d 469 (R.I. 1990) (owners of waste management companies who functioned in implementation of quasi-governmental program through two municipality contracts considered public figures); *Clyburn v. New World Communications, Inc.*, 705 F. Supp. 635 (D.D.C. 1989), *aff'd*, 903 F.2d 29 (D.C. Cir. 1990) (government contractor held public figure); *McDowell v. Paiewonsky*, 769 F.2d 942, 950 (3d Cir. 1985) (decision to work on public projects is a voluntary act rendering one a limited purpose public figure, since such projects — especially controversial ones — engender public scrutiny).

**B.      The Complained of Statements Were Privileged.**

Even if she were not found to be a public figure, Appellee must still prove actual

malice because the statements involve matters of public concern and are privileged. *See*

*Gertz v. Welch*, 418 U.S. 323 (1974); *Huckabee v. Time Warner*, 19 S.W.3d 413 (Tex.

2000). All of the Complained of Statements are protected by constitutional, statutory and

common law privileges, including the fair report and fair comment privileges.

The fair report privilege includes reporting the contents of pleadings filed with the

courts, investigations by governmental bodies, and substantially true accounts of official

or judicial proceedings. The use of the phrase "fair, true and impartial" in the privilege

has been construed to mean "substantially true." *Herald-Post Publishing Co., Inc. v.*

*Hill*, 891 S.W.2d 638 (Tex. 1994); *Langston v. Eagle Publishing Co.*, 719 S.W.2d 612

(Tex. App. – Waco 1986, writ ref'd n.r.e.). Appellee herself describes TEA's plan "to

report to the major news organizations ... that over $3 million in public funds given to

Benji's over the past year, *i.e.* the entire annual budget for operations, was unaccounted

for." (CR 1:9, ¶37). And, to the extent Appellee complains that the information provided

by TEA to KTRK was incorrect, this does not overcome the privilege protecting

Appellant's broadcasts. *See Freedom Communications, Inc. v. Sotelo*, 2006 WL

1644602, 34 Media L. Rep. 2207 (Tex. App. – Eastland 2006, no pet.) (the privilege also

extends to reporting based on erroneous government information.) Furthermore, the

"fair, true and impartial privilege" has been construed to provide "great latitude" to

reports of official proceedings. *Texas Monthly, Inc. v. Transamerican Natural Gas*

*Corp.*, 7 S.W.3d 801 (Tex. App. – Hou. [1st Dist.] 1999, no pet.). *See* Tex. Civ. Prac. &

33

Rem. Code §73.002 (a) and (b). Thus, there is no doubt Appellant's reporting on TEA's investigation of Appellee's financial mismanagement of Benji's falls within the fair report privilege.

In addition, the broadcasts and articles at issue are privileged as a reasonable and fair comment on a matter of public concern published for general information pursuant to the common law and the Texas and the United States Constitutions. *Humane Society of Dallas v. Dallas Morning News, L.P.*, 180 S.W.3d 921, 923 (Tex. App. – Dallas 2005, no pet.). Because the broadcasts focused on highly relevant political issues and government investigations, such as whether over $3 million in state funds was properly accounted for, and the charter revocation and closure of a school in the Houston community, Appellant is protected by the fair comment privilege. *See* Tex. Civ. Prac. & Rem. Code §73.002(b)(2). The fair comment privilege extends to reports on what state agencies and officials are doing. *See Brewer v. Capital Cities/ABC, Inc.*, 986 S.W.2d 636, 644-45 (Tex. App. – Fort Worth 1998, no pet.) (fair comment privilege applied to primarily factual account of state agency inspections); *Swate v. Schiffers*, 975 S.W.2d 70, 77 (Tex. App. – San Antonio 1998, pet. denied) (Broadcasts concerning complaints made to the medical board constituted privileged reports of an official proceeding about medical care, which constitutes a matter of public concern). Thus, Appellant's reporting on allegations of improper, undocumented or unaccounted for use of government funds certainly falls within the purview of the privilege.

34

**IV. Appellee Failed to Prove By Clear and Specific Evidence the Complained of Statements were Published with Actual Malice.**

Despite having the burden to do so, Appellee did not provide a *prima facie* case, by clear and specific evidence, of actual malice by Appellant. To the contrary, Appellant's uncontroverted affidavits squarely establish a lack of actual malice. (CR 2:217-219, 371-373, 433-435). To establish actual malice one must ask whether the speaker subjectively believed what was published at the time of publication. *Casso v. Brand*, 776 S.W.2d 551, 558-59 (Tex. 1989). Actual malice, which Appellee repeatedly confused with "malice" in the trial court, is a term of art in defamation law. It does not mean ill will, but rather publication of a false statement knowing the statement was false, or with reckless disregard as to the truth of the statement. *Gertz v. Welch*, 418 U.S. at 349, 94 S. Ct. at 3013; *Casso v. Brand*, 776 S.W.2d at 554. "Reckless disregard" means not mere "sloppiness", but that the publisher in fact entertained *serious doubts* about the truth of the statement. *Id.* at 558 (quoting *St. Armant v. Thompson*, 390 U.S. 727, 731, 88 S. Ct. 1323, 1325 (1968).

Although it was not its burden, KTRK introduced in the trial court the affidavits from its employees who worked on the reports establishing their belief in the truth of the statements published by KTRK. (CR 2:217-219, 371-373, 433-435). *See Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 688, 109 S. Ct. 2678, 105 L.Ed.2d 562 (1989). Appellee, on the other hand, provided no evidence — let alone clear and specific evidence — of Appellant's state of mind. Instead, Appellee attempts to manipulate what Appellant has said to bolster her case asking how Appellant could have,

35

in the absence of "malice," "conclude[d] that a school had operated for a year without paying payroll or utilities" or believed that "the State had no idea where any of this vast sum of money was spent." (CR 3:512). The answer is simple: Appellant never made the statements Appellee is now trying to attribute to it. As with the other elements of her claim, Appellee has merely thrown up suppositions and hypotheticals — none of which are evidence of the elements of her claim. *See Brownlee v. Brownlee,* 665 S.W.2d 111 (Tex. 1984); *McIntyre v. Ramirez,* 109 S.W.3d 741 (Tex. 2003); *see also, ABC, Inc. v. Shanks,* 1 S.W.3d 230, 237 (Tex. App. – Corpus Christi 1999, pet. denied). "To prove malice, the Appellee must offer proof of the Appellant's state of mind at the time of publication." *Abdel-Hafiz,* 240 S.W.3d 492, 519 (Tex. App. – Fort Worth 2007, pet. denied) (citing *Skeen* 159 S.W.3d at 637). Appellee has failed to do so.

Instead, essentially conceding that she has no evidence of actual malice, Appellee argued that actual malice was demonstrated circumstantially through Appellee's improper mischaracterizations of what Appellant said. (CR 3:512-513). Even if Appellee did not like the choice of words used by Appellant, a "poor choice of words, without any showing to indicate that the authors thought they were making a false statement or at least had serious doubts about its truth, does not create evidence of actual malice." *Abdel-Hafiz,* 240 S.W.3d at 520. To demonstrate actual malice, it is not enough to demonstrate an error in judgment or to claim that different words might have been better used. *Id.* Instead, Appellee must demonstrate that Appellant was *aware* that its choice of words could create a false impression. *Abdel-Hafiz,* 240 S.W.3d at 522; *see also, Huckabee v. Time Warner,* 19 S.W.3d 413, 426 (libel plaintiff must show that

36

publisher selected the material "with the awareness that the omission could create a substantially false impression."); *Isaacks,* 146 S.W.3d at 162 ("When the words lend themselves to more than one interpretation, the plaintiff must establish either the defendant knew that the words would convey a defamatory message, or had reckless disregard for their effect."). An error in judgment is not sufficient to demonstrate actual malice. *Abdel-Hafiz,* 240 S.W.3d at 519. Instead, Appellee was required to demonstrate that Appellant "purposefully published mistaken facts or that the circumstances were 'so improbable that only a reckless publisher would have made the mistake.'" *Id.* (quoting *Freedom Newspapers of Tex. v. Cantu,* 168 S.W.3d 847, 855 (Tex. 2005)). Appellee has not provided any evidence to support a claim that Appellant acted with actual malice. Therefore, it was error for the court to find that Appellee established by clear and specific evidence that Appellant acted with actual malice.

## V. Appellee Failed to Establish With Clear and Specific Evidence That The Complained of Statements Were Materially False.

### A. Appellant's Broadcasts Were Substantially True

Appellee failed to provide any evidence, let alone clear and specific evidence, of material falsity of the Complained of Statements. This is not surprising, because KTRK's reporting was true or substantially true as a matter of law.

Truth is an absolute defense in libel cases in Texas. *See* Tex. Civ. Prac. & Rem. Code §73.005; *Randall's Food Market, Inc. v. Johnson,* 891 S.W.2d 640, 646 (Tex. 1995). KTRK reported truthfully and accurately that the TEA was investigating Appellee and her charter school for not properly accounting for, among other things, over

37

$3 million in government funding for one year. Appellee's narrow complaint is that because KTRK stated the total amount of funding when reporting on questions over mismanagement, she *thinks* people *might infer* that she failed to account for any of it, arguing that she did indeed provide records to show how some of that funding was spent. A publisher cannot be held liable for a true account of events, regardless of what someone may infer from the statements. *See Green v. CBS, Inc.*, 286 F.3d 281, 285 (5th Cir. 2002); *Larson v. Family Violence & Sexual Assault Prevention Center*, 64 S.W.3d 506, 515-516 (Tex. App. – Corpus Christi 2001, pet. denied).

In any event, KTRK did, in fact, report that Appellee provided *some* records and receipts for the use of State funds, but the TEA's concern was that it was insufficient to account for all of the moneys given. Essentially, Appellee admits the truth of the Complained of Statements and instead quibbles over the specifics – a position Texas courts do not recognize as establishing material falsity. *See, e.g., Rogers v. Dallas Morning News, Inc.*, 889 S.W.2d 467 (Tex. App. – Dallas 1994, writ denied) (finding newspaper's inaccurate statement that a charity only spent 10% of its donations on actual services, when, in fact, the charity spent 43% of its donations on services, was a minor error and did not affect the "gist" of the story, which was accurate); *Downer v. Amalgamated Meatcutters and Butcher Workmen of N. Am.*, 550 S.W.2d 744, 747 (Tex. Civ. App. – Dallas 1977, writ ref'd n.r.e.) (Affirming summary judgment where Appellant published statement that Appellee embezzled $2,187.77 instead of $840.73); *Fort Worth Press Co. v. Davis,* 96 S.W.2d 416, 419 (Tex. Civ. App. – Fort Worth 1936, writ denied) (reversing trial court judgment and finding for media defendant where

defendant incorrectly stated plaintiff wasted $80,000 in taxpayer funds rather than $17,575.00).

The question is whether a statement is substantially true and that is a question of law for the court to decide. *Herald-Post Publishing Co. v. Hill*, 891 S.W.2d 638 (Tex. 1994) (Newspaper reported that witness at trial accused an attorney and his investigator of threatening her when in fact only the investigator made the threat. The court dismissed, as a matter of law, on substantial truth grounds); *McIlvain v. Jacobs*, 794 S.W.2d 14, 16 (Tex. 1990) (Despite the presence of several minor mischaracterizations, the court held as a matter of law the report was substantially true and affirmed summary judgment). Further, in Texas, it is not enough to prove that a stated fact was literally false. Instead, Appellee must show that the statements were materially false — meaning the alleged defamatory statement had to have been more damaging to the Appellee's reputation, in the mind of the average listener, than a truthful statement would have been. *McIlvain v. Jacobs*, 794 S.W.2d 14, 16 (Tex. 1990); *KTRK Television v. Felder*, 950 S.W.2d 100, 105-106 (Tex. App. – Hou. [14th Dist.] 1997, no writ). If the underlying gist of the Complained of Statements is true and undisputed, "any variance with respect to items of secondary importance" can be disregarded. *Id.*; *Provencio v. Paradigm Media, et al.*, 44 S.W.3d 677 (Tex. App. – El Paso 2001, no pet.) (misleading return address on postcard from news organization to sex offender did not defeat truth defense).

Appellee has not denied that it is true that Benji's was in debt at the time of the KTRK broadcasts, or that TEA had been investigating Benji's finances and had found State money unaccounted for, and, as a result, had closed the school. She also does not

39

contest that TEA provided Benji's with over $3 million in taxpayer funds in just one year, that the financial management issues had been going on for years, and that the State did not know where substantial taxpayer funds provided to Benji's had gone. Benji's failed to account for significant State funds advanced by TEA, suffered from severe financial mismanagement, and lacked accountability in its record keeping with the State. (CR 4:918-925, 945, 948-949, 953). These continual problems ultimately caused the closure of the school and the revocation of Benji's charter by the State. Thus, the "gist" of KTRK's broadcasts is true and undisputed.

B.     The Substantial Truth Test Applies to Appellant's Reporting on Ongoing Allegations Under Investigation by the TEA.

It is also the law in Texas that "a media defendant's reporting of third-party allegations and any investigation thereof is substantially true if it accurately depicts the allegations being made and the existence of any investigation, regardless of whether the underlying allegations are themselves substantially true." *Neely v. Wilson*, 331 S.W.3d 900, 919 (Tex. App. – Austin 2011, pet. granted); *UTV of San Antonio, Inc. v. Ardmore, Inc.*, 82 S.W.3d 609, 611 (Tex. App. – San Antonio 2002, no pet.); *ABC Inc. v. Gill*, 6 S.W.3d 19, 33 (Tex. App. – San Antonio 1999, pet. denied). When a case involves a media defendant, courts have held the defendant need only prove that third party allegations reported in a broadcast were, in fact, made and under investigation, and, the defendant does not need to demonstrate the underlying allegations themselves are substantially true. *Ardmore, Inc.*, 82 S.W.3d at 612. This extends to investigations or charges made even by non-governmental organizations or individuals. *See KTRK*

40

*Television v. Felder*, 950 S.W.2d 100 (Tex. App. – Hou. [14th Dist.] 1997, no writ); *see also, ABC Inc. v. Gill*, 6 S.W.3d 19. In the *Felder* case, a report that a school with a history of discipline and personnel problems was embroiled in another controversy in which there were allegations of physical threats and verbal abuse was substantially true, whether or not the details were literally true. Similarly, Appellant's reporting on the allegations under investigation by TEA concerning Appellee's financial mismanagement of Benji's is substantially true.

Because Appellee failed to demonstrate by clear and specific evidence that the Complained of Statements were materially false, and Appellant provided uncontroverted evidence that they are substantially true, it was error for the trial court to deny Appellant's Motion to Dismiss.

## VI. Appellee Failed to Establish With Clear and Specific Evidence That The Complained of Statements Were "Of and Concerning" Appellee.

Appellee failed to establish by clear and specific evidence a *prima facie* case that the Complained of Statements were "of and concerning" Appellee. As is clear from the record in this case, none of the Complained of Statements ever mentions Appellee by name or position. (CR 1:26-27, 29-30, 63, 72-73, 77-78, 82-83). Instead, the Complained of Statements all refer to Benji's or "the school." In fact, in looking at the broadcasts themselves, only two broadcasts even mention Appellee Robinson — and neither in the context of the $3 million. In one broadcast, in discussing how many students stood by Benji's, despite the problems, the report includes a statement from a student praising Robinson for giving students a second chance, saying "Ms. Robinson,

41

she sit down and talk to you other schools would just suspend you." This is hardly a defamatory statement. (CR 1:26-27, 29-30).

The only other mention of Robinson is in the September 25th and September 27th broadcasts which involve a discussion about the lease issue that Appellee does not dispute. (CR 1:63, 72). Those broadcasts discuss the fact that the City of Houston was looking into the lease issue, and note that Robinson is listed in the Secretary of State's records as a founder of both the school board and the Charter Holder board. (CR 1:63, 72). Robinson does not deny any of this. None of the other broadcasts and none of the Complained of Statements ever name Appellee. For there to be a cause of action for defamation, the allegedly defamatory statements must be "of and concerning" the plaintiff. *See Huckabee v. Time Warner Entm't Co.*, 19 S.W.3d 413, 429 (Tex. 2000); *Newspapers, Inc. v. Matthews*, 339 S.W.2d 890, 893 (Tex. 1960). "There must be evidence showing that the attack was read as specifically directed at the plaintiff." *Rosenblatt v. Baer*, 383 U.S. 75, 81, 86 S. Ct. 669 (1966). Because the Complained of Statements were not of and concerning Appellee and she did not introduce clear and specific evidence that they were, it was error for the trial court to so find.

## PRAYER

The Texas Citizens' Participation Act requires a court to dismiss a lawsuit where the claims arise out of a defendant's exercise of the right of free speech, unless the plaintiff can establish by clear and specific evidence a *prima facie* case for each essential element of every one of his or her claims. Appellee has failed to meet her burden, and

the trial court erred in denying Appellant's Motion to Dismiss brought pursuant to this statute.

Respectfully submitted,

HAYNES AND BOONE, LLP

By:_____/s/_____
Laura Lee Prather
State Bar No. 16234200
Catherine Lewis Robb
State Bar No. 24007924

600 Congress Avenue, Suite 1300
Austin, TX 78701
Telephone:  (512) 867-8400
Telecopier:  (512) 867-8470

ATTORNEYS FOR APPELLANT
KTRK TELEVISION, INC.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been sent, as indicated below, on this 21st day of June, 2012, to the following counsel of record:

*Via Certified Mail, Return Receipt Requested*

Berry Dunbar Bowen
3014 Brazos Street
Houston, TX 77006

Counsel for Appellee

_____/s/_____

# APPENDIX

Pursuant to Texas Rules of Appellate Procedure 38.1(k)(1)(A) and 38.2(a)(2), Appellee attaches the following items to the Appendix:

|  | **TAB** |
|---|---|
| Order Denying Defendant's Motion to Dismiss | A |
| Findings of Fact and Conclusions of Law | B |
| Order Denying Defendant's Motion for Reconsideration | C |
| Tex. Civ. Prac. & Rem. Code §27.001 *et seq.* | D |

# APPENDIX TAB U:
Appellant's Brief in Reply in
No. 01-12-00372-CV
(WITHOUT EXHIBITS)

ACCEPTED
221EFJ017154720
FIRST COURT OF APPEALS
HOUSTON, TEXAS
12 October 29 P1:35
M KARINNE McCULLOUGH
CLERK

CAUSE NO. 01-12-00372-CV

IN THE FIRST COURT OF APPEALS
HOUSTON, TEXAS

KTRK TELEVISION, INC.

Appellant,

v.

THEAOLA ROBINSON,

Appellee.

On Appeal from the 234th Judicial District Court of Harris County, Texas,
the Hon. Reece Rondon, Presiding

## APPELLANT KTRK TELEVISION, INC.'s BRIEF IN REPLY

Laura Lee Prather
State Bar No. 16234200
Catherine Lewis Robb
State Bar No. 24007924
Haynes and Boone, LLP
600 Congress Avenue, Suite 1300
Austin, Texas 78701
Telephone:    (512) 867-8400
Facsimile:    (512) 867-8470

ATTORNEYS FOR APPELLANT
KTRK TELEVISION, INC.

APPELLANT REQUESTS ORAL ARGUMENT

# TABLE OF CONTENTS

**Page**

I.    SUMMARY ........................................................................................................1

II.   STANDARD OF REVIEW........................................................................................4

III.  ROBINSON'S IMPROPER RECITATION OF "FACTS"..............................7

    A.    Robinson's Statement of Facts........................................................................7

    B.    Other Facts ........................................................................................................8

    C.    KTRK's Undisputed Facts ........................................................................9

IV.   THE TRIAL COURT IMPROPERLY FOUND THAT A LEGAL ACTION
    OVER PRIOR  BROADCASTS COULD NOT HAVE BEEN BROUGHT
    TO DETER FREE SPEECH. ...............................................................................9

V.    ROBINSON DID NOT ESTABLISH EACH ELEMENT OF HER
    CLAIM OF DEFAMATION *PER SE* BY CLEAR AND
    SPECIFIC EVIDENCE ........................................................................................10

    A.    Robinson did not establish that the statements were
        defamatory *per se* ........................................................................................11

    B.    Robinson did not establish that the statements were materially
        false ........................................................................................................14

    C.    Robinson did not establish that the statements were made with
        actual malice........................................................................................................16

    D.    Robinson did not establish the statements were of and
        concerning her ........................................................................................20

VI.   THE ANTI-SLAPP STATUTE IS CONSTITUTIONAL ...............................22

VII.  PRAYER ........................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*ABC, Inc. v. Shanks,*
1 S.W.3d 230 (Tex. App. – Corpus Christi 1999, pet. denied)...................................... 19

*Abdel-Hafiz v. ABC, Inc.,*
240 S.W.3d 492 (Tex. App. – Fort Worth 2007, pet. denied) .............................. 16, 18

*Abdenour v. Mid Nat'l Holdings, Inc.,*
190 S.W.3d 237 (Tex. App. – Hou. [1st Dist.] 2006, no pet.)...................................... 8

*Anderson Dev't Co. v. Tobias,*
116 P.3d 323 (Utah 2005)...................................................................................... 23

*Barber v. Colorado Indep. Sch. Dist.,*
901 S.W.2d 447 (Tex. 1995)...................................................................................... 4

*Bentley v. Bunton,*
94 S.W.3d 561 (Tex. 2002)............................................................................... 19, 20

*Berg v. AMF Inc.,*
29 S.W.3d 212 (Tex. App. – Hou. [14th Dist.] 2000, no pet.) .................................... 5

*Brewer v. Simental,*
268 S.W.3d 763 (Tex. App. – Waco 2008) .............................................................. 22

*Brownlee v. Brownlee,*
665 S.W.2d 111 (Tex. 1984)...................................................................................... 19

*Cabral v. Martins,*
177 Cal. App. 4th 471, 99 Cal. Rptr. 3d 394 (2009)................................................... 4

*Casso v. Brand,*
776 S.W.2d 551 (Tex. 1989)............................................................................... 17, 24

*Channel Two Television v. Dickerson,*
725 S.W.2d 470 (Tex. App. – Hou. [1st Dist.] 1987, no writ) .................................... 6

*City of Dallas v. Reed,*
258 S.W.3d 620 (Tex. 2008)...................................................................................... 4

*Columbia Valley Regional Medical Center v. Bannert,*
    112 S.W.3d 193 (Tex. App. – Corpus Christi 2003, no pet.) ................................. 12

*Cullum v. White,*
    No. 2011 WL 6202800 (Tex. App. – San Antonio 2011, n.w.h.).............................. 21

*Day v. Farrell,*
    Cause No. 97-2722, 2000 WL 33159180 (R.I. Sup. Ct. May 15, 2000) .................... 23

*Diamond Shamrock Refining and Marketing Co. v. Mendez,*
    844 S.W.2d 198 (Tex. 1992)................................................................................. 10

*Doe v. Cahill,*
    884 A.2d 451 (Del. 2005) ..................................................................................... 7

*Dolcefino v. Turner,*
    987 S.W.2d 100 (Tex. App. 1998) *aff'd sub nom. Turner v. KTRK Television,*
    *Inc.,* 38 S.W.3d 103 (Tex. 2000)......................................................................... 15

*Downer v. Amalgamated Meatcutters and Butcher Workmen of N. Am.,*
    550 S.W.2d 744 (Tex. Civ. App. – Dallas 1977, writ ref'd n.r.e.) ......................... 16

*Duncan v. Betterowe, Inc.*
    474 S.W.2d 619 (Tex. Civ, App. – Hou. [14th Dist.) 1971, n.w.h.)............................ 11

*Equilon Enterprises v. Consumer Cause, Inc.,*
    29 Cal. 4th 53, 52 P.3d 685 (2002)................................................................. 23, 24

*Fort Worth Press Co. v. Davis,*
    96 S.W.2d 416 (Tex. Civ. App. – Fort Worth 1936, writ denied)............................ 16

*Fredonia State Bank v. General Am. Life Ins. Co.,*
    881 S.W.2d 279 (Tex. 1994)................................................................................. 8, 9

*Furst v. Smith,*
    176 S.W.3d 864 (Tex. App. – Hou. [1st Dist.] 2005, no pet.)................................... 6

*Gertz v. Robert Welch, Inc.,*
    418 U.S. 323, 94 S. Ct. 2997, 41 L. Ed. 789 (1974)................................................ 17

*Gone v. Gone,*
    993 S.W.2d 845 (Tex. App. – Hou. [14th Dist.] 1999, pet. denied)............................ 5

*Green v. CBS, Inc.,*
    286 F.3d 281 (5th Cir. 2002) .................................................................................. 12

*Guam Greyhound v. Brizill,*
No. CVA07-021, 2008 WL 4206682 (Guam Sept. 11, 2008) ............................. 23

*Guzman v. State,*
955 S.W.2d 85 (Tex. Crim. App. 1997) ............................................ 5

*Habib v. Winther,*
146 Wash. App. 1025 (2008) ..................................................... 4

*Hancock v. Variyam,*
345 S.W.3d 157 (Tex. App. – Amarillo 2011, pet. granted) ...................... 12

*Harte-Hanks Communications, Inc. v. Connaughton,*
491 U.S. 657, 109 S. Ct. 2678, 105 L.Ed.2d 562 (1989) ....................... 17

*HBO, A Div. of Time Warner Entm't Co., L.P. v. Huckabee,*
995 S.W.2d 152 (Tex. App. – Hou. [14th Dist.] 1998), *aff'd sub nom.,*
*Huckabee v. Time Warner Entm't Co. L.P.,* 19 S.W.3d 413 (Tex. 2000) ........... 16

*Herald-Post Publishing Co. v. Hill,*
891 S.W.2d 638 (Tex. 1994) ................................................... 16

*Hinojosa v. Columbia/St. David's Healthcare System, L.P.,*
106 S.W.3d 380 (Tex. App. – Austin 2003, no pet.) ........................... 11

*Hometown Props., Inc. v. Fleming,*
680 A.2d 56 (R.I. 1996) ...................................................... 23

*Huckabee v. Time Warner Entm't Co. L.P.,*
19 S.W.3d 413 (Tex. 2000) ....................................... 15, 17, 19, 20

*In re C.E.,*
01-12-00371-CV, 2012 WL 4717882 (Tex. App – Hou. [1st Dist.] Oct. 4,
2012, n.p.h.) ................................................................. 5

*In re Does,*
242 S.W.3d 805 (Tex. App. – Texarkana 2007, no pet.) .......................... 7

*In Re J.F.K.,*
345 S.W.3d 706 (Tex. App. – Dallas 2011, no pet.) ............................ 8

*In re R.J.H.,*
79 S.W.3d 1 (Tex. 2002) ...................................................... 5

*Lafayette Morehouse, Inc. v. Chronicle Publ'g Co.,*
37 Cal. App. 4th 855 (Cal. App. 1995) ....................................... 23

v

*Lee v. Pennington,*
830 So.2d 1037 (La. App. 2002)................................................................. 23

*Main v. Royall,*
348 S.W.3d 381 (Tex. App. – Dallas 2011, no pet.)............................... 11, 14

*Mann v. Quality Old Time Serv., Inc.,*
120 Cal. App. 4th 90, 15 Cal. Rptr. 3d 215 (2004)..................................... 4

*McIlvain v. Jacobs,*
794 S.W.2d 14 (Tex. 1990)................................................................. 15, 16

*McIntyre v. Ramirez,*
109 S.W.3d 741 (Tex. 2003)..................................................................... 19

*Miami Herald Pub. Co. v. Tornillo,*
418 U.S. 241, 94 S. Ct. 2831, 41 L. Ed. 2d 730 (1974)............................ 15

*New Times, Inc. v. Isaacks,*
146 S.W.3d 144 (Tex. 2004)..................................................................... 19

*Newspapers, Inc. v. Matthews,*
339 S.W.2d 890 (Tex. 1960)..................................................................... 20

*Nexus v. Swift,*
785 N.W.2d 771 (Minn. App. 2010)......................................................... 23

*Nguyen-Lam v. Cao,*
171 Cal. App. 4th 858, 90 Cal. Rptr. 3d 205 (2009)................................... 4

*Owens Corning v. Carter,*
997 S.W.2d 560 (Tex. 1999)..................................................................... 22

*Poe v. San Antonio Exp. News Corp.,*
590 S.W.2d 537 (Tex. Civ. App. – San Antonio 1979, writ ref'd n.r.e.) ............. 20, 21

*Ramos v. State,*
31 S.W.3d 762 (Tex. App. – Hou. [1st Dist.] 2000, no pet.)..................... 6

*Ramsey v. State,*
249 S.W.3d 568 (Tex. App. – Waco 2008, no pet.) ................................... 5

*Reid v. Dalton,*
100 P.3d 349 (Wash. Ct. App. 2004)......................................................... 23

*Roberts v. McAfee, Inc.*,
  660 F.3d 1156 (9th Cir. 2011) ....................................................................... 4

*Rogers v. Dallas Morning News, Inc.*,
  889 S.W.2d 467 (Tex. App. – Dallas 1994, writ denied) .............................. 16

*Rosenblatt v. Baer*,
  383 U.S. 75, 86 S. Ct. 669 (1966) ...................................................... 17, 20, 21

*S. Cantu & Son v. Ramirez*,
  101 S.W.2d 820 (Tex. Civ. App. – San Antonio 1936, no writ) ..................... 7

*Salvaggio v. High Plains Broadcasting, Inc.*,
  Cause No. 2011-CI-10127 (131st Dist. Ct., Bexar County, Tex., Feb. 27, 2012) ....... 10

*Sandholm v. Kuecker*,
  405 Ill. App. 3d 835, 942 N.E.2d 544 (2010) .............................................. 23

*Sax v. Votteler*,
  648 S.W.2d 661 (Tex. 1983) ........................................................................ 22

*Schauer v. Memorial Care Systems*,
  856 S.W.2d 437 (Tex. App. – Hou. [1 Dist.] 1993, no writ) ......................... 19

*Senator Jeff Wentworth v Elizabeth Ames Jones*,
  Cause No. 2012-CI-08201 (73rd Dist. Ct., Bexar Co., Tex. filed May 17, 2012) ...... 23

*Shoreline Towers Condo. Ass'n v. Gassman*,
  404 Ill. App. 3d 1013, 936 N.E.2d 1198 (2010) ............................................. 4

*Simmons v. Ware*,
  920 S.W.2d 438 (Tex. App. – Amarillo 1996, no writ) ................................. 19

*Simpton v. High Plains Broadcasting, Inc.*,
  Cause No. 2011-CI-13290 (285th Dist. Ct., Bexar County, Tex., March 23, 2012) ..... 10

*State v. Stone*,
  137 S.W.3d 167 (Tex. App. – Hou. [1st Dist.] 2004, pet. ref'd) ..................... 6

*Surgitek, Bristol-Myers Corp. v. Abel*,
  997 S.W.2d 598 (Tex. 1999) .......................................................................... 6

*Texas Pub. Bldg. Auth. v. Mattox*,
  686 S.W.2d 924 (Tex. 1985) ........................................................................ 22

*Turner v. KTRK Television, Inc.,*
    38 S.W.3d 103 (Tex. 2000)........................................................................12

*Viera v. Hearst Newspapers, LLC d/b/a The Houston Chronicle, KHOU-TV, Inc.*
    *and Post-Newsweek Stations Houston, Inc. d/b/a KPRC-TV,*
    Cause No. 2011-42884 (190th Dist. Ct., Harris County, Tex. Sept. 11, 2011)..... 10, 22

*Wallbuilder Presentations, Inc., et al. v. W.S. Smith, et al.,*
    Cause No. CV-11-1349 (415th Dist. Ct., Parker Co., Tex., 2011, pet. filed).............. 23

*Western Steel Co. v. Altenberg,*
    206 S.W.3d 121 (Tex. 2006)......................................................................9

## STATUTES

42 U.S.C. §1983 ....................................................................................9

Tex. Civ. Prac. & Rem. Code §27.005 (b) .................................................5, 6

Tex. Civ. Prac. & Rem. Code §27.005 (c) ...................................................5

Tex. Civ. Prac. & Rem. Code §27.006(a) ...................................................6

Tex. Civ. Prac. & Rem. Code §27.008 ......................................................4

## OTHER AUTHORITIES

Texas Rule of Appellate Procedure 33.1 ...................................................22

Texas Rule of Appellate Procedure 38.1(f)...............................................7, 8

Texas Rule of Appellate Procedure 38.1(i) .................................................9

# I.
## SUMMARY

It is important to reiterate what this appeal is — and is not — about. This appeal is about whether or not KTRK can report on a matter of significant public interest without being subject to lawsuits brought in retaliation for that speech. If KTRK cannot avail itself of the protections of the Anti-SLAPP statute to protect its reporting on how millions of tax-payer dollars were mismanaged by a charter school — closed by the State for mismanagement of funds — it is difficult to conceive of what kind of speech would fall under that statute. The appeal is not about Robinson's grievances against the TEA for closing the school and firing her, those were the subject of her separate litigation against the TEA, which the court dismissed. In her failed attempt to demonstrate a *prima facie* case of defamation, Robinson (1) misinterprets and mischaracterizes KTRK's reporting that the TEA did not have a proper and full accounting of the State funds Benji's received to mean that she, Robinson, did something criminal; and (2) claims that KTRK had no basis to question how the funds were spent because the TEA had full access to her financial records. Neither of Robinson's assertions is supported by the evidence in the record before this Court or the actual statements in the KTRK reports.

Appellee did not challenge KTRK's uncontroverted Statements of Facts resulting in her confirmation of substantial truth. TEA had spent years attempting to gain a proper accounting of how its funds were being spent by Benji's. These efforts proved fruitless and often were met with the direct interference and intransigence of Robinson,[1] what she

---

[1] CR 2:304-367, 455, 463; CR 4: 1099-1112; CR 4: 918-925, 945, 948-949, 953.

calls "peaceful disobedience.[2] Regardless of what may have been Robinson's good intentions in starting and running the school, the evidence is clear that Robinson and her fellow Benji's board members or employees were poor financial managers, did not properly account for their use of State funds (which included multi-million dollar budgets each year), and did not cooperate with TEA in its attempts to investigate and properly account for the use of those State funds.[3] Ultimately, because of Benji's and Robinson's inability to satisfy TEA in many critical areas for maintenance of a charter school, TEA took over the school and revoked its charter.[4] Whether that was the right or wrong decision is not at issue in this case.[5] What is paramount is Robinson cannot make out a *prima facie* showing of her claim and cannot prevent KTRK from reporting on this grave matter of public concern — the education of the State's school age children, the viability of a charter school, and the use of and accounting for significant public funds.

Robinson fails to establish a *prima facie* case of defamation chiefly because she relies on *statements that KTRK never said.* Robinson repeatedly misquotes the broadcasts, claiming that KTRK said she was "caught stealing,"[6] that $3 million in State funds were "wholly unaccounted for,"[7] that KTRK "fabricated" a claim of "over $3 million in missing public funds," reported "missing millions," "the entire $3 million was unaccounted for," or that "a school had operated for a year without paying payroll or

---

[2] Appellee's Brief, pp. 11-12.
[3] CR 2:311-312, 355, 357, 360, 492-493; 3:551-553, 585-586; 623, 679-680, 712-713.
[4] CR 2: 259-263, 470-471; 4: 894, 903-908.
[5] It is clear from her Statement of Facts that Appellee's real complaint is with TEA's actions. *See* Appellee's Response, Statement of Facts ¶¶24 and 25.
[6] Appellee's Response, Statement of Facts ¶25.
[7] Appellee's Response, p. 26.

2

utilities or food services workers or the like." Those statements are not found in the KTRK reports. The broadcasts discussed an ongoing problem with Benji's and its inability to account for the use of all of the funds it received from the State — a budget Robinson admits was over $3 million per year.[8] KTRK reported, truthfully, that the TEA did not have a full accounting of how over $3 million a year in taxpayer dollars Benji's was given was spent — it did not at any time accuse Robinson of stealing those funds. KTRK did not discuss a specific time period because this was a chronic problem, nor did it say that none of the annual budget could be accounted for, but rather not every dollar was accounted for properly. In its broadcasts and by way of example, KTRK offered a list of unpaid debts owed by Benji's of more than $500,000[9], but this was by no means an exhaustive listing of evidence of the continuing financial problems the school suffered. Appellee herself admits TEA had on-site conservators from 2008 forward[10], admits TEA found the school no longer financially viable[11], and admits the State cited "critical cash flow issues" as one of the reasons for closing the school.[12] The import of the broadcasts is undisputed and supported by extensive public records.[13] Thus, because Robinson did not demonstrate a *prima facie* case that any statements in the KTRK broadcasts were defamatory, false, were not privileged, were of and concerning her, and were made with actual malice, the trial court erred in denying KTRK's Motion to Dismiss.

---

[8] Appellee's Response, Statement of Facts ¶3.
[9] CR 2:372.
[10] Appellee's Response, p. 24.
[11] Appellee's Response, Statement of Facts ¶9.
[12] *Id.* at ¶8.
[13] CR 4: 918-925, 945, 948-949, 953.

## II.
## STANDARD OF REVIEW

As a starting point, this Court can and should review the trial court's denial of KTRK's Motion to Dismiss. Robinson is wrong to assert the Legislature "denied review of orders affirmatively denying the motion to dismiss." This is outlined in detail in KTRK's Response to Robinson's Motion to Dismiss for Lack of Jurisdiction, and KTRK's Sur-Reply, which are incorporated herein. In sum, the plain meaning of the statute is clear that an appeal is available, "from *a trial court order* on a motion to dismiss a legal action under Section 27.003, *or* from a trial court's failure to rule on that motion in the time prescribed by Section 27.005."[14]

Indeed, other jurisdictions with similar statutes conduct their review of Anti-SLAPP motions on a *de novo* basis.[15] Texas courts should do the same because questions of law are reviewed *de novo*.[16] Ruling on an Anti-SLAPP motion is a two-pronged decision and both prongs are questions of law.[17] First, is whether "the legal action is

---

[14] Tex. Civ. Prac. & Rem. Code §27.008 (emphasis added).

[15] *See, e.g., Cabral v. Martins,* 177 Cal. App. 4th 471, 478, 99 Cal. Rptr. 3d 394, 400 (2009) (applying *de novo* review to an anti-SLAPP appeal). Texas' anti-SLAPP statute was modeled after California's law. *See* Cal. C.C.P. §§425.16. Other states with similar statutes review anti-SLAPP rulings *de novo. See e.g., Cabral v. Martins,* 177 Cal. App. 4th 471, 478, 99 Cal. Rptr. 3d 394, 400 (2009) ("A ruling on a special motion to strike under section 425.16 is reviewed *de novo*."); *Nguyen-Lam v. Cao,* 171 Cal. App. 4th 858, 866, 90 Cal. Rptr. 3d 205, 211 (2009) (reviewing a court's denial of a California anti-SLAPP motion *de novo*); *Shoreline Towers Condo. Ass'n v. Gassman,* 404 Ill. App. 3d 1013, 1019, 936 N.E.2d 1198, 1205 (2010) (applying *de novo* review to an anti-SLAPP motion to dismiss); *Habib v. Winther,* 146 Wash. App. 1025 (2008) ("The trial court's interpretation and application of the anti-SLAPP statute is reviewed *de novo*.").

[16] *See City of Dallas v. Reed,* 258 S.W.3d 620, 622 (Tex. 2008) (holding that "The existence of a special defect is a question of law, which we review *de novo*"); *Barber v. Colorado Indep. Sch. Dist.,* 901 S.W.2d 447, 450 (Tex. 1995) (holding that "we are obliged to decide *de novo* the issues of law" despite a mixed finding of fact and law).

[17] California, whose law the Texas anti-SLAPP statute was patterned after, uses a similarly worded two-pronged approach to an anti-SLAPP motion to dismiss, evaluating first whether the claim is based on the protected activity and second whether the party that brought the claim has a probability of prevailing on the claims. With this test in place, both federal and state courts in California consistently have applied *de novo* review to trial court anti-SLAPP rulings. *See Mann v. Quality Old Time Serv., Inc.,* 120 Cal. App. 4th 90, 103, 15 Cal. Rptr. 3d 215, 221 (2004) ("We apply the *de novo* standard of review to both prongs of the anti-SLAPP statute."); *see also, Roberts v. McAfee, Inc.,* 660 F.3d 1156, 1163 (9th Cir. 2011) ("We review *de novo* a district court decision on a motion to strike under

based on, relates to, or is in response to the party's exercise of: (1) the right of free speech; (2) the right to petition; or (3) the right of association."[18] Second, is whether "the party bringing the legal action establishes by clear and specific evidence a *prima facie* case for each essential element of the claim in question."[19] The establishment of a prima facie case is a question of law.[20] Although the Citizen's Participation Act (the Anti-SLAPP statute) is relatively new, Texas courts are not new to reviewing *prima facie* showings. In other areas of Texas jurisprudence, whether or not a party has made a *prima facie* showing is a question of law which is reviewed *de novo*.[21]

Generally, appellate review of a trial court's findings of fact is deferential, but appellate "review of the application of the law to the facts is *de novo* because the trial court is in no better position to decide legal issues than the appellate court."[22] Further, while an appellate court gives deference to trial court rulings on mixed questions of law and fact when their resolution turns on credibility, if the mixed questions of law and fact do not fall into that category, the appellate court should apply a *de novo* review.[23]

---

California's anti-SLAPP statute. The anti-SLAPP statute requires a two-part analysis: (1) the defendant must make a *prima facie* showing that the suit arises "from an act in furtherance of the defendant's rights of petition or free speech"; and (2) once the defendant makes this showing, "the burden shifts to the plaintiff to demonstrate a probability of prevailing on the challenged claims.").

[18] Tex. Civ. Prac. & Rem. Code § 27.005 (b).

[19] Tex. Civ. Prac. & Rem. Code § 27.005 (c).

[20] *See Berg v. AMF Inc.*, 29 S.W.3d 212, 219 (Tex. App. – Hou. [14th Dist.] 2000, no pet.) (holding that "Whether this burden [of a *prima facie* showing] has been met is a question of law for the court.").

[21] *See In re C.E.*, 01-12-00371-CV, 2012 WL 4717882 (Tex. App – Hou. [1st Dist.] Oct. 4, 2012, n.p.h.) (in a genetic testing case, holding that "[b]ecause a determination of whether a party has presented *prima facie* proof of a meritorious claim is a question of law, we review the trial court's decision of this issue *de novo*."); *Ramsey v. State*, 249 S.W.3d 568, 574 (Tex. App. – Waco 2008, no pet.) ("the determination of whether a bill-of-review plaintiff has made a *prima facie* showing of a meritorious claim or defense (or of a meritorious ground for appeal) is a question of law."); *Gone v. Gone*, 993 S.W.2d 845, 848 (Tex. App. – Hou. [14th Dist.] 1999, pet. denied) (reviewing determination of a *prima facie* case *de novo*).

[22] *In re R.J.H.*, 79 S.W.3d 1, 6 (Tex. 2002).

[23] *See, e.g.. Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).

As was the case here, a court examines evidence consisting of "the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based"[24] in making an Anti-SLAPP ruling, but does not determine facts that turns on witness credibility. Accordingly, the application of the law to the facts in this case should be reviewed *de novo*. Indeed, there is precedent in Texas for doing so.[25]

Further, Robinson's reliance on typical summary judgment standards is misplaced. An Anti-SLAPP ruling is not a summary judgment ruling in which evidence favorable to a non-movant will be taken as true. According to Tex. Civ. Prac. & Rem. Code §27.005(b), the Court *shall* dismiss the legal action if the moving party shows by a preponderance of evidence that the action "is based on, relates to, or is in response to the party's exercise of: (1) the right of free speech; (2) the right to petition; or (3) the right of association." To avoid dismissal, the non-moving party must meet the very heavy burden of establishing by the heightened standard of clear and specific evidence,[26] a *prima facie* case for each essential element of the claim in question. To meet this burden, the non-moving party must provide clear and specific evidence that would be sufficient to

---

[24] Tex. Civ. Prac. & Rem. Code Ann. §27.006(a). Subsection (b) of §27.006 allows for limited discovery, but there was no discovery conducted in this case.

[25] *See, e.g., Surgitek, Bristol-Myers Corp. v. Abel*, 997 S.W.2d 598, 603 (Tex. 1999) (holding that, in an appellate review of a joinder determination based on prima facie evidence, "we conclude that a court of appeals should conduct a *de novo* review of the entire record"); *Furst v. Smith*, 176 S.W.3d 864, 868 (Tex. App. – Hou. [1st Dist.] 2005, no pet.) (reviewing the question of whether a court had jurisdiction de novo, based in part on supporting affidavits); *Ramos v. State*, 31 S.W.3d 762, 764 (Tex. App. – Hou. [1st Dist.] 2000, no pet.) (conducting a *de novo* review of an affidavit in an appeal challenging probable cause for a search warrant because "the facts of this case do not involve an evaluation of credibility of any witness by the trial course and probable cause is a question of law"). *But see, State v. Stone*, 137 S.W.3d 167, 174 (Tex. App. – Hou. [1st Dist.] 2004, pet. ref'd) ("Appellate review of an affidavit in support of a search warrant, however, is not de novo; rather, great deference is given to the magistrate's determination of probable cause." The reasoning behind this standard relates to public policy).

[26] This is a heightened standard, greater than just the preponderance of evidence. *See, e.g., Channel Two Television v. Dickerson*, 725 S.W.2d 470, 472 (Tex. App. – Hou. [1st Dist.] 1987, no writ).

preclude the granting of summary judgment.[27] Under the standard of "clear and specific evidence," the charges "may not be aided by presumptions or inferences, or intendment."[28] Robinson cannot prevail here because she cannot demonstrate with clear and specific evidence a *prima facie* case for each essential element of her claim.[29]

## III.
## ROBINSON'S IMPROPER RECITATION OF "FACTS"

Appellee has violated Texas Rule of Appellate Procedure 38.1(f) by including argument and unverified facts in her Statement of Facts. Virtually half of her Brief is devoted to argument disguised as "facts."[30] Appellee's unsupported and argumentative facts contained in her Statement of Facts, as well as the litany of unsupported "facts" found (without reference to the Record) in the Argument section of her Brief, should be disregarded accordingly.

### A.     Robinson's Statement of Facts

Robinson's Statement of Facts is rife with alleged "facts" unsupported by record references. Pursuant to Texas Rule of Appellate Procedure 38.1(f), a party's statement of facts must include parenthetical references to the record to indicate where the record supports each statement. Robinson fails to provide any record cite for the facts contained in the initial statement, the summary and many of the paragraphs contained in her

---

[27]*See. e.g., In re Does*, 242 S.W.3d 805 (Tex. App. – Texarkana 2007, no pet.). In the *In re Does* case, adopting this standard, the court required a defamation plaintiff to establish a *prima facie* case for each essential element of his claim before he could obtain the identity of an anonymous defendant. The court found it necessary for the plaintiff first to support his defamation claim with facts sufficient to defeat a motion for summary judgment before the identity of the potential defendant would be ordered disclosed. *Id.* at 821; *see also, Doe v. Cahill*, 884 A.2d 451, 460 (Del. 2005).

[28] *See, S. Cantu & Son v. Ramirez*, 101 S.W.2d 820, 822 (Tex. Civ. App. – San Antonio 1936, no writ) (court of appeals reversed a jury verdict that had found fraud because evidence wasn't "clear and specific.").

[29] This means she must establish that the statements are defamatory *per se*, are not substantially true, are not privileged, are of and concerning her, and that they were made with actual malice.

[30] *See, e.g.,* Appellee's Brief, Statement of Facts ¶¶3, 5, 7, 13, 14, 21, 22, 23-26.

Statement of Facts.[31] They should be disregarded by this Court accordingly.[32] In addition, there is no evidence for the bulk of her assertions. For example, in paragraph 25, Robinson attempts to introduce, for the first time on appeal, an argument that TEA formally disbanded the interim board in the Spring of 2011 (well after the broadcasts at issue) and turned over funds to Robinson and other Benji's board members. Not only are these claims irrelevant, there is no evidence for them in the record and Robinson does not purport to provide any. They are not to be considered by this Court.

Additionally, pursuant to Texas Rule of Appellate Procedure 38.1(f), the Statement of Facts should be presented without argument. With the exception of paragraphs 26-34, Robinson's Statement of Facts does not comply with this rule.[33] Therefore, none of the arguments improperly contained in her Statement of Facts should be considered by this Court.

## B.  Other Facts

Furthermore, Robinson also includes other unsupported "facts" and arguments in pages 42 through 45 of her Brief. These include reference to a letter that is not part of the record[34] and unsupported argument about Robinson's motivations for filing three different

---

[31] More specifically, *see* Appellee's Brief, Statement of Facts ¶¶3, 5, 23-26 (including footnotes).

[32] *See. e.g., Fredonia State Bank v. General Am. Life Ins. Co.*, 881 S.W.2d 279, 283-284 (Tex. 1994); *Abdenour v. Mid Nat'l Holdings, Inc.*, 190 S.W.3d 237, 241-42 (Tex. App. — Hou. [1st Dist.] 2006, no pet.).

[33] *See* Appellee's Brief, Statement of Facts, the first sentence of ¶13, the first two sentences and the second to last sentence of ¶14, ¶23, ¶24, the last sentence and fn. 6 of ¶25, and ¶27 and its corresponding fn. 7.

[34] *See* Appellee's Brief, Appendix A. A party may not attempt to supplement the record by including documents or evidence in the Appendix that are not part of the appellate record. *See In Re J.F.K.*, 345 S.W.3d 706, 710 (Tex. App. — Dallas 2011, no pet.). Furthermore, even were the Court to consider Appendix A, it does not support the proposition for which it is cited. KTRK admittedly submitted affidavits to this Court in the course of this appeal (*See* Exhibits B and C to Appellant's Response to Appellee's Motion to Dismiss for Lack of Jurisdiction), but the affidavits were not an attempt to supplement the trial court record or address the underlying issues, as Robinson attempts to do, but rather to assist this Court in evaluating its own jurisdiction.

lawsuits arising out of the same broadcasts against KTRK and distantly related entities.[35]

KTRK objects to each of these improper facts and arguments, and they should not be considered by this Court.[36]

## C. KTRK's Undisputed Facts

Notably, Robinson does not contest KTRK's Statement of Facts. Therefore, all of KTRK's Facts contained in its Appellant's Brief must be accepted as true by this Court.[37] In particular, Robinson does not dispute that TEA had been dissatisfied with Benji's lack of accountability for many years, that TEA attempted to oversee and improve Benji's (to no avail and in the face of Robinson's attempts to thwart such efforts), or that TEA had grave concerns over the school's poor accounting, poor financial management, unsatisfactory audits, and failure to maintain State accountability standards in the area of finance, governance, and educational achievement.[38]

## IV.
## THE TRIAL COURT IMPROPERLY FOUND THAT A LEGAL ACTION OVER PRIOR BROADCASTS COULD NOT HAVE BEEN BROUGHT TO DETER FREE SPEECH.

In its Findings and Conclusions[39], the trial court incorrectly found that a lawsuit brought over a prior broadcast could not have been brought to inhibit free speech — an improper conclusion contrary to established law. To determine whether a legal action

---

[35] In fact, at the bottom of page 43, Robinson demonstrates KTRK's point about Robinson's repeated and ill-founded attempts to sue KTRK. For instance, she attempted to sue KTRK's ultimate parent company, Disney, for a civil rights claim under 42 U.S.C. §1983. It is undisputed that Disney is not and never has been a government actor so that it could be liable for such a claim. Thus, what Robinson's argument reveals is that she has tried repeatedly to find a way to blame and punish KTRK (and its ultimate parent company) for the school's closure.

[36] See Texas Rule of Appellate Procedure 38.1(i).

[37] See TRAP 38.1(g); see also, Western Steel Co. v. Altenberg, 206 S.W.3d 121, 124 (Tex. 2006); Fredonia State Bank v. General Am. Life Ins. Co., 881 S.W.2d 279, 283 (Tex. 1994).

[38] See Appellants' Brief, Statement of Facts, I A-C.

[39] CR 4:999-1001.

9

was brought to deter or prevent a party from exercising its constitutional rights, the Court must consider the impact on future speech, such as a reporter's continued coverage of an issue of public interest. As the Texas Supreme Court has long held, "[e]very defamation action that the law permits necessarily inhibits free speech."[40] Thus, courts throughout Texas have consistently applied the new Anti-SLAPP statute to lawsuits filed over broadcasts (as well as other past speech) that have already aired.[41] To conclude otherwise would eviscerate the statute and make it impossible to dismiss any case arising out of past speech. The Legislature intended for the Anti-SLAPP statute to apply to all citizens — including the media — who have reported on significant matters of public concern in their community and been retaliated against for doing so. To interpret the law otherwise would render it meaningless.

## V.
## ROBINSON DID NOT ESTABLISH EACH ELEMENT OF HER CLAIM OF DEFAMATION *PER SE* BY CLEAR AND SPECIFIC EVIDENCE

Because Robinson did not meet her burden on at least one element of her claim for defamation *per se*, the Anti-SLAPP statute required dismissal of her claims. As

---

[40]*Diamond Shamrock Refining and Marketing Co. v. Mendez*, 844 S.W.2d 198 (Tex. 1992), *citing New York Times v. Sullivan*, 376 U.S. 254, 272, 84 S. Ct. 710, 721 (1964) ("whatever is added to the field of libel is taken from the field of free debate.").

[41] For example, Judge Kerrigan, in the 190th District Court of Harris County, granted the media defendants' Anti-SLAPP Motion arising out of a prior broadcast mistakenly identifying the plaintiffs as wanted by law enforcement. *Viera v. Hearst Newspapers, LLC d/b/a The Houston Chronicle, KHOU-TV, Inc. and Post-Newsweek Stations Houston, Inc. d/b/a KPRC-TV*, Cause No. 2011-42884 (190th Dist. Ct., Harris County, Tex. Sept. 11, 2011) included in the Record at CR 2:448. Similarly, two Bexar County courts have granted media defendants' Anti-SLAPP Motions arising out of prior broadcasts. *See Salvaggio v. High Plains Broadcasting, Inc.*, Cause No. 2011-CI-10127 (131st Dist. Ct., Bexar County, Tex., Feb. 27, 2012) (Judge Cathy Stryker) (granting the media defendants' Anti-SLAPP Motion arising out of a series of television reports on allegations that a Police Lieutenant had cheated on his promotional exam) and *Simpton v. High Plains Broadcasting, Inc.*, Cause No. 2011-CI-13290 (285th Dist. Ct., Bexar County, Tex., March 23, 2012) (Judge David Berchelmann) (granting the media defendants' Anti-SLAPP Motion arising out of an investigative series conducted over a six month period reporting on allegations that a local dental chain was providing unnecessary and improper dental work and was under investigation for Medicaid fraud by the Texas Attorney General's Office).

discussed more fully in KTRK's opening Brief, Robinson failed to establish a *prima facie* case for <u>any</u> element of her claim — including that the statements KTRK published were defamatory *per se*, that they were materially false, that they were not privileged, that they were "of and concerning" Robinson, and that they were made with actual malice.[42] Additionally, Robinson does not argue in her Response that she is not a public figure and does not address any of the litany of cases establishing she would qualify as such.[43] Thus, Appellee appears to concede the actual malice standard applies.

## A.     <u>Robinson did not establish that the statements were defamatory *per se*</u>

Robinson brought a claim for defamation *per se*.[44] She claims the Complained of Statements are so obviously hurtful they require no proof of injury, such as a statement that "unambiguously charge[s] a crime, dishonesty fraud, rascality, or general depravity[.]"[45] But, Robinson's argument that the statements were defamatory *per se* is based on her own highly charged interpretation of them — not on the words that KTRK actually said and the context in which KTRK said them. This is not a permissible

---

[42] Appellee's Brief cites to two cases in discussing what constitutes *prima facie* evidence, *Hinojosa v. Columbia/St. David's Healthcare System, L.P.*, 106 S.W.3d 380, 386 (Tex. App. – Austin 2003, no pet.) and *Duncan v. Betterowe, Inc.* 474 S.W.2d 619, 621 (Tex. Civ. App. – Hou. [14th Dist.) 1971, n.w.h.). In *Hinojosa*, the court found that *prima facie* evidence sufficient to raise a fact issue (of live birth) had been established because plaintiff submitted a properly filed death certificate indicating the baby survived birth and died 20 minutes after birth. Similarly, in *Duncan v. Betterowe*, while the opinion does not specify what evidence was found insufficient to establish a *prima facie* case, the court again explains that it requires evidence at least sufficient to raise a fact issue. Thus, Appellee appears to agree with Appellant that she must at a minimum present evidence sufficient to raise a fact issue on each required element of her claim for defamation *per se* as a requirement of presenting a *prima facie* evidence.

[43] Appellee does make the nonsensical assertion that Appellant did not provide affidavit evidence demonstrating she is a public figure; however, affidavits are not necessary on this point of law.

[44] Appellee has only brought a claim for defamation *per se* and not for defamation *per quod*, which requires proof of injury and damages. *Main v. Royall*, 348 S.W.3d 381, 390 (Tex. App. – Dallas 2011, no pet.).

[45] *Main v. Royall*, 348 S.W.3d 381, 390 (Tex. App. – Dallas 2011, no pet.) (emphasis added).

application of the law in defamation cases.[46] "The parties' opinion of the statement[], or the defendant's intent in making the statement[] have no bearing on whether [it is] defamatory. 'Common sense requires courts to understand the statement as ordinary men and women would.'"[47] Robinson misstates and twists the broadcasts' language to claim KTRK alleged that not one cent of State money was spent on Benji's or that Robinson was charged with criminal conduct. Robinson's argument that KTRK said or insinuated that the entire $3 million was "embezzled" is simply without merit. KTRK never claimed that none of the budgeted money was spent on the school or that Robinson misappropriated the money, but simply explained that it had been mismanaged and not properly accounted for by Benji's. KTRK also *never* accused Robinson of embezzling funds or other criminal behavior or said that TEA or others were investigating criminal conduct by Robinson.[48] None of the broadcasts ever mention the words "embezzlement" or "misappropriation" (or assert that such has happened), or any allegations of possible criminal behavior.[49] Nowhere in the Complained of Statements, or in the broadcasts as a whole, does KTRK "unambiguously charge" Robinson with a crime, dishonesty, fraud, rascality, or general depravity as required in a *per se* libel case.[50]

---

[46] *See Green v. CBS, Inc.*, 286 F.3d 281, 285 (5th Cir. 2002); *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 114 (Tex. 2000); *Columbia Valley Regional Medical Center v. Bannert*, 112 S.W.3d 193, 198 (Tex. App. – Corpus Christi 2003, no pet.).

[47] *Hancock v. Variyam*, 345 S.W.3d 157, 164 (Tex. App. – Amarillo 2011, pet. granted) (citations, parentheticals and quotations omitted).

[48] CR 1:26-27, 29-30, 63, 72-73, 77-78, 82-83. In fact, as discussed elsewhere, KTRK did not make any statements about Robinson except to include a quote from a former student praising her and to briefly discuss a lease issue over which Robinson has not brought any claim. Furthermore, in arguing that no criminal threat had been made against her — a charge that only Robinson herself (and not KTRK) has suggested. Robinson makes a nonsensical assertion that a KTRK reporter once charged her with criminal prosecution, despite the fact that a private citizen does not have the power to prosecute. *See* Appellee's Brief, fn. 31.

[49] CR 1:26-27, 29-30, 63, 72-73, 77-78, 82-83.

[50] *Id.*

12

The broadcasts clearly state that the TEA was concerned with the "lack of financial record" (or "lack of sufficient financial records") and "money mismanagement" and that it had not been provided with "proper financial records."[51] The truth of these statements is unequivocally set forth in the Record.[52] TEA, as the steward of public funds, had every right to be concerned that it had not been provided with sufficient or proper financial records to account for the use of public money that was entrusted to a charter school. TEA also had every right to demand a proper accounting, according to their public requirements and standards[53], and to be concerned when such was not done. Further, when such public funds were not properly accounted for, KTRK had a right and responsibility to report on this matter of public concern. But, reporting that TEA wanted answers or a proper accounting of how all (not just part) of the funds were spent does not mean that either TEA or KTRK accused Benji's or Robinson of engaging in criminal behavior. There is a vast difference between stating that a governmental body, understandably concerned with a failure to properly account for public money, is trying to figure out how taxpayer dollars are being spent by a charter school and stating that its founder has committed a crime or misappropriated the funds.

The problem being investigated (and what KTRK reported) was Benji's accounting for the use of the funds, because all of the $3 million given to the school was not accounted for in a proper manner.[54] This is a true statement supported by

---

[51] CR 1:26-27, 30, 63, 78.
[52] CR 2:266-267, 271-272, 312, 328, 332, 335-336, 357-358, 361, 455, 463; 4:901-904.
[53] CR 2:265-274, 283-284, 311-313, 330-334, 360-361.
[54] In her Brief, Appellee conveniently ignores years of findings by TEA of financial instability and mismanagement. *Compare* Appellee's Brief, fn. 1 to Appellant's Brief, pp. 3-6. She also ignores the impropriety of the lease

13

considerable undisputed evidence in the Record[55] and does not unambiguously charge Robinson with a "crime, dishonesty fraud, rascality, or general depravity[.]" It is a long-standing principle in libel law that if the court must resort to innuendo or extrinsic evidence to determine that the statement was defamatory, then it is libel *per quod* and requires proof of injury and damages. *Main v. Royall*, 348 S.W.3d 381, 390 (Tex. App. – Dallas 2011, no pet.). Robinson did not plead (and could not demonstrate) defamation *per quod*, and because of her reliance on innuendo, Robinson has failed to establish that the statements are defamatory *per se*.

## B.  Robinson did not establish that the statements were materially false

Robinson argues that the broadcasts are false because Benji's closure was due to reasons other than the poor accounting for State money. Robinson's semantics fail. Indeed, the TEA declared a state of "financial exigency" prior to the school shutting down.[56] Contrary to Robinson's repeated claim TEA had access to all of Benji's financial information since 2008[57], the TEA records clearly discuss Robinson's refusal to cooperate with Robert Seale, the individual hired by TEA to provide Benji's and Robinson with "financial management leadership."[58] According to TEA, Robinson mounted an ongoing effort to block Seale's access to the school's financial data, even forbidding the school's chief bookkeeper from speaking to Mr. Seale.[59] At the same time, Benji's and Robinson, in particular, had repeatedly failed to provide acceptable accounting and financial records

---

arrangement she entered where she leased out City property for a profit of $8.999.00 a year. *Compare* Appellee's Brief, Statement of Facts 23, ¶11 to CR 2:232-254. These facts are undisputed.

[55] *See, e.g.*, CR 2:304-367.

[56] CR 2:316, 361.

[57] *See, e.g.*, Appellee's Brief, pp. 18, 24.

[58] CR 2:331-332.

[59] *Id.*

14

to TEA. Thus, despite the State's attempts to assist the school, Robinson sought to thwart any intervention by the State, only compounding the problems at hand.[60] It was not until Rick Schneider took over as superintendent on September 7, 2010 that, within a few days, he discovered the school's bank account held less than $100.[61] Schneider reported to TEA that the school was in urgent financial condition, and on September 13, 2010, the board of managers accepted Schneider's recommendation to "declare a financial exigency" and voted to close the school.[62] Given the foregoing, none of which is contested by Appellee, it is apparent the statements are substantially true, and Appellee has failed to meet her burden of establishing material falsity.[63]

To be clear, Robinson does not deny that TEA had been overseeing Benji's for a number of years, that Benji's had significant financial problems and was in debt, or that it was closed due to financial exigency. Robinson further admits that she is not arguing the gist of the Complained of Statements is false.[64] Instead, Robinson objects to KTRK's characterization of the State's concerns. Under long-standing Texas law, Robinson, and the Court are not permitted to act as an after-the-fact editor of substantially true accounts about matters of public concern.[65]

---

[60] CR 2:266-267, 271-272, 328, 332, 455, 463; 4:901-904.

[61] CR 2:334; *see also*, CR 2:361, 400, 425, 477.

[62] CR 2:316, 334.

[63] *See McIlvain v. Jacobs*, 794 S.W.2d 14 (Tex. 1990) (to recover for defamation against a media defendant, plaintiff must show material falsity).

[64] *See* Appellee's Brief, page 25.

[65] *Dolcefino v. Turner*, 987 S.W.2d 100, 121 (Tex. App. 1998) ( "the exercise of editorial judgment to omit information favorable to the plaintiff is no evidence of actual malice.") *aff'd sub nom. Turner v. KTRK Television, Inc.*, 38 S.W.3d 103 (Tex. 2000). *See also, Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258, 94 S. Ct. 2831, 2840, 41 L. Ed. 2d 730 (1974) ("The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials — whether fair or unfair — constitute the exercise of editorial control and judgment."); *Huckabee v. Time Warner Entm't Co. L.P.*, 19 S.W.3d 413, 426 (Tex. 2000) ("the First Amendment protects the organization's choice of which material to include

15

In addition, to the extent Appellee is quibbling over details, Texas courts do not recognize minor errors as establishing material falsity.[66] The question of whether a statement is substantially true is a question of law for the court to decide.[67] In light of the overwhelming evidence that Benji's and Robinson had habitually failed to provide adequate financial records and properly account for the considerable State funds advanced to them over the course of several years; in light of the fact that the financial accounting problems and financial exigency caused the closure of the school, and in light of Robinson's admission that she was not contesting the gist of the statements, Robinson failed to establish that the Complained of Statements were materially false.

## C. Robinson did not establish that the statements were made with actual malice

The actual malice standard applies here because Appellee is a public figure and because the Complained of Statements are privileged as a matter of law. As discussed more fully in Appellant's Brief, Appellee, as the Superintendent of a school that received

---

in its broadcast"); *HBO, A Div. of Time Warner Entm't Co., L.P. v. Huckabee*, 995 S.W.2d 152, 161 (Tex. App. – Hou. [14th Dist.] 1998) *aff'd sub nom. Huckabee v. Time Warner Entm't Co. L.P.*, 19 S.W.3d 413 (Tex. 2000) ("[T]he editorial choice to exclude certain information ... is not specific, affirmative proof that shows appellant knew the publication was false or entertained serious doubts about its truthfulness. Appellant's decision to exclude certain information from the documentary is a protected exercise of editorial control and judgment, not evidence of actual malice."); *Abdel-Hafiz v. ABC, Inc.*, 240 S.W.3d 492, 520 (Tex. App. – Fort Worth 2007, pet. denied).

[66] *See, e.g., Rogers v. Dallas Morning News, Inc.*, 889 S.W.2d 467 (Tex. App. – Dallas 1994, writ denied) (finding newspaper's inaccurate statement that a charity only spent 10% of its donations on actual services, when, in fact, the charity spent 43% of its donations on services, was a minor error and did not affect the "gist" of the story, which was accurate); *Downer v. Amalgamated Meatcutters and Butcher Workmen of N. Am.*, 550 S.W.2d 744, 747 (Tex. Civ. App. – Dallas 1977, writ ref'd n.r.e.) (Affirming summary judgment where defendant published statement that said plaintiff embezzled $2,187.77 instead of $840.73); *Fort Worth Press Co. v. Davis*, 96 S.W.2d 416, 419 (Tex. Civ. App. – Fort Worth 1936, writ denied) (reversing trial court judgment and finding for media defendant where defendant incorrectly stated plaintiff wasted $80,000 in taxpayer funds rather than $17,575.00).

[67] *Herald-Post Publishing Co. v. Hill*, 891 S.W.2d 638 (Tex. 1994) (Newspaper reported that witness at trial accused an attorney and his investigator of threatening her when in fact only the investigator made the threat. The court dismissed, as a matter of law, on substantial truth grounds); *McIlvain v. Jacobs*, 794 S.W.2d 14, 16 (Tex. 1990) (Despite the presence of several minor mischaracterizations, the court held as a matter of law the report was substantially true and affirmed summary judgment).

16

considerable state and federal funding, is a public figure.[68] Further, by speaking out concerning the school and its closing, Appellee "thrust herself to the forefront of [the] particular public controversy to influence the resolution of the issues involved in it," and, thus, became a limited purpose public figure.[69] But, even if she were not, Appellee would still be required to prove actual malice because the statements involve matters of public concern — specifically, the use of public funds and the education of the State's school children — and, as such, are privileged.[70] All of the Complained of Statements are protected by constitutional, statutory and common law privileges, including the fair report and fair comment privileges. To overcome these privileges and defeat Appellant's Anti-SLAPP motion, Appellee had the burden of establishing actual malice.

Not only did Robinson fail to present any evidence of actual malice, KTRK actually disproved actual malice through its employees' affidavits establishing their belief in the truth of the statements at issue and the steps they took to formulate such a belief.[71] Texas courts have repeatedly permitted affidavits to establish a lack of actual malice in defamation cases. And the Texas Supreme Court ruled that "it would be a mistake" to refuse to rely on uncontroverted affidavits of reporters testifying to their own lack of actual malice.[72]

KTRK reporter Cisneros stated in her affidavit that she conducted an investigation into Benji's financial troubles, including speaking with TEA representatives, who

---

[68] *See, e.g., Rosenblatt v. Baer,* 383 U.S. 75, 85-86, 86 S. Ct. 669, 676 (1966).

[69] *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 351-2, 94 S. Ct. 2997, 3013, 41 L. Ed. 789 (1974).

[70] *See Id.; see also, Huckabee v. Time Warner Entm't Co.,* 19 S.W.3d 413 (Tex. 2000).

[71] CR 2:217-219, 371-373, 433-435. *See Harte-Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 688, 109 S. Ct. 2678, 105 L.Ed.2d 562 (1989).

[72] *See Casso v. Brand,* 776 S.W.2d 551, 558 (Tex. 1989).

17

informed her about the financial insolvency and mismanagement at Benji's, the numerous debts owed by Benji's, and Benji's failure to properly account for monies provided to it.[73] Cisneros' affidavit reflects that the report was based on her research into Benji's and her conversations with TEA officials who told her about their mounting concerns over Benji's. Even if Cisneros could have chosen more precise words in explaining TEA's concerns, which is essentially what Robinson claims, poor word choice[74] or an error in judgment cannot demonstrate actual malice.[75]

Nevertheless, Robinson, ignoring what KTRK actually stated, argues that she has demonstrated actual malice because "any reasonable person would entertain doubt that a public school could operate for an entire year and yet the entire annual funding for the school for that year, over $3 million, would be completely 'unaccounted for'"[76] and '[t]here is simply no way that anyone could conclude that a school had operated for a year without paying payroll or utilities or food services workers or the like."[77] KTRK never stated that the school was, or could have been, operating for entire year without paying for any services or that the State money was not used for the school. KTRK also never stated the entirety of the 2010 funding was unaccounted for, but rather Benji's was not able to properly account for all the money. Robinson simply relies on her own

---

[73] CR 2:372.
[74] *Abdel-Hafiz v. ABC, Inc.*, 240 S.W.3d 492, 520 (Tex. App.—Fort Worth 2007, pet. denied).
[75] *Id.* at 519.
[76] Robinson's Brief, page 34.
[77] *Id.* at 35.

interpretation of the statements in asserting her claim — which is not evidence of the elements of her claim.[78]

To prove actual malice, Robinson must demonstrate that KTRK knew that its choice of words could create a false impression[79] or that KTRK "purposefully published mistaken facts or that the circumstances were 'so improbable that only a reckless publisher would have made the mistake.'"[80] There is no such evidence in the Record.

Appellee tries to assert recklessness by comparing KTRK's broadcasts to other reports in the Houston area about Benji's closure.[81] But the other reports demonstrate that this was a matter of significant public concern in Houston and that KTRK did not "ma[k]e this up."[82] Appellee relies on *Bentley v. Bunton,*[83] but does not articulate how it supports her case. In *Bentley,* the defendant, a talk show host, repeatedly accused the plaintiff, a local judge, of being corrupt — actually using the word "corrupt" on many occasions — and did so despite expressing his own doubt to a friend and being told by others that they did not believe the accusation to be true. Due to the nature of the accused

---

[78] *See Brownlee v. Brownlee,* 665 S.W.2d 111 (Tex. 1984); *McIntyre v. Ramirez,* 109 S.W.3d 741 (Tex. 2003); *see also, ABC, Inc. v. Shanks,* 1 S.W.3d 230, 237 (Tex. App. – Corpus Christi 1999, pet. denied) (finding import of statements to be clear and unambiguous as to meaning under standard of how average person would read statements and rejecting Plaintiff's argument of innuendo); *Simmons v. Ware,* 920 S.W.2d 438, 451, (Tex. App. – Amarillo 1996, no writ) ("The test for actionable "innuendo" is not what construction a plaintiff might place upon the statements, but rather, how the statement would be construed by the average reasonable person or the general public"); *Schauer v. Memorial Care Systems,* 856 S.W.2d 437, 448 (Tex. App. – Hou. [1 Dist.] 1993, no writ) (rejecting plaintiff's argument that the statements — that the Plaintiff "was not enforcing the documentations of narcotics wastage" — were defamatory and finding that no reasonable person would find the Complained of Statements accused plaintiff of a crime).
[79] *Id.* at 522; *see also, Huckabee v. Time Warner Entm't Co.,* 19 S.W.3d 413, 426 (Tex. 2000) (libel plaintiff must show that publisher selected the material "with the awareness that the omission could create a substantially false impression."); *New Times, Inc. v. Isaacks,* 146 S.W.3d 144, 162 (Tex. 2004) ("When the words lend themselves to more than one interpretation, the plaintiff must establish either the defendant knew that the words would convey a defamatory message, or had reckless disregard for their effect.").
[80] *Id.* (quoting *Freedom Newspapers of Tex. v. Cantu,* 168 S.W.3d 847, 855 (Tex. 2005)).
[81] *See* Appellee's Brief, page 6, 7.
[82] *Id.,* page 18. (The reports also support the proposition that Appellee is a public figure.)
[83] 94 S.W.3d 561 (Tex. 2002).

statements and the evidence that defendant lacked a good faith belief in the truth of the statements or, at least, had good reason to question them, the *Bentley* court found the plaintiff had established actual malice.[84] In contrast, KTRK never accused Robinson of being "corrupt" or of any other crime and KTRK has provided considerable evidence that its reporters had a good faith belief in the truth of the statements.

**D.    Robinson did not establish the statements were of and concerning her**

"There must be evidence showing that the attack was read as specifically directed at the plaintiff."[85] However, Robinson did not and cannot establish that the statements were "of and concerning" her.[86] Citing to *Rosenblatt* and to *Poe v. San Antonio Exp. News Corp.*,[87] and various website posts (only *some* of which actually mention Robinson), Robinson claims the "United States Supreme Court has already ruled the Complained of Statements in this action are capable of being libelous per se as to Robinson."[88] Robinson mischaracterizes both *Rosenblatt* and *Poe* in making such claims.

In *Rosenblatt*, the Supreme Court found error in the trial judge's instruction to the jury that "an imputation of impropriety or a crime to one or some of a small group that cast suspicion upon all is actionable." The court also held that it was error for the trial judge to authorize the jury to award the plaintiff[89] a recovery without regard to evidence that the asserted implication of the column was made specifically of and concerning him,

---

[84] *Id.* at 602.

[85] *Rosenblatt v. Baer*, 383 U.S. 75, 81, 86 S. Ct. 669 (1966).

[86] *See Huckabee v. Time Warner Entm't Co.*, 19 S.W.3d 413, 429 (Tex. 2000); *Newspapers, Inc. v. Matthews*, 339 S.W.2d 890, 893 (Tex. 1960).

[87] 590 S.W.2d 537 (Tex. Civ. App. – San Antonio 1979, writ ref'd n.r.e.).

[88] *See* Appellee's Brief, page 29. Because *Poe* is a Texas case, Robinson presumably refers to *Rosenblatt* in making this assertion.

[89] Plaintiff was a supervisor of a County Recreation Area and was considered a public figure.

the instruction was erroneous.[90] As in this case, there had been no explicit charge of embezzlement, and the *Rosenblatt* court found that without a finding of actual malice there could be no liability.[91]

*Poe* is also distinguishable. In *Poe,* while the publication did not specifically refer to the plaintiff by name, it did provide significant description referring to "a middle aged male teacher" and a "mid-fortyish teacher" in discussing allegations of sexual impropriety made against him.[92] Here, the broadcasts refer to the academy or to Benji's in discussing the Complained of Statements; they never refer to *any* individual person — even by reference, description, or title — and only refer to the institution.[93]

Additionally, although Plaintiff points to comments left on KTRK's website in response to its stories as "proof" that the stories were "of and concerning" her, all of the comments she cites to were posted *after* KTRK's broadcast of September 25, 2010, in which Robinson's name was mentioned only in connection with the lease issue — a contention she does not (and cannot) dispute — and not in connection with the Complained of Statements.[94]

---

[90] Additionally, although Robinson states she is citing to Judge Harlan's concurrence in *Rosenblatt,* the portion referenced is actually the dissent.

[91] *Rosenblatt v. Baer,* 383 U.S. at 88.

[92] *Poe,* 590 S.W.2d 538.

[93] Like *Poe,* the Complained of Statements in the other case cited to by Plaintiff, *Cullum v. White,* No. 2011 WL 6202800 (Tex. App. – San Antonio 2011, n.w.h.), also more explicitly referred to the plaintiff and is distinguishable. In *Cullum,* while the Complained of Statements contained in emails did not specifically mention plaintiff by name, they referred to "Damon's mother" (where Damon was her son) and the Ranch owner and operator (which she was). In addition, a website that contained allegedly defamatory comments referred to a cosmetic connection and plaintiff was well known as a long time Mary Kay representative. Thus, in both instances, the statements referred to plaintiff by using her well known characteristics. In contrast, the Complained of Statements in question in this case *never* referred to Plaintiff by title, characteristic, or affiliation — instead simply referring to the school or Benji's (and *not* any identifiable individual such as the school's superintendent, founder, or leader).

[94] Furthermore, while neither KTRK's September 15, 2010 broadcast, nor the comments posted in response thereto mention Robinson, the two other broadcasts/stories of that same day that she attached to her Petition (from the *Houston Chronicle* and My Fox Houston) do mention Robinson by name — as do the comments in response. In

21

# VI.
## THE ANTI-SLAPP STATUTE IS CONSTITUTIONAL

On appeal, Robinson argues for the first time that the Texas Anti-SLAPP statute is unconstitutional.[95] However, it is a prerequisite to presenting a complaint on appeal that the complaint was made to the trial court in a timely manner, and that the trial court ruled on the request, or refused to do so.[96] This is true even when the issue is a constitutional question.[97] Thus, because Robinson did not make this argument at the trial court level, she has waived it, and it cannot be considered now.

Even if this Court were to find the constitutional issue has not been waived and reaches the merits of the question, a statute enacted by the Legislature is presumed to be constitutional and valid.[98] "[A] mere difference of opinion, where reasonable minds could differ, is not a sufficient basis for striking down legislation as arbitrary or unreasonable."[99] Robinson urges an open courts violation and cites *Owens Corning v. Carter* for the rule that "to establish an open courts violation in this context, plaintiffs must show that: (1) they have a well-recognized common-law cause of action that is being restricted; and (2) the restriction is unreasonable or arbitrary when balanced against the purpose and basis of the statute."[100] Robinson's constitutional challenge fails on both

---

fact, the *Chronicle* stated in its article that Robinson was paid $120,000 salary in 2009, refused to comment for the story, and kicked a reporter off campus stating "if you want to talk to my parents you have to talk to me first." This story receive the most comments — both in terms of numbers and vitriol. The *Chronicle* has not been sued by Robinson.

[95] *See, generally*, Robinsons Response to Motion to Dismiss (absent any discussion of constitutionality).

[96] *See* Texas Rule of Appellate Procedure 33.1.

[97] *See Brewer v. Simental*, 268 S.W.3d 763, 767 (Tex. App. – Waco 2008) ("Constitutional violations must be raised in the trial court to be preserved for appellate review.").

[98] *See Texas Pub. Bldg. Auth. v. Mattox*, 686 S.W.2d 924, 927 (Tex. 1985) ("We begin our analysis of the issues presented in this case by presuming, as we must, the constitutionality of an act of the Legislature").

[99] *Sax v. Votteler*, 648 S.W.2d 661, 664 (Tex. 1983).

[100] *Owens Corning v. Carter*, 997 S.W.2d 560, 573 (Tex. 1999).

22

prongs.

First, there is no restriction on the cause of action of defamation under the Anti-SLAPP statute; there is only a restriction on groundless claims. If a plaintiff can establish *prima facie* evidence of each element of the claim, the case will not be dismissed. Courts throughout the state have interpreted the statute and have found a *prima facie* case was established in other cases, thus denying the relevant motions to dismiss.[101] Thus, the standard adopted by the Legislature is working.

Second, every other state considering the constitutionality of similar Anti-SLAPP statutes has upheld their constitutionality.[102] California, the state upon which Texas' statute was patterned and a state that has had the benefit of 20 years of jurisprudence in this area, has repeatedly upheld the constitutionality of the law.[103] The Supreme Court of California, addressing this very concern, held that the Anti-SLAPP statute of that state "does not bar a plaintiff from litigating an action that arises out of the defendant's free speech or petitioning. It subjects to potential dismissal only those causes of action as to

---

[101] *See, e.g., Senator Jeff Wentworth v Elizabeth Ames Jones,* Cause No. 2012-CI-08201 (73rd Dist. Ct., Bexar Co., Tex. filed May 17, 2012) (motion to dismiss denied); *Wallbuilder Presentations, Inc., et al. v. W.S. Smith, et al.,* Cause No. CV-11-1349 (415th Dist. Ct., Parker Co., Tex., 2011, pet. filed) (motion to dismiss denied).

[102] *See, e.g., Equilon Enterprises v. Consumer Cause, Inc.,* 29 Cal. 4th 53, 63, 52 P.3d 685 (2002). *See also, Guam Greyhound v. Brizill,* No. CVA07-021, 2008 WL 4206682, (Guam Sept. 11, 2008) (rejecting argument that statute limited a right to bring a defamation claim); *Anderson Dev't Co. v. Tobias,* 116 P.3d 323, 338 (Utah 2005) (bill of attainder); *Sandholm v. Kuecker,* 405 Ill. App. 3d 835, 855, 942 N.E.2d 544 (2010) (finding that statute did not violate state constitution's guarantee to a remedy); *Nexus v. Swift,* 785 N.W.2d 771 (Minn. App. 2010) (addressing due process and right to jury trial); *Reid v. Dalton,* 100 P.3d 349, 356 (Wash. Ct. App. 2004) (rejecting argument that there is a constitutional right to file litigation that does not involve a bona fide grievance); *Lee v. Pennington,* 830 So.2d 1037 (La. App. 2002) (rejecting arguments that anti-SLAPP statute violated open access to courts, jury trial and due process); *Day v. Farrell,* No. 97-2722, 2000 WL 33159180 (R.I. Sup. Ct. May 15, 2000) (rejecting constitutional challenge to anti-SLAPP law based on access and due process); *Hometown Props., Inc. v. Fleming,* 680 A.2d 56 (R.I. 1996) (addressing numerous challenges, including separation of powers and right of access); *Lafayette Morehouse, Inc. v. Chronicle Publ'g Co.,* 37 Cal. App. 4th 855 (Cal. App. 1995) (right of access).

[103] *See, e.g., Equilon Enterprises v. Consumer Cause, Inc.,* 29 Cal. 4th 53, 63, 52 P.3d 685 (2002); *Lafayette Morehouse, Inc. v. Chronicle Publ'g Co.,* 37 Cal. App. 4th 855 (Cal. App. 1995) (right of access).

23

which the plaintiff is unable to show a probability of prevailing on the merits."[104]

As for Robinson's proposal that the Legislature should have imposed a *mens rea* requirement on Anti-SLAPP movants, "[a] requirement that courts confronted with Anti-SLAPP motions inquire into the plaintiff's subjective intent would commit scarce judicial resources to an inquiry inimical to the legislative purpose that unjustified SLAPP's be terminated at an early stage. Imposing a requirement of establishing bad faith or ulterior motive adds a needless burden to SLAPP targets seeking relief."[105]

In addition, Robinson's argument about the standard of proof required in an Anti-SLAPP motion, ignores that Texas already applies a higher standard of proof in defamation cases. At trial, Robinson would be required to prove by "clear and convincing evidence" that KTRK made "false and defamatory statements about [her] with actual malice."[106] Since the Anti-SLAPP statute's "clear and specific" evidentiary burden is lighter than defamation's "clear and convincing" standard, Robinson's fear of losing her defamation case at the Anti-SLAPP stage, when it is winnable at the trial stage, is unfounded. Thus, Appellee's last minute challenge to the constitutionality of the Texas Anti-SLAPP statute should be denied.

## VII.
## PRAYER

Because Robinson failed to meet her burden of establishing by clear and specific evidence a *prima facie* case for each essential element of every one of her claims, this

---

[104] *Equilon Enterprises v. Consumer Cause, Inc.*, 29 Cal. 4th 53, 63, 52 P.3d 685 (2002).
[105] *Id.*
[106] *Casso v. Brand*, 776 S.W.2d 551, 554 (Tex. 1989) (holding that the clear and convincing standard applies when a public figure sues for defamation, whether the defendant is a media defendant or not).

Court should reverse the trial court's order denying KTRK's Motion to Dismiss and render judgment that the case be dismissed.

Respectfully submitted,

HAYNES AND BOONE, LLP

By: /s/ Laura Lee Prather
       Laura Lee Prather
       State Bar No. 16234200
       Catherine Lewis Robb
       State Bar No. 24007924
Laura.prather@haynesboone.com
Catherine.robb@haynesboone.com

600 Congress Avenue, Suite 1300
Austin, TX 78701
Telephone:  (512) 867-8400
Telecopier:  (512) 867-8470

ATTORNEYS FOR APPELLANT
KTRK TELEVISION, INC.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been sent, as indicated below, on this 29th day of October, 2012, to the following counsel of record:

*Via Certified Mail, Return Receipt Requested*

Berry Dunbar Bowen
3014 Brazos Street
Houston, TX 77006

Counsel for Appellee

          /s/ Laura Lee Prather

A-269881_5

25

# APPENDIX TAB V:
Appellant's Response to Appellee's Motion to Dismiss for Lack of Jurisdiction in No. 01-12-00372-CV (WITHOUT EXHIBITS)

# IN THE FIRST COURT OF APPEALS
## HOUSTON, TEXAS

## KTRK TELEVISION, INC.

### Appellant,

### v.

## THEAOLA ROBINSON,

### Appellee.

## On Appeal from the 234th Judicial District Court of Harris County, Texas, The Hon. Reece Rondon, Presiding

## APPELLANT'S RESPONSE TO APPELLEE'S
## MOTION TO DISMISS FOR LACK OF JURISDICTION

Laura Lee Prather
State Bar No. 16234200
Catherine Lewis Robb
State Bar No. 24007924
Haynes and Boone, LLP
600 Congress Avenue, Suite 1300
Austin, TX  78701
Telephone:        (512) 867-8400
Telecopier:       (512) 867-8470

ATTORNEYS FOR APPELLANT
KTRK TELEVISION, INC.

# TABLE OF CONTENTS

**Page**

I.  The Legislative Intent of Section 27.008 Demonstrates a Clear Desire to Allow Interlocutory Appeals of All Rulings on Anti-SLAPP Motions to Dismiss ...................... 1

    A.  The Plain Meaning of the Statute is Clear .............................................. 2

    B.  The Code Construction Act Mandates Jurisdiction ................................... 5

    C.  Appellee's Interpretation Runs Afoul of the Purpose of the Anti-SLAPP Law ........ 8

    D.  Appellee's Construction Would Leave Portions of the Law Meaningless .............. 11

II.  Appellee Misplaces Her Reliance on Other State's Laws ............................... 12

III.  Appellee Misplaces Her Reliance on Tex Civ. Prac. & Rem. Code § 51.014 and Her Strict Construction Argument ........................................................ 14

IV.  Conclusion ............................................................................ 16

CERTIFICATE OF SERVICE ............................................................... 18

APPENDIX ................................................................................ 19

ii

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*All One God Faith, Inc. v. Hain Celestial Group, Inc.,*
Cause No. C 09-03517 JF (HRL), 2009 WL 4907433 (N.D. Cal. Dec. 14, 2009)..............14, 6

*Bailey v. Clark,*
407 S.W.2d 520 (Tex. Civ. App. – Ft. Worth 1966, no writ)...................................15

*Batzel v. Smith,*
333 F.3d 1018 (9th Cir. 2003) ...............................................................13, 14

*Bridgestone/Firestone, Inc. v. Glyn-Jones,*
878 S.W.2d 132 (Tex. 1994)...................................................................8

*Bruce C. Carter, et. al. v. NW Communications of Texas, Inc. et. al.,*
Cause No. DC-12-02166 (160th Judicial District, Dallas Co., Tex. May 24, 2012)
[Appendix J].............................................................................10

*Cameron v. Terrell & Garrett, Inc.,*
618 S.W.2d 535 (Tex. 1981)...................................................................4

*City of LaPorte v. Barfield,*
898 S.W.2d 288 (Tex. 1995)...................................................................12

*City of San Antonio v. City of Boerne,*
111 S.W.3d 22 (Tex. 2003)...................................................................1, 4

*Cont'l Cas. Ins. Co. v. Functional Restoration Assocs.,*
19 S.W.3d 393 (Tex. 2000)...................................................................4

*Dwayne Viera and Kerwin Jordan v. Hearst Newspapers, et. al.,*
Cause No. 2011-42884 (190th Dist. Ct., Harris County, Tex., Nov. 22, 2011)
(2 CR 448).............................................................................10

*East Tex. Salt Water Disposal Co. v. Werline,*
307 S.W.3d 267 (Tex. 2010)...................................................................16

*Enochs v. Brown,*
872 S.W.2d 312 (Tex. App. – Austin 1994, no writ)...................................................5

*Entergy Gulf States, Inc. v. Summers,*
282 S.W.3d 433 (Tex. 2009)...................................................................2, 4

iii

*Fitzgerald v. Advanced Spine Fixation Sys., Inc.,*
   996 S.W.2d 864 (Tex. 1999)................................................................................11

*Grant v Wood,*
   916 S.W.2d 42 (Tex. App. – Hou. [1st Dist.] 1995, orig. proceeding)........................3

*Herbert v. Lando,*
   441 U.S. 153 (1979)...........................................................................................13

*Hilton v. Hallmark Cards,*
   599 F.3d 894 (9th Cir. 2010) ..............................................................................13

*In re D.B.,*
   80 S.W.3d 698 (Tex. App. – Dallas 2002, no pet.)................................................15

*In re Estate of Nash,*
   220 S.W. 3d 914 (Tex. 2007)................................................................................2

*In re NCAA Student-Athlete Name & Likeness Litig.,*
   Cause No. C 09-1967 CW, 2010 WL 5644656 (N.D. Cal. 2010) ...........................14

*Jones v. Fowler,*
   969 S.W.2d 429 (Tex. 1992).................................................................................2

*Judy A. Jennings and Rebecca Bell-Metereau v. Wallbuilder Presentations, Inc., et. al.,*
   Cause No. 02-12-047-CV, Appellee's Brief (2nd Judicial District, Ft. Worth,
   April 26, 2012).....................................................................................................1

*Klein v. Hernandez,*
   315 S.W.3d 1 (Tex. 2010)...................................................................................16

*Marks v. St. Luke's Episcopal Hospital,*
   319 S.W.3d 658 (Tex. 2010)...............................................................................12

*Nootsie, Ltd. v. Williamson Co Appraisal Dist.,*
   925 S.W.2d 659 (Tex. 1996)...............................................................................16

*Ortiz v. Flores,*
   2010 WL 4259360 (Tex. App – San Antonio 2010, no pet.)..................................15

*Sipple v. Foundation for Nat'l Progress,*
   71 Cal. App. 4th 226 (1999) ...............................................................................10

*State v. Gonzalez,*
   82 S.W.3d 322 (Tex. 2002)...................................................................................1

*State v. Shumake,*
   199 S.W.3d 279 (Tex. 2006).................................................................................4

*Stephen Simpton, et. al., v. High Plains Broadcasting, Inc., et. al.,*
Cause No. 2011-CI-13290 (285th Dist. Ct., Bexar Co., Tex., March 23, 2012)
[Appendix I]...........................................................................................................10

*Surgitek v. Able,*
997 S.W.2d 598 (Tex. 1999)...............................................................................16

*Texas A&M University System v. Koseoglu,*
233, S.W.3d 835, 843 (Tex. 2007)......................................................................16

*Texas Workers' Compensation Insurance Fund v. Del Industrial, Inc.,*
35 S.W.3d 591 (Tex. 2000)..............................................................................2, 4

*The Garment Workers Center v. Superior Court,*
117 Cal. App. 4th 1156 (2004) ...........................................................................10

*Traxler v. Entergy Gulf States, Inc.,*
___ S.W.3d ___, 2012 WL 753682, 55 Tex. Sup. Ct. J. 431 (Tex. March 9, 2012)
[Appendix D] ...............................................................................................2, 3, 11

*Wholesale TV and Radio Advertising, LLC v. Better Business Bureau of Metropolitan
Dallas, Inc.,* Cause No. CC-11-08382-A, 14th Dist. Ct., Dallas Co., Tex.,
Sept. 6, 2011) (2 CR 446-447)............................................................................10

*Yolanda Flores v. Houston Community College System, et. al.,*
Cause No. 2011-49084 (51st Dist., Harris Co., Tex., Nov. 11, 2011),
(CR 4:956-957) ...................................................................................................10

**STATUTES**

Mo. Rev. Stat. §537.528(3) (Supp. 2006) [Appendix E].......................................3, 13

N.M. Stat. Ann 38.2-9.1-9.2 (2011) [Appendix F].................................................3, 13

Tex. Civ. Prac. & Rem. Code, §15.003(b)..................................................................14

Tex. Civ. Prac. & Rem. Code, §15.0642 ...................................................................15

Tex. Civ. Prac. & Rem. Code, Ch. 27......................................................................2, 7

Tex. Civ. Prac. & Rem. Code §27.002 .........................................................................9

Tex. Civ. Prac. & Rem. Code §27.007 ....................................................................5, 11

Tex. Civ. Prac. & Rem. Code §27.008 ...................................................1, 2, 3, 6, 7, 16

Tex. Civ. Prac. & Rem. Code, §27.008(a)....................................................................3

Tex. Civ. Prac. & Rem. Code §27.008(b)...................................................1, 3, 12, 15

Tex. Civ. Prac. & Rem. Code §27.008(c)................................................................15, 5

Tex. Civ. Prac. & Rem. Code §27.011(b)...............................................................12, 9

Tex Civ. Prac. & Rem. Code §51.014 .........................................................................14

Tex. Civ. Prac. & Rem. Code, §51.014(a)(6) ..............................................................14

Tex. Civ. Prac. & Rem. Code, §171.098 .....................................................................14

Texas Family Code, §§56.01(c) and 56.03(b) ............................................................15

Tex. Gov't Code, Ch. 311, §311.011(a) ....................................................................4, 5

Tex. Gov't Code §311.021(2)........................................................................................2

Tex. Gov't Code §312.005......................................................................................1, 6, 8

Tex. Govt. Code §1205.068 ........................................................................................15

Tex. Health & Safety Code, §574.070(a) ...................................................................15

Tex. Rev. Civ. Stat. art. 4447cc, §7(e).......................................................................15

Wash. Rev. Code 4:24.525 (2011) [Appendix G] ....................................................3, 13

## OTHER AUTHORITIES

Texas Rule of Appellate Procedure 26.1(b)................................................................14

Texas Rule of Civil Procedure 76a(a)........................................................................15

Michol O'Connor, O'Connor's Texas Rules: Civil Trial, Ch. 3, §9 (2012)................7

Jerry D. Bullard, "Peering Over the 82nd Lege: An Update of Bills that Passed and Those
    That Didn't (But You Ought to Know About Anyway)," 21st Annual Conference on
    State and Federal Appeals, the University of Texas School of Law, p. 6 [Appendix H] .........8

In her Motion to Dismiss[2], Appellee attempts to turn Texas Supreme Court precedent on its head by advocating ignoring the plain meaning and legislative intent of Tex. Civ. Prac. & Rem. Code §27.008 in an effort to persuade this Court it lacks jurisdiction over Appellant's appeal of the trial court's denial of its Motion to Dismiss. Appellee contends that this Court has no jurisdiction over a signed Order Denying Appellant's Motion to Dismiss — while acknowledging that if the Motion had been denied by operation of law or had been granted, there would be jurisdiction. To come to this conclusion, one must ignore both the express language in the statute and the legislative intent.[3] The right to an interlocutory and expedited appeal of a ruling on an Anti-SLAPP motion to dismiss is specifically authorized by Tex. Civ. Prac. & Rem. Code §27.008(b).

**I.     The Legislative Intent of Section 27.008 Demonstrates a Clear Desire to Allow Interlocutory Appeals of All Rulings on Anti-SLAPP Motions**

In construing a statute, the Court's objective is to determine and give effect to the Legislative intent. *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 25 (Tex. 2003); *State v. Gonzalez*, 82 S.W.3d 322, 327 (Tex. 2002); *see also*, Tex. Gov't Code §312.005; *American Home Products Corp. v. Clark*, 38 S.W.3d 92, 95 (Tex. 2000). In doing so, the Court looks first to the "plain and common meaning of the statute's words." *Gonzalez*, 82 S.W.3d at 327. If a statute's meaning is unambiguous, the Court interprets the statute according to the plain meaning. *Id.* Next, the Court determines the legislative intent and, in doing so, looks at the

---

[1] To the extent this Court determines there is no jurisdiction, Appellant would request this matter be converted to a mandamus proceeding. *See In re J.P.L.*, 359 S.W.3d 695 (Tex. App. – San Antonio 2011, pet. filed).

[2] Appellee's arguments appear to be taken almost verbatim (all but two paragraphs) from the arguments made by the Appellee in the pending case of *Judy A. Jennings and Rebecca Bell-Metereau v. Wallbuilder Presentations, Inc., et. al.*, Cause No. 02-12-047-CV, before the 2nd Judicial District Court of Appeals in Ft. Worth.

[3] *See* Appendix A, B and C; *see also*, CR 424-432, 436-44.

entire act and not just isolated provisions. *Jones v. Fowler*, 969 S.W.2d 429, 432 (Tex. 1992). Finally, the Court presumes the Legislature intended the entire statute to be effective. *See* Tex. Gov't Code §311.021(2). To give full effect to Chapter 27 of the Tex. Civ. Prac. & Rem. Code, this Court must acknowledge the right to appeal any order on a motion to dismiss brought under Tex. Civ. Prac. & Rem. Code, Ch. 27 (the "Anti-SLAPP statute").

## A.    The Plain Meaning of the Statute is Clear

According to Texas Supreme Court precedent, courts are to look at the plain meaning of a statute as the best evidence of legislative intent. *Traxler v. Entergy Gulf States, Inc.*, __ S.W.3d ___, 2012 WL 753682, 55 Tex. Sup. Ct. J. 431 (Tex. March 9, 2012)[4] (When engaging in statutory construction, the Court's primary objective is to determine the Legislature's intent which, when possible, the Court discerns from the plain meaning of the words chosen.). In fact, the cardinal rule of statutory construction is that each word is presumed to have been used for a purpose. *Texas Workers' Compensation Insurance Fund v. Del Industrial, Inc.*, 35 S.W.3d 591, 594 (Tex. 2000). "Where the text is clear, text is determinative of that intent." *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009). Therefore, "the words [the Legislature] chooses should be the surest guide to legislative intent." *Id., citing Fitzgerald v. Advanced Spine Fixation Sys., Inc.*, 996 S.W.2d 864, 866 (Tex. 1999). "If a statute is clear and unambiguous, we apply its words according to their common meaning without resort to rules of construction or extrinsic aids." *In re Estate of Nash*, 220 S.W. 3d 914, 917 (Tex. 2007).

Here the words of the statute are clear and unambiguous. Section 27.008 provides for the appeal of rulings on anti-SLAPP motions, articulating the deadline for filing said appeals and mandating the expedited treatment of the appeals by the appellate court. Because all forms of rulings on motions to dismiss can be appealed, Section 27.008 deals first, in section (a), with

---

[4] A true and correct copy is attached hereto as Appendix D.

2

situations where a trial judge refuses to rule. Section 27.008(a) addresses the circumstance when a trial court does not rule in a timely manner on a Motion to Dismiss, and it provides that, in those circumstances, the motion is considered denied by operation of law. It also specifies that a motion that is denied by operation of law may be appealed. This is to avoid a situation such as this Court faced in *Grant v Wood*, 916 S.W.2d 42 (Tex. App. – Hou. [1st Dist.] 1995, orig. proceeding), in which the trial judge refused to rule on a summary judgment thereby causing the right to an interlocutory appeal to effectively be held in abeyance by her inaction. Then, Section 27.008(b) deals with the expediting of all appeals under the statute. It addresses the fact that all appeals under the new statute — whether they are appeals from denial by operation of law or appeals from a trial court's order *on* a Motion to Dismiss[5] (meaning whether the court grants or denies the motion) are to be conducted on an expedited basis. The statute means exactly what it says. *See In re* Canales, 52 S.W.3d 698,704 (Tex. 2001). It is hard to interpret the word "on" to mean anything but a ruling either way. *See Traxler v. Entergy Gulf States, Inc.*, 55 Tex. Sup. Ct. J. 431, 2012 WL 753682, *4, fn. 25 (string cite omitted)(courts rely on the common meaning of the words chosen by the Legislature, "a preference we have described as cardinal law.") Appellee's hypertechnical and disjointed analysis gives no meaning to the words "order on a motion to dismiss." This is counter to the fundamentals of statutory construction.

If Appellee's interpretation of Section 27.008 were to prevail, it would essentially strike the language below from the statute and insert the new language in brackets that the Legislature never wrote into the law:

> (a)    If a court does not rule on a motion to dismiss under
> Section 27.003 in the time prescribed by Section 27.005, the

---

[5] Texas is not unique in its choice of language. The Missouri, New Mexico and Washington state anti-SLAPP statutes use the same verbiage indicating the right to appeal all rulings *on* motions to dismiss. *See* Mo. Rev. Stat. §537.528(3) (Supp. 2006); N.M. Stat. Ann 38.2-9.1-9.2 (2011); Wash. Rev. Code 4:24.525 (2011). A true and correct copy of each of these statutes is attached hereto as Appendix E, F and G.

motion is considered to have been denied by operation of law and the moving party may appeal.

(b)     An appellate court shall expedite an appeal or other writ, ~~whether interlocutory or not~~, from a trial court order ~~on~~ [granting] a motion to dismiss a legal action under Section 27.003 or from a trial court's failure to rule on that motion in the time prescribed by Section 27.005.

(c)     An appeal or other writ under this section must be filed on or before the 60th day after the trial court's order ~~is signed~~ [granting a motion to dismiss] or the time prescribed by Section 27.005 expires, as applicable.

A complete re-writing of the statute by the Court, such as Appellee is advocating, would defeat every rule of statutory construction ever mandated by the courts[6]. According to the Texas Supreme Court,

> [i]t is a rule of statutory construction that every word of a statute must be presumed to have been used for a purpose. Likewise, we believe every word excluded from a statute must also be presumed to have been excluded for a purpose. Only when it is necessary to give effect to the clear legislative intent can we insert additional words or requirements into a statutory provisions.

*Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 540 (Tex. 1981). When possible to do so, effect must be given to every sentence, clause and word of a statute so that no part thereof is rendered superfluous or inoperative. *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 29 (Tex. 2003), *citing Spence v. Fenchler*, 107 Tex. 443, 180 S.W. 597, 601 (1915); *see also, Cont'l Cas. Ins. Co. v. Functional Restoration Assocs.*, 19 S.W.3d 393, 402 (Tex. 2000). In this

---

[6] When called on to interpret a statute, courts should ascertain and give effect to the Legislature's intent as expressed by the language of the statute. *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009); *State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006) ("When possible we discern [legislative intent] from the plain meaning of the words chosen."). Words and phrases are read in context and construed according to the rules of grammar and common usage. Tex. Gov't Code §311.011(a)(West 2005). "[E]very word in a statute is presumed to have been used for a purpose, and a cardinal rule of statutory construction is that each sentence, clause and word is to be given effect if reasonable and possible." *Tex. Workers' Comp. Ins. Fund v. Del Indus., Inc.*, 35 S.W.3d 591, 593 (Tex. 2000) (citing *Perkins v. State*, 367 S.W.2d 140, 146 (Tex. 1963).

instance, it is not necessary to butcher the statute, as suggested by the Appellee, when the plain meaning as written in clear.

### B.     The Code Construction Act Mandates Jurisdiction

Pursuant to the Code Construction Act, words and phrases shall be read in context and construed according to the rules of grammar and common usage.[7] Courts are also to presume that the Legislature intended just and reasonable results in enacting the statute. *Enochs v. Brown*, 872 S.W.2d 312 (Tex. App. – Austin 1994, no writ). Herein, the only just and reasonable result would be providing an appellate right to all litigants who are the subject of rulings on Anti-SLAPP motions to dismiss. The statements contained in concurrent legislative analysis, the explanation of lawmakers involved in the drafting and negotiations of the bill and the commentary of legal analysts interpreting the bill after it became law, all come to the same conclusion. The only aberrant voice is that of a self-interested litigant who would rather not go through the interlocutory appeal process.

According to the statute's plain language and the House Research Organization's Bill Analysis (http://www.capitol.state.tx.us/BillLookup/Text.aspx?LegSess=82R&Bill=HB2973)[8], the bill provides for an expedited appeal of the motion to dismiss from any form of a ruling. Pursuant to Section 27.008(c), an appeal would have to be filed within 60 days *"after the date the trial court order is signed or the time prescribed by Section 27.005 (requiring the trial court to rule within 30 days) expires."*[9] It does not say "after the order is *granted*," it says "after the order is signed" — meaning the court could sign it and choose to either grant or deny it.

---

[7] *See* Tex. Gov't Code, Ch. 311, §311.011(a).

[8] Attached hereto as Appendix A, for the Court's convenience. *See* "Compiling Texas Legislative History," Legislative Reference Library, Part VIII listing House Research Organization reports as helpful in identifying legislative intent.

[9] The reason for the 60 day deadline to appeal is because of the provision in which the parties are given the opportunity to request Findings of Fact and Conclusions of Law under Tex. Civ. Prac. & Rem. Code §27.007 and the deadlines that ensue from such a request.

5

Subsection (a) simply clarifies that even those orders that are not signed can be appealed, and section (a) works in tandem with section (b) providing that all appeals under the statute are to be expedited.

In interpreting a statute, a court is required to diligently attempt to ascertain the legislative intent. Tex. Gov't Code §312.005. The affidavits of the co-sponsor and lead negotiator of HB 2973 (the anti-SLAPP bill) make it clear the Legislature intended there to be an immediate appeal right from *all* forms of orders on anti-SLAPP motions to dismiss. In fact, the affidavits of Senator Rodney Ellis and former Senator Don Adams explain exactly how the language in Section 27.008 came to be. *See* Appendix B and C. Paragraph 4 of Senator Ellis' (co-sponsor of HB 2973) affidavit explains how this portion of the bill was drafted:

> 4.     "Given the desire for an expedited resolution, this law was also meant to provide for a right to immediate and expedited appeal by both the movant and the respondent. Pre-filing drafts of the legislation included only the right to appeal by the movant and provided no means of resolution if the court did not rule within the thirty day deadline prescribed in Section 27.005(a). I believed that there should be the right to appeal by everyone — no matter if the motion was denied by the court or granted by the court, and I believed there needed to be a mechanism by which there would be a resolution to the motion even if the court did not rule so that the case could continue to be resolved in an expeditious fashion. Both issues were addressed and remedied by the language in Section 27.008 which, in section 27.008(a) outlines the mechanism for a motion being denied by operation of law if not ruled on by the court within 30 days, and which, in section 27.008(b) was changed from providing for an expedited appeal only of orders on the denial of a motion to appeals of any orders on a motion to dismiss, as well as those orders that were denied by operation of law. The intent was to provide the broadest right to appeal in an expedited fashion. The modified version of the bill is what was introduced when the bill was filed."

*See* Appendix B, ¶ 4. Similarly, former Senator Don Adams' (lead negotiator of HB 2973) explains in his affidavit how the appeals provisions were drafted.

5.     "Given the desire for an expedited resolution, this law was also meant to provide for a right to immediate and expedited appeal by both the movant and the respondent. Pre-filing drafts of the legislation included only the right to appeal by the movant and provided no means of resolution if the court did not rule within the thirty day deadline prescribed in Section 27.005(a). In discussing the draft of the bill with Vice Chairman of the House Civil Jurisprudence and Judiciary Committee (and former trial court judge) Tryon Lewis, he expressed concern that there should be the right to appeal by everyone — no matter if the motion was denied by the court or granted by the court. He also expressed concern that there needed to be a mechanism by which there would be a resolution to the motion even if the court did not rule so that the case could continue to be resolved in an expeditious fashion.

6.     "Both of Vice Chairman Lewis' concerns were addressed and remedied by the language in Section 27.008 which, in section 27.008(a) outlines the mechanism for a motion being denied by operation of law if not ruled on by the court within 30 days, and which, in section 27.008(b) was changed from providing for an expedited appeal only of orders on the denial of a motion to appeals of any 'orders on' a motion to dismiss, as well as those orders that were denied by operation of law. The intent was to provide the broadest right to appeal in an expedited fashion. The modified version of the bill was approved by Vice Chairman Lewis as appropriately addressing his concerns and is what was introduced when the bill was filed."

*See* Appendix C, ¶¶ 5 and 6.[10] Furthermore, after the fact commentators and legal authorities

have come to the same logical and rational conclusion in interpreting the right of appeal under

§27.008. *See* O'Connor's Texas Rules, Ch. 3, Motion to Dismiss — Anti-SLAPP Motion,

Section 9 Appellate Review:

§9.1. Deadline — An appeal or other writ must be filed within 60 days after the court signs its order or, if the court does not rule, within 90 days after the date of the hearing. CPRC §§27.005, 27.008(c).

§9.2 Expedited — An appeal or other writ, whether interlocutory or not, must be expedited by the appellate court. CPRC §27.008(b). The appeal

---

[10] In ¶¶ 14-16, Appellee opines about the Legislative rationale behind Ch. 27 and attempts to theorize about the Legislature and what it was thinking when it passed the law at issue. The affidavits of Senator Rodney Ellis (a sponsor of the bill at issue) and former Senator Don Adams (lead negotiator of the bill at issue) should clarify exactly what the Legislature was thinking, how the language at issue in §27.008, Tex. Civ. Prac. & Rem. Code, came to be and should cease the need for private litigants like Appellee to offer unsupported hypotheses to this Court with no basis for doing so.

7

> or writ is expedited whether the trial court issues an order on a motion to dismiss or the motion is denied by operation of law.

*Id.; see also,* Jerry D. Bullard, "Peering Over the 82[nd] Lege: An Update of Bills that Passed and Those That Didn't (But You Ought to Know About Anyway)," 21st Annual Conference on State and Federal Appeals, the University of Texas School of Law, p. 6 ("The trial court's decision on the motion to dismiss ... is reviewable by appeal on an expedited basis.")[11] Appellee's proposed interpretation of the statute not only ignores the plain meaning of the word "on," but also advocates a strained, hyper-technical reading of the statute ignoring the context and purpose of the entire statutory scheme. *See Bridgestone/Firestone, Inc. v. Glyn-Jones,* 878 S.W.2d 132, 133 (Tex. 1994) (when construing a statute, courts do not view disputed portions in isolation.).

The labyrinthine interpretation advocated by Appellee that would only give rise to an appeal for grants of motions to dismiss or denials by operation of law would, among other things, require this Court to ignore the plain meaning of the terms "trial court order **on a motion to dismiss**" and **"after the trial court order is signed."** It would also, without explanation, deprive one entire segment of litigants involved in anti-SLAPP cases — those whose motions are denied by the Court signing an order — the right to an appeal but maintain the right for litigants whose motions have been denied by operation of law. This interpretation is both counter-intuitive and also contrary to the plain meaning and legislative intent of the statute.

### C.     Appellee's Interpretation Runs Afoul of the Purpose of the Anti-SLAPP Law

The Code Construction Act mandates that a court "diligently attempt to ascertain legislative intent" when interpreting a statute. *See* Tex. Gov't Code, §312.005. If attempting to construe the language of the statute does not lead to a clear understanding (which Appellant

---

[11] A copy of which is attached as Appendix H.

8

argues it does), the Court may consider the purpose of the statute. Texas Civil Practices &

Remedies Code §27.002 states the express purpose of the statute:

> The purpose of this chapter is to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury.

Section 27.011(b) confirms that the chapter should be construed liberally to effectuate this

purpose and intent fully. In addition, the affidavits of Senator Ellis and former Senator Adams

also explain the purpose of the bill they shepherded through the legislative process:

> The purpose of HB 2973 was to protect the rights of individuals who are the victims of frivolous lawsuits for exercising their First Amendment rights. The legislation was designed to protect speakers from the burdens of trial itself (including discovery) rather than merely from ultimate judgments of liability. In particular, this law was designed to protect journalists, whistleblowers, and others from abusive litigation filed against them by those who disagree with or otherwise do not like the content of their speech. One of the key issues in this legislation is for meritless cases to be resolved in an expeditious fashion without the expense of needless discovery.

*See* Appendix B, ¶ 3 and C, ¶ 4. The legislative history contained in the record, including the

committee hearing before the House Judiciary and Civil Jurisprudence committee, establishes the

overarching concern and importance in anti-SLAPP cases of curtailing costly legal battles and

discovery before there is a ruling on whether a plaintiff's claims have merit. *See* CR 2:424-432,

436-445, 4:787-789; *see also,* Appendix A.

In fact, the lynch pin for anti-SLAPP legislation is the ability for the court to make a

determination and the litigants to get a resolution of whether the case has merit prior to costly

discovery being undertaken. The 28 states, District of Columbia, and territory of Guam, all of

whom have recognized the need to pass anti-SLAPP legislation, have recognized the need for a

mechanism for early disposition of cases involving free speech rights, prior to lengthy and costly

9

discovery, when there is no valid basis for the claim going forward. The Texas law was patterned, in large part, after the California anti-SLAPP statute — a jurisdiction in which the law has more than twenty years of judicial interpretation. In California, similar to Texas, discovery is stayed during the pendency of the anti-SLAPP proceedings and either party is entitled to immediately appeal the court's decision on the anti-SLAPP motion. Courts there explain that allowing discovery during the anti-SLAPP proceedings, absent a clear showing of good cause "would subvert the intent of the anti-SLAPP legislation." *Sipple v. Foundation for Nat'l Progress*, 71 Cal. App. 4th 226, 247 (1999). If the issues raised in an anti-SLAPP motion can be resolved without discovery "the court should consider resolving those issues before permitting what may otherwise turn out to be unnecessary, expensive and burdensome discovery proceedings." *The Garment Workers Center v. Superior Court*, 117 Cal. App. 4th 1156, 1162 (2004). In Texas, there have already been multiple anti-SLAPP motions granted prior to discovery taking place.[12]

Under Appellee's proposed strained interpretation of the law, if the Motion to Dismiss is granted or denied by operation of law, then the statute would continue to curtail costly discovery while an appellate court reviewed the validity of the trial court's decision. But, if the trial court had ordered dismissal, no appeal would be permitted, and discovery would ensue. This interpretation would be an affront to the purpose of the statute. In fact, it would encourage movants who are even the slightest bit concerned about an unfavorable ruling to advocate for a

---

[12] *See, e.g., Dwayne Viera and Kerwin Jordan v. Hearst Newspapers, et. al.*, Cause No. 2011-42884 (190th Dist. Ct., Harris County, Tex., Nov. 22, 2011) (2 CR 448); *Yolanda Flores v. Houston Community College System, et. al.*, Cause No. 2011-49084 (51st Dist., Harris Co., Tex., Nov. 11, 2011), (CR 4:956-957), *Wholesale TV and Radio Advertising, LLC v. Better Business Bureau of Metropolitan Dallas, Inc.*, Cause No. CC-11-08382-A, 14th Dist. Court, Dallas County, Tex., Sept. 6, 2011) (2 CR 446-447), *Stephen Simpton, et. al., v. High Plains Broadcasting, Inc.. et. al.*, Cause No. 2011-CI-13290 (285th Dist. Ct., Bexar Co., Tex., March 23, 2012) attached hereto for the Court's convenience as Appendix I; *Bruce C. Carter, et. al. v. NW Communications of Texas, Inc. et. al.*, Cause No. DC-12-02166 (160th Judicial District, Dallas Co., Tex. May 24, 2012) attached hereto for the Court's convenience as Appendix J.

court not to rule, not remind the court about the thirty day deadline, and sit on their hands in hopes that the court would not rule at all on their motion. Such an outcome would turn Texas jurisprudence on its head.

**D.    Appellee's Construction Would Leave Portions of the Law Meaningless**

As previously mentioned, section 27.011 of the statute expressly states the chapter "shall be construed liberally to effectuate its purpose and intent fully." This is consistent with Texas Supreme Court precedent providing, as a general rule, that statutes are to "be given the most comprehensive and liberal construction possible," and "certainly should not be given a narrow, technical construction." *Traxler v. Entergy Gulf States, Inc.*, at *2, *citing City of Mason v. W. Tex. Utils. Co.*, 150 Tex. 18, 237 S.W.2d 273, 275, 279 (1951).

Courts are required to give meaning to a legislative act, yet Appellee is advocating just the opposite — that this statute be stripped of its plain meaning giving rise to an appeal on all orders on motions to dismiss (explicitly granting or denying a motion, as well as those that are denied by operation of law). Moreover, in determining how certain words might be interpreted, the courts look at the entire act, and not a single section in isolation. *Fitzgerald v. Advanced Spine Fixation Sys., Inc.*, 996 S.W.2d 864, 866 (Tex. 1999). Given this, it is important to note that if Appellee's interpretation of the statute were to prevail, it would leave §27.007 meaningless — which would be directly contrary to Texas Supreme court mandate. Section 27.007 provides a mechanism for an anti-SLAPP movant whose motion has been denied to request findings and a deadline for a court to enter same. Thus, it anticipates those litigants whose motions to dismiss have been denied by a court order may want to obtain Findings from the trial court prior to appealing the denial of the motion. If that same movant did not have the right to an immediate appeal, what would be the purpose of requesting and obtaining findings in a 30-day period from the trial court? Furthermore, Appellant's proposal is a direct assertion that

11

the appeal process would never include a point of error on denial of an anti-SLAPP motion. If that were the case, what would the point of 27.007 be and how could the purpose of the law be achieved?

Also, under Appellee's proposed construction the word "on" in Section 27.008(b) would be meaningless when, in fact, it demonstrates that the legislative purpose was to cover all possible actions by the trial court and recognizes that one of the three possible rulings by the trial court is a final disposition and the other two are interlocutory. Finally, the reference in Section 27.008(b) to "an appeal or other writ, whether interlocutory or not" anticipates the fact that the grant of a Motion to Dismiss would not be considered an interlocutory appeal — it would just be a regular appeal — but the denial of a Motion to Dismiss (whether by a signed order or by operation of law) would be an interlocutory appeal. If the Legislature did not intend for all dispositions of the motion to be appealable, then the words "whether interlocutory or not" would be meaningless. This is because there would need to be no provision for appeal if it only applied to the grant of Motion to Dismiss — that would be a final judgment and would be appealable regardless. The ultimate goal is for the Court to understand the Legislature's intent and apply that intent according to the statute's purpose.[13] All of the foregoing establishes an immediate right to appeal from all forms of orders on anti-SLAPP motions to dismiss.

## II.    Appellee Misplaces Her Reliance on Other State's Laws

In paragraphs 15 and 16 of her Motion to Dismiss, Appellee attempts to distinguish the Texas law from the other state's laws and makes a misguided reference to the need for discovery

---

[13] *See Marks v. St. Luke's Episcopal Hospital*, 319 S.W.3d 658, 663 (Tex. 2010), *citing* Tex. Gov't Code §312.005 (West 2005); *City of LaPorte v. Barfield*, 898 S.W.2d 288, 292 (Tex. 1995) (referring to legislative intent as the "polestar of statutory construction."). *See also*, Tex. Civ. Prac. & Rem. Code §27.011(b).

when no such motion was made at the trial court level.[14] The Court need not go beyond the plain language in the statute to reach an analysis of any of this; however, to the extent the Court does indulge any portion of Appellee's argument allegedly taken from other state's anti-SLAPP laws, it is worth noting that Texas is not the only state that provides for a full right of appeal arising from any order **on a motion to dismiss**. The Missouri, New Mexico and Washington state anti-SLAPP statutes use the same verbiage indicating the right to appeal all rulings on motions to dismiss.[15] Some states choose to use the terms "grant or denial" and others choose to use the term "on" — either way, the outcome is the same.

In reviewing other jurisdictions, such as California, where there has been twenty years of precedent interpreting anti-SLAPP legislation[16], it is clear that the denial of an anti-SLAPP Motion constitutes a collateral order that is immediately appealable. *Hilton v. Hallmark Cards*, 599 F.3d 894, 900 (9th Cir. 2010); *Batzel v. Smith*, 333 F.3d 1018, 1025 (9th Cir. 2003). In *Batzel*, the Ninth Circuit explained that California law provides a "substantive immunity" from the burdens of litigation and for that reason, includes the right to immediately appeal the denial of an anti-SLAPP motion. "This provision, along with the legislative history behind §425.16, demonstrates that California lawmakers wanted to protect speakers from the trial itself rather than merely from liability. If the defendant were required to wait until final judgment to appeal the denial of a meritorious anti-SLAPP motion, a decision by this court reversing the district

---

[14] In addition, Appellee cites to *Herbert v. Lando*, 441 U.S. 153 (1979) improperly claiming that it stands for the proposition that a plaintiff "must be given a right to discovery prior to dismissal of a defamation action if liability is governed by a malice standard." Appellee's Motion, p. 7. That is simply not the law. *Herbert v. Lando* stands for the proposition that the United States Supreme Court refused to recognize an absolute privilege concerning the editorial process. It says nothing about mandatory discovery.

[15] *See* Mo. Rev. Stat. §537.528(3) (Supp. 2006)(from a trial court order on the special motions); N.M. Stat. Ann 38.2-9.1-9.2 (2011) ("from a trial court order on the special motions"); Wash. Rev. Code 4:24.525 (2011) ("from a trial court order on the special motion"). A true and correct copy of each of these statutes is attached hereto as Appendix E, F and G.

[16] California's anti-SLAPP statute has served as the model for other states, such as Texas, Washington D.C., Washington state and others who have recently enacted or amended such legislation.

13

court's denial of the motion would not remedy the fact that the defendant had been compelled to defend against a meritless claim brought to chill rights of free expression. Thus, a defendant's rights under the anti-SLAPP statute are in the nature of immunity; they protect the defendant from the burdens of trial, not merely from ultimate judgments of liability." *Batzel v. Smith, supra,* 333 F.3d at 1025. Furthermore, in federal court, if an anti-SLAPP motion is appealed, all discovery is stayed in the trial court — precisely because of the "immunity" from liability analysis. *See, e.g., In re NCAA Student-Athlete Name & Likeness Litig.,* Cause No. C 09-1967 CW, 2010 WL 5644656, *3 (N.D. Cal. 2010); *All One God Faith, Inc. v. Hain Celestial Group, Inc.,* No. C 09-03517 JF (HRL), 2009 WL 4907433, *2 n.2 (N.D. Cal. December 14, 2009). Similarly, Texas lawmakers sought to protect those who had been SLAPPed with meritless lawsuits for exercising their free speech rights from trial, as well as liability, unless and until it could finally be determined that there was a valid claim.

## III.  Appellee Misplaces Her Reliance on Tex Civ. Prac. & Rem. Code § 51.014 and Her Strict Construction Argument

Appellee spends a significant amount of her briefing focusing on the fact that this does not qualify as an interlocutory appeal under Section 51.014(a)(6) of the Tex. Civ. Prac. & Rem. Code because it is not an appeal from a summary judgment and because it is not an appeal made within twenty days under Texas Rule of Appellate Procedure 26.1(b).[17]  Appellant does not disagree with Appellee on either of these points. However, neither of these points is relevant to the Court's inquiry herein. Contrary to Appellee's assertion, the Texas Legislature has provided for interlocutory appeals of trial court orders in a number of statutes other than Texas Civil Practice & Remedies Code, Section 51.014. *See, e.g.,* Tex. Civ. Prac. & Rem. Code, §171.098 (providing for interlocutory appeal of certain orders under Texas Arbitration Act); Tex. Civ.

---

[17] *See* Appellee's Motion to Dismiss, ¶¶ 11-14.

14

Prac. & Rem. Code, §15.003(b) (providing for interlocutory appeal in certain instances involving inability to establish venue where there are multiple plaintiffs); Tex. Civ. Prac. & Rem. Code, §15.0642 (essentially allowing interlocutory appeal where statute allows for mandamus to enforce mandatory venue provisions); Tex. Govt. Code §1205.068 (allowing certain interlocutory appeals under Texas Public Security Declaratory Judgment Act); Tex. Health & Safety Code, §574.070(a) (allowing for interlocutory appeal of orders requiring, renewing, or modifying court ordered mental health services); Texas Family Code, §§56.01(c) and 56.03(b) (allowing for interlocutory appeal of certain family law matters); Tex. Rev. Civ. Stat. art. 4447cc, §7(e) (allowing for interlocutory appeal under Texas Environmental, Health, and Safety Audit Privilege Act of order requiring disclosure of audit report). Additionally, Texas Rule of Civil Procedure 76a(a) allows for an immediate appeal of an order relating to the sealing or unsealing of court records, which, in practice, operates as a grant of a right to an interlocutory appeal. Thus, the interlocutory appeal rights provided for all orders on a motion to dismiss found in Tex Civ. Prac. & Rem. Code §27.008(b) is well founded in the law. Further, the sixty day deadline to appeal any signed trial court order provided in Tex. Civ. Prac. & Rem. Code §27.008(c) is entirely consistent with Texas precedent holding that "when a statute provides the deadline for perfecting an appeal, compliance with that statutory deadline, *not the deadline in the rules of appellate procedure* is necessary to give the appellate court jurisdiction." *Bailey v. Clark*, 407 S.W.2d 520, 521 (Tex. Civ. App. – Ft. Worth 1966, no writ). *See also, In re D.B.*, 80 S.W.3d 698, 702, fn. 8 (Tex. App. – Dallas 2002, no pet.); *Ortiz v. Flores*, 2010 WL 4259360 (Tex. App – San Antonio 2010, no pet.).

Finally, despite Plaintiff's argument, that interlocutory appeals should be strictly construed, the Texas Supreme Court has on many occasions interpreted statutes so as to allow

interlocutory appeals. *See, e.g., Klein v. Hernandez*, 315 S.W.3d 1 (Tex. 2010) (finding resident physician could file interlocutory appeal of denial of defense of immunity under provision allowing for interlocutory appeal of grant or denial of defense of immunity for state employee); *East Tex. Salt Water Disposal Co. v. Werline*, 307 S.W.3d 267 (Tex. 2010) (allowing interlocutory appeal under Texas Arbitration Act despite argument that reading of statute did not allow appeal); *see also, Surgitek v. Able*, 997 S.W.2d 598, 601 (Tex. 1999) (adopting functional rather than formalistic approach to determine whether order fit within interlocutory appeal statute). This Court is obligated to reject interpretations of a statute that defeat the purpose of the legislation so long as another reasonable interpretation exists. *Nootsie, Ltd. v. Williamson Co Appraisal Dist.*, 925 S.W.2d 659, 662 (Tex. 1996), *citing, Citizens Bank v. First State Bank*, 580 S.W.2d 344, 347-48 (Tex. 1979). Thus, Appellee's strict construction analysis is a red herring since section 27.008 provides the express right to an interlocutory and immediate appeal from <u>all</u> orders on anti-SLAPP motions to dismiss.

## IV.    Conclusion

Appellee's interpretation would preclude an aggrieved a right to appeal. For the entire phrase "from a trial court order on a motion to dismiss" to be given effect, the statute must allow an appeal to be filed by both a plaintiff challenging the grant of a motion to dismiss and a movant challenging the denial of one. *See, e.g., Texas A&M University System v. Koseoglu*, 233, S.W.3d 835, 843 (Tex. 2007). This construction is supported not only by the plain language of Section 27.008, but also by its logical application. A person sued for exercising his free speech rights should be able to appeal the denial of a motion to dismiss in the same way whether the trial court entered an actual ruling or let the motion lapse as a matter of law. Both defendants' interests in having an interlocutory review of whether there is basis for a claim against them are identical. There is no sound rationale for distinguishing one from the other.

16

Thus, this Court needs look no further than the statute's plain language which is clear and unambiguous. Even so, if the Court chooses to consider, the statute's objectives, its legislative history, and the consequences of Appellee's proposed construction, the outcome is still the same, there is simply no basis to permit appeals of only those orders that were denied by operation of law or granted by a trial judge's ruling and foreclose the same opportunity for litigants' whose motions have been denied by a trial judge's ruling.

WHEREFORE PREMISES CONSIDERED, Appellee's Motion to Dismiss should be denied because this Court has jurisdiction over this appeal.

Respectfully submitted,

HAYNES AND BOONE, LLP


By:___/s/ Laura Lee Prather_____
      Laura Lee Prather
      State Bar No. 16234200
      Catherine Lewis Robb
      State Bar No. 24007924

600 Congress Avenue, Suite 1300
Austin, TX 78701
Telephone:        (512) 867-8400
Telecopier:   (512) 867-8470

ATTORNEYS FOR APPELLANT
KTRK TELEVISION, INC.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been sent via certified mail, return receipt requested, to the following parties on this the 14th day of August, 2012:

Berry Dunbar Bowen
3014 Brazos Street
Houston, TX 77006

Counsel for Appellee


_____/s/ Laura Lee Prather_____

## APPENDIX

A.     House Research Organization Bill Analysis of HB 2973, May 2, 2011

B.     Affidavit of Senator Rodney Ellis, Senate Sponsor of HB 2973

C.     Affidavit of Senator Don Adams, Lead Negotiator of HB 2973

D.     *Traxler v. Entergy Gulf States, Inc.,* __ S.W.3d ___, 2012 WL 753682, 55 Tex. Sup. Ct. J. 431 (Tex. March 9, 2012)

E.     Mo. Rev. Stat. §537.528(3) (Supp. 2006)

F.     N.M. Stat. Ann 38.2-9.1 (2011)

G.     Wash. Rev. Code 4:24.525 (2011)

H.     Jerry D. Bullard, "Peering Over the 82nd Lege: An Update of Bills that Passed and Those That Didn't (But You Ought to Know About Anyway)," 21st Annual Conference on State and Federal Appeals, the University of Texas School of Law

I.     (1) *Stephen Simpton, D.D.S., et al. v. High Plains Broadcasting, Inc.,* Cause No. 2011-CI-13290, 285th Judicial District, Bexar County — Order Granting Defendant's Motion to Dismiss

       (2) *Stephen Simpton, D.D.S., et al. v. High Plains Broadcasting, Inc.,* Cause No. 2011-CI-13290, 285th Judicial District, Bexar County — Final Judgment and Order on Defendants' Attorney's Fees and Sanctions

J.     *Bruce Carter, et al. v. NW Communications of Texas, Inc., et al.,* Cause No. 12-02166, 160th Judicial District, Dallas County — Order Granting Defendants' Motion for Summary Judgment and Motion to Dismiss

# APPENDIX TAB W:
Defendant KTRK Television Inc.'s Motion to Dismiss Pursuant to Tex. Civ. Prac. & Rem. Code Chapter 27 Anti-SLAPP Motion in Cause No. 2011-54895 (WITHOUT EXHIBITS)

CAUSE NO. 2011-54895

| | | |
|---|---|---|
| THEAOLA ROBINSON, and BENJI'S SPECIAL EDUCATION ACADEMY, INC, | § § § § § § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § § | |
| v. | § § | HARRIS COUNTY, TEXAS |
| THE WALT DISNEY COMPANY; ABC TELEVISION NETWORK, INC.; CC TEXAS HOLDING CO., INC.; and, KTRK TELEVISIONS, INC. | § § § § § § | |
| Defendants. | § | 234TH JUDICIAL DISTRICT |

## DEFENDANT KTRK TELEVISION INC.'S MOTION TO DISMISS PURSUANT TO TEX. CIV. PRAC. & REM. CODE CHAPTER 27 ANTI-SLAPP MOTION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, KTRK Televisions, Inc. ("Defendant" or "KTRK"),[1] by and through its undersigned attorneys, and files this its Motion to Dismiss pursuant to Chapter 27 of the Texas Civil Practice & Remedies Code (hereinafter "Defendant's Anti-SLAPP Motion" or "Motion to Dismiss"), and in support thereof, states as follows:

## I.
## INTRODUCTION AND FACTUAL BACKGROUND

Plaintiffs are a former charter school director and the charter school that has been closed down and had its charter revoked by the State for financial mismanagement. Despite the fact

---

[1] The Walt Disney Company ("TWDC") and CC Texas Holding Company, Inc. ("CCTHC") have filed Special Appearances contesting this Court's jurisdiction, and ABC Television Network which is not a corporate entity and has not been served in this matter; therefore, at this time, filing an Anti-SLAPP motion on behalf of these named defendants would be premature. Should the Court ultimately exercise jurisdiction over these Defendants, TWDC, CCTHC, and "ABC Television Network" reserve the right to file their own Anti-SLAPP motion asserting the same defenses and arguments as KTRK asserts herein.

that the State has found that Plaintiffs have demonstrated repeated unaccountability for the use of State funds, have failed to make retirement contributions and health coverage payments, have failed to pay their taxes owed to the IRS, and more, Plaintiffs are now trying to silence those critics, like KTRK, who are making the public aware of the unaccountability of their taxpayer dollars and are giving exposure to this matter of public concern. Plaintiffs have sued KTRK for reporting on this matter of public concern. Texas law no longer permits frivolous lawsuits filed out of retaliation by one who wants to silence a critic or who sues simply because they do not like what was said about them. The Texas Citizens Participation Act (known as the Anti-SLAPP statute) was passed unanimously by the Texas Legislature earlier this year to put an early and definitive end to lawsuits aimed at retaliating against one for exercising his free speech rights. This is precisely the type of lawsuit to which the new law applies.

This lawsuit concerns KTRK's reporting on the allegations of financial (and other) mismanagement at, and the State's revocation of the charter for, the Benji's Special Education Academy ("Benji's"). Plaintiffs in this suit are the non-profit corporation that ran Benji's (hereinafter "Charter Holder")[2], and the charter school's former director/Superintendent, Theaola Robinson ("Robinson"), who was also on the board of the Charter Holder.[3] At the time of the KTRK broadcasts at issue, Plaintiffs were being investigated by the Texas Education Agency for, among other things, mismanagement and poor financial practices regarding State taxpayer funds. At that time, Benji's had been taken over by the Texas Education Agency ("TEA") who ordered the school's closure and eventually revoked the school's charter. Benji's was

---

[2] Both the school itself and the Charter Holder use the name "Benji's" or "Benji's Special Education Academy" — often without distinguishing between the two. But, while the Charter Holder is a non-profit corporation and a Plaintiff in this lawsuit, Benji's (the school), has been taken over by the State and is not a Plaintiff in this suit. In fact, Plaintiff Robinson sued Benji's (the school) recently in federal court. For ease, only the school itself will be referred to as Benji's.

[3] Ms. Robinson's involvement in both organizations can be seen by the attached Secretary of State documents for Benji's and the Charter Holder. *See* Secretary of State documents for Benji's, attached hereto as Exhibit A-1; Secretary of State documents for Charter Holder, attached hereto as Exhibit A-2.

2

responsible for educating hundreds of students and was tasked with utilizing more than $3 million in State taxpayer funds to do so.[4] TEA, after years of receiving either no response or inadequate responses to their inquiries about the school's use of State taxpayer funds, ultimately appointed a new Board of Managers and new Superintendent to assist Benji's with its financial and mismanagement woes.[5] Plaintiffs' financial woes included, but was not limited to, the following:

(1)    the Charter Holder was the subject of a warrant hold for nonpayment to the Teachers Retirement System in the amount of $43,000.00 for retirement contributions and $13,000.00 in health coverage;

(2)    the Department of Agriculture cancelled the Charter Holder's participation in child nutrition programs because of the Charter Holder's failure to demonstrate fiscal responsibility;

(3)    the Charter Holder owed the IRS a debt of $87,000.00 for unpaid taxes;

(4)    the Charter Holder's board of directors failed to oversee or adequately supervise its financial resources; and,

(5)    the Charter Holder failed to properly account for accrued unreimbursed leave as a liability.[6]

KTRK, like several other local media outlets, reported on these significant matters of public concern to the Houston community.[7] Of all the reports, KTRK was the only station to be sued out of retaliation for what it said.

---

[4] Plaintiffs do not contest that they received over $3 million in state funds in the 2009-2010 time frame.

[5] *See* September 3, 2010, letter from Commissioner of Education, Robert Scott, to Members of the Charter Holders Board and Theaola Robinson, attached hereto as Exhibit B. This was just the latest in a series of actions taken by the TEA against the Charter Holder. The TEA had previously appointed one, and, then two, conservators to oversee the school and had, on at least one prior occasion, threatened to revoke the Charter Holder's/school's charter. *See* May 14, 2009, letter from Commissioner Scott to Theaola Robinson, attached hereto as Exhibit C. Additionally, the Charter Holder/school had been in poor financial condition for years and had poor financial records. *See* State Office of Administrative Hearings Proposal for Decision in Docket No. 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; Texas Education Agency v. Benji's Special Education Academy, Inc., attached hereto as Exhibit D.

[6] *See* Exhibit D, pp. 54-55, Findings 58-68.

[7] *See* Affidavit of Cynthia Cisneros, attached hereto as Exhibit E; *see also*, Exhibits 5, 6, and 12 attached to Plaintiffs' Original Petition attached hereto as Exhibit F; *see also, e.g.,* September 14, 2010 article "School Closing Due to Lack of Funds" on Click2Houston.com, attached hereto as Exhibit G; September 14, 2010 article "State Orders 30-Year Old School Closed" on myfoxhouston.com, attached hereto as Exhibit H; September 15, 2010, story "Fifth Ward charter school defies state order to close" on praisehouston.com, attached hereto as Exhibit I;

3

## II.
## SUMMARY OF ARGUMENT

Plaintiffs' lawsuit is directly aimed at preventing Defendant from exercising its First Amendment right to speak out on issues of public concern (and at punishing Defendant for doing so). It is the exact scenario the Texas Legislature sought to address in its passage of the recently enacted Anti-SLAPP statute, and it is this type of reporting, the law is designed to protect.[8] The new statute requires early dismissal of a lawsuit when a movant establishes that it is being sued for the exercise of its free speech rights. In the instant case, Defendant was sued[9] for airing a series of reports about Plaintiffs and the allegations and investigations surrounding Benji's Academy. As demonstrated below, Defendant has met its statutory burden and dismissal is mandated. Plaintiffs cannot overcome the basis for dismissal because they cannot establish by clear and specific evidence each essential element of their claim. Specifically, because the complained of statements were substantially true, as well as an accurate reporting of ongoing allegations, Plaintiffs cannot establish that the broadcast(s) over which they sue are materially false. Additionally, because the statements are privileged as a reasonable and fair comment on a matter of public concern and because Plaintiffs' claims are barred by common law, statutory and

September 15, 2010 article "School Ordered to Shut Down Opens Anyway" on click2houston.com, attached hereto as Exhibit J; September 15, 2010, article "Charter school stays open in defiance of state order to close, accuses TEA of racism" on khou.com, attached hereto as Exhibit K; September 15, 2010 article "Defiant Fifth Ward charter school vows to stay open" on chron.com, attached hereto as Exhibit L; September 16, 2010, Staff Editorial in The Daily Cougar "Charter school should adhere to TEA ruling" on the dailycougar.com, attached hereto as Exhibit M.

[8] *See* House Bill 2973 (The Texas Citizens Participation Act also known as the "Anti-SLAPP" statute), attached hereto as Exhibit N, Tex. Civ. Prac. & Rem. Code §27.001(7) ("'Matter of public concern' includes an issue related to: (A) health or safety; (B) environmental, economic, or community well-being; (C) the government; (D) a public official or public figure; or (E) a good, product, or service in the marketplace.").

[9] Plaintiffs have actually attempted to sue Defendants three different times. They sued Disney originally in federal court (Cause No. 4-10-CV-03498). Then, they tried to add Defendants to the lawsuit between Plaintiffs and the TEA (Cause No. 4-11-CV-00358), and finally, they now sue in this court but still against parties that either do not exist or that they know the Court has no jurisdiction over and solely for the purpose of harassment. The Anti-SLAPP statute not only mandates the award of attorney's fees in favor of the successful movant but also mandates sanctions be awarded to deter the party who brought the legal action from bringing similar actions in the future. Tex. Civ. Prac. & Rem. Code §27.009. The Plaintiffs extraordinary actions in this case and the litany of previous cases filed against Defendants clearly demonstrates the justification for such an award of fees and sanctions.

4

constitutional privileges found in Section 73.002 of the Texas Civil Practice and Remedies Code and Article I, Section 8 of the Texas Constitution, as well as the First and Fourteenth Amendments to the United States Constitution, Plaintiffs' suit cannot survive. Further, Plaintiffs cannot establish the essential element of actual malice[10] to overcome the applicable privileges. Thus, because Plaintiffs cannot meet their burden, dismissal is warranted under the Anti-SLAPP statute, fees should be awarded to Defendant, and Plaintiffs should be sanctioned for bringing such a suit. *See* Tex. Civ. Prac. & Rem. Code §27.009.

## III.
## TEXAS' ANTI-SLAPP STATUTE MANDATES DISMISSAL OF THIS CLAIM

The purpose of Texas' new Anti-SLAPP statute is to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury. *See* Tex. Civ. Prac. & Rem. Code. §27.002. Plaintiffs' lawsuit squarely falls within the protection of the Anti-SLAPP statute and should be immediately dismissed.

**A.      Passage of the Texas Anti-SLAPP Statute Effective June 17, 2011**

During the 82nd Legislative Session, Texas lawmakers unanimously adopted House Bill 2973 — the Texas Citizens Participation Act, also known as the Anti-SLAPP statute. Texas is the 28th state in the nation to adopt an Anti-SLAPP statute for the purpose of protecting public participation in discussions about matters of public concern. The bill was intended to remedy the nationally recognized problem of abusive lawsuits against those who speak out on issues of public debate or who expose wrong-doing. The newly enacted law provides defendants with

---

[10] *See, e.g.,* Affidavit of Cynthia Cisneros, attached hereto as Exhibit E; Affidavit of Jessica Wiley, attached hereto as Exhibit A, and Affidavit of Katie McCall, attached hereto as Exhibit O -- all of which demonstrate the absence of actual malice.

5

substantive rights to expeditiously and economically dispense with litigation brought for the purposes of retaliation or silencing public comment. Because the law was passed unanimously in both the Texas House and Senate, it went into immediate effect upon the Governor's signature — June 17, 2011.[11] Pursuant to Section 3 of the bill, the law applies to "a legal action filed on or after the effective date of this Act." Plaintiffs' lawsuit was filed on September 14, 2011, almost three months after the June 17, 2011 effective date of the statute.[12] In order to further the Court's understanding of the intent behind HB 2973, Defendant offers the legislative history of the Anti-SLAPP statute,[13] which clearly shows that the purpose behind the Act is to encourage and safeguard the constitutional rights of persons to speak freely about matters of public concern. It also sets out the basic operation of the new law, which is quite straightforward: if a claim in a lawsuit arises out of a party's exercise of the right of free speech, then the claim is subject to a motion to dismiss, which must be granted unless the Plaintiffs can establish by clear and specific evidence[14] a *prima facie* case for each essential element of their claim. Tex. Civ. Prac. & Rem. Code § 27.005(b). Anti-SLAPP Motions have recently been filed in a number of Texas courts and have already been granted in both Dallas and Harris Counties for, among other things, lawsuits brought against media entities reporting on government investigations and consumer concerns.[15]

---

[11] *See* Exhibit N.

[12] *See* Exhibit F.

[13] The audio CD of the March 28, 2011 Committee of Judiciary and Civil Jurisprudence Hearing regarding the passage of HB 2973 is attached hereto as Exhibit P and the list of witnesses from the March 28, 2011 Committee of Judiciary and Civil Jurisprudence Hearing regarding the passage of HB 2973 is attached hereto as Exhibit Q.

[14] This is a heightened standard greater than just the preponderance of evidence. *See, e.g., Channel Two Television v. Dickerson*, 725 S.W.2d 470, 472 (Tex. App. -- Hou. [1st Dist.] 1987, no writ).

[15] *See* Order Granting Motion to Dismiss (and attached Motion to Dismiss) in *Wholesale TV and Radio Advertising, LLC v. Better Business Bureau of Metropolitan Dallas, Inc.*, Cause No. CC-11-08382-A, in the 14th Judicial District, Dallas County, Texas, attached hereto as Exhibit R; Order Granting Motion to Dismiss (and attached Motion to Dismiss) in *Dwayne Veira and Kerwin Jordan v. Hearst Newspapers, LLC d/b/a The Houston Chronicle, KHOU-TV, Inc., and Post-Newsweek Stations, Houston, Inc. d/b/a KPRC-TV*, Cause No. 2011-42884, in the 334th Judicial District, Harris County, Texas, attached hereto as Exhibit S.

6

## B. Plaintiffs' Lawsuit Falls Within the Protection of the Anti-SLAPP Statute.

This lawsuit was served on Defendant KTRK on October 31, 2011.[16] As required by the statute, this Motion is being timely filed within sixty days of service. Tex. Civ. Prac. & Rem. Code §27.003(b). After the motion to dismiss is filed under the Anti-SLAPP statute, the court engages in an analysis to determine whether the statute applies to the lawsuit. If the lawsuit is "based on, relates to, or is in response to a party's exercise of the right of free speech, right to petition, or right of association," the statute applies. *See* Tex. Civ. Prac. & Rem. Code §27.003(a). Exercise of the right of free speech is defined as a communication made in connection with a matter of public concern[17] which the KTRK broadcasts clearly fall within. KTRK's reports concerned the Texas Education Agency's investigations into financial mismanagement at Benji's, Benji's difficulty in accounting for state funds, and the TEA's closure of Benji's. Reporting on governmental proceedings and use of taxpayer funds squarely fall within the purview of the statute.

## C. Dismissal of the Case is Mandated by the Anti-SLAPP Statute.

Once a defendant establishes that the Anti-SLAPP statue applies to the plaintiffs' complaint, the burden shifts to plaintiffs. Dismissal is required unless the plaintiffs can meet their very heavy burden of establishing a prima facie case for each essential element of their claims under the heightened standard of clear and specific evidence.[18] This means the Plaintiffs must provide actual proof and not just allegations that would be sufficient to preclude the granting of summary judgment. *In re Does*, 242 S.W.3d 805 (Tex. App. – Texarkana 2007, no pet).

---

[16] *See* Executed Return of Service attached to Plaintiffs' Original Petition, attached hereto as Exhibit F.
[17] Tex. Civ. Prac. & Rem. Code §27.001(2).
[18] Tex. Civ. Prac. & Rem. Code §27.005(c).

7

The court adopted this standard in the *In re Does* case and required the defamation plaintiff to establish a prima facie case for each essential element of his claim before he could obtain the identity of an anonymous defendant. The court found it necessary for the plaintiff first to support his defamation claim with facts sufficient to defeat a motion for summary judgment before the identity of the potential defendant would be ordered disclosed, otherwise disclosure would not be warranted. *Id.* at 821; *see also, Doe v. Cahill*, 884 A.2d 451, 460 (Del. 2005). In *Doe*, the plaintiff could not meet this burden, and neither can the Plaintiffs herein.

**D.    Dismissal of a Similar Case was Recently Granted Pursuant to the Anti-SLAPP Statute.**

Despite its relative newness[19], Motions to Dismiss pursuant to the Anti-SLAPP statute have already been granted in at least two Texas cases. *See,* Exhibits R and S. In *Viera v. Jordan,* a case similar to the one at issue, also involving an investigative report, a Harris County court granted the media defendants' motion to dismiss where Defendants identified plaintiffs as suspects in a criminal investigation although it was later determined that the plaintiffs were not involved in the crimes. *See* Exhibit S. In that case, the local Crime Stoppers and law enforcement identified seven individuals who were being sought in connection with a crime at an area HEB store. After Crime Stoppers (and HEB) released the videotape of the crime scene and information about the suspected perpetrators, the defendants broadcast such information — information on a matter of public concern. It was later discovered that two of the seven photographed (the plaintiffs) were not involved in the crime. The media defendants moved for dismissal under the Anti-SLAPP statute arguing that the plaintiffs could not meet their burden of establishing clear and specific evidence of each essential element of their claim because the

---

[19] Although the statute is new to Texas, it is not new in First Amendment jurisprudence. Twenty-seven other states and the District of Columbia have Anti-SLAPP laws, and courts in those jurisdictions regularly dismiss cases, like this one, aimed at encroaching upon one's free speech rights.

8

statements were privileged as an accurate summary of records released by law enforcement. Defendants also argued that plaintiffs could not establish material falsity because the report was about a criminal investigation, and the existence of that investigation was true even though the individuals had incorrectly been identified as having been involved in the crime. As in the instant case, the gist of the underlying story was true. In *Viera,* a government agency was seeking to apprehend the perpetrators of a crime. In our case, a government agency was seeking to account for mismanaged taxpayer money. Either way, the media defendants accurately reported on an ongoing investigation, and, as a result, the plaintiffs cannot establish clear and specific evidence of each essential element of their claim. The court granted the Motion to Dismiss in *Viera* and should do the same in this case.

## IV.
## THE COMPLAINED OF STATEMENTS

Based on Plaintiff's Original Petition[20], it appears that Plaintiffs take issue with the following statements made by Defendants and claim they are defamatory (hereinafter referred to as the "Complained of Statements"):

1) "According to the State, millions in taxpayer dollars cannot be accounted for" and "The state closure is based on a lack of sufficient financial records, meaning the state doesn't know where the over three million dollars of taxpayer money given last year has been spent." (4:30 p.m., September 15, 2010 broadcast)

2) "For the state, the issue is simple – where is the money? They say millions of taxpayer dollars are unaccounted for .... The state closure is based on a lack of sufficient financial records, meaning the state doesn't know where the more than $3 million of taxpayer money given last year has been spent..." (September 15, 2010, story published on Defendant's website)

3) "Where is taxpayer money going and how is taxpayer-owned building being used? ... The Texas Education Agency says it doesn't know how Benji's spent $3 million of taxpayer money, and a lease agreement obtained by Eyewitness

---

[20] Defendant has also filed Special Exceptions because of the vagueness of Plaintiffs' assertions; however, the Court can and should rule on Defendants' Anti-SLAPP motion without delay since there is no doubt Plaintiffs' case was brought against KTRK for its exercise of its free speech rights.

News raises new questions." (September 25, 2010 story published on Defendant's website)

4) "The Texas Education Agency doesn't know how the academy spent $3 million of state money." (September 27, 2010 article published on Defendant's website)

5) "The state says it had no choice, alleging Benji's did not provide proper financial records to account for over $3 million in state funding for the past year." (September 30, 2010 article published on Defendant's website)

6) "On September 14, the TEA ordered Benji's Academy to close, citing millions of dollars in state funding that was not accounted for." (October 11, 2010 article published on Benji's website)

Thus, the gist of the allegedly defamatory statements in the above broadcasts is that millions in taxpayer dollars and/or state funds have not been properly accounted for by Benji's. This is indisputably true.[21] It could be that Plaintiffs' complaint is simply about the amount that was reported as mismanaged and/or unaccounted for, and not the fact that a significant amount of funds were mismanaged and unaccounted for by Plaintiffs. The gist is the same regardless.[22]

## V.
## UNDISPUTED FACTS

Although Defendant has met its burden of establishing this lawsuit was brought by Plaintiffs for Defendant's exercising its First Amendment rights, out of an abundance of caution, Defendant demonstrates herein and through these undisputed facts why Plaintiffs cannot meet their burden of establishing clear and specific evidence of a *prima facie* case for each essential element of their claim as required by the Texas Citizens Participation Act.

1. Plaintiff Benji's Special Education Academy, Inc. (the "Charter Holder") was granted an open-enrollment charter to operate Benji's Special Education Academy ("Benji's") by the Texas State Board of Education ("SBOE") on or around November 2, 1998 (*see* Contract

---

[21] *See* Section V, below.

[22] *See, e.g., Rogers v. Dallas Morning News, Inc.*, 889 S.W.2d 467 (Tex. App. – Dallas 1994, writ denied)(finding newspaper's inaccurate statement that a charity only spent 10% of its donations on actual services, when, in fact, the charity spent 43% of its donations on services, was a minor error and did not affect the "gist" of the story, which was accurate); *Downer v. Amalgamated Meatcutters and Butcher Workmen of N. Am.*, 550 S.W.2d 744, 747 (Tex. Civ. App. – Dallas 1977, writ ref'd n.r.e.) (Affirming summary judgment where defendant published statement that plaintiff embezzled $2,187.77 instead of $840.73).

DL/2781540v4

for Charter for Benji's Special Education Academy, attached hereto as Exhibit T). In 2003, the Charter Holder applied for a renewal of the charter, which was pending until around the time of the controversy that is the subject of this lawsuit. *See* Exhibit D, pp. 4-5.

2. Over the years, TEA's concerns with the school/Charter Holder grew, including concerns about: the school's academically unacceptable state accountability rating for the years 2005, 2007, 2009, and 2010 and federal academic accountability rating as failing to meet Adequate Yearly Progress Standards in 2005, 2006, 2007, and 2009; concerns about the accuracy in reporting student attendance data for the purpose of receiving Foundation School Program funds for four years; Department of Agriculture's termination of the school's agreement to participate in school breakfast and lunch programs; and noncompliance with IDEA and No Child Left Behind laws and guidelines. *See* Exhibit D, pp. 5-6, 44.

3. On July 8, 2010, Plaintiff Theaola Robinson ("Robinson"), then-executive director of Benji's, was notified by the Commissioner of the Texas Education Agency ("TEA") that it intended to appoint a Board of Managers and a new Superintendent for the school in light of ongoing financial, academic, and governance issues with Benji's/Charter Holder. *See* July 8, 2010 Letter from the TEA, attached hereto as Exhibit U.

4. On August 19, 2010, a hearing was held to allow Plaintiffs an opportunity to respond to the Commissioner's plan to appoint a Board and Superintendent. *See* September 3, 2010, letter from Commissioner of Education, Robert Scott, to Members of the Charter Holders (Benji's) Board and Ms. Robinson, attached hereto as Exhibit B. Then, on September 3, 2010, the Commissioner sent a letter to Robinson and Benji's board of directors notifying them that he had decided to appoint a Board of Managers and a new Superintendent. *See* Exhibit B. This appointment of a Board of Managers and Superintendent suspended the powers of Benji's previous board of directors and Robinson. *Id.*

5. The new Board and Superintendent met immediately after being appointed and began investigating the situation at Benji's, including the finances of the school. *See* Exhibit X.

6. In fact, although the TEA did not fully understand the extent of the financial problems until they got access to the school's financial records, the TEA had been concerned about the financial situation for years. *See. e.g.,* Exhibit D, p. 6 (discussing TEA Auditor's concerns with the school as far back as 2004).

7. On or around September 14, 2010, the TEA issued a statement that Benji's was being closed down as of the end of the day because it was no longer financially viable. *See* TEA Statement, attached hereto as Exhibit V.

8. On that same date, the recently appointed Superintendent sent a letter to parents advising that the school was being closed at the close of business that day. *See* September 14, 2010, letter to parents of Benji's students from Superintendent Rick Schneider, attached hereto as Exhibit W. The letter further advised that recently available information

11

indicated that the "school ha[d] virtually no money in the bank and owe[d] numerous creditors, including the Internal Revenue Service." *See* Exhibit W.

9. Despite being officially closed the previous day, on September 15, 2010, through the efforts of Plaintiff Robinson and others and in defiance of the TEA and the new Benji's Board and Superintendent, the school reopened as an unaccredited private school using the same facilities and school buses (which were all paid for by the State). *See* September 16, 2010 letter from Commissioner Scott to Benji's Board of Managers and Superintendent, attached hereto as Exhibit X. Representatives of TEA were refused entrance to the school or access to school and student records. *Id.*

10. On September 16, 2010, the Commissioner issued an order effective immediately suspending all funding of Benji's and suspending Benji's open-enrollment charter. *See* Exhibit X. TEA issued another notice to Plaintiff Robinson and others regarding the school and the open-enrollment charter and a hearing was held on September 21, 2010. *See* September 22, 2010, Recommendation from Commissioner Scott to designee Emi Johnson discussing the meeting, attached hereto as Exhibit Y.

11. On September 24, 2010, the Commissioner sent a letter to Plaintiff Robinson and Members of the Charter Holder Board outlining the various grounds for revoking the charter of Benji's, including:

- failure to protect the health, safety, or welfare of students; material violations of the open-enrolment charter; two consecutive years of unsatisfactory ratings;

- serious unsatisfactory fiscal performance; unsatisfactory compliance performance for three consecutive years, and

- failure to renew a lease for the school facility.

*See* September 24, 2010, Notice of Intent to Revoke Open-Enrollment Charter from Commissioner Scott to Members of the Charter Holder Board, attached hereto as Exhibit Z. The letter also discussed the fact that "[s]pecial program concerns, academic concerns, governance issues, financial management issues," and failures to comply with TEA requirements and directives had plagued the school for many years. *Id.*

12. The September 24th letter went on to discuss in detail the fiscal mismanagement of the school. *See* Exhibit Z. In particular, it noted that the mismanagement had resulted in significant wasting of financial resources and financial insolvency. *Id.* Additionally, the September 24th letter noted that, comparing the lease for the school location between the Charter Holder and the City of Houston and the lease between the Charter Holder and the school itself, the rental payments paid by the charter school (Benji's) to the Charter Holder for the use of the property appeared to be excessive. *Id.*

13. In fact, it was discovered that the Charter Holder — who was leasing the property from the City of Houston for $1 a year — was leasing the property (which it did not own, but

12

merely leased from the City) to Benji's for $9,000.00 a month.[23] *See* Exhibit Z; *see also,* Lease Agreement between the City of Houston and Benji's Special Education Academy, Inc. (Charter Holder) dated August 30, 1996, attached hereto as Exhibit AA; July 23, 1998 Open Enrollment Charter School Facilities Letter of Intent, attached hereto as Exhibit BB, July 8, 2010 Letter from City of Houston to Theaola Robinson, attached hereto as Exhibit CC, Tenancy Agreement between Benji's Special Education Academy, Inc. (Charter Holder) and Benji's Special Education Academy Charter School dated December 18, 2008, attached hereto as Exhibit A-3; Tenancy Agreement between Benji's Special Education Academy, Inc. (Charter Holder) and Benji's Special Education Academy Charter School dated July 1, 2010, attached hereto as Exhibit A-4. Additionally, the July 1, 2010, Tenancy Agreement, which still called for Benji's to pay the Charter Holder $9,000.00 a month, had a term of 10 years, despite the fact that the City did not know that the Charter Holder had entered into such a sub-lease agreement and had not approved such an agreement. *See* Exhibit A-4.

14. The Charter Holder had been in poor financial condition for years and had poor financial records. *See* Exhibit D, p. 55, Finding Nos. 65 and 68. Plaintiff's financial woes included the following:

- the Charter Holder was the subject of a warrant hold for nonpayment to the Teachers Retirement System in the amount of $43,000.00 for retirement contributions and $13,000.00 in health coverage;

- the Department of Agriculture cancelled the Charter Holder's participation in child nutrition programs because of the Charter Holder's failure to demonstrate fiscal responsibility;

- the Charter Holder owed the IRS a debt of $87,000.00 for unpaid taxes;

- the Charter Holder's board of directors failed to oversee or adequately supervise its financial resources, and

- the Charter Holder failed to properly account for accrued unreimbursed leave as a liability.

*See* Exhibit D, pp. 54-55, Findings 58-68.

15. Because of the public controversy and concern over, among other issues, the initial takeover, revocations of charter, and attempted closing of the school by the TEA, the allegations of financial mismanagement of State funds and indebtedness of the school, and the efforts to keep the school open in defiance of the State's orders, starting on around September 14, 2010, Defendant broadcast and posted numerous stories about Plaintiffs. *See* Affidavit of Cynthia Cisneros, attached hereto as Exhibit E; Affidavit of

---

[23] As evidenced by the fact the that the City did not even know of this arrangement between the Charter Holder and Benji's, the Charter Holder did not get permission from the City to enter into a sublease for the property/facilities, which it was required to do if it wanted to lease the City's property.

DL/2781540v4

Jessica Wiley, attached hereto as Exhibit A, and Affidavit of Katie McCall, attached hereto as Exhibit O.

16.     At or around that same time, numerous other media organizations broadcast and/or published stories about Plaintiffs that discussed the money problems the school was facing, the closure by the TEA, and the actions of Plaintiffs. *See, e.g.,* Exhibits 5, 6, and 12 to Plaintiffs' Original Petition, attached as Exhibit F; *see also,* September 14, 2010 article "School Closing Due to Lack of Funds" on Click2Houston.com, attached hereto as Exhibit G; September 14, 2010 article "State Orders 30-Year Old School Closed" on myfoxhouston.com, attached hereto as Exhibit H; September 15, 2010, story "Fifth Ward charter school defies state order to close" on praisehouston.com, attached hereto as Exhibit I; September 15, 2010 article "School Ordered to Shut Down Opens Anyway" on click2houston.com, attached hereto as Exhibit J; September 15, 2010, article "Charter school stays open in defiance of state order to close, accuses TEA of racism" on khou.com, attached hereto as Exhibit K; September 15, 2010 article "Defiant Fifth Ward charter school vows to stay open" on chron.com, attached hereto as Exhibit L; September 16, 2010, Staff Editorial in The Daily Cougar "Charter school should adhere to TEA ruling" on the dailycougar.com, attached hereto as Exhibit M; September 30, 2010 article "Judge considers stopping closure of Benji's charter school" on chron.com, attached hereto as Exhibit CC; October 12, 2010 article "Northeast Houston: Classes resume at Benji's Academy" on khou.com, attached hereto as Exhibit EE; and, October 15, 2010, article "Carol Mims Galloway Says Sending Benji's Academy Students to Another Charter is Just Dumping on Her District" on blogs.houstonpress.com, attached hereto as Exhibit FF. Additionally, the public interest in this topic can be seen not only by the many articles and broadcasts, but by the numerous comments that the stories elicited. *See, e.g.,* Exhibit 6 to Plaintiff's Original Petition — the 168 comments concerning the September 15, 2010 *Houston Chronicle* story.

In an act of apparent retaliation for the prior broadcasts and, in an effort to prevent or discourage Defendant from reporting on such matters, Plaintiffs filed this lawsuit in direct contravention of the Texas Citizens Participation Act, Tex. Civ. Prac. & Rem. Code Ch. 27. Given the foregoing undisputed facts, Plaintiffs cannot provide clear and specific evidence of a *prima facie* case for each element of their defamation claim including that the Complained of Statements were non-privileged or that they were materially false. Thus, Defendant's Motion to Dismiss should be granted.

14

DL/2781540v4

# VI.
## PLAINTIFFS CANNOT MEET THEIR BURDEN TO AVOID DISMISSAL

Because Defendant has established that the lawsuit arises out of KTRK's exercise of its free speech rights about a matter of public concern, the burden has now shifted to the Plaintiffs to provide evidence that they can prevail on their claims. Plaintiffs cannot meet their burden. In short, Plaintiffs cannot demonstrate that they can succeed on the merits of their defamation claim, much less show clear and specific evidence to support each element of their claim, as required by the Anti-SLAPP statute. Plaintiffs cannot prevail on their defamation claim because they cannot establish material falsity of the Complained of Statements, cannot establish that Defendant's statements are not privileged, and cannot overcome the privilege(s) by showing that Defendant acted with actual malice.

In order to prevail on a libel claim against a media defendant in Texas, Plaintiffs have the burden of establishing that defendant (1) published a non-privileged statement, (2) that was defamatory as to the plaintiffs, (3) while acting with actual malice regarding the truth of the statement. *See WFFA TV Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998). Further, in suits against media defendants, it is the plaintiff's burden to prove material falsity. *McIlvain v. Jacobs*, 794 S.W.2d 14 (Tex. 1990). In addition, the First Amendment to the United States Constitution and Article I, Section 8 of the Texas Constitution protect expressions of opinion. *Columbia Valley Regional Medical Center v. Bannert*, 112 S.W.3d 193, 198 (Tex. App. -- Corpus Christi 2003, no pet.). Therefore, a plaintiff must prove that the complained of statements contained false, defamatory facts rather than opinions or characterizations. *Id.* (citing *A.H. Belo Corp. v. Rayzor*, 644 S.W.2d 71, 79 (Tex. App. -- Ft. Worth 1982, writ ref'd n.r.e.)). Finally, the Court must construe the statements at issue as a whole, in light of surrounding circumstances based upon how a person of ordinary intelligence would perceive the entire

15

statement. *Robertson v. Southwestern Bell Yellow Pages*, 190 S.W.2d 899, 902 (Tex. App. -- Dallas 2006, no pet.); *Bannert*, 112 S.W.3d at 198 (citing *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 114 (Tex. 2000)); *see Musser v. Smith Protective Services*, 723 S.W.2d 653, 655 (Tex. App. -- Corpus Christi 2003, no pet.). A statement that may be false, abusive, unpleasant, or objectionable to the plaintiff may still not be defamatory in light of the surrounding circumstances. *See Bannert*, 112 S.W.3d at 198; *Musser*, 723 S.W.2d at 655 (Tex. 1987). This means that the entire broadcast series (not just one, or a few, lines viewed out of context) and surrounding complaints and controversy must be considered by the Court as a whole. Given the fact that Plaintiffs were at the center of an ongoing controversy which arose out of their financial mismanagement and lack of accountability of State funds and which culminated in their charter being revoked, it would be impossible for Plaintiffs to establish material falsity of the Complained of Statements. Furthermore, to overcome the constitutional, statutory and common law privileges, Plaintiffs have the burden of establishing Defendant acted with actual malice[24] — which they cannot.[25]

A.   **Plaintiffs Have the Burden of Showing Material Falsity and Cannot Sustain that Burden Because Defendant's Broadcasts Are Substantially True.**

Plaintiffs cannot meet their burden of establishing clear and specific evidence of material falsity. Plaintiffs do not deny that they were in debt at the time of these broadcasts, that the TEA had been investigating Benji's/the Charter Holder finances and had found State money unaccounted for, or that the school was closed down by the TEA. Similarly, Plaintiffs do not deny that the Charter Holder was leasing the school property from the City of Houston and then leasing the same to the charter school for an excessive amount. It is clear that the statement that

---

[24] *Austin v. INET Technologies, Inc.*, 118 S.W.3d 491, 496-98 (Tex. App. – Dallas 2003, no pet.).

[25] *See, e.g.,* Affidavit of Cynthia Cisneros, attached hereto as Exhibit E; Affidavit of Jessica Wiley, attached hereto as Exhibit A; and, Affidavit of Katie McCall, attached hereto as Exhibit O, all of which demonstrate the absence of actual malice.

16

millions of dollars of taxpayer money was unaccounted for is substantially true. Plaintiffs do not contest that the TEA provided them with over $3 million in taxpayer funds the previous year, nor do they contest that substantial taxpayer funds provided to them were unaccounted for by them. In fact, it appears Plaintiffs complaint is over the exact amount of public funds that was not accounted for, but not over the fact that significant public funds were unaccounted for by Plaintiffs. As demonstrated herein, Plaintiffs cannot demonstrate material falsity and the substantial truth test has been met.

Truth is an absolute defense in libel cases in Texas. *See* Tex. Civ. Prac. & Rem. Code §73.005; *Randall's Food Market, Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex. 1995). The question of whether a statement is substantially true is a question of law for the court to decide,[26] and Texas courts apply the "substantial truth" test. In Texas, it is not enough to prove that a stated fact was literally false. Instead, the plaintiff must show that the statements were materially false — meaning the alleged defamatory statement had to have been more damaging to the plaintiff's reputation, in the mind of the average listener, than a truthful statement would have been. *McIlvain v. Jacobs*, 794 S.W.2d 14, 16 (Tex. 1990); *KTRK Television v. Felder*, 950 S.W.2d 100, 105-106 (Tex. App. – Hou. [14th Dist.] 1997, no writ). If the underlying gist of the complained of statements are true and undisputed, "any variance with respect to items of secondary importance" can be disregarded. *Id.*; *Provencio v. Paradigm Media, et al.*, 44 S.W.3d 677 (Tex. App. – El Paso 2001, no pet.) (misleading return address on postcard from news organization to sex offender did not defeat truth defense).

---

[26] *Herald-Post Publishing Co. v. Hill*, 891 S.W.2d 638 (Tex. 1994) (It is not uncommon for a court to find substantial truth as a matter of law) (Newspaper reported that witness at trial accused an attorney and his investigator of threatening her when in fact only the investigator made the threat. Court dismissed, as a matter of law, on substantial truth grounds); *McIlvain v. Jacobs*, 794 S.W.2d 14, 16 (Tex. 1990) (Despite the presence of several minor mischaracterizations, the court held as a matter of law the report was substantially true and affirmed summary judgment).

DL/2781540v4

Plaintiffs do not dispute that they received more than $3 million from the State of Texas in 2009-2010 nor do they dispute that the State expressed concerns about Benji's financial mismanagement, or that the State closed Benji's down and took away its charter[27]. Plaintiffs simply mischaracterize KTRK's statements by complaining that the Broadcasts and stories allege that the "entire" $3 million in state funds is unaccounted for — rather than just part of it. Even if the broadcasts and stories erroneously reported that the entire $3 million was unaccounted for, it does not render the broadcast "materially false." In fact, there are a litany of cases in which the precise amount of funds being discussed in an investigative report may not have been accurate, but the courts found the publications to be substantially true. *See, e.g., Rogers v. Dallas Morning News, Inc.*, 889 S.W.2d 467 (Tex. App. – Dallas 1994, writ denied) (error in reporting amount of funds did not affect the "gist" of the story); *Downer v. Amalgamated Meatcutters and Butcher Workmen of N. Am.*, 550 S.W.2d 744, 747 (Tex. Civ. App. – Dallas 1977, writ ref'd n.r.e.) (affirming summary judgment incorrect report of amount embezzled); *Fort Worth Press Co. v. Davis*, 96 S.W.2d 416, 419 (Tex. Civ. App. – Fort Worth 1936, writ denied) (reversing trial court judgment and finding for media defendant where defendant incorrectly stated plaintiff wasted $80,000 in taxpayer funds rather than $17,575.00). The "gist" of the KTRK broadcasts is true: Plaintiffs failed to account for significant State funds advanced by the TEA, suffered from severe financial mismanagement and lacked accountability in their record keeping with the State. These continual problems ultimately caused the closure of the school and the revocation of Benji's charter by the State. For that reason alone it is abundantly clear Plaintiffs cannot meet their burden of establishing clear and specific evidence of the required element of material falsity.

---

[27] In fact, the Revocation of Benji's charter was recently upheld by the State Office of Administrative Hearings. *See* State Office of Administrative Hearings Proposal for Decision in Docket No. 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; Texas Education Agency v. Benji's Special Educational Academy, Inc., attached hereto as Exhibit D.

DL/2781540v4

Furthermore, it is clear that what was reported is no more damaging than other truthful information Defendant could have published about Plaintiffs. *See McIlvan v. Jacobs*, 794 S.W.2d at 15-16 (no defamation if allegedly defamatory statement is no more harmful to reputation than a truthful statement would have been). For instance, Defendants could have published that Benji's, under Plaintiffs' leadership, had an academically unacceptable state accountability rating for the years 2005, 2007, 2009, and 2010, and federal academic accountability rating as failing to meet Adequate Yearly Progress standards in 2005, 2006, 2007, and 2009, that there were concerns about the accuracy in reporting student attendance data for the purpose of receiving Foundation School Program funds for four years, that the Department of Agriculture terminated the school's agreement to participate in school breakfast and lunch programs, or that the Charter Holder's application for renewal of its charter had been in limbo for 7 years because of its numerous and continuing difficulties. These statements all would have been true and also would have been far more damaging to Plaintiffs' reputation than the broadcasts at issue.

B.  **Accurate Reporting on Allegations Under Investigation Constitute Substantial Truth.**

It is also the law in Texas that "a media defendant's reporting of third-party allegations and any investigation thereof is substantially true if it accurately depicts the allegations being made and the existence of any investigation, regardless of whether the underlying allegations are themselves substantially true." *Neely v. Wilson*, 331 S.W.3d 900, 919 (Tex. App.—Austin 2011, pet. filed); *UTV of San Antonio, Inc. v. Ardmore, Inc.*, 82 S.W.3d 609, 611 (Tex. App.—San Antonio 2002, no pet.); *ABC Inc. v. Gill*, 6 S.W.3d 19, 33 (Tex. App. —San Antonio 1999, pet. denied). When a case involves a media defendant, courts have held the defendant need only prove that third party allegations reported in a broadcast were, in fact, made and under

19

investigation, and, the defendant does not need to demonstrate the allegations themselves are substantially true. *Ardmore, Inc.*, 82 S.W.3d at 612. This extends to investigations or charges made even by non-governmental organizations or individuals. *See KTRK Television v. Felder*, 950 S.W.2d 100 (Tex. App. – Hou. [14th Dist.] 1997, no writ); *see also, ABC Inc. v. Gill*, 6 S.W.3d 19. In the *Felder* case, a report that a school with a history of discipline and personnel problems was embroiled in another controversy in which there were allegations of physical threats and verbal abuse was substantially true, whether or not the details were literally true. The court explained the rationale behind this doctrine:

> [The plaintiff] argues that *McIlvain* requires not only the fact of an investigation to be true, but also that the allegations under investigation be proven true. We disagree. Based on our reading of both the Supreme Court and appellate court opinions, we are convinced that when, as in this case, the report is merely that allegations were made and they were under investigation, *McIlvain* only requires proof that allegations were in fact made and under investigation in order to prove substantial truth. Otherwise, the media would be subject to potential liability every time it reported an investigation of alleged misconduct or wrongdoing by a private person, public official, or public figure. Such allegations would never be reported by the media for fear an investigation or other proceeding might later prove the allegations untrue, thereby subjecting the media to suit for defamation. Furthermore, when would an allegations be proven true or untrue for purposes of defamation? After an investigation? After a court trial? After an appeal? Undoubtedly, the volume of litigation and concomitant chilling effect on the media under such circumstances would be incalculable.

*Felder*, 950 S.W.2d at 106. *See also, Associated Press v. Boyd*, 05-04-01172-CV, 2005 WL 1140369 (Tex. App.—Dallas 2005, no pet.) (not designated for publication) (the 'sting' of the articles was the accurate reporting of SEC allegations of securities fraud, which was substantially true). Similarly, in the *Ardmore* case, the court found the television station's report on a daycare center experiencing problems that subjected them to inspections by a state agency was substantially true. *Ardmore, Inc.*, 82 S.W.3d at 612; *see also, Grotti v. Belo Corp.*, 188 S.W.3d

768, 777 (Tex. App.—Fort Worth 2006, pet. denied) ("[B]ecause the broadcast accurately reported on third-party allegations and an investigation [the gist of the] broadcast was substantially truthful."); *Hearst Newspaper P'ship, L.P. v. Macias*, 283 S.W.3d 8, 14 (Tex. App.—San Antonio 2009, no pet.) (gist was that housing authority official resigned amidst audits and an investigation). The gist of the stories was that the TEA was investigating the Charter Holder for financial mismanagement and failure to properly account for substantial funds. The specific amount of funds at issue is immaterial. It is undisputed that a significant amount of public money was not properly accounted for by Plaintiffs; Plaintiffs were fraught with severe financial mismanagement, and Plaintiffs owed numerous creditors whom they could not pay. Although it is not Defendants' burden to show that the underlying statements of the third-party allegations are substantially true, the evidence attached illustrates that the "gist" of the broadcasts are substantially true.

## C.    The Broadcasts at Issue in this Lawsuit Are Privileged as a Matter of Law.

Plaintiffs are unable to meet their burden of establishing clear and specific evidence of the elements of their defamation claim because the statements at issue are protected by constitutional, statutory and common law privileges, including the fair report and fair comment privileges. The fair report privilege includes reporting the contents of pleadings filed with the courts, investigations by governmental bodies, and substantially true accounts of official or judicial proceedings. The use of the phrase "fair, true and impartial" in the privilege has been construed to mean "substantially true." *Herald-Post Publishing Co., Inc. v. Hill*, 891 S.W.2d 638 (Tex. 1994); *Langston v. Eagle Publishing Co.*, 719 S.W.2d 612 (Tex. App. -- Waco 1986, writ ref'd n.r.e.). The privilege also extends to reporting based on erroneous government information. *See Freedom Communications, Inc. v. Sotelo*, 2006 WL 1644602, 34 Media L. Rep. 2207 (Tex. App. -- Eastland 2006, no pet.). So, to the extent Plaintiffs complain that the

DL/2781540v4

information provided by TEA to KTRK was incorrect, this does not overcome the privilege protecting KTRK's broadcasts. Furthermore, the "fair, true and impartial privilege" has been construed to provide "great latitude" to reports of official proceedings. *Texas Monthly, Inc. v. Transamerican Natural Gas Corp.*, 7 S.W.3d 801 (Tex. App. -- Hou. [1st Dist.] 1999, no pet.). *See* Tex. Civ. Prac. & Rem. Code § 73.002 (a) and (b). Plaintiffs themselves admit that the TEA advised Defendant that $3 million in State funds were unaccounted for by Plaintiffs. *See* Plaintiffs' Original Petition (Exhibit B), para. 37. Thus, Defendant's reporting on the TEA's investigation of Plaintiffs' financial mismanagement of, and inability to account for, State funds was substantially true and privileged.

In addition, the broadcasts and articles at issue are privileged as a reasonable and fair comment on a matter of public concern published for general information pursuant to the common law and the Texas and the United States Constitutions. *Humane Society of Dallas v. Dallas Morning News, L.P.*, 180 S.W.3d 921, 923 (Tex. App. – Dallas 2005, no pet.). Because the broadcasts focused on highly relevant political issues and government investigations, such as whether over $3 million in state funds was properly accounted for, and the revocation of a charter for (and closing of) a charter school that affected area school children, Defendant is protected by the fair comment privilege. *See* Tex. Civ. Prac. & Rem. Code § 73.002(b)(2). The fair comment privilege extends to reports on what state agencies and officials are doing. *See,* Exhibit BB; *Brewer v. Capital Cities/ABC, Inc.*, 986 S.W.2d 636, 644-45 (Tex. App. – Ft. Worth 1998, no pet.) (fair comment privilege applied to primarily factual account of state agency inspections); *Swate v. Schiffers*, 975 S.W.2d 70, 77 (Tex. App. -- San Antonio 1998, pet. denied) (Broadcasts concerning complaints made to the medical board constituted privileged reports of an official proceeding about medical care, which constitutes a matter of public concern). Thus,

22

Defendant's reporting on allegations of improper and/or undocumented or unaccounted for use of government funds certainly falls within the purview of the privilege, and Plaintiffs cannot meet their burden of establishing the Complained of Statements were nonprivileged.

## D. Plaintiffs Cannot Establish the Essential Element of Actual Malice.

Because the broadcasts are protected by numerous qualified privileges, Plaintiffs cannot defeat these privileges unless they can prove actual malice by the heightened standard of clear and convincing evidence. *Randall's Food Market, Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex. 1995) (Actual malice is required to defeat the application of a qualified privilege); *see also, Hagler v. Proctor & Gamble Mfg. Co.*, 884 S.W.2d 771 (Tex. 1994). "Actual malice" means not ill will, but rather publication of a false statement knowing the statement was false, or with reckless disregard as to the truth of the statement. *Gertz v. Welch*, 418 U.S. 323, 349, 94 S. Ct. 2997, 3013 (1974); *Casso v. Brand*, 776 S.W.2d 551, 554 (Tex. 1989). "Reckless disregard" does not mean sloppiness, but rather that the publisher in fact entertained *serious doubts* about the truth of the statement. *Id.* at 558 (quoting *St. Armant v. Thompson*, 390 U.S. 727, 731, 88 S. Ct. 1323, 1325 (1968).) The affidavits of Defendant's employees — specifically, the Affidavits of Cynthia Cisneros, Jessica Wiley, and Katie McCall — establish their belief in the truth of the broadcasts published by KTRK. *See* Exhibits E, A, and O. *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 688, 109 S. Ct. 2678, 105 L.Ed.2d 562 (1989).

As the Texas Supreme Court found in *Casso v. Brand*, the relevant inquiry as to actual malice focuses on the minds of the speakers and asks whether they subjectively believed that what was published was true at the time of publication. *Casso v. Brand*, 776 S.W.2d at 558-59. Texas law permits summary dispositions to rest solely upon the affidavit of an interested party if it is "clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted." *Id.* at 558-59; *Ross v. Labatt*, 894

23

S.W.2d 393, 396 (Tex. App. – San Antonio 1994, writ dism'd w.o.j.); *see also, San Antonio Express News v. Dracos,* 922 S.W.2d 242 (Tex. App. – San Antonio 1996, no writ) (to negate summary judgment plaintiff had to offer specific affirmative proof to show that the Defendant either knew the publication was false or entertained serious doubts as to its truth). Moreover, the Texas Supreme Court, in *WFAA-TV, Inc. v. McLemore,* confirmed its position that a libel defendant can negate actual malice by presenting evidence that shows that he or she did not publish the alleged defamatory statement with actual knowledge of any falsity or with reckless disregard of the truth. 978 S.W.2d 568, 574 (Tex. 1998); *see also, Brady v. Cox Enterprises, Inc.,* 782 S.W.2d 272 (Tex. App. — Austin 1990, writ denied) (affidavit negating actual malice sufficient for summary judgment); *Carr v. Brasher,* 776 S.W.2d 567 (Tex. 1989) (summary judgment granted based on a defendant's affidavit of absence of actual malice). Cisneros', Willey's, and McCall's affidavits clearly establish their belief in the truth of the statements they published, and their lack of actual malice. *See* Exhibits E, A, and O. Thus, because of the lack of actual malice, Plaintiffs cannot meet their onerous burden of establishing clear and specific evidence to overcome the statutory, constitutional, and common law privileges that protect Defendant's broadcasts, and Defendant's Motion to Dismiss should be granted.

## VII.
## EVIDENCE

The following pleadings and affidavits are provided as evidence in support of Defendant's Anti-SLAPP motion, pursuant to Tex. Civ. Prac. & Rem. Code § 27.006, each of which is attached hereto and incorporated herein for all purposes:

Exhibit A:     Affidavit of Jessica Willey

A-1:   Documents obtained from the Texas Secretary of State's website showing corporate management for Benji's Special Education Academy Independent School District

24

A-2: Documents obtained from the Texas Secretary of State's website showing corporate management for Benji's Special Education Academy (Charter Holder)

A-3: Tenancy Agreement between Benji's Special Education Academy, Inc. (Charter Holder) and Benji's Special Education Academy Charter School dated December 18, 2008

A-4: Tenancy Agreement between Benji's Special Education Academy, Inc. (Charter Holder) and Benji's Special Education Academy Charter School dated July 1, 2010

Exhibit B:     September 3, 2010 letter from Commissioner of Education, Robert Scott, to Members of the Charter Holders (Benji's) Board and Ms. Robinson

Exhibit C:     May 14, 2009 Letter from Commissioner of Education, Robert Scott, to Members of the Charter Holders (Benji's) Board and Ms. Robinson

Exhibit D:     State Office of Administrative Hearings Proposal for Decision in Docket No. 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; *Texas Education Agency v. Benji's Special Educational Academy, Inc.*, December 7, 2011

Exhibit E:     Affidavit of Cynthia Cisneros

Exhibit F:     Plaintiffs' Original Petition

Exhibit G:     September 14, 2010 article "School Closing Due to Lack of Funds" on Click2Houston.com

Exhibit H:     September 14, 2010 article "State Orders 30-Year Old School Closed" on myfoxhouston.com

Exhibit I:     September 15, 2010, story "Fifth Ward charter school defies state order to close" on praisehouston.com

Exhibit J:     September 15, 2010 article "School Ordered to Shut Down Opens Anyway" on click2houston.com

Exhibit K:     September 15, 2010, article "Charter school stays open in defiance of state order to close, accuses TEA of racism" on khou.com

Exhibit L:     September 15, 2010 article "Defiant Fifth Ward charter school vows to stay open" on chron.com

Exhibit M:     September 16, 2010, Staff Editorial in The Daily Cougar "Charter school should adhere to TEA ruling" on the dailycougar.com

25

DL/2781540v4

Exhibit N:     House Bill 2973 (The Texas Citizens Participation Act also known as the "Anti-SLAPP" statute)

Exhibit O:     Affidavit of Katie McCall

Exhibit P:     The audio CD of the March 28, 2011 Committee of Judiciary and Civil Jurisprudence Hearing regarding the passage of HB 2973

Exhibit Q:     The list of witnesses from the March 28, 2011 Committee of Judiciary and Civil Jurisprudence Hearing regarding the passage of HB 2973

Exhibit R:     Order Granting Motion to Dismiss (and attached Motion to Dismiss) in *Wholesale TV and Radio Advertising, LLC v. Better Business Bureau of Metropolitan Dallas, Inc.,* Cause No. CC-11-08382-A, in the 14th Judicial District, Dallas County, Texas

Exhibit S:     Order Granting Motion to Dismiss (and attached Motion to Dismiss) in *Dwayne Veira and Kerwin Jordan v. Hearst Newspapers, LLC d/b/a The Houston Chronicle, KHOU-TV, Inc., and Post-Newsweek Stations, Houston, Inc. d/b/a KPRC-TV,* Cause No. 2011-42884, in the 334th Judicial District, Harris County, Texas

Exhibit T:     Contract for Charter for Benji's Special Education Academy dated November 2, 1998

Exhibit U:     July 8, 2010 Letter from the TEA to Members of the Charter Holder Board and Theaola Robinson

Exhibit V:     Commissioner's Statement concerning Closure of Benji's, dated September 14, 2010

Exhibit W:     September 14, 2010 letter to parents of Benji's students from Superintendent Rick Schneider

Exhibit X:     September 16, 2010 letter from Commissioner Scott to Benji's Board of Managers and Superintendent

Exhibit Y:     September 22, 2010 Recommendation from Commissioner Scott to designee Emi Johnson

Exhibit Z:     September 24, 2010 Notice of Intent to Revoke Open-Enrollment Charter from Commissioner Scott to Members of the Charter Holder Board

Exhibit AA:    Lease Agreement between the City of Houston and Benji's Special Education Academy, Inc. (Charter Holder) dated August 30, 1996

Exhibit BB:    July 23, 1998 Open Enrollment Charter School Facilities Letter of Intent

26

Exhibit CC:   July 8, 2010 Letter from City of Houston to Theaola Robinson

Exhibit DD:   September 30 2010 article "Judge considers stopping closure of Benji's charter school" on chron.com

Exhibit EE:   October 12, 2010 article "Northeast Houston: Classes resume at Benji's Academy" on khou.com

Exhibit FF:   October 15, 2010 article "Carol Mims Galloway Says Sending Benji's Academy Students to Another Charter is Just Dumping on Her District" on blogs.houstonpress.com

Exhibit GG:   Affidavit of Lucy Netherton

# VIII.
## ATTORNEYS' FEES

Should Defendant prevail on this motion, Defendant is entitled to recover attorneys' fees and associated costs pursuant to Tex. Civ. Prac. and Rem. Code §27.009(a). Defendant will submit to this Court evidence of its reasonable and necessary attorneys' fees within 14 days after the Court rules on this motion. Defendant is also entitled to an award of sanctions which is expressly provided for in the statute:

> If the court orders dismissal of a legal action under this Chapter, the Court *shall* award to the moving party: (1) court costs, reasonable attorneys fees, and other expenses incurred in defending against the legal action as justice and equity may require; **and** (2) sanctions against the party who brought the legal action as the court determines sufficient to deter the party who brought the legal action from bringing similar actions described in this Chapter.

*Id.* Especially in light of the extensive procedural history of Plaintiffs' complaints against Defendants, and Plaintiffs' filing of two prior lawsuits against Defendants in federal court where jurisdiction was clearly not proper, Defendants have incurred exponentially more legal costs in defending their free speech rights than should ever have to be spent on a frivolous claim, and an award of sanctions could not be more appropriate than in this case.

27

DL/2781540v4

## IX.
## CONCLUSION AND PRAYER

Plaintiffs bring fatally defective claims based on Defendant's exercising its free speech rights. Plaintiffs' claims are barred by Chapter 27 of the Texas Civil Practice & Remedies Code. The Anti-SLAPP statute mandates dismissal, and Defendant must be awarded its attorneys' fees and cost for defending against this lawsuit, and sanctions must be awarded against Plaintiffs to deter future similar actions.

WHEREFORE, PREMISES CONSIDERED Defendant prays that the Court set this matter for hearing within 30 days, as provided by the Anti-SLAPP statute and that upon hearing, the Court grant this motion and dismiss Plaintiffs' claims against Defendant with prejudice in their entirety, award Defendant the reasonable costs and attorneys' fees it incurred in defending this lawsuit; award sanctions against Plaintiffs to deter future similar actions; and such other and further relief, at law and in equity, to which Defendant may show itself justly entitled.

Respectfully submitted,

SEDGWICK LLP

By: _____
Laura Lee Prather
Texas State Bar No. 16234200
Catherine Lewis Robb
Texas State Bar No. 24007924

919 Congress Avenue, Suite 1250
Austin, Texas 78701
Tel.: (512) 481-8400
Fax.: (512) 481-8444

ATTORNEYS FOR DEFENDANT KTRK
TELEVISION, INC.

28

# CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing document has been sent via certified mail, return receipt requested to the following on this the 21st day of December, 2011.

Berry Dunbar Bowen
3014 Brazos Street
Houston, Texas 77006
(713) 521-3525
(713) 521-3575

Laura Lee Prather
Catherine Lewis Robb

29

# APPENDIX TAB X
Anti-SLAPP Statute

H.B. No. 2973

AN ACT

relating to encouraging public participation by citizens by protecting a person's right to petition, right of free speech, and right of association from meritless lawsuits arising from actions taken in furtherance of those rights.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1. This Act may be cited as the Citizens Participation Act.

SECTION 2. Subtitle B, Title 2, Civil Practice and Remedies Code, is amended by adding Chapter 27 to read as follows:

CHAPTER 27. ACTIONS INVOLVING THE EXERCISE OF CERTAIN CONSTITUTIONAL RIGHTS

Sec. 27.001. DEFINITIONS. In this chapter:

(1) "Communication" includes the making or submitting of a statement or document in any form or medium, including oral, visual, written, audiovisual, or electronic.

(2) "Exercise of the right of association" means a communication between individuals who join together to collectively express, promote, pursue, or defend common interests.

(3) "Exercise of the right of free speech" means a communication made in connection with a matter of public concern.

(4) "Exercise of the right to petition" means any of the following:

(A) a communication in or pertaining to:



EXHIBIT

N

(i)   a judicial proceeding;

(ii)   an official proceeding, other than a judicial proceeding, to administer the law;

(iii)   an executive or other proceeding before a department of the state or federal government or a subdivision of the state or federal government;

(iv)   a legislative proceeding, including a proceeding of a legislative committee;

(v)   a proceeding before an entity that requires by rule that public notice be given before proceedings of that entity;

(vi)   a proceeding in or before a managing board of an educational or eleemosynary institution supported directly or indirectly from public revenue;

(vii)   a proceeding of the governing body of any political subdivision of this state;

(viii)   a report of or debate and statements made in a proceeding described by Subparagraph (iii), (iv), (v), (vi), or (vii); or

(ix)   a public meeting dealing with a public purpose, including statements and discussions at the meeting or other matters of public concern occurring at the meeting;

(B)   a communication in connection with an issue under consideration or review by a legislative, executive, judicial, or other governmental body or in another governmental or official proceeding;

(C)   a communication that is reasonably likely to

2

encourage consideration or review of an issue by a legislative, executive, judicial, or other governmental body or in another governmental or official proceeding;

(D) a communication reasonably likely to enlist public participation in an effort to effect consideration of an issue by a legislative, executive, judicial, or other governmental body or in another governmental or official proceeding; and

(E) any other communication that falls within the protection of the right to petition government under the Constitution of the United States or the constitution of this state.

(5) "Governmental proceeding" means a proceeding, other than a judicial proceeding, by an officer, official, or body of this state or a political subdivision of this state, including a board or commission, or by an officer, official, or body of the federal government.

(6) "Legal action" means a lawsuit, cause of action, petition, complaint, cross-claim, or counterclaim or any other judicial pleading or filing that requests legal or equitable relief.

(7) "Matter of public concern" includes an issue related to:

(A) health or safety;

(B) environmental, economic, or community well-being;

(C) the government;

(D) a public official or public figure; or

3

(E) a good, product, or service in the marketplace.

(8) "Official proceeding" means any type of administrative, executive, legislative, or judicial proceeding that may be conducted before a public servant.

(9) "Public servant" means a person elected, selected, appointed, employed, or otherwise designated as one of the following, even if the person has not yet qualified for office or assumed the person's duties:

(A) an officer, employee, or agent of government;

(B) a juror;

(C) an arbitrator, referee, or other person who is authorized by law or private written agreement to hear or determine a cause or controversy;

(D) an attorney or notary public when participating in the performance of a governmental function; or

(E) a person who is performing a governmental function under a claim of right but is not legally qualified to do so.

Sec. 27.002. PURPOSE. The purpose of this chapter is to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury.

Sec. 27.003. MOTION TO DISMISS. (a) If a legal action is based on, relates to, or is in response to a party's exercise of the

4

right of free speech, right to petition, or right of association, that party may file a motion to dismiss the legal action.

(b) A motion to dismiss a legal action under this section must be filed not later than the 60th day after the date of service of the legal action. The court may extend the time to file a motion under this section on a showing of good cause.

(c) Except as provided by Section 27.006(b), on the filing of a motion under this section, all discovery in the legal action is suspended until the court has ruled on the motion to dismiss.

Sec. 27.004. HEARING. A hearing on a motion under Section 27.003 must be set not later than the 30th day after the date of service of the motion unless the docket conditions of the court require a later hearing.

Sec. 27.005. RULING. (a) The court must rule on a motion under Section 27.003 not later than the 30th day following the date of the hearing on the motion.

(b) Except as provided by Subsection (c), on the motion of a party under Section 27.003, a court shall dismiss a legal action against the moving party if the moving party shows by a preponderance of the evidence that the legal action is based on, relates to, or is in response to the party's exercise of:

(1) the right of free speech;

(2) the right to petition; or

(3) the right of association.

(c) The court may not dismiss a legal action under this section if the party bringing the legal action establishes by clear and specific evidence a prima facie case for each essential element

5

of the claim in question.

Sec. 27.006. EVIDENCE. (a) In determining whether a legal action should be dismissed under this chapter, the court shall consider the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based.

(b) On a motion by a party or on the court's own motion and on a showing of good cause, the court may allow specified and limited discovery relevant to the motion.

Sec. 27.007. ADDITIONAL FINDINGS. (a) At the request of a party making a motion under Section 27.003, the court shall issue findings regarding whether the legal action was brought to deter or prevent the moving party from exercising constitutional rights and is brought for an improper purpose, including to harass or to cause unnecessary delay or to increase the cost of litigation.

(b) The court must issue findings under Subsection (a) not later than the 30th day after the date a request under that subsection is made.

Sec. 27.008. APPEAL. (a) If a court does not rule on a motion to dismiss under Section 27.003 in the time prescribed by Section 27.005, the motion is considered to have been denied by operation of law and the moving party may appeal.

(b) An appellate court shall expedite an appeal or other writ, whether interlocutory or not, from a trial court order on a motion to dismiss a legal action under Section 27.003 or from a trial court's failure to rule on that motion in the time prescribed by Section 27.005.

(c) An appeal or other writ under this section must be filed

on or before the 60th day after the date the trial court's order is signed or the time prescribed by Section 27.005 expires, as applicable.

Sec. 27.009. DAMAGES AND COSTS. (a) If the court orders dismissal of a legal action under this chapter, the court shall award to the moving party:

(1) court costs, reasonable attorney's fees, and other expenses incurred in defending against the legal action as justice and equity may require; and

(2) sanctions against the party who brought the legal action as the court determines sufficient to deter the party who brought the legal action from bringing similar actions described in this chapter.

(b) If the court finds that a motion to dismiss filed under this chapter is frivolous or solely intended to delay, the court may award court costs and reasonable attorney's fees to the responding party.

Sec. 27.010. EXEMPTIONS. (a) This chapter does not apply to an enforcement action that is brought in the name of this state or a political subdivision of this state by the attorney general, a district attorney, a criminal district attorney, or a county attorney.

(b) This chapter does not apply to a legal action brought against a person primarily engaged in the business of selling or leasing goods or services, if the statement or conduct arises out of the sale or lease of goods, services, or an insurance product or a commercial transaction in which the intended audience is an actual

or potential buyer or customer.

(c) This chapter does not apply to a legal action seeking recovery for bodily injury, wrongful death, or survival or to statements made regarding that legal action.

Sec. 27.011. CONSTRUCTION. (a) This chapter does not abrogate or lessen any other defense, remedy, immunity, or privilege available under other constitutional, statutory, case, or common law or rule provisions.

(b) This chapter shall be construed liberally to effectuate its purpose and intent fully.

SECTION 3. The change in law made by this Act applies only to a legal action filed on or after the effective date of this Act. A legal action filed before the effective date of this Act is governed by the law in effect immediately before that date, and that law is continued in effect for that purpose.

SECTION 4. This Act takes effect immediately if it receives a vote of two-thirds of all the members elected to each house, as provided by Section 39, Article III, Texas Constitution. If this Act does not receive the vote necessary for immediate effect, this Act takes effect September 1, 2011.

H.B. No. 2973

_David Dewhurst_
President of the Senate

_Joe Straus_
Speaker of the House

I certify that H.B. No. 2973 was passed by the House on May 4, 2011, by the following vote: Yeas 142, Nays 0, 2 present, not voting; and that the House concurred in Senate amendments to H.B. No. 2973 on May 21, 2011, by the following vote: Yeas 141, Nays 0, 2 present, not voting.

_Robert Haney_
Chief Clerk of the House

I certify that H.B. No. 2973 was passed by the Senate, with amendments, on May 18, 2011, by the following vote: Yeas 31, Nays 0.

_Patsy Spaw_
Secretary of the Senate

APPROVED: **17 JUN '11**
Date

_Rick Perry_
Governor

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
4.00 AM O'CLOCK
JUN 17 2011
Secretary of State

9